## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PEGASYSTEMS INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| APPIAN CORPORATION and | ) |
| BUSINESS PROCESS MANAGEMENT, INC., | ) |
| | ) |
| Defendants. | ) |

Civil Action No.: 19-cv-11461

**LEAVE TO FILE GRANTED
ON DECEMBER 3, 2019
(DKT. 54)**

## FIRST AMENDED COMPLAINT

1.     This is a civil action brought by Pegasystems Inc. seeking equitable relief and damages for false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(b); violations of the Mass. Gen. L. c. 93A; common law unfair competition; and commercial disparagement. This complaint stems from a marketing document published by defendant Business Process Management, Inc., which does business as "BPM.com," but paid for and further distributed by, and likely reviewed before release, edited, and/or partially written by, defendant Appian Corporation. The document masquerades as an independent "market report," but its true purpose is to promote the business of Appian, which paid BPM.com to create the report and which is connected to BPM.com through several significant commercial and personnel relationships. The document contains false and misleading information about the cost and quality of Pegasystems' products and services, and it fails to disclose the material connections between BPM.com and Appian, including the payment and other assistance given by Appian to BPM.com to draft the Report.

**THE PARTIES**

2.      Plaintiff Pegasystems Inc. ("Pegasystems") is a publicly-held corporation that develops, markets, licenses and supports software applications for marketing, sales, customer service, and operations.  Pegasystems' products include software for business process management. Pegasystems is incorporated in Massachusetts and maintains its headquarters in Cambridge, Massachusetts.

3.      Defendant Appian Corporation ("Appian") is a publicly-held corporation that also develops business process management products.  Appian is a direct competitor with Pegasystems. Appian is incorporated in Delaware, and maintains its headquarters in Reston, Virginia.

4.      Defendant Business Process Management, Inc. ("BPM.com") operates a website at www.bpm.com that offers news and information related to business process management software. The BPM.com website states that BPM.com is headquartered in Cohasset, MA, which Plaintiff therefore alleges on information and belief.

5.      Defendants Appian and BPM.com have material relationships with each other. Appian commissioned and paid BPM.com to create the Report.  Appian also purchases paid advertising on the BPM.com website to promote products that compete with Pegasystems. In addition, BPM.com's editor-in-chief is employed by an Appian business partner, and Appian promotes that editor-in-chief's work for the business partner on its website. These material relationships, which were not disclosed by BPM.com or Appian in connection with the advertising and marketing claims at issue in this case, are described further below.

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331 because this matter involves violations of the Lanham Act. This court

B5054038.3

has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. §

1367.

7.      This Court has personal jurisdiction over defendant BPM.com, which resides in

Massachusetts.

8.      This Court has personal jurisdiction over defendant Appian, which does business

in Massachusetts and maintains an office in Boston, Massachusetts. This matter also arises from

Appian's distribution of the deceptive marketing document, which was originally created in

Massachusetts, which Appian obtained from an entity located in Massachusetts (BPM.com), and

which makes false and misleading claims that caused injury to Pegasystems in Massachusetts.

Appian also made additional claims on its website that caused injury to Pegasystems in

Massachusetts.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## FACTS

## PEGASYSTEMS

10.      Pegasystems was founded in 1983 in Cambridge, Massachusetts. The company is

still headquartered in Cambridge today, and employees over 4,600 people worldwide.

11.      Pegasystems develops, markets, licenses, and supports enterprise software

applications that help organizations transform the way they engage with their customers and

process and complete work across their enterprise.  Its cloud-architected portfolio of customer

engagement and digital process automation applications leverages artificial intelligence, case

management, and robotic automation technology, built on its Pega Platform, empowering

businesses to quickly design, extend, and scale their enterprise applications to meet strategic

business needs.

3

12.    Pegasystems' products and services are used by Global 3000 organizations and government agencies across the globe.

13.    Pegasystems' applications and platform intersect with several software markets, including business process management ("BPM"), part of the digital process automation ("DPA") market.

14.    For the fourth quarter of 2018, the Forrester New Wave report evaluated eleven vendors in the BPM space for ten separate criteria. Pegasystems earned the highest score in six of those criteria, including developer experience, process features, functional integration, business results correlation, administration and management, and market approach.  For the remaining categories, Pegasystems was scored as "on par" with the rest of the field. The Forrester report further stated that "Pegasystems leads the pack by integrating decisions with actions."

15.    By contrast, Appian received the highest score in the Forrester New Wave report in only two categories. The report further identified six categories in which Appian "needs improvement" and stated that Appian "development costs can rise beyond initial expectations."

16.    In 2019, the Gartner Magic Quadrant Report identified Pegasystems as one of three industry leaders (along with Appian and IBM), but gave Pegasystems the highest marks for "Ability to Execute" and "Completeness of Vision."

17.    In 2019, The Forrester Wave report identified both Appian and Pegasystems as Leaders," but noted that Pegasystems had a superior offering of artificial intelligence development tools and superior market presence.

4

## BPM.COM'S FALSE AND MISLEADING MARKET REPORT

18.     On or about May 16, 2019, BPM.com published a document entitled "Market Report: Analysis of Process Automation Investments and Total Cost of Ownership (TCO)" (the "Report"). **Exhibit A**.

19.     The Report states that it is the result of BPM.com's "market research on end-user organization investment strategies and experiences with Business Process Management (BPM) software platforms;" and that its purpose was to "understand how automation software is being used to improve and automate mission-critical processes, and how these results correlate to economic advantages."

20.     In fact, the Report was commissioned and paid for by Appian – a fact that was never disclosed by either BPM or Appian, either in the Report itself or in communications disseminated about the Report.  The actual purpose of BPM in creating the Report was to earn a commission fee from Appian by creating a piece of Appian marketing collateral.  BPM's stated purpose for conducting the Report was false.

21.     BPM.com's methodology in creating the report was unscientific and unreliable. The "Methodology" section of the Report states that BPM.com sent out surveys to an undisclosed number of customers, selected according to undisclosed criteria. BPM.com purportedly received approximately 500 responses. BPM.com then purportedly "eliminated" an undisclosed amount of "non-compliant entries" according to largely undisclosed criteria. The Report claims that after eliminating non-compliant entries, the data that was left represented only 104 projects. Only 38% of those 104 projects (i.e., 39 or 40 projects) concerned the three companies who were the focus of the report (Pegasystems, Appian and IBM). The Report did not disclose the size or character of the projects about which the survey respondents were reporting, or the number of reports related to each project.

5

B5054038.3

22.     Only 10% of the 104 projects used for the Report, or approximately 10 total, concern Pegasystems. In other words, out of the thousands of projects created and implemented using Pegasystems products and services, BPM.com hand-selected only 10 projects of an undisclosed character and size.

23.     Responses related to Appian make up 17% of the 104 projects, or approximately 18 total.  This sample size, though still woefully inadequate for the putative purpose of the report, was nearly twice that of the Pegasystems sample size used.  Moreover, for any given analysis within the Report, missing data for some variables would make the useful sample sizes for both Pegasystems and Appian even smaller.

24.     BPM manipulated its selection of responses and projects in order to create a sample favorable to Appian and detrimental to Pegasystems.

25.     Although it is possible to infer BPM.com's shoddy methodology and tiny sample size from the discussion at the beginning of the document, the Report goes on to report its findings with no additional disclosures, as if they were reliable "averages" of "critical measures." The lack of reliable methodology and inadequate sample size are neither clearly nor conspicuously disclosed by the Report in a manner such as to sufficiently explain the false and misleading statements in the remainder of the report, as alleged below.  Nor are any descriptive statistics about the measured projects provided that would reveal whether BPM.com's comparisons are legitimate or are apples-to-oranges.

26.     Page 6 of the Report purports to contain an analysis of the "Total Cost of Ownership (TCO) related to intelligent process automation initiatives and associated platforms." The Report concludes that "organizations that run on Pega have spent the most – approximately 2.5 times more than the average, at $46 million … Appian customers have reported the lowest total upfront costs on average, at $4 million."  This section of the Report, including the foregoing

6

statements, the claimed averages, and the relative comparison of the two companies' averages, is false and misleading.

27.     Included in the "TCO" section was a table that claimed to show "Total Cost of Ownership Calculated by Average Investment in BPM Software and Related Services." The figures reported in the table include the purported average "License Cost & Vendor Professional Services," which were reported as $13,000,000 for Pegasystems and only $1,345,000 for Appian; and the average additional personnel costs, which were reported as $32,714,286 for Pegasystems and only $2,925,000 for Appian. The averages reported in the table are false and misleading.  The reported differences in TCO would be easily explained if, as is likely the case, the few hand-picked Pegasystems projects included in the study were larger than those chosen for Appian.

28.     The "TCO" section of the Report also purported to contain a "Summary of Program Project Metrics Across Vendor Customers." These metrics included the percentage of customers who reached positive ROI in 2 years, and total development time. The Report stated that only 28% of Pegasystems' customers reached positive ROI in 2 years, compared to 57% for Appian. The Report also stated that the average "total development time in weeks" was 199 for Pegasystems, and only 45 for Appian. These statements, and the numbers on the metrics table that purport to be reliable averages, are false and misleading for the same reasons.  Among other reasons, the number, size, and characteristics of projects sampled for each vendor is not disclosed.  By publishing the comparison and drawing overall conclusions about the vendors, however, BPM.com falsely and misleadingly implies that the sample sizes were adequate, the characteristics of the compared studies were matched or controlled for, and that the study was otherwise valid.

29.     Page 7 of the Report discusses the number of "FTEs" (or "full time equivalent" employees) who were dedicated to each software project. This section includes a table purporting to show the "Average Development Team Composition Across Vendor Customers," and concluded that "[o]verall, firms running on Appian required far fewer total FTEs than competitors … just over one fifth the required FTEs cited by IBM and Pega customers. In addition, those using IBM or Pega cited requiring an average of 4-6 times more outside consultants than using Appian." This section of the Report, including the foregoing statements, the claimed averages, and the relative comparison of the two companies' averages, is false and misleading for the same reasons as set forth above.

30.     Page 8 of the Report discusses the "Time to Market/Speed of Application Delivery." This section includes a table that purports to show the "Average Number of Weeks for Implementation Across All Three [L]eading Vendor Customers." The section and table report that the average total number of weeks for Pegasystems is 83, compared with 17 for Appian. From these numbers, the Report concludes that Appian implementation is on average "3-5 times faster" than Pegasystems implementation. This section of the Report, including the foregoing statements, the claimed averages, and the relative comparison of the two companies' averages, is false and misleading for the same reasons as set forth above.

31.     The final page of the Report is a "summary of our key findings yielded by this research." Among these key finds were that those "running Appian demonstrated a clear advantage on Total Cost of Ownership (TCO) … over Pega," and that "Pega customers reported spending on average 11 times more than Appian customers." The Report concluded that "it takes on average of 4 years to deliver a project on Pega… and less than one year with Appian. Overall, Appian was distinguished as the clear leader for lower TCO." The Report also found that "Pega customers required about 5 times more FTEs on average than Appian customers (who cited the

8

lowest TCO)." This section of the Report, including the foregoing statements, the claimed averages, and the relative comparison of the two companies' averages, is false and misleading for the reasons set forth above.

## APPIAN DISTRIBUTES THE REPORT AND MAKES ADDITIONAL FALSE CLAIMS

32.     After the Report was published by BPM.com, Appian began distributing it as part of its marketing and advertising materials, including on its website.

33.     Appian created a web page at https://www.appian.com/resources/bpm-com-market-report-total-cost-of-ownership-tco/ to promote the Report. A printout of this web page is attached as **Exhibit B**. The page was housed in the "Analyst Reports" section of the website, where it was placed alongside reputable independent industry studies.

34.     The web page at Exhibit B claims that, based on "approximately 500 responses, BPM.com found that on average: Appian customers build complete enterprise solutions 5 times faster, Appian customers use 79% fewer resources and Appian has more than 2x customers who've reached ROI in 2 years." The page then states: "Check out this report to learn more about the business value of Appian, and why customers are choosing and using Appian to increase productivity and ROI." Also on the page is a submission form allowing potential customers to receive a copy of the Report. These statements are false and misleading.  For example, it is literally false that the comparisons described on the web page are based on "approximately 500 responses;" the Report itself shows that they were based on a much smaller sampling, and only a small percentage of that smaller sampling (making up only 27 projects – 10 for Pegasystems and 17 for Appian) was used to compare Pegasystems and Appian.

35.     Appian also established a second web page to promote the report at https://www.appian.com/appian-vs-pega/, with a link stating "Read the 2019 BPM.COM

9

Report." This link leads to the web page at Exhibit B. A printout of this second web page is attached **Exhibit C.**

36.     The web page at Exhibit C represents the contents of the report as "Appian v. Pega: Discover Why Enterprises Choose Appian." In making this comparison, the page at Exhibit C states that Appian was "5x FASTER To Build an App," that Appian requires "79% FEWER Resources Used" and that "2x MORE [Appian] Customers Reach ROI in 2 Years." The page also states that "while typical Pega projects can take years to implement, Appian guarantees first enterprise delivery in under eight weeks."  These statements are false and misleading.

37.     The web pages at Exhibit B and Exhibit C contain no information or disclosure about the methodology or sample size used to create the Report or the material relationships between Appian and BPM.com. They do not disclose that Appian hired BPM to create the Report and paid BPM a fee to do so.  Instead, Appian falsely and misleadingly presents the contents of the Report as if they were the result of an independent and methodologically sound study with a sample size sufficient to adequately measure "typical" results. Appian knows that the purported results it is boasting about are not, is it claims, "typical."

38.     Appian is responsible for substantiating the commercial statements it makes, even if they originate from third parties, but especially when Appian is the financial sponsor and promotor of the Report. Appian did not substantiate any of the claims in Exhibits B and C or in the Report.  Moreover, Appian knew based on its industry experience that the averages stated in the Report were not representative of the actual experiences of Appian or Pegasystems customers, and it also knew that a sample size of ten projects was inadequate to survey the experience of Pegasystems customers. It therefore knew, or had reason to know, the statements it was making, based on the Report, were false.

10

39.     Appian distributed and promoted the Report to customers and potential customers, including but not limited to by means of the website and in other communications.

40.     Appian knows that the findings made in the Report about Pegasystems are inaccurate, and therefore has willfully disseminated false and misleading claims, by commissioning the Report, by redistributing the document, and by characterizing it in its own marketing materials.

41.     On information and belief, the Report was viewed by customers and potential customers in Massachusetts, including those shown the report by Appian, and those who downloaded the report through the BPM.com and Appian websites.

42.     Besides disclosing the Report publicly, Appian disseminated the report on an individual basis to major customers for which Appian and Pegasystems compete, citing the report as evidence that Appian projects are quicker and less expensive.  Each of these individual customers represented prospective revenue streams in the millions of dollars.

### UNDISCLOSED MATERIAL RELATIONSHIPS BETWEEEN APPIAN AND BPM.COM

43.     Appian hired BPM to produce the Report and paid it a Commission to do so.

44.     Appian purchases paid advertising on the BPM.com website. An example of an Appian advertisement appearing on the BPM website is attached as **Exhibit D**. In that advertisement, Appian makes one of the same claims the Report purports to support: that Appian's services will provide "faster" results.

45.     The Report does not disclose that Appian hired BPM to produce the Report or that it purchases paid advertising on the BPM.com website.

46.     Appian, when distributing and promoting the Report, did not disclose that it hired BPM to produce the Report or that it purchases paid advertising on the BPM.com website.

11

47.     Nathaniel Palmer is the Editor-and-Chief of the BPM.com website, Vice President and Chief Technical Officer of BPM.com, and the principal author of the content on the BPM.com website.

48.     Since 2015, Nathaniel Palmer has also been an employee of Serco, Inc. ("Serco"). Appian advertises Serco on its website as one of its "partners."  Nathaniel Palmer is listed by the Appian website as the contact person for Serco. A printout of this page of the Appian website is attached as **Exhibit E**.

49.     Serco partners with Appian to implement the software services developed by Appian. Thus, Serco's services are part of the services purportedly analyzed by the Report. For example, where the Report boasts of the time Appian takes to "Design and Implement" user interfaces (*See* Ex. A, p. 8), it is boasting of the implementation services performed by Serco and other Appian "partners."

50.     The Report does not disclose Nathaniel Palmer's employment by Serco, or Serco's partnership with Appian, or that both Serco and Palmer are promoted on the Appian website, or that the Report includes statements that implicate and could be used to promote Serco services.

51.     Appian, when distributing and promoting the Report, did not disclose Nathaniel Palmer's employment by Serco, or Serco's partnership with Appian, or that both Serco and Palmer are promoted on the Appian website, or that the Report includes statements that implicate and could be used to promote Serco services.

52.     There are additional material connections between Appian and BPM.com that were not disclosed by either Defendant when distributing and promoting the Report.

53.     Appian and BPM.com promoted and positioned the Report as if it was a neutral independent market study, which was false and misleading.

54.     On information and belief, Appian and BPM.com communicated about the contents of the Report prior to its creation, publication and/or distribution in order to discuss its contents and/or results.

## COUNT I

### False Advertising Under 15 U.S.C. § 1125

55.     Plaintiff repeats and incorporates all other paragraphs of the Complaint as if fully set forth herein.

56.     Section 43 of the Lanham Act prohibits the use of any communication "in commercial advertising or promotion [that] misrepresents the nature, characteristics, qualities, or geographic origin of ... goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B).

57.     In publishing, promoting and distributing the Report, each Defendant made false and misleading representations of fact in commercial promotions or advertising, which misrepresent the nature, characteristics and qualities of Appian and Pegasystems goods and services in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. §1125(a)(1)(B).

58.     Both BPM.com and Appian falsely and misleadingly held out the Report as an independent market study, without disclosing the fact that it was a commissioned piece of marketing material that Appian helped prepare, or their other material relationships.

59.     The Report contains false and misleading statements of fact about the average cost, quality and speed of Pegasystems services, as well as false and misleading comparisons between the cost, quality and speed of Pegasystems and Appian services.

60.     Appian's promotion of the Report on its website contains additional false and misleading statements of fact about the average cost, quality and speed of Pegasystems services, as well as false and misleading comparisons between the cost, quality and speed of Pegasystems and Appian services.

13

61.     BPM's creation of the Report as a commissioned piece of marketing material for Appian, while falsely describing it as an independent market study, makes BPM an agent of Appian and an interested participant in the false and misleading advertising.

62.     These statements actually deceived or had a tendency to deceive a substantial segment of BPM.com's audience, as well as Appian and Pegasystems customers and potential customers.

63.     Customers have informed Pegasystems that Appian has distributed or drawn their attention to the Report.  These customers have been confused or deceived by the false and misleading conclusions of the Report, damaging Pegasystems' goodwill and jeopardizing millions of dollars in potential future revenue.

64.     The deception caused by these statements is likely to influence customer purchasing decisions and has caused or is likely to cause damage to Pegasystems.

## COUNT II

### Violations of Mass. Gen. L. c. 93A §§ 2 and 11

65.     Plaintiff repeats and incorporates all other paragraphs of the Complaint as if fully set forth herein.

66.     At all relevant times hereto, the Defendants were engaged in trade or commerce as those terms are used in Mass. G.L. c. 93A, §§ 2 and 11.

67.     While engaged in trade or commerce, Defendants engaged in unfair and deceptive acts and practices, including, without limitation the creation of a false and misleading report which presented a small and manipulated collection of survey responses as if they were industry averages reported by an independent source; the promotion and distribution of that report to customers and potential customers along with additional false statements; and the failure to disclose their material connections to each other.

14

68.     As a result of the unfair and deceptive conduct of Defendants, Plaintiff sustained damages including but not limited to the damages to its reputation, damage to its relationships with existing and prospective customers, loss of customers and prospective customers, and lost business opportunities.

69.     The unfair and deceptive events described above occurred primarily and substantially in Massachusetts, in which all parties do business and maintain offices, in which the unfair and deceptive statements originated, and in which the unfair and deceptive statements caused harm to Pegasystems, a Massachusetts entity.

**COUNT III**
**Common Law False Advertising and Unfair Competition**

70.     Plaintiff repeats and incorporates all other paragraphs of the Complaint as if fully set forth herein.

71.     Defendants have, in commercial advertising, used the Report and the Appian website to misrepresent the nature characteristics and qualities of Appian services, Pegasystems services, and the purportedly independent nature of the Report.

72.     Such acts constitute acts of unfair competition and false advertising at common law.

**COUNT IV**
**Commercial Disparagement or Injurious Falsehood**

73.     Plaintiff repeats and incorporates all other paragraphs of the Complaint as if fully set forth herein.

74.     Defendants published false statements to third persons and the public.

75.     Defendants' false statements concerned Pegasystems products or services, and included statements falsely representing the "average" cost, quality and speed of Pegasystems goods and services, and false comparisons between Pegasystems and Appian goods and services.

15

76.     Defendants knew the statements were false, or acted with reckless disregard as to their truth or falsity.

77.     Pecuniary harm to Pegasystems' interests resulting from these false statements was intended and foreseeable by Defendants.

78.     The false statements have resulted in special damages in the form of pecuniary loss.

## REQUEST FOR RELIEF

WHEREFORE, Pegasystems requests relief as follows:

79.     Enter judgment in favor of Pegasystems on all counts;

80.     Enter a preliminary injunction and a permanent injunction, including an order restraining Appian and BPM.com, and their officers, directors, employees, agents, affiliates, successors, assigns, and all those in privity or acting in concert with them, from further promotion and distribution of the Report; requiring Appian and BPM.com to publish a statement explaining that the Report is not accurate and withdrawing it from circulation; requiring Appian and BPM.com to send notice of the withdrawal of the Report to all parties who received or saw the Report; and restraining BPM.com and Appian from engaging in similar false and misleading advertising claims in the future.

81.     Order that Defendants pay Pegasystems the damages Pegasystems has sustained by reason of the conduct alleged herein;

82.     Order that Defendants pay the costs and attorneys' fees of this action as provided in 15 U.S.C. § 1117 and other applicable law;

83.     Order that Defendants pay multiple damages and attorneys' fees as provided by Mass. Gen. L. c. 93A and other applicable law;

84.     Grant such other and further relief as is just and proper.

16

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Pegasystems hereby demands a jury trial on all claims so triable.

Respectfully submitted,

PEGASYSTEMS INC.

By its attorneys,

/s/ _____

August T. Horvath (*pro hac vice*)
Foley Hoag LLP
1301 Sixth Avenue, 25th floor
New York, New York 10019
Telephone:  646-927-5544
Facsimile:  646-927-5599
ahorvath@foleyhoag.com

David A. Kluft (BBO #658970)
Neil Austin (BBO # 657204)
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts 02210-2600
Telephone:  617-832-1000
Facsimile:  617-832-7000
dkluft@foleyhoag.com
naustin@foleyhoag.com

Dated:  December 4, 2019

17

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system and all attachments will be sent electronically on December 4, 2019, to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent to any non-registered parties.

*/s/ August T. Horvath*
August T. Horvath

18

B5054038.3