# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

PEGASYSTEMS, INC.,

               Plaintiff/
               Counterclaim-Defendant,

     v.

APPIAN CORPORATION

               Defendant/
               Counterclaim-Plaintiff

and

BUSINESS PROCESS MANAGEMENT, INC.,

               Defendant.

Case No. 19-cv-11461

## MEMORANDUM OF LAW IN SUPPORT OF APPIAN CORPORATION'S MOTION SEEKING THE COURT'S PERMISSION TO INTERVIEW FORMER PEGASYSTEMS AND CURRENT APPIAN EMPLOYEE JOHN PETRONIO

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ........................................................................................................................3

    A.     The Sinur Report.......................................................................................3

    B.     Pegasystems' Previous Efforts To Block Discovery ....................................4

    C.     Appian's Attempt To Interview Mr. Petronio................................................7

ARGUMENT .............................................................................................................................9

I.      INFORMAL INTERVIEWS WITH AN ADVERSARY'S EX-EMPLOYEES ARE
PROPER ........................................................................................................................10

II.    THE ███████████████████ IN MR. PETRONIO'S EMPLOYMENT
AGREEMENT DOES NOT PREVENT HIM FROM VOLUNTARILY SPEAKING
WITH APPIAN ABOUT THE SINUR REPORT ................................................................11

    A.     Pegasystems Has Failed To Show That Appian's Interview With Mr.
Petronio Would Reveal Any ██████████ .............................12

    B.     Appian's Proposed Safeguards Would Adequately Protect Any Legitimate
Interest Pegasystems May Have ███████████████ .................14

    C.     Public Policy Prohibits The Use Of ████████████ To
Frustrate Investigation Of An Ex-Employer's Wrongdoing........................15

III.   MR. PETRONIO'S ██████████████████████ DOES
NOT PRECLUDE HIM FROM SPEAKING WITH APPIAN ...........................................17

CONCLUSION ........................................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chambers v. Capital Cities/ABC*,
   159 F.R.D. 441 (S.D.N.Y. 1995) ..........................................................................10, 15, 16, 17

*ChampionsWorld, LLC v. U.S. Soccer Fed'n*,
   276 F.R.D. 577 (N.D. Ill. 2011) ....................................................................................11

*Diamond Resorts Int'l, Inc. v. Phillips*,
   2018 U.S. Dist. LEXIS 114028 (M.D. Tenn. Apr. 17, 2018) ...................................16

*Dynamics Research Corp. v. Analytic Sciences Corp.*,
   400 N.E.2d 1274 (Mass. App. Ct. 1980) ...................................................................12

*E. Bag & Paper Co. v. Ross*,
   2007 Mass. App. LEXIS 1405 (Mass. App. Ct. Aug. 13, 2007) .......................12, 14

*EEOC v. Astra USA*,
   94 F.3d 738 (1st Cir. 1996)..................................................................................15, 17

*Frey v. Bekins Van Lines, Inc.*,
   2011 U.S. Dist. LEXIS 28575 (E.D.N.Y. Mar. 21, 2011) .......................................16

*FTC v. AMG Servs.*,
   2013 U.S. Dist. LEXIS 206720 (D. Nev. Aug. 20, 2013) ..................................10, 15

*G-I Holdings, Inc. v. Baron & Budd*,
   199 F.R.D. 529 (S.D.N.Y. 2001) ................................................................................11

*Gen. Steel Domestic Sales, LLC v. Steelwise, LLC*,
   2009 U.S. Dist. LEXIS 4872 (D. Colo. Jan. 23, 2009)............................................18

*Interface Operations LLC v. Laungisa*,
   2016 U.S. Dist. LEXIS 21056 (D. Nev. Feb. 22, 2016) ..........................................16

*Ishimatsu v. Royal Crown Ins. Co.*,
   8 N. Mar. I. 424 (Sup. Ct. N. Mariana Islands 2010) .............................................18

*Kaveney v. Murphy*,
   97 F. Supp. 2d 88 (D. Mass. 2000) ......................................................................10, 11

*Poulin v. Greer*,
   18 F.3d 979 (1st Cir. 1994).........................................................................................9

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Rosario-Diaz v. Gonzalez,*
    140 F.3d 312 (1st Cir. 1998) .......................................................................................10

*Thomas & Betts Corp. v. Richards Mfg. Co.,*
    2007 U.S. Dist. LEXIS 31085 (D.N.J. Apr. 26, 2007) ...........................................12

*Vineberg v. Bissonnette,*
    538 F.3d 50 (1st Cir. 2008) ..........................................................................................2

*Zapata v. Bedoya,*
    2016 U.S. Dist. LEXIS 124010 (E.D.N.Y. Sept. 13, 2016) .....................................17

**Statutes**

Mass. Gen. Laws ch. 93A .....................................................................................................4

**Other Authorities**

Mass. R. Prof. Conduct 4.2 .................................................................................................10

Mass. R. Prof. Conduct 4.4 .................................................................................................10

Restatement (Third) Unfair Competition § 41(d) ........................................................11

## PRELIMINARY STATEMENT

Appian brings this motion seeking the Court's permission for its outside counsel to interview Appian's own employee John Petronio—a former Pegasystems employee who worked on matters relevant to this case while at Pegasystems, and who is willing to be interviewed by Appian's counsel—despite Pegasystems' improper attempts to block that interview.

By way of background, in 2014, Pegasystems secretly commissioned a report comparing Pegasystems to Appian, purportedly authored by an outside industry analyst named Jim Sinur (the "Sinur Report"), that contained disparaging falsehoods about Appian's software platform. Pegasystems then misrepresented the Sinur Report to the marketplace as an "independent" and "objective" comparison of the parties' software platforms.  Based on this (and other) wrongful conduct, Appian asserted false advertising counterclaims against Pegasystems, and also raised a defense of unclean hands vis-à-vis Pegasystems' own false advertising claims against Appian. The Court denied Pegasystems' motion to dismiss Appian's counterclaims concerning the Sinur Report, holding they are plausibly pleaded and Appian is entitled to take discovery as to them.

Appian served discovery requests on Pegasystems relating to the Sinur Report in January 2020—***almost ten months ago***.  To date, however, Pegasystems still has not produced ***any discovery*** regarding its role in the commissioning and drafting of the Sinur Report and has gone to extreme lengths to avoid disclosing such information.  Most recently, Pegasystems filed a frivolous motion to stay discovery relating to the Sinur Report (ECF 175) on the ground that Pegasystems believes it will eventually be entitled to summary judgment under the equitable doctrine of laches—even though, as the Court has recognized, it is impossible to properly evaluate Pegasystems' laches defense without the very discovery that it seeks to stay.  *See* Memorandum and Order (ECF 122) at 12 ("Because a laches defense 'necessarily requires a fact-sensitive inquiry into

the particular circumstances of the case . . . a laches defense is normally not susceptible to pretrial resolution.'" (*citing Vineberg v. Bissonnette*, 538 F.3d 50, 57 (1st Cir. 2008))).

Faced with Pegasystems' extraordinary efforts to handicap Appian by refusing discovery concerning the Sinur Report, Appian has attempted to investigate the relevant facts based on the information already available to it.  Appian's counsel learned that John Petronio—a current Appian employee who worked for Pegasystems at the time Pegasystems commissioned the Sinur Report—likely has relevant knowledge, as he worked with Mr. Sinur on connection with the Sinur Report.  Appian has not yet interviewed Mr. Petronio regarding these matters, but it would like to do so as soon as possible.

To avoid any possible dispute, Appian informed Pegasystems of its intent to interview Mr. Petronio and asked whether Pegasystems maintained that such an interview would be improper for any reason.  To moot any possible concerns, Appian even volunteered to conduct the interview on an outside-attorneys'-eyes-only basis and subject to the Court's Protective Order, to make absolutely certain that no competitive harm would result to Pegasystems.  However, consistent with its practice of stonewalling all Sinur-related discovery, Pegasystems took the position that Appian is ***categorically barred from interviewing its own employee*** regarding these matters.  In support, Pegasystems pointed to two contractual provisions: (1) ██████████ ████████████ in Mr. Petronio's employment agreement with Pegasystems; and (2) a "██ ████████████ contained in his separation agreement.

By their own terms, neither of these provisions is applicable here.  The ████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████  It does not preclude him from speaking about the creation or distribution of a now-discontinued marketing piece that Pegasystems maintains

reflected the opinions of an objective third party (Mr. Sinur), and which Pegasystems has argued is both non-proprietary and obsolete—especially given the protections Appian has offered to implement to ensure that no competitive harm results.  Likewise, the ███████████████████ ███████████████████████████████████████████; it says nothing about whether he may speak to Pegasystems' adversaries.

Moreover, if these provisions did purport to block Mr. Petronio from speaking voluntarily with Appian about the Sinur Report, they would be unenforceable as against public policy. Courts nationwide have held that employers cannot use ███████████████████████ ██████ to block their former employees from voluntarily participating in an investigation into the former employer's own potential wrongdoing, especially in the context of lawsuits that assert violations of federal law.  That is precisely what Pegasystems is attempting to do here, and public policy forbids this self-serving interference with the fact-gathering process.

Pegasystems' real goal here is unmistakably clear: it is not trying to shield legitimately confidential information or to protect itself against competitive harm.  It simply wants to keep its wrongdoing with respect to the Sinur Report under wraps as long as possible, while making it as difficult and expensive as possible for Appian to investigate its meritorious counterclaims and unclean hands defense.  The Court should put an end to Pegasystems' gamesmanship and hold that Mr. Petronio's agreements with Pegasystems do not provide a basis for blocking him from voluntarily speaking with Appian about the Sinur Report.

## BACKGROUND

### A.    The Sinur Report

As the Court is aware, Appian's counterclaims against Pegasystems, and its unclean hands defense against Pegasystems' own claims, arise in part from Pegasystems' conduct in con-

nection with the Sinur Report.[1]  In 2014, Pegasystems paid for and directed the content of a re-
port attributed to Jim Sinur, an influential industry analyst, which compared the parties' respec-
tive software platforms, portraying Appian's platform as inferior.  Counterclaim (ECF 71) ¶ 19.
To support its claims of inferiority, the Sinur Report made false statements about Appian and the
features and capability of its product.  *Id.* ¶ 21.  Moreover, the Sinur Report failed to disclose
Pegasystems' role in commissioning the piece and influencing its content—indeed, Pegasystems
explicitly misrepresented the Sinur Report as an "independent" and "objective" analysis.  *Id.* ¶
20; Declaration of Adeel A. Mangi ("Mangi Decl.") Ex. 1.

Between 2014 and at least 2019, Pegasystems repeatedly distributed the Sinur Report to
prospective customers, diverting business from Appian and injuring Appian's reputation and
goodwill.  Counterclaim ¶¶ 25-27; Mangi Decl. Exs. 2-5, 6 at 11.  Based on this conduct, Appian
has asserted counterclaims against Pegasystems for false advertising under the Lanham Act, vio-
lations of Mass. Gen. Laws ch. 93A, and commercial disparagement.  Counterclaim ¶¶ 50-69.
Appian anticipates that its damages as a result of Pegasystems' conduct will vastly exceed any-
thing that Pegasystems claims from Appian.  Moreover, because Pegasystems' misconduct di-
rectly mirrors Appian's alleged misconduct with respect to the BPM.com Report, Appian has
also asserted an unclean hands defense to Pegasystems' underlying claims based in part on Pega-
systems' Sinur Report-related conduct.  Answer (ECF 71) at 11-12.

### B.    Pegasystems' Previous Efforts To Block Discovery

Even though Appian served numerous discovery requests concerning the Sinur Report
almost ten months ago, to date, Pegasystems has not produced a single document relating to its

---

[1] Appian also has separate claims for defamation and false advertising arising from disparaging and de-
famatory statements distorting a ruling by this Court that Pegasystems executives made on LinkedIn in
December 2019.  Counterclaim, ECF No. 71 ¶¶ 43-46.

role in commissioning and creating the Sinur Report, its motives for doing so, or the revenues or profits it gained as a result.  To the contrary, Pegasystems has gone to extreme lengths to avoid producing such documents.

Appian initially served Pegasystems with discovery requests relating to the Sinur Report on January 13, 2020.  *See* Mangi Decl. Ex. 7 (Expedited Requests No. 3-9).  In those requests, Appian sought documents relating to the Sinur Report, including materials relating to its creation and drafting, as well as substantiation for and distribution of the Report.  These requests mirrored Pegasystems' own previous demands for all documents relating to the BPM.com Report that is the subject of Pegasystems' own claims—demands to which Appian has agreed.

Pegasystems initially refused ***even to respond*** to Appian's requests on the basis of the Court's temporary stay of counterclaim discovery pending resolution of Pegasystems' motion to dismiss the counterclaims, even though Appian's requests were equally relevant to its unclean hands defense, as to which there was no stay.[2]  *See* Mangi Decl. Ex. 8 at 7-10.  When Appian pointed this out to Pegasystems, *see* Mangi Decl. Ex. 9 at 3-4; *Id.* Ex. 10 at 3, Pegasystems attempted to draw meaningless distinctions between "counterclaim"-related Sinur Report discovery and "unclean hands"-related Sinur Report discovery—but it failed to produce any documents in either purported category.  *Id.* Ex. 11 at 2.  On May 22, 2020, the Court denied Pegasystems' motion to dismiss Appian's counterclaims relating to the Sinur Report, rendering Pegasystems' claimed distinction moot.  Memorandum and Order (ECF 122) at 10-15.

Thereafter, on June 19, Pegasystems finally served objections to Appian's six-month-old discovery requests.  *See* Mangi Decl. Ex. 12.  Although Pegasystems agreed (in theory) to pro-

---

[2] There was one exception to Pegasystems' blanket refusal: Pegasystems did agree to produce its communications with Mr. Sinur regarding the Sinur Report.  But ***it still has yet to produce any such documents*** even though it agreed to do so over seven months ago.

duce some Sinur Report-related documents, it continued to refuse production of certain crucial categories, such as internal communications relating to the Sinur Report that postdate Pegasystems' filing of its complaint.  Appian pointed out that Appian had agreed to produce documents relating to the BPM.com Report, and that Pegasystems should therefore do the same with respect to the Sinur Report.  It was only after Appian filed a letter-motion asking the Court to compel production of such materials (*see* ECF 158) that Pegasystems finally agreed, without limitation, to produce the requested materials.  *See* ECF 159 (Pegasystems informing the Court that it would "produce any non-privileged post-complaint Pegasystems internal documents and communications relating to the . . . Sinur [Report]"); *see also* Mangi Decl. Ex. 13 at 3 (Pegasystems confirming to Appian that it would produce all "documents and communications regarding . . . the Sinur [Report] . . . , including internal and external documents and communications, both pre- or post-complaint.").

That was more than two months ago.  Yet, as of today, Pegasystems still has not produced any such documents.  Instead, going back on its word, Pegasystems recently moved the Court to stay ***all discovery*** related to the Sinur Report—including the discovery it had already expressly promised to provide—based on its hope that it will eventually win summary judgment on Appian's claims under the equitable doctrine of laches.  *See* ECF 174, 175.  Pegasystems has also refused to respond to a recent interrogatory served by Appian requesting information about revenues from customers who were exposed to the Sinur Report.  *See* Mangi Decl. Ex. 14.  Pegasystems is clearly engaged in self-help and one-sided discovery:  failing to produce any discovery relating to the Sinur Report, despite the absence of any stay order, even while insisting that discovery from Appian press ahead.

### C.     Appian's Attempt To Interview Mr. Petronio

Meanwhile, Appian's counsel learned that John Petronio, one of Appian's employees, had worked with Jim Sinur in connection with the Sinur Report during his tenure as an employee at Pegasystems, which ended in 2015.  Pegasystems recently conceded as much in response to an interrogatory: "John Petronio was Mr. Sinur's primary point of contact with Pegasystems during the drafting of the Sinur Paper."  Mangi Decl. Ex. 15 at 3.

On September 22, 2020, Appian informed Pegasystems of its desire to interview Mr. Petronio about his role vis-à-vis the Sinur Report.  Mangi Decl. Ex. 16.  Appian stated that it was not aware of any reason why such an interview would be improper, but to avoid any possible dispute, it asked Pegasystems to confirm that it did not have a different view—and if it disagreed, to produce any relevant agreements or other documents that purportedly prohibit Appian from interviewing Mr. Petronio.  *Id.*

On September 29, Pegasystems responded that any interview of Mr. Petronio by Appian would violate the ███████████████ of Mr. Petronio's former employment agreement with Pegasystems, as well as a ███████████ in Mr. Petronio's separation agreement.  According to Pegasystems, the only "appropriate forum" for Appian to question its own employee about his knowledge would be in "a deposition under oath."  Mangi Decl. Ex. 17.  Pegasystems offered no explanation as to why an informal interview would violate Mr. Petronio's confidentiality obligations, but a deposition would not.  *Id.*

On October 6, Mr. Petronio's independent counsel, whom Pegasystems had copied on its letter, wrote to both Pegasystems and Appian.  He stated that Mr. Petronio was "mindful of his obligations," but "willing to be interviewed by Appian about the Sinur paper once the parties resolve their differences between them concerning this particular matter."  Mangi Decl. Ex. 18.

Although Pegasystems initially refused even to provide copies of the agreements it referenced, it eventually reversed course and produced them.  The ███████████████ in Mr. Petronio's employment agreement with Pegasystems states:



Mangi Decl. Ex. 19 at 2 (emphasis in original).  Mr. Petronio's separation agreement contains a ███████████████ that states:



Mangi Decl. Ex. 20 at 3.[3]  Neither agreement specifies how long the relevant provisions will remain in effect following Mr. Petronio's 2015 separation from Pegasystems.

On October 22, Appian responded and explained that the law prevents Pegasystems from invoking these provisions to block Mr. Petronio from voluntarily speaking with Appian in an in-

---

[3] In the separation agreement, Mr. Petronio also acknowledged his obligations under his employment agreement, ███████████████████████████████ *Id.* at 2.

vestigation into Pegasystems' wrongdoing.  Mangi Decl. Ex. 21.  However, to assuage any concerns regarding disclosure of supposedly confidential material to its competitor, Appian offered to conduct its interview of Mr. Petronio on an "outside-attorneys'-eyes only" basis and to designate the interview as "Highly Confidential" under the Protective Order entered in this case.  Under this proposal, none of the information disclosed by Mr. Petronio could be made available to any Appian employee.  Appian further noted that this accommodation would ensure that Pegasystems enjoyed the exact same protection for supposedly confidential information that it would receive during a formal deposition of Mr. Petronio, to which it had earlier consented.  *Id.*

On October 29, Pegasystems again refused to consent to the interview, and instead posed a number of already-answered questions, such as "how do you propose to ensure no Pegasystems confidential information is solicited or disclosed," and "do you agree that [the] interview will be subject to the protective order?"  Mangi Decl. Ex. 22 at 2-3.  Given that Appian had just answered those very questions in its prior letter, this letter indicated that Pegasystems was seeking to draw out the conferral process in the hope of further delaying discovery into Pegasystems' wrongdoing.  Accordingly, Appian notified Pegasystems that it would seek the Court's assistance in resolving this issue if Pegasystems did not consent by November 4.  *Id*. Ex. 23.  On November 4, Pegasystems once again refused to consent to the interview.  *Id*. Ex. 24.  Pegasystems further suggested, for the first time, that proceeding with the interview would be an ethical violation on the part of Appian's outside counsel.  *Id.*

## ARGUMENT

Appian brings this motion pursuant to the Court's inherent authority to manage and supervise discovery and the cases before it.  *See Poulin v. Greer*, 18 F.3d 979, 986 (1st Cir. 1994) ("District courts have broad discretionary powers to manage cases and, concomitantly, to man-

age pretrial discovery."); *Rosario-Diaz v. Gonzalez*, 140 F.3d 312, 315 (1st Cir. 1998) (the "Civil Rules endow trial judges with formidable case-management authority," and "in exercising this power, trial judges enjoy great latitude").  This supervisory authority extends to informal discovery, including the exact situation presented here.

In the leading case of *Chambers v. Capital Cities/ABC*, 159 F.R.D. 441 (S.D.N.Y. 1995), for example, the court granted the plaintiff's motion for permission to conduct *ex parte* "pre-testimonial interviews" of the defendant's ex-employees pursuant to the "court's [inherent] authority over [federal] discovery." *Id.* at 444.  Observing that the question arose "in the course of routine judicial administration of discovery governed by the Federal Rules of Civil Procedure and supervision of pre-discovery interviewing which is part of such discovery," the court held that such a motion by the plaintiff was proper, given that the plaintiff "would plainly be adversely affected by his inability" to secure relevant information through "pre-deposition interviews." *Id.*

Pursuant to that same authority, and for the reasons below, the Court should order that Appian is permitted to interview Mr. Petronio about the Sinur Report on an outside-attorneys'-eyes only basis, and that Pegasystems may not exploit its agreements with Mr. Petronio to block this interview.

## I.   INFORMAL INTERVIEWS WITH AN ADVERSARY'S EX-EMPLOYEES ARE PROPER

As a threshold matter, it is well-established that litigants may investigate their claims outside the formal channels of discovery, including through voluntary interviews.  *See FTC v. AMG Servs.*, 2013 U.S. Dist. LEXIS 206720, at *10 (D. Nev. Aug. 20, 2013) ("If a witness is willing to speak to counsel, without compulsion, such informal interviews are permitted . . . .").  In fact, this District has recognized that "formal discovery" is "an ***inadequate substitute*** for the 'oppor-

tunity to speak directly with potentially favorable witnesses.'"  *Kaveney v. Murphy*, 97 F. Supp. 2d 88, 95 (D. Mass. 2000) (emphasis added).

"This principle applies to former employees of an adverse party.  Indeed, *ex parte* interviews with [former employees] have been recognized as having an important role in information gathering . . . ."  *G-I Holdings, Inc. v. Baron & Budd*, 199 F.R.D. 529, 533 (S.D.N.Y. 2001); *see also ChampionsWorld, LLC v. U.S. Soccer Fed'n*, 276 F.R.D. 577, 589 (N.D. Ill. 2011) ("Generally speaking, counsel may conduct *ex parte* interviews of former employees of a corporate adversary.").  For this reason, there is no requirement that Appian "consent to Pegasystems' attendance at and participation in the interview," as Pegasystems suggested in one of its letters.  Mangi Decl. Ex. 22 at 2.  Rather, unless something in Mr. Petronio's agreements with Pegasystems modifies this baseline rule, Appian's proposed *ex parte* interview is entirely proper.[4]

## II.   THE ███████████████████ IN MR. PETRONIO'S EMPLOYMENT AGREEMENT DOES NOT PREVENT HIM FROM VOLUNTARILY SPEAKING WITH APPIAN ABOUT THE SINUR REPORT

Pegasystems' attempt to use the ███████████████ in Mr. Petronio's employment agreement to block Appian from interviewing him fails for three reasons.  First, by its own terms, that provision ████████████████████████████████████ and Pegasystems has not made any showing that such information is implicated here.  Second, even if legitimately ████████████████ were at issue, Appian's proposed interview protocol will adequately protect Pegasystems' supposed interest in that information's confidentiality.  Fi-

---

[4] The ethical rules cited by Pegasystems are not to the contrary.  Those rules are either irrelevant on their face (see Mass. R. Prof. Conduct 4.4), or directly undermine Pegasystems' position.  *See* Mass. R. Prof. Conduct 4.2 cmt. 7 (stating that, with respect to *ex parte* communications with "former constituents" of an organization, the "consent of the organization's lawyer is not required.").

nally, in all events, public policy prohibits employers from using ██████████████ to

block their ex-employees from voluntarily participating in an investigation of their wrongdoing.

A.  **Pegasystems Has Failed To Show That Appian's Interview With Mr. Petronio Would Reveal Any** ██████████████████

On its face, the ████████████████ in Mr. Petronio's employment agreement ████

████████████████████████████████████████████████████████████████

██████████████████████ Mangi Decl. Ex. 19 at 2. ████████████████████████

████████████████████████████████████████ *See* Restatement (Third) Un-

fair Competition § 41(d), cmt. d (noting that "[a] promise to refrain from the use or disclosure of

commercial information is ordinarily unenforceable unless the information is sufficiently secret

to justify the restraint"); *Dynamics Research Corp. v. Analytic Sciences Corp.*, 400 N.E.2d 1274,

1283 (Mass. App. Ct. 1980) ("The employer's interest in the secret must be ***crystal clear*** to justi-

fy the restraint of the employee . . . ." (quoting 2 Callman, Unfair Competition, Trademarks and

Monopolies § 53.2(a), at 384) (emphasis added)).

Under Massachusetts law, "the burden is on the employer to show not only that enforce-

ment of a confidentiality agreement is necessary to protect the employer's legitimate business

interests, such as trade secrets or confidential information, but also to identify precisely ***what*** in-

formation, in fact, the employer is seeking to qualify as such." *E. Bag & Paper Co. v. Ross*,

2007 Mass. App. LEXIS 1405, at *8 (Mass. Ct. App. Aug. 13, 2007) (emphasis in original); *see*

*also Thomas & Betts Corp. v. Richards Mfg. Co.*, 2007 U.S. Dist. LEXIS 31085, at *35 (D.N.J.

Apr. 26, 2007) ("[W]hen an employer does not identify confidential information with sufficient

particularity, it is not reasonable to enforce a post-employment restrictive covenant.").

Pegasystems has failed to identify any legitimately ██████████████████ it believes

will be disclosed if Mr. Petronio voluntarily speaks with Appian about the Sinur Report.   To the

contrary, Pegasystems has repeatedly taken the position that the Sinur Report reflects nothing more than the personal opinions of Mr. Sinur—an "independent" industry analyst—which Mr. Sinur formed based on a review of publicly available resources and other information within his own personal knowledge and experience (rather than proprietary Pegasystems information).

For example, Pegasystems recently asserted that in the Sinur Report, "Mr. Sinur is expressing *his own* impressions and opinions. *The opinions expressed are Mr. Sinur's own true opinions, formed based on his extensive experience*."  Mangi Decl. Ex. 25 at 1 (emphasis added).  Pegasystems also referenced Mr. Sinur's long tenure as an industry analyst, with deep knowledge regarding the industry and its participants, including information and briefings he received as an analyst directly from vendors such as Pegasystems and Appian, and asserted that "[a]ll of this information, *in addition to publicly available information* about the companies, . . . collectively forms the basis of his opinions."  *Id.* (emphasis added); *see also* Pegasystems' Mot. to Dismiss (ECF 83) at 5 (describing the Sinur Report as "an industry analyst's opinions based on his review of the industry" and "his own experience and impressions").

In other words, Pegasystems claims that the Sinur Report was based entirely on (1) Mr. Sinur's own personal work experience, which he accumulated independent of Pegasystems; and (2) "publicly available information" that is non-proprietary by definition.  This precludes the notion that there is anything ███████████ about the Sinur Report or its creation within the meaning of  Mr. Petronio's ██████████████████████████████████████ ████████████████████████████████████████.

Furthermore, Pegasystems has informed the Court that it removed the Sinur Report from its website in 2019 as part of an effort to "retire" materials that were "stale, out of date, [and] no longer consistent with Company messaging."  ECF 76-1 ¶ 3; *see also* ECF 97 at 6 (Pegasystems

arguing that it has been "years" since "the[] relevance" of the Sinur Report "has passed"). Pega-systems cannot possibly have a legitimate competitive interest in keeping confidential, indefi-nitely, the genesis of this supposedly "stale," "out of date," and "[ir]relevan[t]" material created some six years ago. Pegasystems certainly has not come forward and explained how such a le-gitimate competitive interest exists, despite bearing the burden on this issue.

### B.      Appian's Proposed Safeguards Would Adequately Protect Any Legitimate Interest Pegasystems May Have ██████████████████

Even if Pegasystems could identify any information concerning the Sinur Report that qualifies as competitively sensitive, under Massachusetts law, Pegasystems must also show that blocking the interview "is ***necessary to protect*** [Pegasystems'] legitimate business interests." *E. Bag & Paper Co.*, 2007 Mass. App. LEXIS 1405, at *8 (emphasis added).

Again, to avoid any possible dispute, Appian has agreed to interview Mr. Petronio on an "outside counsel only" basis pursuant to the Protective Order entered in this case. *See* ECF 99. The interview would also be designated "Highly Confidential" under that Order, thus preventing any information Mr. Petronio may disclose from reaching Appian's employees, let alone being used competitively against Pegasystems. Therefore, even if the interview were to touch on any legitimately confidential information—which it will not—precluding the interview is not neces-sary to protect Pegasystems' "legitimate business interests." For these same reasons, it is also unnecessary on these facts for Appian to preview its interview questions to Pegasystems or to allow Pegasystems to participate in the interview, as Pegasystems has suggested.

Notably, Appian's proposed approach is consistent with the approaches endorsed by oth-er courts in similar scenarios. *See*, *e.g.*, *JDS Uniphase Corp. Secs. Litig.*, 238 F. Supp. 2d 1127, 1138 (N.D. Cal. 2002) (permitting interviews notwithstanding former employees' confidentiality obligations, on condition that the parties "enter into a protective order providing that any infor-

mation plaintiffs learn during the course of these interviews may be used only for purposes of this litigation"); *AMG Servs.*, 2013 U.S. Dist. LEXIS 206720, at *11 (allowing informal interview of former employees where parties "agreed that any information in the informal interviews is subject to the amended confidentiality and protective order").

Pegasystems has already tacitly acknowledged that Appian's approach would protect its legitimate business interests by recognizing that it would be proper for Pegasystems to conduct a formal deposition of Mr. Petronio subject to the Protective Order.  Whether the context is a formal deposition or an informal interview subject to Appian's proposed protocol, anything elicited from Mr. Petronio would be equally protected from competitive use by Appian.  The fact that Pegasystems nonetheless strenuously opposes an informal interview makes clear that it is not the disclosure of competitively sensitive information that Pegasystems is concerned about—it is the disclosure of ***any*** facts that might be damaging to its position in this case.  Protecting such facts is not the proper purpose of an employee ██████████████████.

**C.     Public Policy Prohibits The Use Of ████████████████████ To Frustrate Investigation Of An Ex-Employer's Wrongdoing**

Finally, even if the ████████████████ applied to Appian's planned interview of Mr. Petronio, it would be unenforceable here.  As the First Circuit has explained, it is a "bedrock" principle that "[a] promise" in an employee agreement "is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement."  *EEOC v. Astra USA*, 94 F.3d 738, 744 (1st Cir. 1996).  Following that principle, courts routinely hold that the public interest in investigating wrongdoing and access to potential evidence outweighs the interest in enforcing ████████████████ against ex-employees.

The seminal case of *Chambers v. Capital Cities/ABC*, 159 F.R.D. 441 (S.D.N.Y. 1995), addressed whether the defendant's confidentiality agreements prohibited its ex-employees from

engaging in voluntary "pre-testimonial interviews" or "pre-deposition conversations" with the plaintiff. *Id.* at 444. The court observed that "agreements obtained by employers requiring former employees to remain silent about underlying events leading up to disputes, or concerning potentially illegal practices when approached by others[,] can be harmful to the public's ability to rein in improper behavior." *Id.* Moreover, it noted, "[i]f applied to depositions or pre-deposition interviewing," such agreements "inherently chill communication relevant to the litigation." Thus, the court held, "[a]bsent possible extraordinary circumstances," it is "against public policy" to enforce such agreements, at least in the context "of depositions or pre-deposition interviews concerning litigation arising under federal law." *Id.*

Courts around the country have followed *Chambers*'s lead to permit ex-employees to voluntarily participate in investigations into potential wrongdoing by their former employer. *See, e.g.*, *Diamond Resorts Int'l, Inc. v. Phillips*, 2018 U.S. Dist. LEXIS 114028, at *7-8 (M.D. Tenn. Apr. 17, 2018) ("An employer cannot use confidentiality or non-disclosure agreements to chill former employees from voluntarily participating in legitimate investigations into [the employer's] alleged wrongdoing . . . ." (quotation marks omitted)); *Interface Operations LLC v. Laungisa*, 2016 U.S. Dist. LEXIS 21056, at *7 (D. Nev. Feb. 22, 2016) ("[C]ourts typically prohibit parties from invoking confidentiality agreements in order to withhold evidence."); *Frey v. Bekins Van Lines, Inc.*, 2011 U.S. Dist. LEXIS 28575, at *3 (E.D.N.Y. Mar. 21, 2011) ("[C]onfidentiality agreements cannot preclude otherwise permissible discovery," especially "facts relating to alleged or potential violations of . . . law"); *JDS Uniphase*, 238 F. Supp. 2d at 1138 ("[Defendant] cannot use its confidentiality agreements to chill former employees from voluntarily participating in legitimate investigations into alleged wrongdoing by [Defendant].").

Moreover, as these cases make clear, the public policy against using ███████████ ████████ to stymie discovery from ex-employees applies to informal discovery via *ex parte* interviews, just as it does to formal discovery via depositions.  *See Chambers*, 159 F.R.D. at 444 (applying policy to "pre-deposition conversations"); *JDS Uniphase*, 238 F. Supp. 2d at 1134 (applying policy to "voluntar[y] cooperat[tion]" via "interviews"); *see also Astra USA*, 94 F.3d at 738 (rejecting argument that plaintiff may communicate with adversary's present and former employees who had signed non-cooperation agreements only via formal subpoena).

## III.   MR. PETRONIO'S ██████████████████████████ DOES NOT PRECLUDE HIM FROM SPEAKING WITH APPIAN

Nor does the ██████████████████ in Mr. Petronio's separation agreement provide any basis to block Mr. Petronio from voluntarily speaking with Appian.  By its plain language, ████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████  It imposes no obligation on Mr. Petronio to **refrain from** speaking to **anyone else**, including Pegasystems' adversaries in such litigation.  To the extent there is any ambiguity in this language—and, in Appian's view, there is none—it must be construed against Pegasystems, as the party that presumably drafted the agreement, and as the party that seeks to restrict otherwise lawful speech.

Moreover, even if this provision could be interpreted to block Mr. Petronio from speaking to Appian about the Sinur Report, it would be unenforceable as against public policy.  As with ██████████████████, courts have held that ████████████████████ are unenforceable in the context of civil litigation because they undermine enforcement of the law and stymie voluntary participation in the fact-finding process.  *See, e.g.*, *Zapata v. Bedoya*, 2016 U.S. Dist. LEXIS 124010, at *3-5 (E.D.N.Y. Sept. 13, 2016) (rejecting clause precluding plaintiffs from "voluntarily meet[ing] with any lawyer that is representing anyone in a case against De-

fendants" as "contrary to [public] policy"); *Gen. Steel Domestic Sales, LLC v. Steelwise, LLC*, 2009 U.S. Dist. LEXIS 4872, at *4, 34 (D. Colo. Jan. 23, 2009) (striking provision precluding individuals from "voluntarily cooperating with any third party . . . in any litigation involving General Steel" as "contrary to public policy and violative of both the spirit and the letter of the Federal Rules of Civil Procedure"); *Ishimatsu v. Royal Crown Ins. Co.*, 8 N. Mar. I. 424, 433 (Sup. Ct. N. Mariana Islands 2010) ("[M]aking a truthful statement about [underlying events] does not violate a cooperation clause; it would violate public policy to prevent one party from giving an honest factual account to another party . . . ." (citing cases)).

## CONCLUSION

Nothing in the Federal Rules of Civil Procedure or in Mr. Petronio's agreements with Pegasystems precludes Appian from speaking with him about the Sinur Report, on an outside-attorney's-eyes-only basis and subject to "Highly Confidential" treatment under the Protective Order. And to the extent Mr. Petronio's agreements do purport to preclude such an interview, they violate public policy and are unenforceable. Appian's motion should be granted.

Dated:  November 6, 2020

By: /s/ Adeel A. Mangi

Adeel A. Mangi (*pro hac vice*)
Jonah M. Knobler (*pro hac vice*)
Michael Sochynsky (*pro hac vice*)
Isaac Weingram (*pro hac vice*)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone:  (212) 336-2000
Facsimile:   (212) 336-2222
aamangi@pbwt.com
jknobler@pbwt.com
msochynsky@pbwt.com
iweingram@pbwt.com

-and-

Timothy H. Madden (BBO #654040)
DONNELLY, CONROY & GELHAAR, LLP
260 Franklin Street, Suite 1600
Boston, Massachusetts 02110
(617) 720-2880
thm@dcglaw.com

*Attorneys for Defendant Appian Corp.*

## **CERTIFICATE OF SERVICE**

      I, Adeel A. Mangi, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Adeel A. Mangi       

Adeel A. Mangi
