**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

PEGASYSTEMS INC.,

                          Plaintiff,

v.

APPIAN CORPORATION and BUSINESS
PROCESS MANAGEMENT, INC.,

                          Defendants.

Case No. 19-cv-11461-PBS-MPK

## OPPOSITION TO APPIAN'S MOTION
## FOR PERMISSION TO INTERVIEW JOHN PETRONIO

Plaintiff Pegasystems Inc. ("Pegasystems") opposes the motion of Appian Corporation ("Appian") seeking the Court's permission to interview John Petronio, a former Pegasystems employee who now works for Appian. Appian's motion is both improper and unnecessary. It is improper because it seeks an advisory opinion regarding the enforceability of a contract to which Appian is not even a party. Neither party to the contracts at issue in Appian's motion is asking the Court to address any purported controversy with respect to its contractual obligations. To the contrary, Appian is merely seeking an order that will provide it with peace of mind that its plan to interview Mr. Petronio will not create any legal jeopardy for itself or the witness. Accordingly, there is no actual controversy for the Court to decide. Appian's motion is also unnecessary. Pegasystems has been clear that it intends to take Mr. Petronio's deposition, and thus Appian will not be deprived of an opportunity to question him, and better still, it will be able to do so while Mr. Petronio is under oath. The Court should deny Appian's motion.

1

## I.      <u>Facts</u>

John Petronio worked for Pegasystems from 2004 to 2014 and was Jim Sinur's primary point of contact at Pegasystems when Mr. Sinur was drafting "Appian and Pegasystems – Head to Head Comparison" (the "Sinur Paper"), the document at the core of Appian's counterclaim.  Mr. Petronio left Pegasystems in 2015, and one year later—as Pegasystems recently learned—he quietly began working for Appian, first as a consultant, and since 2019 as an employee.  In other words, the very person at the heart of Appian's allegation that Pegasystems engaged in misconduct concerning the Sinur Paper *has been working for Appian for years.*

On September 22, 2020, Appian notified Pegasystems that it "intend[ed] to interview Mr. Petronio" and stated that it was "not aware of ██████████████ that Petronio owes to Pegasystems that would preclude such an interview."  Appian demanded that Pegasystems respond and produce within seven days any agreements or documents that it contends limit or restrict Mr. Petronio's ability to participate in such an interview.  *See* D.E. #178 (Declaration of Adeel A. Mangi ("Mangi Decl.")) at Ex. 16.

Pegasystems responded to Appian's letter on September 29.  Mangi Decl. at Ex. 17. Among other things, it noted "Mr. Petronio has ongoing obligations to Pegasystems as set forth in his 2004 Standards Letter and his 2015 Separation Agreement."  *Id.*  As the Court can see from copies of those documents produced to Appian (and now attached to Appian's motion), the Standards Letter is a letter agreement signed by Mr. Petronio when he accepted employment at Pegasystems in December 2004, and the Separation Agreement is a letter agreement signed by Mr. Petronio upon termination of his employment in February 2015.  *See* Mangi Decl. at Ex. 19 (Standards Letter) and Ex. 20 (Separation Agreement).

Mr. Petronio's Standards Letter emphasizes that "████████████████████████

██████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Mangi Decl. at Ex. 19. ███████████

███████████████████████████

        ██████████████████████████████████████████████████████████████████

        ██████████████████████████████████████████████████████████████████

        ██████████████████████████████████████████████████████████████████

        ██████████████████████████████████████████████████████████████████

        ██████████████████████████████████████████████████████████████████

        ██████████████████████████████████████████████████████████████████

        ████████████████████████████████████

*Id.* The Standards Letter also provides that "████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████." *Id.*

        The Separation Agreement expressly incorporates the Standards Letter and provides that,

in signing it, Mr. Petronio "████████████████████████████████████████████████████

████████████████████████████████████████████████████████" Mangi Decl. at Ex. 20.

The Separation Agreement also requires Mr. Petronio to "██████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████" *Id.*

---

[1] Indeed, of all the provisions contained in the Standards Letter, this is the only one underlined for emphasis.

Based on the language in these agreements, Pegasystems informed Appian in its September 29 letter that Mr. Petronio has "███████████████" to Pegasystems and that a private interview with Appian's counsel would be contrary to these obligations.  Mangi Decl. at Ex. 17.  ███████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████ *Id.*  However, Pegasystems did *not* seek to restrict Appian's access to Mr. Petronio's information; it merely required that the questioning of Mr. Petronio take place at a deposition, in a transparent forum, with the witness under oath, and with both parties allowed to ask questions.  *Id.*

For reasons unknown, Appian was apparently not comfortable going forward with a deposition of Mr. Petronio without first conducting an *ex parte* interview.  Instead of agreeing to conduct its questioning on the record and under oath, Appian began a letter-writing campaign, sending two more letters to Pegasystems and threatening to go to the Court unless Pegasystems responded in writing by a specified date with the answer it wanted to hear.  *See* Mangi Decl. at Ex. 21 (October 22 letter) and Ex. 24 (November 4 letter, in which Appian wrote, "[i]f Pegasystems' answer is not 'we consent,' we will promptly seek relief from the Court….").  Pegasystems responded to the letters and made its position clear:  The letter agreements are enforceable, and a pre-deposition interview with Appian's lawyers would be incompatible with Mr. Petronio's obligations under those agreements.  Mangi Decl. at Ex. 22.  Pegasystems also made clear that this is not a dispute that should go to the Court in any event, and that any effort by Appian, a third party, to seek a ruling from the Court that the letter agreements do not prohibit an interview of Mr. Petronio would constitute a request for an advisory opinion.  *Id.*  If Appian wished to move forward

with the interview, Pegasystems stated, it was free to do so, but it did so at its own risk.  Instead of accepting that risk, Appian filed the instant motion.

## II.       Argument

### A.       Appian's Motion Is An Improper Request For An Advisory Opinion

The exercise of judicial power by federal courts is limited to "cases" and "controversies." U.S. Constitution, Art. III, § 2; *Muskrat v. United States,* 219 U.S. 346, 359 (1911).  "The federal courts established pursuant to Article III of the Constitution do not render advisory opinions." *Golden v. Zwickler*, 394 U.S. 103, 108 (1969) (quoting *United Public Workers of America v. Mitchell*, 330 U.S. 75, 89 (1947)); *Alabama State Federation of Labor v. McAdory*, 325 U.S. 450, 461 (1945) (noting the Court's "considered practice not to decide abstract, hypothetical or contingent questions"); *CTC Communs. Corp. v. Verizon New Eng. Inc.*, 2006 U.S. Dist. LEXIS 106331, *17 (D. Mass. June 15, 2006) (declining to render an advisory opinion on a hypothetical "what if" situation).  Yet this is exactly what Appian is asking this Court to do.  It wants the Court to render an advisory opinion to give itself and Mr. Petronio comfort that their hypothetical secret interview will not pose a risk of liability.

Consider the circumstances.  Pegasystems and Mr. Petronio are parties to two agreements addressing Mr. Petronio's ███████████████████.  Neither party is disputing that the agreements are valid and enforceable, and neither party has petitioned this court for relief under the agreements.  Indeed, Mr. Petronio concedes that he has contractual obligations to Pegasystems and notes that he is "mindful of" those obligations.  *See* Mangi Decl. at Ex. 18 (letter from Petronio's counsel denying that Mr. Petronio "has violated (or will violate) his ████████ ████████ to Pegasystems").  He has taken no position on whether the interview *should* occur and has merely stated that he is "willing" to be interviewed if Appian and Pegasystems resolve their differences.  *Id.*  And for its part, Pegasystems has not forbade Appian from interviewing Mr.

Petronio; it has merely said that, if Appian moves forward with the interview, it does so at its own risk.

Meanwhile, Appian, which is not a party to the agreements, is asking the Court to weigh in regarding their interpretation so that Appian can move forward with its plan to conduct a behind-closed-doors interview of a key witness in advance of his deposition.[2]  In effect, Appian is asking the Court to issue a decree in which it finds that Pegasystems' interpretation of its contractual agreements with its former employee is incorrect and that Appian is therefore free to conduct the interview without risk that Pegasystems will file suit against Mr. Petronio (or Appian) to enforce its contractual rights.  Worse, it is asking the Court to assess these issues on a hypothetical basis, and without any record of the specific questions Appian's counsel intends to ask, and it is doing so when neither of the actual *parties* to the agreements are requesting judicial relief.  This is the textbook definition of a request for an advisory opinion, and the Court should decline to get involved.

**B.**     **The Case Law Appian Relies On Is Inapposite.**

The case law Appian cites in its brief only underscores the misguided nature of its request.  First, none of the cases involves the unusual scenario present here, in which Party A has, for years, secretly employed the former employee of Party B, whose work is the basis of Party A's claim against Party B.  To the contrary, the cases on which Appian relies involve attempts to interview *employees generally* – not a single, specific employee – to investigate alleged corporate

---

[2] Appian suggests that an interview is necessary because Pegasystems has allegedly been "stonewalling" all Sinur-related discovery.  Appian's allegations regarding Pegasystems' discovery conduct are baseless.  In fact, Pegasystems recently produced more than 1,000 documents related to dissemination of the Sinur Paper and expects to produce additional Sinur-related material soon. By way of comparison, Pegasystems has thus far produced nearly twice as many documents as Appian.  Moreover, Mr. Sinur has separately produced documents in response to a subpoena.

wrongdoing in situations where it would be difficult to develop the same evidence through depositions.  *See, e.g., JDS Uniphase Corp. Sec. Litig.*, 238 F. Supp. 2d 1127 (N.D. Cal. 2002) (seeking to interview former employees of public company in class action securities litigation); *Chambers v. Capital Cities/ABC*, 159 F.R.D. 441 (S.D.N.Y. 1995) (seeking to interview current and former employees of defendant in connection with age discrimination claims); *FTC v. AMG Services,* 2013 U.S. Dist. LEXIS 206720, (D. Nev. Aug. 20, 2013) (seeking to interview former employees of defendants in government enforcement action); *Kaveny v. Murphy*, 97 F. Supp. 2d. 88, 89 (D. Mass. 2000) (seeking to interview members of the Cambridge Police Department in an employment litigation).  The facts of these cases are very different from those presented here.

Second, *Chambers*, which Appian describes as the "leading case" on this question, involved a situation in which the defendant sought to preclude *both* interviews *and* depositions— and it did so based on agreements with former employees "that they not reveal information about their employment with Capital Cities which might be harmful to the company in other disputes." *Chambers*, 159 F.R.D. at 442, 445.  The Court found that, under those circumstances, the plaintiff "would plainly be adversely affected by his inability to secure through depositions or pre-deposition interviews … information relevant to this claim." *Chambers*, 159 F.R.D. at 445.  Here, the agreements at issue are of a much different sort.  ████████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ ██████████████████████████ *Chambers,* 159 F.R.D. at 444 ("Legal responses to confidentiality agreements between employers and former employees are entirely dependent on the nature and subject matter of the agreement and the context in which the agreement is before the court.")

Moreover, unlike in *Chambers*, there is no risk of precluded discovery efforts here because Pegasystems has already agreed that the parties will have an opportunity to depose Mr. Petronio.

Third, the cases Appian relies on make clear that a key factor in determining whether to ignore a ███████████████ with a former employee is the public interest in disclosure. For example, in *AMG Services*, the court held that the public has an interest in whether the defendant violated the consumer protection laws enforced by the FTC, and found that an agreement prohibiting former employees from cooperating with the FTC would be void as against public policy. *AMG Services*, 2013 U.S. Dist. LEXIS 206720 at *7. Similarly, in *JDS Uniphase Corp. Sec. Litig.*, the court held that the public has an interest in whether the defendant violated the federal securities law—particularly in light of Sarbanes Oxley provisions prohibiting discrimination against employees who assist in securities investigations—and found that agreements that "muzzle" former employees with overbroad confidentiality provisions are against public policy. *JDS Uniphase Corp. Sec. Litig*, 238 F. Supp. 2d at 1136. Here, by contrast, there is no compelling public interest in the subject matter of the interview—*i.e.,* Mr. Petronio's involvement in the creation and dissemination of the Sinur Paper, a document created more than six years ago and which has not been publicly accessible since January 2019. *See* D.E. #76-1 at ¶ 3.

Finally, the cases Appian relies on show that courts look carefully at attempts to interview current or former employees and often require restrictions or safeguards for those interviews to proceed. For example, in *In re JDS Uniphase Corp. Sec. Litig.*, the Court allowed the interview to proceed only after counsel disclosed the proposed questions and after the court carefully analyzed the relevant confidentiality provisions. *In re JDS Uniphase Corp. Sec. Litig.*, 238 F. Supp. 2d at 1138. The court agreed that the former employer "unquestionably has a legitimate

interest in preventing dissemination of … confidential business information." *Id.* at 1137.  It just found that the definition of "confidential" in the applicable agreements was too broad.  *Id.*  The same is not true here.  Internal information about a company's marketing or development efforts is narrow and specific.  Indeed, the protective order in this very case treats information about "marketing strategy" as confidential, and Appian routinely designates documents regarding the BPM.com Report as HIGHLY CONFIDENTIAL.[3]  Moreover, unlike the moving party in *JDS Uniphase Corp. Sec. Litig.*, Appian has not indicated what it intends to ask Mr. Petronio during its pre-deposition interview, thus making it impossible for Pegasystems to assess the risk that confidential information will be disclosed.

C.     **If The Court Is Inclined To Consider Appian's Request For "Permission" To Interview Mr. Petronio, It Should Either Deny The Request Or Require Appian To Disclose The Questions It Intends To Ask.**

For the reasons discussed above, the Court should deny Appian's motion on the basis that it constitutes a request for an advisory opinion.  However, if the Court is inclined to consider Appian's request, it should either deny the motion or require Appian to disclose the questions it intends to ask.  This result is appropriate for three main reasons.

First, Pegasystems has a legitimate interest in protecting its confidential information.  *See In re JDS Uniphase Corp. Sec. Litig.*, 238 F. Supp. 2d at 1137.  ███████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████  There is nothing inappropriate or problematic about such an agreement, particularly

---

[3] By way of example, Defendants have thus far blocked Pegasystems' counsel from telling Pegasystems the names of the Appian customers who allegedly responded to the BPM.com survey because they contend that such information is HIGHLY CONFIDENTIAL.

in a case such as this where the parties are direct competitors and where the litigation itself is governed by a protective order that contains a definition of "Confidential Information" that is arguably even *broader* than that in the Standards Letter.

Second, Appian has refused to provide information that would allow Pegasystems to assess potential confidentiality implications of the planned interview. In the course of responding to Appian's letters, Pegasystems asked whether Appian would be willing to disclose the questions it intends to ask Mr. Petronio so that Pegasystems could make an assessment of whether the interview would result in the disclosure of confidential information. Mangi Decl. at Ex. 22. Appian refused to do so and instead indicated only that it planned to interview Mr. Petronio regarding his involvement in "the commissioning and creation of the Sinur Paper."[4] Mangi Decl. at Ex. 24. Based on this minimal amount of disclosure from Appian, Pegasystems is concerned that the interview will touch on any number of confidential topics, including in particular Pegasystems' marketing strategy, the identity of Pegasystems' customers, and efforts to engage with these customers. But of course, it is entirely possible that a free-flowing interview would delve into topics unrelated to the creation of the Sinur Paper, which might result in disclosure of even more confidential information.

Third, Mr. Petronio is bound by his Separation Agreement to



" Here, the underlying claims are based on the creation and dissemination of the Sinur Paper, and Mr. Petronio was the

---

[4] Appian's refusal to provide any meaningful disclosure regarding the questions it intends to ask demonstrates the absurdity of Appian's argument that Pegasystems has failed to establish that the interview would result in disclosure of confidential information. *See* D.E. # 177 at 12-14. If Appian were willing to provide a list of questions, Pegasystems would obviously be much better equipped to assess potential confidentiality concerns.

main point of contact at Pegasystems for Mr. Sinur.  Under the circumstances, if any party is

entitled to an *ex parte* interview of Mr. Petronio, it should be Pegasystems.  Yet Pegasystems is

not pressing for such an interview and instead is willing to conduct its questioning of Mr.

Petronio at a deposition, under oath, and with full transparency to both parties.  Appian's

contention that Pegasystems is seeking to use the ████████████ to prevent Mr. Petronio

from providing relevant information is simply not true.  Pegasystems is merely asserting that, in

light of his obligation to ████████ with Pegasystems regarding ████████████████, it

would be inappropriate for him to submit to a *pre-deposition interview* with counsel for Appian,

a litigation adversary and competitor.  Again, Pegasystems has no problem with Mr. Petronio

sitting for a deposition; indeed, it intends to notice his deposition shortly.

Once again, the cases on which Appian relies are inapposite.  Appian tries to portray Mr.

Petronio's agreement to ████████ with Pegasystems as a directive not to provide information to

Appian, but that characterization is false.  Pegasystems has made clear that both parties can

question Mr. Petronio at a deposition.  Thus, this case is nothing like *Zapata v. Bedoya*, in which

the court declined to approve a settlement agreement that sought to bar plaintiffs in a wage and

hour claim from meeting with any lawyers representing anyone in a case against defendants.

*Zapata v. Bedoya*, 2016 U.S. Dist. LEXIS 124010, *3-4 (E.D.N.Y. Sept. 13, 2016).  Nor does it

bear any similarities to *Gen. Steel Domestic Sales, LLC v. Steelwise, LLC*, 2009 U.S. Dist. LEXIS

4872, * (D. Colo. Jan. 23, 2009), another case involving a settlement agreement—this one

restricting California consumer fraud investigators and prosecutors from voluntarily cooperating

with any third party in any litigation involving General Steel.  And it is certainly nothing like

*Ishimatsu v. Royal Crown Ins. Corp.*, a car accident case in the Northern Mariana Islands in which

the insurer initially denied the insured's claim on the basis that his admission that he hit the other

11

car violated the cooperation provision in the insurance policy.  *Ishimatsu v. Royal Crown Ins. Corp.*, 8 N. Mar. I. 424, 433 (Sup. Ct. N. Mariana Islands 2010).

Appian's contention that it can resolve Pegasystems' concerns by treating the interview as HIGHLY CONFIDENTIAL under the protective order also misses the mark.  The basic premise of the protective order is a party can designate material *it produces* in the litigation as CONFIDENTIAL or HIGHLY CONFIDENTIAL.  In such a scenario, the party with the privacy interest knows what information is being produced.  Here, Appian proposes to treat the entire interview as HIGHLY CONFIDENTIAL as a means to avoid providing any disclosure regarding the Pegasystems information that Mr. Petronio discloses during the interview.  That approach restricts Pegasystems' ability to determine what, if any, ██████████████ was passed along during the interview.  Moreover, it turns Petronio's obligations to ██████ with Pegasystems on its head.  Rather than cooperating with Pegasystems in defense of the case, an interview of the type suggested by Appian would, in effect, constitute ████████ with Pegasystems' litigation adversary.

Finally, allowing Appian's counsel to conduct an ex parte interview of Mr. Petronio would be unfair.  As discussed in its recent motion for leave to file a motion for partial summary judgment (D.E. # 174), discovery has shown that, despite suggestions to the contrary, Appian knew about the Sinur Paper, and any potential claims based on the Paper, in 2014 when it was published and even went so far as to draft point-by-point rebuttal in the spring of 2014.  In the five-and-a-half years between when it first learned of the Sinur Paper and when it filed its claims based on the Sinur Paper, much of the relevant evidence has been lost or destroyed, including emails and documents associated with Petronio.  To allow Appian to conduct a secret, pre-deposition

interview under these circumstances would only amplify the prejudice suffered by Pegasystems on account of Appian's delay in bringing it claims.

### III.    <u>Conclusion</u>

For all of the reasons stated above, the Court should deny Appian's request for an advisory opinion.  To the extent the Court is inclined to consider Appian's request, the Court should either deny it or require Appian to provide a list of questions it intends to ask so that Pegasystems may assess the potential ████████ implications of such an interview.

Dated:  November 20, 2020

Respectfully submitted,

PEGASYSTEMS INC.

By its attorneys,

  /s/ Neil Austin
August T. Horvath (*pro hac vice*)
Foley Hoag LLP
1301 Avenue of the Americas, 25th floor
New York, New York 10019
Telephone:  646-927-5544
Facsimile:  646-927-5599
ahorvath@foleyhoag.com

Neil Austin (BBO # 657204)
Nicole Kinsley (BBO # 682528)
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts 02210-2600
Telephone:  617-832-1000
Facsimile:  617-832-7000
naustin@foleyhoag.com
nkinsley@foleyhoag.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent to any non-registered parties.

/s/ Neil Austin
Neil Austin

FH5208580.2