## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PEGASYSTEMS INC.,<br><br>   Plaintiff/Counterclaim Defendant,<br><br> v.<br><br>APPIAN CORPORATION,<br><br>   Defendant/Counterclaim Plaintiff,<br><br> and<br><br>BUSINESS PROCESS MANAGEMENT, INC.,<br><br>   Defendant. | Case No. 19-cv-11461-PBS-MPK<br><br>LEAVE TO FILE OVERSIZED BRIEF GRANTED ON APRIL 14, 2022 |

## MEMORANDUM OF LAW IN SUPPORT OF APPIAN CORPORATION'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS ............................................................................................................2

    A.    The BPM Software Market ...............................................................................2

    B.    Pegasystems' Complaint ...................................................................................3

    C.    Pegasystems' Failure to Adduce Any Evidence of Injury .......................................3

        1.    Pegasystems Has Repeatedly Admitted That It Suffered No Lost Business Proximately Caused by the BPM.com Report ............................. 3

        2.    Pegasystems' Fact Witnesses Have Confirmed That Pegasystems Lost No Business Proximately Caused by the BPM.com Report ............... 5

        3.    Pegasystems' Claim That It Lost Business With ▉▉▉▉ Because of the BPM.com Report Is Conclusory and Unsupported ............................7

        4.    Pegasystems' Speculative Expert Reports ................................................. 9

            a.    Rebecca Kirk Fair .........................................................................9

            b.    Keri Pearlson ...............................................................................11

        5.    Pegasystems' Bare-Bones Claim of "Reputational" Injury ..................... 12

LEGAL STANDARD...................................................................................................................14

ARGUMENT ...............................................................................................................................14

I.    INJURY PROXIMATELY CAUSED BY THE BPM.COM REPORT IS AN INDISPENSABLE ELEMENT OF PEGASYSTEMS' CLAIMS ....................................14

II.    NO REASONABLE FACT-FINDER COULD CONCLUDE THAT PEGASYSTEMS HAS MET ITS BURDEN OF SHOWING AN ACTUAL INJURY PROXIMATELY CAUSED BY THE BPM.COM REPORT .........................16

    A.    There Is No Evidence That Pegasystems Lost Sales or Business Because of the BPM.com Report .........................................................................16

B.    There Is No Evidence That Appian Gained Customers or Business Because of the BPM.com Report................................................................20

C.    There Is No Evidence Of Cognizable Reputational Injury....................................22

III.    PEGASYSTEMS CANNOT RELY ON A "PRESUMPTION OF INJURY" TO SURVIVE SUMMARY JUDGMENT ............................................................................25

CONCLUSION..............................................................................................................................27

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aktiebolaget Electrolux v. Armatron Int'l, Inc.*,
  999 F.2d 1 (1st Cir. 1993) ......................................................................................16

*Am. Med. Sys., Inc. v. Biolitec, Inc.*,
  774 F. Supp. 2d 375 (D. Mass. 2011) ....................................................................25

*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*,
  258 F.3d 578 (7th Cir. 2001) ...........................................................................15, 26

*Balance Dynamics Corp. v. Schmitt Indus., Inc.*,
  204 F.3d 683 (6th Cir. 2000) ...........................................................................24, 27

*Brown v. Armstrong*,
  957 F. Supp. 1293 (D. Mass. 1996) ........................................................................17

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*,
  284 F.3d 302 (1st Cir. 2002)...................................................................14, 15, 19

*Cherkaoui v. City of Quincy*,
  877 F.3d 14 (1st Cir. 2017)......................................................................................14

*Clapper v. Amnesty Int'l, USA*,
  568 U.S. 398 (2013)..................................................................................................24

*Dependable Sales & Serv., Inc. v. TrueCar, Inc.*,
  377 F. Supp. 3d 337 (S.D.N.Y. 2019)......................................................................23

*e-ImageData Corp. v. Digital Check Corp.*,
  2018 WL 1411226 (E.D. Wis. Mar. 21, 2018) ........................................................19

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006).................................................................................................26

*Enzymotec Ltd. v. NBTY, Inc.*,
  754 F. Supp. 2d 527 (E.D.N.Y. 2010) .....................................................................17

*Express Homebuyers U.S. v. Wbh Mktg.*,
  2018 U.S. Dist. LEXIS 214039 (E.D. Va. Aug. 29, 2018).....................................15

*Falcon Stainless, Inc. v. Rino Cos.*,
  2011 WL 13130703 (C.D. Cal. Oct. 11, 2011), *aff'd*, 572 F. App'x 483 (9th
  Cir. 2014) ................................................................................................................27

# TABLE OF AUTHORITIES

(continued)

Page(s)

*Fishman Transducers, Inc. v. Paul*,
  684 F.3d 187 (1st Cir. 2012)..................................................................21

*Gravelle v. Kaba Ilco Corp.*,
  684 F. App'x 974 (Fed. Cir. 2017) ........................................................15

*Gucci Am., Inc. v. Daffy's, Inc.*,
  354 F.3d 228 (3d Cir. 2003)....................................................................21

*Guldseth v. Family Med. Assocs. LLC*,
  2021 WL 681913 (D. Mass. Feb. 22, 2021) .......................................1, 2

*Harper House, Inc. v. Thomas Nelson, Inc.*,
  889 F.2d 197 (9th Cir. 1989) ..................................................................15

*HipSaver Co. v. J.T. Posey Co.*,
  497 F. Supp. 2d 96 (D. Mass. 2007) (Saris, J.).................................22, 25, 26, 27

*In re Century 21-RE/MAX Real Estate Advert. Claims Litig.*,
  882 F. Supp. 915 (C.D. Cal. 1994) ........................................................24

*Ironhawk Techs., Inc. v. Dropbox, Inc.*,
  2 F.4th 1150 (9th Cir. 2021) ...................................................................17

*Jakobiec v. Merrill Lynch Life Ins. Co.*,
  711 F.3d 217 (1st Cir. 2013)......................................................................2

*Kern v. Med. Protective Co.*,
  2018 WL 4502187 (D.N.J. Sept. 20, 2018) ...........................................27

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014)......................................................................... *passim*

*Lundgren v. AmeriStar Credit Solutions, Inc.*,
  40 F. Supp. 3d 543 (W.D. Pa. 2014).................................................23, 25

*Lupyan v. Corinthian Colls. Inc.*,
  761 F.3d 314 (3d Cir. 2014)....................................................................27

*MicroStrategy Inc. v. Bus. Objects, S.A.*,
  429 F.3d 1344 (Fed. Cir. 2005)...............................................................19

*Monahan Prods. LLC v. Sam's East, Inc.*,
  463 F. Supp. 3d 128 (D. Mass. 2020) .....................................................24

# TABLE OF AUTHORITIES

(continued)

Page(s)

*New England Surfaces v. E.I. du Pont de Nemours & Co.*,
    546 F.3d 1 (1st Cir. 2008).........................................................................................23

*Packgen v. Berry Plastics Corp.*,
    847 F.3d 80 (1st Cir. 2017)......................................................................................22

*Pandora Jewelry, LLC v. Chamilia, LLC*,
    2008 WL 4533902 (D. Md. Sept. 30, 2008) ..........................................................17

*Quabaug Rubber Co. v. Fabiano Shoe Co.*,
    567 F.2d 154 (1st Cir. 1977)....................................................................................23

*Quidel Corp. v. Siemens Med. Solutions USA, Inc.*,
    2020 WL 4747724 (S.D. Cal. Aug. 17, 2020), *aff'd*, 2021 WL 4622504 (9th
    Cir. Oct. 7, 2021) ..............................................................................................19, 26

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
    919 F.3d 869 (5th Cir. 2019)....................................................................................25

*Santiago v. Sherwin Williams Co.*,
    3 F.3d 546 (1st Cir. 1993).........................................................................................16

*Scholz v. Goudreau*,
    132 F. Supp. 3d 239 (D. Mass. 2015), *aff'd*, 901 F.3d 37 (1st Cir. 2018)..........17, 23, 26

*Seven-Up Co. v. Coca-Cola Co.*,
    86 F.3d 1379 (5th Cir. 1996) .............................................................................15, 18

*Societe Civile Succession Richard Guiono v. Beseder Inc.*,
    2007 WL 3238703 (D. Ariz. Oct. 31, 2007)...........................................................23

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)..................................................................................................26

*Swarovski Aktiengesellschaft v. Bldg. No. 19, Inc.*,
    704 F.3d 44 (1st Cir. 2013).......................................................................................26

*Torres v. E.I. Dupont de Nemours & Co.*,
    219 F.3d 13 (1st Cir. 2000).......................................................................................14

*TrafficSchool.com, Inc. v. eDriver Inc.*,
    653 F.3d 820 (9th Cir. 2011) ....................................................................................26

*UPS Store, Inc. v. Hagan*,
    2017 WL 3309721 (S.D.N.Y. Aug. 2, 2017)...........................................................15

v

## TABLE OF AUTHORITIES

(continued)

Page(s)

*Verisign, Inc. v. XYZ.com LLC*,
  848 F.3d 292 (4th Cir. 2017) ........................................................................14, 21

*Xiao Wei Yang Catering Linkage in Inner Mongolia Co. v. Inner Mongolia Xiao*
  *Wei Yang USA, Inc.*,
  340 F. Supp. 3d 70 (D. Mass. 2018) ...................................................................25

*Yourga v. City of Northhampton*,
  474 F. Supp. 3d 408 (D. Mass. 2020) ................................................................14

**Statutes**

Lanham Act.................................................................................................... *passim*

Mass. Gen. Laws ch. 93A .........................................................................3, 15

**Other Authorities**

Fed. R. Evid. 301 ...............................................................................................27

Appian Corporation ("Appian") moves for summary judgment as to all of Pegasystems, Inc.'s ("Pegasystems") claims, on the ground that Pegasystems has failed to adduce any evidence from which a reasonable fact-finder could conclude that it has suffered a cognizable injury proximately caused by Appian's challenged conduct.

## PRELIMINARY STATEMENT

To prove a Lanham Act violation, it is not enough to show that false advertising has occurred.  The plaintiff must also show "*injury* flowing directly from the deception wrought by the defendant's advertising"—*i.e.*, that the advertising "*cause[d] [customers] to withhold trade from the plaintiff*."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014) (emphasis added).  Pegasystems, therefore, "cannot obtain relief without **evidence** of injury proximately caused by [Appian's] alleged misrepresentations."  *Id.* at 140 (emphasis in original).

Since the inception of this case, Pegasystems has been on a quest for proof that it suffered an injury due to the one advertisement it has challenged, the BPM.com Report.  Yet at every turn, Pegasystems has been forced to concede—both to Appian and to this Court—that it has failed to identify any such loss.  Not a single document produced by either party shows that Pegasystems lost a sale to Appian because of the BPM.com Report.  Pegasystems' witnesses, including its Rule 30(b)(6) witness on the subject, ████████████████████████████████ ████████████████████████████.  And Pegasystems' damages expert conceded ██████████████████████████████████████████████ ████████████████████  To quote U2, with discovery now closed and the case ready for trial, Pegasystems "still hasn't found what it's looking for."

Summary judgment is "the put up or shut up moment in litigation"—and Pegasystems "has failed to put up."  *Guldseth v. Family Med. Assocs. LLC*, 2021 WL 681913, at *6 (D. Mass. Feb.

22, 2021) (quoting *Jakobiec v. Merrill Lynch Life Ins. Co.*, 711 F.3d 217, 226 (1st Cir. 2013)). Pegasystems has no competent evidence that it lost a single dollar of business, or suffered any other cognizable injury, as a proximate result of the BPM.com Report.  A reasonable fact-finder could not conclude—absent rank speculation—that Pegasystems has satisfied this core element of each of its claims.  Appian is entitled to summary judgment.

## STATEMENT OF FACTS

### A.    The BPM Software Market

This is a case between sellers of competing Business Process Management ("BPM") platforms—integrated suites of software tools that allow companies to develop new business processes and automate existing ones in order to make their businesses more efficient.  Statement of Undisputed Material Facts ("SUMF") ¶¶ 1-3, 9.  The target customers for the parties' BPM platforms are generally large corporations and government agencies, and the decisionmakers who choose which platform to purchase—which is often a multi-million-dollar decision—are sophisticated individuals (such as Chief Technology Officers) with substantial technical expertise.  *Id.* ¶¶ 10-13; *see also id.* ¶ 14 (ECF 353 at 3) (Pegasystems brief emphasizing "the sophistication of customers in [this] market").  In Pegasystems' own telling, "the decision to purchase BPM software is made following a long, careful analysis that involves extensive communication with the vendors under consideration," and is generally not driven by mass advertising.  *Id.* ¶ 14 (ECF 353 at 4); *see also id.* at 8 (discussing the "long and complex sales cycle").[1]

---

[1] This is not to say that advertising plays *no* role in the decision-making process; if that were true, neither company would advertise.  A years-long relentless campaign of deception, such as the one Pegasystems unleashed on Appian, can have a significant impact in the marketplace and cause substantial injury to a competitor—as the proof at trial on Appian's counterclaims will show.  But as detailed below, Pegasystems has *no* evidence—zero—that the isolated and short-lived BPM.com Report caused it to suffer any commercial injury.

### B.      Pegasystems' Complaint

Pegasystems filed this lawsuit in July 2019, challenging the BPM.com Report—a paper comparing Appian's platform with those of Pegasystems and IBM (another BPM vendor).  *Id*. ¶¶ 20-21, 26.  Appian had commissioned co-defendant BPM.com to prepare the report based on an underlying survey of BPM software users.  Appian hosted the report on its website for an eight-month period, from May 17, 2019 to January 17, 2020.  *Id*. ¶¶ 22-23.[2]

In its complaint, Pegasystems alleged that the BPM.com Report injured it in a variety of ways, "including but not limited to … damages to its reputation, damage to its relationships with existing and prospective customers, loss of customers and prospective customers, and lost business opportunities."  *Id.* ¶ 27 (Am. Compl., ECF 55 ¶ 68).  Pegasystems asserted claims for false advertising under the Lanham Act and its state law analogue (Mass. Gen. Laws ch. 93A), and for common-law commercial disparagement.[3]  SUMF ¶ 28 (ECF 55 ¶¶ 55-69; 73-78).

### C.      Pegasystems' Failure to Adduce Any Evidence of Injury

#### 1.      Pegasystems Has Repeatedly Admitted That It Suffered No Lost Business Proximately Caused by the BPM.com Report

Once this case moved past the pleadings stage, however, Pegasystems began to tell a very different story.  Throughout discovery, Pegasystems repeatedly admitted to Appian and the Court that it has been unable to identify *any* business lost because of the BPM.com Report.

First, in a May 13, 2020 letter, Pegasystems informed Appian that it had "not ascertained that any customer or potential customer has ceased using or declined to use Pegasystems' software as a result of the BPM Report."  SUMF ¶ 29.  Next, during a July 21, 2020 hearing, Pegasystems

---

[2] After this lawsuit was filed, Appian voluntarily removed the report from its website and permanently stopped distributing it, thereby mooting any claim for injunctive relief.  ECF 87.

[3] Pega also asserted other causes of action, which have since been dismissed.  ECF 56 at 16-18.

told the Court it was "not in possession of any documents showing that [its] business was diminished in any way as a result of the [BPM.com] [R]eport," and admitted that it was "not in a position … to be able to say that" Pegasystems "lost … particular client[s] because of the BPM[.com] Report." *Id.* ¶¶ 30-31.  A few months later, at an October 1, 2020 hearing, Pegasystems again conceded: "We don't know of particular customers that we identify as lost now." *Id.* ¶ 32.

Following this hearing, the Court ordered Pegasystems to identify, by name, "any customers or potential customers it believes stopped using Pegasystems' services or failed to hire Pegasystems as a result of Appian's actions." *Id.* ¶ 33 (Oct. 2, 2020 Order, ECF 171).  The Court also ordered Pegasystems to produce all communications (within a specified time period) mentioning Appian with those customers "whom Pegasystems identifies as having been deceived or confused by" the BPM.com Report.  *Id.* ¶ 34.  Similarly, Pegasystems had earlier agreed to produce such customer communications with all "customers or potential customers that Pegasystems believes ceased or declined to do business with Pegasystems as a result of the BPM.com Report." *Id.* ¶ 35 (ECF 149 at 14).  Thus, pursuant to the Court's order and Pegasystems' own agreement, Pegasystems was obligated to identify, by customer name, any lost business supposedly attributable to the BPM.com Report and to produce specific discovery relevant to each of those customers.

But Pegasystems came up empty.  First, on October 22, 2020, in response to the Court's order to identify its lost customers, Pegasystems again admitted that it "had not, to date, identified specific customers or potential customers that it believes stopped using Pegasystems services or failed to hire Pegasystems as a result of Appian's … actions." *Id.* ¶ 36.  Then, on November 30, 2020—the deadline set by the Court—Pegasystems produced communications for just three customers: ████████████████████████████████████████████████

████████████████████████████████ *Id.* ¶ 37.  However, Pegasystems also stipulated that it is

"***not claiming***, and will not assert any claim in the future, that its revenue from" ███████

████████ "was affected in any way by any conduct challenged in this case." *Id.* ¶ 38 (emphasis

added).  As Pegasystems' counsel confirmed to the Court, "it's simply not true that [Pegasystems]

lost these customers as a result of the BPM.com Report." *Id.* ¶ 39.[4]

In December 2020, Appian brought a motion seeking to confirm that Pegasystems would

not be identifying any additional customers as lost or deceived, given that the Court-imposed dead-

lines to do so had already passed.  *Id.* ¶ 45 (ECF 218).  At the hearing on that motion, the Court

asked Pegasystems: "[F]rom what you know … from your own data of your own customer rela-

tions, do you believe that you've lost a customer because of the BPM.com Report?"  Pegasystems'

response could not have been clearer: "Based on the information available to Pegasystems now …

***we've not identified specific lost customers***." *Id.* ¶ 46 (emphasis added).  The Court responded

with an Order in which it "warn[ed] Pegasystems that if, in the future, it uncovers additional cus-

tomers who were misled or confused by the report, it should be able to articulate why it did not

previously produce the names of those customers." *Id.* ¶ 47 (Jan. 29, 2021 Order, ECF 242).

### 2.    Pegasystems' Fact Witnesses Have Confirmed That Pegasystems Lost No Business Proximately Caused by the BPM.com Report

Pegasystems' fact witnesses uniformly testified that Pegasystems did not lose any business

because of the BPM.com Report.  Don Schuerman, Pegasystems' Chief Technology Officer and

Vice President of Product Strategy and Marketing, testified as Pegasystems' Rule 30(b)(6) witness

on "[a]ll injuries and damages that Pegasystems purports to have sustained or claims as a result of

the BPM Report," including any purported loss of any "specific customer" or "revenue."  *Id.* ¶ 50.

Mr. Schuerman repeatedly admitted ██████████████████████████████████

---

[4] It is obvious why Pegasystems agreed to this stipulation.  None of these customers has ever done business with Appian; rather, Appian *lost* opportunities with each of them ***to Pegasystems***.  SUMF ¶¶ 40-44.

███████████████████████████████████████████████████████████████

*Id.* ¶¶ 51-52.

Mr. Schuerman was not alone in this respect.  In its initial disclosures, Pegasystems iden-

tified Patrick Dwyer as a person with knowledge of the purported "impact to Pegasystems of the

BPM.com Report."  *Id.* ¶ 53.  Mr. Dwyer is a senior sales executive who leads the team responsible

for enterprise accounts (i.e., those with the "highest potential or largest customers") in several key

industries.  *Id.* ¶¶ 54-55.  Yet Mr. Dwyer had no recollection of anyone at Pegasystems ever talking

about any loss of business due to the BPM.com Report and denied having any knowledge of "any

monetary loss as a result of the BPM report."  *Id.* ¶¶ 56-59.

Pegasystems also identified Leon Trefler as someone knowledgeable about the supposed

"impact to Pegasystems of the BPM.com Report."  *Id.* ¶ 60.  Mr. Trefler is the brother of Pegasys-

tems' CEO Alan Trefler and one of the most senior executives in the company.  *Id.* ¶ 61.  ████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████  *Id.* ¶¶ 62-63.  But none of these were

customers that Pegasystems had identified as lost or deceived pursuant to the Court's orders.  *Id.*

¶¶ 48-49, 75-76; *supra*, at 4-5.  ████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████  *Id.* ¶¶ 64-65.[5]  In any event, Pegasystems has forfeited its ability to assert any

injury in connection with them: following Mr. Trefler's deposition, Appian promptly asked Pega-

systems whether it was identifying these customers as "lost" pursuant to the Court's order, *see*

---

[5] Mr. Trefler speculated ██████████████████████████████████████████████
████████████████████  SUMF ¶ 66.  However, Pegasystems did not produce any such communication.  *Id.* ¶¶
67-68.  To the contrary, the ██████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████  *Id.* ¶¶ 69-74.

Oct. 2, 2020 Order (ECF 171), and Pegasystems confirmed that it was not.  SUMF ¶¶ 77-80.

Several of Pegasystems' other witnesses, who would be expected to know of any injury caused by the BPM.com Report, similarly could not identify any.  Mark Ryan, a senior Pegasystems sales executive, ████████████████████████████████████████████████████████████ ████████████████████████████████ *Id.* ¶ 84.  Robert Spencer, another senior Pegasystems sales executive, likewise ████████████████████████████████████████████████████████ ████████████████████████████████████████ *Id.* ¶¶ 81-83.

Pegasystems' inability to point to any injury attributable to the BPM.com Report is striking given the resources and sales-tracking capabilities at its disposal.  Pegasystems is a billion-dollar, publicly traded company whose "primary" product offerings include a customer relationship management ("CRM") platform designed to help businesses track their interactions with customers. *Id.* ¶¶ 4-5.  ████████████████████████████████████████████████████████████████ ████████████████████████████████ *Id.* ¶¶ 6-7.  Pegasystems assuredly scoured its CRM database for any evidence that it was injured by the BPM.com Report, but came up with nothing.[6]

> ### 3.   Pegasystems' Claim That It Lost Business With ██████ Because of the BPM.com Report Is Conclusory and Unsupported

Following the Court's October 2, 2020 and January 29, 2021 orders, Pegasystems belatedly identified just *one* customer from which it purportedly lost business: ████████████████████████

---

[6] It is not as though Pegasystems were tasked with the impossible.  In support of its counterclaims, Appian identified seven specific customers who awarded business to Pegasystems instead of Appian because of the Sinur Report and Pegasystems' other false advertising, and cited concrete documentary evidence to that effect. *See, e.g.,* Declaration of Adeel A. Mangi ("Mangi Decl.") Ex. 66 (████████████████████████████████████████████████████████████"); *id.* Ex. 67 ████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████"); *id.* Ex. 68 (████████████████████████████████████████████████); *id.* Ex. 69 (████████████████████████████████████████████ ████████████"). Pegasystems, in contrast, failed to uncover *any* analogous proof supporting its claims.

██████. *Id.* ¶ 85.  However, there is no evidence from which a reasonable fact-finder could conclude that the BPM.com Report played any role—let alone a substantial role—in ████████ decision to choose Appian instead of Pegasystems.  Pegasystems did not produce any communications it may have had with ██████, and none of its witnesses testified to any first-hand interactions with ██████.  *Id.* ¶ 90.  Indeed, there is no evidence that anyone at ██████ even ***read*** the BPM.com Report.  *Id.* ¶ 89.  Pegasystems merely points to a single document █████████ ██████████████████████████████████████████████████████████ █████████████████ *Id.* ¶ 86. ██████████████████████████████ proves nothing about how ████████████████████ (to the extent they read it at all), or whether the report played any role in ████████s ultimate purchase decision.  Indeed, the record is utterly silent on those subjects.  *Id.* ¶¶ 88-90.

Notably, at Pegasystems' Rule 30(b)(6) deposition on the subject of its "injuries and damages … as a result of the BPM Report and the bases for those claims," Pegasystems' designee, Mr. Schuerman, was repeatedly asked if he could name a single customer that Pegasystems lost because of the BPM.com Report. ████████████████████████ *Id.* ¶ 92-93.  When Appian's counsel affirmatively brought up ██████, Mr. Schuerman ██████████████████████████ █████████████████████████████████████████████████████████ ████████████████ *Id.* ¶¶ 94-97.  Mr. Schuerman ██████████████████████████ █████████████████████████████████████████████████████████ *Id.* ¶ 97.  When asked why Pegasystems nonetheless claimed that the BPM.com Report caused it to lose business from ████████████████████ █████████████████████████████████████████████████████████ ██████████████████████████████████ *Id.* ¶ 98.

### 4.    Pegasystems' Speculative Expert Reports

In an attempt to fill the evidentiary void left by its lack of documentary evidence and witness testimony, Pegasystems has tendered two expert reports laden with unsupported, *ipse dixit* claims about the ***possible*** impact of the BPM.com Report.  But neither expert identifies any tangible impact that the BPM.com Report ***actually*** had on Pegasystems.  For this reason, Appian has moved to exclude this testimony as speculative and irrelevant.  Whether or not the Court excludes it, however, this testimony provides no basis for a reasonable fact-finder to conclude that Pegasystems has met its burden.

### a.    Rebecca Kirk Fair

Pegasystems retained Rebecca Kirk Fair, an economist, to ███████████████████ ███████████████████████████████████████████ *Id.* ¶ 101.  Ms. Kirk Fair concluded ████████████████████████████████ ██████████████████████████████████████ *Id.* ¶ 102 (emphasis added). Ms. Kirk Fair testified █████████████████████████████████ ██████████████████████████████████████ *Id.* ¶¶ 103-104.  Despite these admissions, however, Ms. Kirk Fair ████████████████████████ ███████████████████████████████████████████ ████████████████████████ *Id.* ¶¶ 106, 133.

First, Ms. Kirk Fair ██████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████ *Id.* ¶ 106. ██████████████████████████ ███████████████████████████████████████████ █████████████████████ *Id.* ¶ 108. ██████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████ *Id.* ¶¶ 111-112.  In her own words: ██████████████

██████████████████████████████████████████████████

*Id.* ¶ 113.  Ms. Kirk Fair therefore offers no opinion ████████████████

██████████████████████████████████████████████████

██████████████████████████████ *Id.* ¶ 107.

     Second, Ms. Kirk Fair ████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████ *Id.* ¶¶ 115-116.  Here too, Ms. Kirk Fair undertook no analysis of why any of these customers actually chose Appian over Pegasystems or other competitors—and for many of them, ████████████████████████████████████████ *Id.* ¶¶ 117-118; *see also id.* ¶ 119 ████████████████ ████████████████████

     Ms. Kirk Fair also made no attempt to consider any of the alternative plausible explanations for Appian's new customer growth and its ability to successfully compete against Pegasystems. *Id.* ¶¶ 121-132.  As Ms. Kirk Fair testified, ████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████ *Id.* ¶¶ 129-132.  Instead, Ms. Kirk Fair ████████████ ██████████████████████████████████████████████████ ████████████████████ *Id.* ¶ 133.

     In reality, as detailed in the accompanying Statement of Undisputed Material Facts, the

handful of specific customer communications Ms. Kirk Fair cites for this proposition show nothing of the sort.  *Id.* ¶¶ 138-160.  To give just one example, ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████  *Id.* ¶ 140.

Ms. Kirk Fair also contends ██████████████████████████████████

██████████████ ████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████  *Id.* ¶¶ 138-152.  Appian's mere distribution of the BPM.com Report to a customer does not establish that it helped Appian win that customer, ██████████████

█████████  *Id.* ¶ 146 ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████  *Id.* ¶ 135.

### b.    Keri Pearlson

Pegasystems also retained Dr. Keri Pearlson—an academic specializing in cybersecurity, with no meaningful experience in the BPM industry—██████████████████████████

████████████████████████████████████████████████████

customers." *Id.* ¶¶ 161-164.  In her report, Dr. Pearlson ███████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████ *Id.* ¶ 165.[7]

Dr. Pearlson does not point to any record evidence that any customer actually chose Appian over Pegasystems because of the BPM.com Report.  *Id.* ¶ 168.  Instead, her ████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████ *Id.* ¶ 166.  In other words, ████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████ *See, e.g.*, *id.* ¶ 167 ████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

███████████████████████████ Again, however, she points to no customer or opportunity that was actually lost.

## 5.   Pegasystems' Bare-Bones Claim of "Reputational" Injury

Aware that it cannot show any lost business, Pegasystems claims that it suffered "reputational" injury.  But the evidence that Pegasystems points to in support of this theory is just as conclusory and speculative as its evidence of lost business.  Indeed, Pegasystems has made no attempt to articulate how its reputation was harmed, with whom, or how that harm tangibly affected Pegasystems' business (if at all).

For starters, Pegasystems has identified just three instances when a customer actually raised potential concerns about the BPM.com Report: ██████████████████████████ But each of those

---

[7] ████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ (cited in SUMF ¶ 165).

customers ████████████████████████████████████████████ *Id.*

¶¶ 40-44; 175-176.  Plainly, any impact the report had on these companies' view of Pegasystems

was not sufficient to affect their purchase decisions.  Mr. Schuerman—whom Pegasystems desig-

nated to testify regarding "any purported loss of goodwill as a result of the BPM.com Report"—

████████████████████████████████████████████████████████████████

████████████████████████████████████ *Id.* ¶¶ 178-182.

      Pegasystems also contends that it ██████████████████████████████

████████████████████████████████████████████████████████████████

████ *Id.* ¶ 190.  Yet Pegasystems has not supported this conclusory statement with record evi-

dence.  It has not attempted ██████████████████████████████████████

████████████████████ *Id.* ¶ 191.  And its Rule 30(b)(6) designee, Mr. Schuerman,

████████████████████████████████████████████████████████████████

████████████████ *Id.* ¶ 185.

      In fact, the record affirmatively refutes Pegasystems' claim of reputational harm and shows

that any *de minimis* responsive measures Pegasystems took—██████████████████████

█████████████████—were gratuitous.  As one Pegasystems employee explained in Oc-

tober 2019, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ *Id.* ¶ 192.

And Patrick Dwyer, a senior Pegasystems sales executive, ██████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ *Id.* ¶ 193.

      Indeed, Pegasystems' internal documents show that, ██████████████████████



*Id.* ¶¶ 194-199.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Yourga v. City of Northhampton*, 474 F. Supp. 3d 408, 413 (D. Mass. 2020).  A dispute is genuine only "if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Cherkaoui v. City of Quincy*, 877 F.3d 14, 23-24 (1st Cir. 2017).  Although a court should "draw all reasonable inferences in the nonmovant's favor," it may "not draw ***unreasonable*** inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective."  *Id.* (internal quotation marks and citations omitted).  It "is well settled that the mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment."  *Torres v. E.I. Dupont de Nemours & Co.*, 219 F.3d 13, 18 (1st Cir. 2000).

## ARGUMENT

## I.   INJURY PROXIMATELY CAUSED BY THE BPM.COM REPORT IS AN INDISPENSABLE ELEMENT OF PEGASYSTEMS' CLAIMS

As the Supreme Court has explained, a Lanham Act plaintiff "must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers ***causes them to withhold trade from the plaintiff***."  *Lexmark*, 572 U.S. at 133 (emphasis added); *see also Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 310–11 (1st Cir. 2002).  This "is not a minor or technical element

14

of a Lanham Act claim; indeed, … it is [a] core requirement." *Verisign, Inc. v. XYZ.com LLC*, 848 F.3d 292, 299-300 (4th Cir. 2017).   Put another way, "actual evidence of some injury resulting from the deception is an essential element of the plaintiff's case." *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989) (emphasis deleted).[8]   The requirement that a Lanham Act plaintiff show proximate causation of an injury is heightened where, as here, "the [plaintiff] seek[s] monetary damages" rather than merely "injunctive relief." *UPS Store, Inc. v. Hagan*, 2017 WL 3309721, at *8 (S.D.N.Y. Aug. 2, 2017); *see also Cashmere*, 284 F.3d at 311.[9]

Pegasystems' obligation to prove injury proximately caused by the BPM.com Report does not disappear merely because it has elected to forgo the remedy of actual damages (*i.e.*, recovery of its own lost profits) and pin its hopes on disgorgement of Appian's profits.   Courts have rejected the notion that a plaintiff "need not show an actual injury" merely "because the Lanham Act provides for disgorgement of profits." *Gravelle v. Kaba Ilco Corp.*, 684 F. App'x 974, 981 (Fed. Cir. 2017).   Actual injury and remedies "are separate inquiries under the Lanham Act," and "without the former, there can be no entitlement" to ***any*** remedy, including disgorgement. *Id.*; *see also Express Homebuyers U.S. v. Wbh Mktg.*, 2018 U.S. Dist. LEXIS 214039, *12 (E.D. Va. Aug. 29, 2018) (under *Lexmark*, "only when a plaintiff has adequately shown injury and causation may it recover disgorgement").   Indeed, without demonstrating actual injury traceable to the challenged representation, a plaintiff cannot even meet the irreducible minimum requirements of Article III

---

[8] This is not to say that Pegasystems must establish that the BPM.com Report was the sole, or even the primary, cause of a customer's decision not to select Pegasystems.   Proof that the BPM.com Report was a "substantial factor" in a customer's decision would suffice. *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1387 & n.12 (5th Cir. 1996).   But Pegasystems has not even shown that.

[9] Pegasystems' state-law claims are subject to an injury requirement at least as stringent as its Lanham Act claim. *See* ECF 56 at 14 ("False advertising claims under the Lanham Act and Chapter 93A rise and fall together."); *id.* at 18 (a plaintiff asserting commercial disparagement must prove "special damages in the form of pecuniary loss").

standing.  *See B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 258 F.3d 578, 581 (7th Cir. 2001)

(holding that permitting a Lanham Act claim without "proof of loss" would violate "Article III of

the Constitution, which makes injury in fact an essential component of a case or controversy").[10]

## II. NO REASONABLE FACT-FINDER COULD CONCLUDE THAT PEGASYS-TEMS HAS MET ITS BURDEN OF SHOWING AN ACTUAL INJURY PROXI-MATELY CAUSED BY THE BPM.COM REPORT

### A. There Is No Evidence That Pegasystems Lost Sales or Business Because of the BPM.com Report

Despite the ample resources at its disposal, and the nearly three years during which it has

relentlessly litigated this case, Pegasystems has failed to identify any business it lost as a proximate

result of the BPM.com Report.  As discussed above, throughout discovery, Pegasystems repeatedly

admitted that it had been unable to identify such lost business.  *See supra*, at 3-5; SUMF ¶¶ 29-36,

46.  Pegasystems' witnesses—including its Rule 30(b)(6) corporate representative—█████████

██████████  *See supra*, at 5-7; SUMF ¶¶ 50-84.  And Pegasystems' own damages expert

████████████████████████████████████████████████████████████

██████████████████████████████████  SUMF ¶ 102.

Attempting to paper over this failure of proof, Pegasystems and its experts insist that it was

████████████████████████████████████████████████████████████

████████████████████████████████████  *Id*. ¶¶ 29, 165.  But Pega-

systems may not proceed to trial armed only with speculation of this sort.  The Lanham Act is no

exception to the general rule: "[w]here there is no evidence from which the fact-finder, without

---

[10] Nearly 30 years ago, the First Circuit suggested in *dicta* that the Lanham Act's "actual harm" requirement potentially could be "bypass[ed]" if a defendant's conduct was sufficiently "inequitable."  *See Aktiebolaget Electrolux v. Armatron Int'l, Inc*., 999 F.2d 1, 5 (1st Cir. 1993).  But that was prior to the Supreme Court's decision in *Lexmark*, which squarely held that a Lanham Act plaintiff "cannot obtain relief without ***evidence*** of injury proximately caused by [the] alleged misrepresentations."  572 U.S. at 140 (emphasis in original).

speculation, can find causation, … the case is appropriately kept from the jury." *Santiago v. Sherwin Williams Co.*, 3 F.3d 546, 552 (1st Cir. 1993).

Thus, courts consistently award summary judgment to defendants where, as here, a Lanham Act plaintiff offers only testimony that it believes it was injured, but fails to "come forward with specific admissible facts" to support that belief. *Scholz v. Goudreau*, 132 F. Supp. 3d 239, 255 (D. Mass. 2015), *aff'd*, 901 F.3d 37 (1st Cir. 2018); *see, e.g.*, *Brown v. Armstrong*, 957 F. Supp. 1293, 1304 (D. Mass. 1996) (granting summary judgment to defendant, where plaintiff offered "no evidence that any consumer was actually misled or made a purchasing decision as a result of having been misled," as well as "no evidence to link the loss of Plaintiffs' sales" to defendant's advertising); *Enzymotec Ltd. v. NBTY, Inc.*, 754 F. Supp. 2d 527, 547-48 (E.D.N.Y. 2010) (same, where the "only evidence" of causation was a "vague allegation based on hearsay about an unnamed customer['s]" decision not to purchase based on a challenged statement); *Pandora Jewelry, LLC v. Chamilia, LLC*, 2008 WL 4533902, at *9 & n.11 (D. Md. Sept. 30, 2008) (same, where plaintiff could not "point to even a single diverted customer … stemming from any of the communications at issue").[11]

The only specific customer that Pegasystems has ever claimed was lost as a result of the BPM.com Report is ███████. *Supra*, at 7-8. However, when it comes to ███████, non-speculative evidence of proximate causation is utterly absent. The entirety of Pegasystems' evidence is as

---

[11] The need for actual evidence that the BPM.com Report proximately caused lost business is especially acute in this case, because—by Pegasystems' own admission—it involves an extremely expensive product, an unusually sophisticated purchaser, and a sales process generally not driven by mass advertising. *Supra*, at 2. Courts recognize that "[w]hen the buyer has expertise in the field, or the goods are expensive, the buyer can be expected to exercise greater care in his purchases." *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1167 (9th Cir. 2021). Pegasystems' burden in proving actual—rather than merely speculative—injury should thus be even more demanding, and its conclusory assertions of harm even less adequate, than in a run-of-the-mill Lanham Act case.

follows: ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████ *See supra*, at 8; SUMF ¶¶ 86-87, 97-98.  Absent from

the record is ████████████████████████████████████████

██████████████████████████ or any evidence that anyone at ████████ (let alone a relevant deci-

sionmaker) actually read the report and relied on it to select Appian instead of Pegasystems.

On this record, a fact-finder could not conclude, without speculating, that the BPM.com

Report proximately caused Pegasystems to lose business from ████████  Even Pegasystems' expert,

Ms. Kirk Fair, ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████ SUMF ¶ 99-100; *see also Seven-Up*, 86 F.3d

at 1388-89 (setting aside verdict for plaintiff Seven-Up in Lanham Act case, even though bottling

company viewed portions of defendant Coca-Cola's challenged presentation before switching

from Seven-Up to Coca-Cola's Sprite, because Seven-Up "did not present any direct evidence that

even a single board member of either bottling company relied on or was influenced by any of the

material in the Coca-Cola presentation in deciding to switch to distributing Sprite").

Ms. Kirk Fair's citation to a handful of communications with additional customers does

not move the needle on the question of causation of an injury.  *See supra*, at 10-11; SUMF ¶¶ 138-

160.[12]  As a threshold matter, Pegasystems is precluded from claiming any injury vis-à-vis these

customers because it failed to identify them as having been deceived or lost during discovery and

---

[12] These communications involved the following customers: ████████████████████████
███████████████████

never produced the communications required by the Court's October 2, 2020 and January 29, 2021 orders. *See supra*, at 4-5; SUMF ¶¶ 48-49.  That bars Pegasystems from advancing these customers as the basis for its claimed injury now.  *Cf. Quidel Corp. v. Siemens Med. Solutions USA, Inc.*, 2020 WL 4747724, at *6-7 (S.D. Cal. Aug. 17, 2020) (at summary judgment stage, barring plaintiff from asserting loss of customers who had "never before been disclosed"), *aff'd*, 2021 WL 4622504 (9th Cir. Oct. 7, 2021); *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1356 (Fed. Cir. 2005) (affirming exclusion of damages theories and evidence not disclosed during discovery).[13]

In any event, despite citing these communications, Ms. Kirk Fair █████████████ ██████████████████████████████████████████████████████████████████████████ SUMF ¶ 102 (███████████████████████████████████████████████████████████ ████████████████████████████████; *id.* ¶ 135 (████████████████████████████ ████████████████████████████████████████████).[14]  And for good reason: the cited communications would not permit a reasonable fact-finder to conclude, without speculating, that Pegasystems lost any of these customers to Appian because of the BPM.com Report.  ████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████

---

[13] Pegasystems' failure to disclose the identities of these additional customers when ordered to do so by the Court "was not harmless": it "made it impossible for [Appian] to defend against" these lost-customer claims by precluding Appian from taking discovery from (or concerning) these customers.  *Quidel*, 2020 WL 4747724, at *7 (citing cases).

[14] Rather, Ms. Kirk Fair ██████████████████████████████████████████████████████ ██████████████████████  SUMF ¶ 135.  But "materiality and injury are separate elements of a false advertising claim" under the Lanham Act, and proof of the former (which Appian disputes, but which is beyond the scope of this motion) is not proof of the latter.  *e-ImageData Corp. v. Digital Check Corp.*, 2018 WL 1411226, at *3 (E.D. Wis. Mar. 21, 2018); *see also Cashmere*, 284 F.3d at 310-11 (to prevail on a Lanham Act claim, a plaintiff must prove that "the misrepresentation is material … **and** [that] the plaintiff has been … injured as a result of the misrepresentation" (emphasis added)).

■ *Id.* ¶¶ 138-160.

Finally, Dr. Pearlson's opinions ███████████████████████████████

██████████████████ are insufficient to establish proximate causation of an actual injury because

they are untethered to any actual events or customers.  As discussed in the accompanying *Daubert*

motion, not only does Dr. Pearlson lack any meaningful expertise in the BPM software market,

but her ██████████████████████████████████████████████████████ is

divorced from any actual customer decisions reflected in the record.  *See supra*, at 11-12; SUMF

¶¶ 162-164.  Furthermore, at deposition, she, too, ██████████████████████

█████████████████████████████████████████████████████████

████████████████ *Id.* ¶ 168.  This sort of conclusory speculation, even when offered by a purported

expert, is insufficient to create a triable issue of fact.

> **B.    There Is No Evidence That Appian Gained Customers or Business Because of the BPM.com Report**

As Appian has shown, Pegasystems cannot dispense with showing that the BPM.com Re-

port caused it to *lose* business by arguing that it seeks disgorgement of Appian's alleged *gains*.

*Supra*, at 15-16.  But even if that were not so—and Pegasystems could survive summary judgment

merely by adducing evidence that Appian gained customers via the BPM.com Report—Pegasys-

tems has failed to raise a genuine dispute on that point, too.

Most significantly, Pegasystems' expert, Ms. Kirk Fair, ████████████████████

█████████████████████████████████████████████████████████

████████████████████████████ SUMF ¶¶ 102-104.  Instead, Ms. Kirk Fair

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████



*See supra*, at 9-10; SUMF ¶¶ 107-114; 117-120.  Notably, she did not opine that Pegasystems would have captured the business of any specific customer in either group if Appian had not, or that the report contributed in any way to a Pegasystems "loss."  Indeed, ▓▓▓▓▓▓▓▓▓▓ there is no evidence that Pegasystems was competing for those accounts in the first place, so there is no basis to assume that Appian's success with these customers caused any injury to Pegasystems—let alone a loss occasioned by the BPM.com Report.

Such a vague and open-ended opinion—unsupported by any analysis showing a causal link between the BPM.com Report and Appian's growth—is too useless to be admissible, let alone to create a triable issue concerning proximate causation of actual injury.  *See Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 195-96 (1st Cir. 2012) (affirming exclusion of expert who identified decline in sales, but did not "provide any basis for the jury to attribute all, or any particular amount of the decline in revenue … to [the defendant's] … false advertising"); *Gucci Am., Inc. v. Daffy's, Inc.*, 354 F.3d 228, 242 (3d Cir. 2003) (disgorgement unavailable where "the record does not establish what percentage of [defendant's] sales, if any, was the result" of the challenged advertising); *Verisign*, 848 F.3d at 300-01 (excluding damages analysis that "assumes rather than demonstrates" that identified revenues were "the result of [defendant's] allegedly false statements").

What is more, Ms. Kirk Fair ▓▓▓▓▓▓▓▓

█████████████████████ SUMF ¶¶ 121-132.[15]  For this reason too, even if her opinion were admissible, a reasonable fact-finder could not conclude that Appian gained any of the customers in the groups that Ms. Kirk Fair identifies as a proximate result of the BPM.com Report.  *Cf. HipSaver Co. v. J.T. Posey Co.*, 497 F. Supp. 2d 96, 105 (D. Mass. 2007) (Saris, J.) ("differential growth rates" before and after challenged advertising were insufficient to create triable issue as to causation and injury, where there were "other independent variables that could equally explain these different growth rates which [plaintiff] and its expert ha[d] not addressed"); *Packgen v. Berry Plastics Corp.*, 847 F.3d 80, 87 (1st Cir. 2017) ("An expert should adequately account for obvious alternative explanations.").

## C.    There Is No Evidence Of Cognizable Reputational Injury

In a last-ditch attempt to escape summary judgment, Pegasystems and its expert, Dr. Pearlson, █████████████████████████████████████ *Supra*, at 12-13.  However, as the Supreme Court explained in *Lexmark*, whether the alleged injury is "economic or reputational," cognizable harm under the Lanham Act "occurs" only "when deception of consumers ***causes them to withhold trade from the plaintiff***."  572 U.S. at 133 (emphasis added).  Absent non-speculative evidence that the BPM.com Report caused (or will cause) customers to "withhold trade" from Pegasystems—and, as discussed above, there is none—Pegasystems' claim of reputational harm in the ether is not redressable under the Lanham Act.

---

[15] 

Furthermore, even if reputational harm without any resulting economic impact were cognizable under the statute, Pegasystems' proof of such harm ████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████ SUMF ¶ 171.  That is not good enough: "at the summary judgment stage," a plaintiff "needs to point to **actual evidence** of reputational injury."  *Scholz*, 132 F. Supp. 3d at 254-55 (emphasis added).  For example, in *Quabaug Rubber Co. v. Fabiano Shoe Co*., 567 F.2d 154 (1st Cir. 1977), the First Circuit held that testimony from a Lanham Act plaintiff's president was insufficient to show cognizable "harm" where he merely "express[ed] his **belief** that [his company's] reputation had been injured."  *Id.* at 162; *see also New England Surfaces v. E.I. du Pont de Nemours & Co.*, 546 F.3d 1, 7 (1st Cir. 2008) ("conclusory accusation that [defendant's] actions caused [plaintiff] to lose 'goodwill'" insufficient to avoid summary judgment).  Other courts have similarly granted summary judgment for defendants, despite self-serving testimony about "reputational" injury, when such claims were not substantiated with objective evidence.[16]

Here, the only objective evidence Pegasystems has pointed to █████████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████ *See supra*, at 5; SUMF

---

[16] *See, e.g.*, *Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 377 F. Supp. 3d 337, 352-53 (S.D.N.Y. 2019) ("vague" testimony of several witnesses that plaintiff suffered "damage to reputation," without identification of "an actual sale lost" or other "discernable injury," was "speculative" and insufficient to defeat summary judgment); *One Source Env'tl, LLC v. M + W Zander, Inc.*, 2015 WL 7428572, at *11 (D. Vt. Nov. 20, 2015) (conclusory testimony that "customers may now have some 'negative bias' against" plaintiff was "[in]sufficient … to create a genuine dispute"); *Lundgren v. AmeriStar Credit Solutions, Inc.*, 40 F. Supp. 3d 543, 550 (W.D. Pa. 2014) (granting summary judgment for defendant where Lanham Act plaintiff failed to bolster his self-serving testimony regarding reputational injury with other "record evidence"); *Societe Civile Succession Richard Guiono v. Beseder Inc.*, 2007 WL 3238703, at *6 (D. Ariz. Oct. 31, 2007) (granting summary judgment for defendant, even though plaintiff "broadly testif[ed] that he believed his reputation had been personally damaged," because plaintiff "offered no further testimony to support his contention" other than one alleged "instance of harm" that "did not result in the loss of any clients").

¶¶ 40-44; *cf. Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 694-95 (6th Cir. 2000) (mere fact that customers made "inquiries" after seeing challenged advertising is not "evidence of actual damage to goodwill").  Beyond Pegasystems' conclusory and self-serving testimony, ███ ████████████████████████████, the record is silent as to any "reputational injury."

Relatedly, Pegasystems asserts ██████████████████████████████████ █████████████████  However, courts are wary of allowing plaintiffs to bootstrap their way to a showing of injury through their own voluntary actions.  *See Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 418 (2013) (holding that the "self-inflicted harm" of spending money to prevent speculative and unproven threats does not confer Article III standing).  Thus, before recovery is permitted for voluntary rehabilitative efforts, a Lanham Act plaintiff must show that the defendant's advertising "caused an injury making [those efforts] ***necessary***."  *In re Century 21-RE/MAX Real Estate Advert. Claims Litig.*, 882 F. Supp. 915, 925 (C.D. Cal. 1994) (emphasis added); *see also Monahan Prods. LLC v. Sam's East, Inc.*, 463 F. Supp. 3d 128, 147 (D. Mass. 2020) (holding, in trademark context, that plaintiff was "entitled to [damages for] corrective advertising only to the extent necessary to correct [any] confusion").  Because Pegasystems has failed to establish any underlying injury caused by the BPM.com Report, its purported voluntary expenditures in response are not cognizable harms, under either the Lanham Act or Article III.

Moreover, Pegasystems' evidence regarding such response costs is utterly conclusory. Pegasystems' Rule 30(b)(6) witness on the topic of its injuries and losses testified ███ ████████████████████████████████████████ ████████████████████████████████████████ SUMF ¶ 181, ████████████████████████████████████ ███████████████  *Id.* ¶ 185.  And, unsurprisingly, Pegasystems' damages expert, Ms. Kirk Fair, ███

███████████████████████████████████████████████████

████████████████ *Id.* ¶ 191.  *See Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d

869, 882 & n.53 (5th Cir. 2019) (disregarding as "speculative" plaintiff's "evidence of … steps

taken to combat … lost goodwill," where plaintiff offered only vague testimony that it "spent a lot

of time going to customers and trying to correct the misinformation, a lot of meetings, … letter-

writing, things like that"); *Lundgren*, 40 F. Supp. 3d at 550 (plaintiff's vague claim that he "spen[t]

his time and money" to repair his tarnished reputation insufficient to survive summary judgment,

absent "record evidence in support").

## III.    PEGASYSTEMS CANNOT RELY ON A "PRESUMPTION OF INJURY" TO SURVIVE SUMMARY JUDGMENT

Lacking any evidence of injury, Pegasystems may try to rely on *HipSaver Co. v. J.T. Posey*

*Co.*, 497 F. Supp. 2d 96 (D. Mass. 2007), where this Court applied out-of-circuit precedent to

endorse a "rebuttable presumption of causation and injury for willful literally false advertising in

a two firm market where a defendant makes comparative statements targeting a direct competitor's

products." *Id.* at 109.  For several reasons, however, the narrow "presumption" identified in *Hip-*

*Saver* is unavailable here.

First, following *HipSaver*, other courts within the First Circuit have rejected the argument

that Lanham Act plaintiffs are entitled to a "presumption" of injury—under any circumstances.

*See, e.g.*, *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 774 F. Supp. 2d 375, 391 n.5 (D. Mass. 2011) (de-

clining to apply presumption, and noting that although other "circuits have recognized this pre-

sumption, the First Circuit has not"); *Xiao Wei Yang Catering Linkage in Inner Mongolia Co. v.*

*Inner Mongolia Xiao Wei Yang USA, Inc.*, 340 F. Supp. 3d 70, 79 n.3 (D. Mass. 2018) (same).

Second, *HipSaver* was decided well before *Lexmark*, where the Supreme Court squarely

held that a Lanham Act plaintiff "cannot obtain relief without **evidence** of injury," and "must plead

(and ultimately *prove*) an injury … proximately caused by the defendant's misrepresentations." 572 U.S. at 140 (second emphasis added); *see also Scholz*, 132 F. Supp. 3d at 254-55. The Supreme Court's emphasis on the word "evidence" demonstrates that this core element of a Lanham Act claim must be "prove[n]," not merely presumed. *Id.*[17]

Third, *HipSaver*'s presumption of injury is incompatible with the Supreme Court's modern Article III standing jurisprudence, which requires the plaintiff to prove affirmatively that it has suffered an injury-in-fact. *See, e.g.*, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (noting that "[t]he plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing" each element of standing); *id.* at 339 (stating that injury-in-fact "is a constitutional requirement" which "a plaintiff must *show*" (emphasis added)); *see also B. Sanfield*, 258 F.3d at 581 (observing that permitting a Lanham Act claim without "proof of loss" would violate "Article III …, which makes injury in fact an essential component of a case or controversy").

Fourth, the key factual predicate for the presumption applied in *HipSaver*—a two-player market—is missing here. This prerequisite is necessary because a presumption of harm is unreasonable unless the Court can "presume that every dollar defendant makes has come directly out of plaintiff's pocket." *TrafficSchool.com, Inc. v. eDriver Inc.*, 653 F.3d 820, 831 (9th Cir. 2011). Here, it is undisputed that Appian and Pegasystems *do not* compete in a "two firm market" (or anything close to one). SUMF ¶¶ 16-19. Moreover, while the BPM.com Report does target Pegasystems in part, it places equal emphasis on comparing Appian's software with that of IBM—another competitor—and it refers to several smaller competitors as well. SUMF ¶ 21. *See Quidel*,

---

[17] Since *HipSaver*, the First Circuit has also strongly questioned the viability of "presumptions" of irreparable harm as a shortcut to preliminary relief in Lanham Act cases. *See Swarovski Aktiengesellschaft v. Bldg. No. 19, Inc.*, 704 F.3d 44, 54 (1st Cir. 2013) (discussing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393-94 (2006)). This skepticism of presumptions as substitutes for actual proof—even at the preliminary injunction stage—further counsels against applying *HipSaver*'s presumption here.

2020 WL 4747724, at *10-11 (refusing to apply "presumption of injury" where "numerous competitors" sold the type of product at issue); *Falcon Stainless, Inc. v. Rino Cos.*, 2011 WL 13130703, at *15 (C.D. Cal. Oct. 11, 2011) (same), *aff'd*, 572 F. App'x 483 (9th Cir. 2014).

Finally, even if a presumption of injury were available to Pegasystems, *HipSaver* itself recognizes that this presumption is "rebuttable." 497 F. Supp. 2d at 108. Under Fed. R. Evid. 301, the introduction of ***any*** evidence to rebut a presumption "destroys that presumption." *Kern v. Med. Protective Co.*, 2018 WL 4502187, at *7 (D.N.J. Sept. 20, 2018) (quoting *Lupyan v. Corinthian Colls. Inc.*, 761 F.3d 314, 320 (3d Cir. 2014)). "Moreover, the 'quantum of evidence' needed to burst an evidentiary presumption's bubble … is 'minimal.'" *Lupyan*, 761 F.3d at 320. Here, as detailed above, the unchallenged evidence—including the unusual sophistication of purchasers in this market, the centrality of direct vendor-customer interactions (rather than advertising) to the sales cycle, and the conspicuous absence of any contemporaneous proof that Pegasystems lost a single sale due to the BPM.com Report—rebuts any putative "presumption" of injury. *See Balance Dynamics*, 204 F.3d at 694-95 (in Lanham Act case, the fact that "no customers had ever informed [plaintiff] that it was losing a sale due to the [challenged] communications," *inter alia*, "defeat[ed] any presumption of damage") (cited with approval in *HipSaver*).

## CONCLUSION

For the reasons stated above, Appian's Motion for Summary Judgment should be granted.


Dated:  April 15, 2022

By: /s/ Adeel A. Mangi

Adeel A. Mangi (*pro hac vice*)
Steven A. Zalesin (*pro hac vice*)
Jonah M. Knobler (*pro hac vice*)
Jason Vitullo (*pro hac vice*)
Michael Sochynsky (*pro hac vice*)
PATTERSON BELKNAP WEBB & TYLER LLP

1133 Avenue of the Americas
New York, New York 10036-6710
Telephone:  (212) 336-2000
Facsimile:  (212)336-2222
aamangi@pbwt.com
sazalesin@pbwt.com
jknobler@pbwt.com
jvitullo@pbwt.com
msochynsky@pbwt.com

-and-

Timothy H. Madden (BBO #654040)
DONNELLY, CONROY & GELHAAR, LLP
260 Franklin Street, Suite 1600
Boston, Massachusetts 02110
(617) 720-2880
thm@dcglaw.com

*Attorneys for Defendant/Counterclaim Plaintiff
Appian Corporation*

28

## <u>CERTIFICATE OF SERVICE</u>

I, Adeel A. Mangi, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Adeel A. Mangi
Adeel A. Mangi