## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

PEGASYSTEMS INC.,

    Plaintiff,

    v.

APPIAN CORPORATION and BUSINESS
PROCESS MANAGEMENT, INC.,

    Defendants.

Case No. 19-cv-11461-PBS-MPK

## STATEMENT OF UNDISPUTED MATERIAL FACTS
## IN SUPPORT OF PEGASYSTEMS' MOTION FOR
## SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, Plaintiff and Counterclaim Defendant Pegasystems Inc. ("Pegasystems" or "Pega") hereby submits the following statement of undisputed material facts in support of its motion for summary judgment against Defendants Appian Corporation ("Appian") and Business Process Management, Inc. ("BPM.com"), and with respect to Appian's counterclaims.

## I.      BACKGROUND

1.      Pegasystems is a publicly-held Massachusetts corporation with its principal place of business in Cambridge, Massachusetts.  *See* Dkt. 55 (First Amended Complaint) at ¶ 2, 11. Pegasystems develops, markets, licenses and supports software applications. Pegasystems' products include software for business process management ("BPM"), which allows businesses to automate their processes and make those processes more efficient. *Id*. at ¶¶ 2, 11.

2.      Appian is a publicly-held Delaware corporation headquartered in Tysons, Virginia. Appian develops, markets, licenses and supports BPM software.  *See* Dkt. 71 (Answer and Counterclaims) at ¶ 8; Exhibit ("Ex.") 1 (Expert Report of Richard M. Marshall) at ¶ 47.

3.     Pegasystems and Appian are direct competitors in the BPM space. *See* Dkt. 55 at ¶ 3; Dkt. 335 (Amended Answer/Counterclaim) at ¶ 3; Ex. 2 (Excerpts of Deposition Transcript of Arturo Oliver, (Appian Senior Director of Product Strategy and Tech Partnerships), April 27, 2021) at 31:13-31:15; Ex. 3 (Deposition of Thomas Libretto, (Pegasystems Chief Marketing Officer and Senior Vice President), April 21, 2021) at 30:09-30:25; Ex. 4 (Excerpts of Deposition Transcript of Cathryn Siemer, (Formerly Appian Market Intelligence Analyst and Analyst Relations Manager), May 21, 2021) at 45:20-45:25; Ex. 5 (Excerpts of Deposition Transcript of Trenton Buff, (Appian Account Executive), December 14, 2021) at 30:22 - 31:02.

4.     BPM.com is headquartered in Cohasset, Massachusetts. *See* Dkt. 74 at ¶ 4.  It is a leading market research company with expertise in the BPM space that, among other things, until recently operated a website at www.bpm.com that has been the leading destination for research, white papers and community forums on BPM and process automation for over a decade. *See* Ex. 6 at 2; Dkt. 74 at ¶ 4.  BPM.com is led by ███████████████████ Nathanial Palmer.  Ex. 7 at ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

5.     Selling BPM software is a process that can take Appian months. ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

6.   ██████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████████

7.   ██████████████████████████████████

██████████████████████████████████

8.   Purchasers of BPM software are sophisticated consumers with technical expertise. *See* Dkt. 17 at 16 ("The Report's audience – those who use BPM software – are sophisticated business professionals with technical expertise."); Dkt. 122 at 10.

9.   ██████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████

10.   A separate litigation between Appian and Pegasystems is pending in Virginia State Court and is on trial at the time of this filing.  In that case, Appian asserts, among other things, that Pegasystems misappropriated its trade secrets by working with Youyoung Zou, a developer (not an Appian employee) with experience working in Appian software, to learn about the Appian

3

software platform. *Appian Corporation vs. Pegasystems Inc. & Youyoung Zou*, Case No. 2020-07216 (Va. Cir. Ct.) ("the Virginia Litigation").  *See* Dkt. 550-1.

11.     In the Virginia Litigation, Appian's expert assessing unjust enrichment damages from the alleged trade secret misappropriation has calculated roughly $480 million dollars in Pegasystems' profits from opportunities where it competed directly with Appian from 2013 to 2021, and $3 billion in Pegasystems' profits generally from Q3 2013 through Q3 2021.  Ex. 98 (Excerpt of Virginia Litigation Trial Transcript) at. 3247:11-3250:2; 3298:6-21; 3304:9-3305:3; 3325:15-3326:5.  Those amounts encompass all Pegasystems' profit Appian has put at issue in this litigation.

## II.     THE BPM.COM REPORT

12.     On May 16, 2019, BPM.com published a document titled "Market Report: Analysis of Process Automation Investments and Total Cost of Ownership (TCO) Appian, IBM, and Pega" (the "BPM.com Report").  *See* Dkt. 55 at ¶ 18; Dkt. 335 at ¶18.  *See also* Ex. 6.

13.     Appian commissioned the BPM.com Report, but the BPM.com Report does not disclose that fact. *See* Ex. 11 (Excerpts of Deposition Transcript of Nathaniel Palmer, December 6, 2021) at 65:25-66:5; Ex. 6.  Appian paid BPM.com █████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████

14.     A "commissioned" report is one "that's generated as marketing collateral for the company … by whom it's commissioned," according to Palmer.  *See* Ex. 11 at 66:11-21.

15.     The BPM.com Report does not inform readers that it is Appian marketing collateral.  Rather, it describes itself as a "market report" based on "research" intended to "understand how automation software is being used to improve and automate mission-critical

4

processes, and how these results correlate to economic advantages and overall investment size."
Ex. 6 at cover, 2.  It describes its "methodology" and reports its "research findings," often as
"averages" presented in tables comparing Appian, IBM, and Pega.  *Id.* at 2, 6-10.

16.  ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████.

### A.     The Content of the BPM.Com Report

17.     The BPM.com Report describes its "Methodology" as follows:   "The research
began with an online survey consisting of approximately 50 questions related to the participant's
current practice with the software in question.  From the survey we received approximately 500
responses.  We then evaluated and validated each response.  We eliminated any non-compliant
entries, such as those from organizations deemed too small or from firms engaged in the sale,
development, or specific services involved in this type of software.  Then our team conducted
follow up interviews with selected respondents to further validate and expand upon their answers.
All responses included in this research represent **verified end user organizations** that are
currently using process automation software and have documented project results.  Through the
validation process, our survey yielded a net total of 104 verified projects."  Ex. 6 at 2 (emphasis in
original).

18.     After describing its methodology, the BPM.com Report breaks down its alleged
"research findings" into four areas:  (i) Total Cost of Ownership: (ii) Project Team Breakdown and
Total FTEs, (iii) Time to Market/Speed of Application Delivery, (iv) Enterprise Platform vs.
Departmental Silos.  The Report characterizes topics (ii)-(iv) as "factors that contribute to overall

TCO." *Id.* In each area, BPM.com's "research" allegedly showed that Appian is the superior choice—often by a significant margin. *Id.* at 6-9.

19.   The BPM.com Report describes its section on Total Cost of Ownership ("TCO") as addressing "Differences in investment required between leading platforms, including combined sums of license, implementation, personnel, and maintenance costs." *Id.* 2.  It states: "We noticed a stark contrast for TCO between vendors (see Table 1).  Organizations that run on Pega have spent the most—approximately 2.5 times more than the average, at $46 million…. Appian customers have reported the lowest total upfront costs on average, at $4 million." *Id.* at 6.

20.   Table 1 reinforces the message that organizations that run on Pega spend, on average, ten times more on TCO than organizations that run on Appian. *Id.* at 6.

| | Overall | Appian | IBM | Pega |
|---|---|---|---|---|
| License Cost & Vendor Professional Services | $3,050,526 | $1,345,000 | $7,160,000 | $13,000,000 |
| Other Personnel Costs in Implementation | $14,629,000 | $2,925,000 | $10,920,000 | $32,714,286 |
| Other Costs Relative to Rollout | $512,500 | $120,333 | $7,500,000 | (none cited) |
| Total Up Front Investment | $18,192,026 | $4,390,333 | $25,580,000 | $45,714,286 |
| Real or Expected Annual O&M Costs | $1,620,225 | $837,000 | $14,352,000 | $7,642,857 |

*Table 1: Total Cost of Ownership Calculated by Average Investment in BPM Software and Related Services*

21.   In a section labeled "Conclusions and Key Finding," the BPM.com Report claims "Pega customers reported spending on average 11 times more than Appian customers, and nearly twice that of IBM customers." *Id.* at 10.

22.   The BPM.com Report defines "Project Team Breakdown and Total FTEs," the second area of its "research findings," as "Team resources across various development roles required to deliver the projects cited by respondents." *Id.* at 2.  The Report states, "One of the leading components of TCO, as well as an area of measurable differentiation between vendors is

6

the associated team size required to deliver comparable capabilities." *Id.* at 7. It goes on: "Overall, firms running on Appian required far fewer total FTEs than competitors—less than a third of staff reported for the overall average, and just over one fifth the required FTEs cited by IBM and Pega customers." *Id.*

23.     Table 3 (*id.*) reinforces the message that the average Pega development team is five times the size of the average Appian development team:

| | Overall | Appian | IBM | Pega |
|---|---|---|---|---|
| Enterprise Architects or Solution Architects | 5 | 1 | 4 | 3 |
| Platform/Product-specific Developers | 6 | 3 | 14 | 11 |
| QA or Testing Roles (exclusive of other roles) | 7 | 2 | 13 | 11 |
| Integration Architects | 6 | 1 | 4 | 6 |
| Outside Technical Staff | 8 | 2 | 8 | 13 |
| **Totals** | **32** | **9** | **39** | **44** |

*Table 3: Average Development Team Composition Across Vendor Customers and All Respondents*

24.     The BPM.com Report underscores the connection between development team size and TCO, and claims Pega's large development teams led to higher TCO for Pega customers: "Since personnel cost was the largest factor in overall TCO (see Table 1) it is logical that customers having the highest TCO also employ greater numbers of resources and require larger project team sizes. For example, Pega customers cited both the highest TCO in the study, as well consistently requiring more FTEs than other vendors or the overall market." *Id.*

25.     The BPM.Com Report defines "Time to Market / Speed of Application Delivery," the third area of its "research findings," as "The reported timeframes involved for key development activities required to deliver the projects cited." *Id.* at 2. The BPM.com Report states this is an "important metric for measuring both overall value and ownership cost" and that "[r]espondents cited an average of about 50 weeks for core development activity." *Id.* at 8. According to the

Report, "Appian customers report on average 3 times faster application delivery compared to the overall market, and notably 3-5 times faster than what IBM or Pega customers have reported." *Id.*

26.     Table 4 (*id.*) reinforces the message that Pega takes, on average, five times longer to develop applications than Appian.

| | Average No. of Weeks | | | |
|---|---|---|---|---|
| | Overall | Appian | IBM | Pega |
| Translation of Design Models to Run-time | 13 | 5 | 8 | 30 |
| Data Modelling and Data Structure Design | 6 | 3 | 7 | 2 |
| Software/Service Integration | 15 | 4 | 15 | 19 |
| UX/UI Design and Implementation | 6 | 2 | 9 | 19 |
| All Testing (Function to Regression) | 11 | 3 | 7 | 13 |
| Total Weeks Involved With Core Development | 51 | 17 | 46 | 83 |

*Table 4: Average Number of Weeks for Implementation Across All Three leading Vendor Customers and All Respondents*

27.     The BPM.com Report defines "Enterprise Platform vs. Departmental Silos," the fourth area of its "research findings," as "The scope of projects cited by respondents, and the contrast between leading vendors relative to departmental and enterprise wide initiatives." *Id.* at 2. The BPM.com Report notes, "Respondents running on either Appian, IBM, or Pega all had multiple use cases for their platform.  Even so, through our analysis of the responses as well as through follow-up interviews, we found notable areas of contrast." *Id.* at 9.  The greatest contrast, according to the Report, was that "Appian's customers are far more widely to use the platform to develop apps that are used across the enterprise." *Id.*

28.     Table 5 (*id.*) reinforces this message:

8

| | Overall | Appian | IBM | Pega |
|---|---|---|---|---|
| Application Specific (introduce application or specific function) | 20% | 0% | 0% | 0% |
| Departmental (multiple processes, single department) | 0% | 8% | 0% | 0% |
| Enterprise Horizontal (few processes, but across the enterprise) | 0% | 33% | 0% | 0% |
| Enterprise Platform (used for a growing portfolio of processes) | 40% | 59% | 0% | 34% |
| Multi-Department, But Not Enterprise | 40% | 0% | 100% | 66% |
| **Total** | **100%** | **100%** | **100%** | **100%** |

*Table 5: Project Scope as Reported by All Respondents and Specific to Each Platform Vendor*

**B.      Creation of the BPM.com Report**

29.      Discovery in this case has revealed the process that led to the BPM.com Report's "research findings."  Defendants' internal documents speak for themselves.

*1.      THE PLANNING STAGE*

30.      Appian had a prior relationship with Mr. Palmer, who was an employee of Serco, an Appian partner and customer.  Mr. Palmer is listed as the contact person for Serco on Appian's website.  *See* Ex. 11 at 8:8-16, 75:18-19; Dkt. 55.5.

31.      ███████████████████████████████████

████████████████████████████████████████████

██   ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████





████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

██    ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

    *2.*    *APPIAN'S INFLUENCE OVER THE SURVEY*

49.    The BPM.com Report was based on the results of a survey administered by BPM.com. Ex. 6 at 2.

50.    The survey covered topics including the respondents' companies (e.g., industry segment, number of employees), the nature of the BPM projects at their companies, satisfaction with BPM vendors, amount of time and money spent on various aspects of development using BPM software, number of employees responsible for various aspects of the BPM software, and various measures of the return on investment (ROI) related to the BPM software. *See, generally,* Ex. 18.

51.    ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████ None of the other vendors referenced in the BPM.com Report were allowed to select which of their customers should be targeted.  Ex. 11 at 157:18-20.

52.    ████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

█    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

█    ████████████████████████████████████████

██████████████████

█    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████



61. ███████████████████████████████████████████████

    *3.*    *APPIAN'S INFLUENCE OVER THE SUBSTANCE OF THE WHITE PAPER*

62. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████

63.    During the drafting and revision of the BPM.com Report, Appian requested BPM.com focus the Report on the subject of TCO, ████████████████████████████ ████████████████████ Ex. 11 at 139:14-22, 140:20-25, 206:9-12 ("There were pages that I had put in the draft that ultimately they had suggested removing, which were not specific to TCO, but matters such as the net promoter score."), ███████████

64. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

**C.**    **The False and Misleading Statements in the BPM.com Report**

65.    The BPM.com Report represents that its "research findings" are based on 104 survey responses. Ex. 6 at 2, 5. ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



████████

68.     The BPM.com Report does not disclose the actual number of survey responses considered in each Table, leaving readers to assume it is 104.  *See generally* Ex. 6.

69.     The BPM.com Report represents that claims about Pega in its "research findings" are based on at least ten survey responses—10% of 104.  *See, e.g.*, Ex. 6 at 5 (Vendor Adoption graphic).  ████████████████████

████████████████████

████████████████████

██████████

██   ████████████████

████████████████████

████████████████████

██████████████

██   ████████████████

████████████████████

████████████████████

_____

████████████████
██   ████████████████████
████████████████
██   ████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

72.     The BPM.com Report's claim that the average TCO for Pega owners is about $46 million (*see* Ex. 6 at 6 (Table 1)) is based on ███████████████████████

███████████████████████████████████████████████████

73.     ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

74.     The BPM.com Report's claim that the average Pega development team consists of 44 Full-Time Equivalents (see Ex. 6 at 7 (Table 3)) ███████████████████████████

███████████████████████████████████







80.     The BPM.com Report asserts that 66.6% of Pega customers' projects are "not enterprise," but it does not disclose ███████████████████████████████ ████████

81.     In addition, the BPM.com Report contained a number of additional false statements, including:

| Representation in BPM.com Report | The Undisputed Facts |
|---|---|
| "The purpose of this research is to understand how automation software is being used to improve and automate mission-critical processes, and how these results correlate to economic advantages and overall investment size." Ex. 6 at 2. | ████████████████████████████████████████████████████████████████████████████████████████████████████ |
| "We eliminated any non-compliant entries, such as those from organizations deemed too small or from firms engaged in the sale, development, or specific services involved with this type of software." Ex. 6 at 2. | ███████████████████ Appian's include Serco, its partner and Palmer's employer. *See* Ex. 28; Ex. 11 at 8:8-16, 75:18-19; Dkt. 55.5. |

---

[23] *See* Ex. 28 at Column AD.

| | |
|---|---|
| "Then our team conducted follow up interviews with selected respondents to further validate and expand upon their answers." Ex. 6 at 2. | ███████████████████████████████ |
| "All responses included in this research represent verified end user organizations that are currently using process automation software and have documented project results." Ex. 6 at 2. | Verified responses meant "we had gone through and they passed the smell test." Ex. 11 at 156:12-15. ███████████████████████████████ |
| "We place special focus on [Appian, Pega, and IBM] in particular because of their larger market presence and high ranking in other market assessments conducted by technology analyst firms such as Gartner and Forrester.   Further, all of the respondents who use Appian and Pega are from firms with greater than 5,000 employees (or greater than 1,000 for IMB). For these reasons, we performed breakout analysis on the projects from these three vendors." Ex. 6 at 5. | ███████████████████████████████ |

### D.    Defendants' Promotion and Use of the BPM.com Report

82.    ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

███      ████████████████████████████████████████████████

██████████████████████████████████████████

84.     The BPM.com Paper was hosted on both Appian and BPM.com's website.  Dkts. 55-2, 55-3, 55-4; *see also* Ex. 31.  Although it was gated on Appian's website, meaning a user had to enter personal information in order to access it, it was ungated on BPM.com's website.  Dkts. 55-2 and 55-4.  Nowhere on either website was it disclosed that Appian had any involvement in the BPM.com Report.  ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████  There is no evidence reflecting the number or identity of individuals or entities that accessed the Report on BPM.com.

85.     ████████████████████████████████████████████████████

█████████████████████████████████████████████

86.     Appian promoted the BPM.com Report and the claims made within it through multiple marketing channels in the United States and abroad, ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████  (c) having BPM.com host the Report on its website  (Dkt. 55-4; Ex. 35 at APPN00006685), (d) posting claims from the BPM.com Report and a link to the report on two Pega-focused webpages on the Appian

website (Ex. 30; Dkts. 55-2 and 55-3), (e) ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████

87.     In several of these channels, Appian specifically called out the alleged findings

from the BPM.com Report and repeated that they were based on 500 responses.  For example, on

its website, Appian claimed that "[t]hrough approximately 500 responses, BPM.com found that on

average: [i] Appian customers build complete enterprise solutions 5 times faster[;] [ii] Appian

customers use 79% fewer resources[;] [and] [iii] Appian has more than 2x customers who've

reached ROI in 2 years."  Dkt. 55-2.

88.     The BPM.com Report was also reported on and further distributed.  ████████████

████████████████████████████████████████████████

████  This further extended the reach of the BPM.com Report.

**E.     Harm to Pega**

89.     Total Cost of Ownership is an important consideration for purchasers of BPM

products.

90.     ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

91.     ████████████████████████████████████████████

████████████████████████████████████████████████



98.     The claims in the BPM.com Report are difficult to rebut because there are no other publicly available sources that would provide similar analyses that a reader could compare these results with.  Ex. 11 at 145:4-8.

99.     ████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

### III.     THE SCALABILITY DOCUMENTS

100.     Appian has brought false advertising and commercial disparagement claims against Pegasystems based on the following documents: (1) the Scalability White Paper (Ex. 53 (challenged statements highlighted in green)) and Scalability Slide Deck (Ex. 54); (2) the Technical Competitive Brief (Ex. 55 (challenged statements highlighted in green)); (3) the Sinur Paper (Ex. 56 (challenged statements highlighted in green)), (4) the Pega 7 vs. Appian Comparison (Ex.57 (challenged statement highlighted in green)); (5) the Appian vs. Pega 7 BPM Comparison Chart (Ex. 58); and (6) the Pega vs. Appian Technology Assessment (Ex. 59) (collectively, the "Scalability Documents").

### A.     The Scalability White Paper & Slide Deck

101. ███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

█████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████

███████████████████████████████████████████

█████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████

**B.**     **The Technical Competitive Brief**

108.   The Technical Competitive Brief █████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

     ███████████████████████████████████████████████████████████

     ███████████████████████████████████████████████████████████

███████████████████████████████████

     ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

     ███████████████████████████████████████████████████████████

████████████████████████████████████

     ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████

114.   In the Virginia Litigation, Appian's expert witness testified that the Technical

Competitive Brief contains Appian trade secrets.  Ex. 98 at 2247:14-2252:22.

115.   ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

█████████████

**C.     The Sinur Paper**

116.     Pegasystems retained Jim Sinur to write a comparison of Pegasystems and Appian in February 2014, subsequently titled "Appian and Pegasystems – Head to Head Comparison" (the "Sinur Paper").  Ex. 56 (challenged statements highlighted in green).

117.     The Sinur Paper is dated "February 24, 2014" on its title page.  Ex. 56 at 1.

118.     Pegasystems paid Mr. Sinur ▮▮▮▮ to write the Sinur Paper.  Ex. 65.  The Sinur Paper does not disclose it was commissioned by Pegasystems.

119.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



120. ███████████████████████████████████████

███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████

**D.    Pega 7 vs. Appian Comparison**

123.    The Pega 7 vs. Appian Comparison ████████████████

█████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████

███████████████████████████████████████

██████████████████████████████

128. ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████

## IV.    TIMELINESS OF APPIAN'S CLAIMS

### A.    Appian's Knowledge of the Sinur Paper

129. ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████



[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

**B.      Appian's Knowledge of the Scalability Documents**

140.    On October 11, 2013, Appian employee Elizabeth Epstein sent an email to one of her colleagues, Robert Loren, with the subject line "Pega Anti-Appian presentation" asking for "more details," including "Screenshots" of what Pegasystems "showed" in a presentation

Pegasystems made to Bank of America during a sales pitch.  Ex. 75 (produced in the Virginia Litigation).

141.    Robert Loren—an account executive at Appian at the time—responded as follows: "It was a complete hit job on us.  A lot of stuff about Kx – check pointing, data sync issues, scalability.  Ambarish would know more, but whoever put it together knows our product and how to exploit potential issues.  I can ask Stephen if he can send [it to] me, but since nothing has come of it, I am hesitant to make a big deal about it."  Ex. 75.

142.    In response, Elizabeth Epstein wrote:  "OK, if you want to avoid ruffling feathers at BOA I understand…but if you think you can casually ask Stepehn [sic] for it, it would be VERY useful for future reference, because this is not the last time they are going to give such a presentation about us!  It might also help me do a little detective work on where they are getting such information."  Ex. 75.

143.    Ms. Epstein later testified that it was "important to [her] to get a copy of the Pega anti[-]Appian presentation" because "[p]er [her] role at Appian at the time as director of sales strategy and innovation, it would have been relevant to [her] responsibilities to collect such a document."  Ex. 76 (Excerpts of Deposition Transcript of Elizabeth Epstein in Virginia Litigation, entered into the record of a public proceeding) at 40:18-41:07.



148.    In the *Maxwell* litigation, Pegasystems learned of a zip file belonging to Pegasystems that Bruce Maxwell, a former Pegasystems employee who was then hired by Appian, "had accessed after joining Appian."   Ex. 78 (Excerpts of Deposition Transcript of Richard

Baldwin in Virginia Litigation) at BALDWIN00049-50.  The name of this zip file was "Leon's briefcase."  Ex. 78 at BALDWIN00049.

149.    The contents of the Leon's briefcase zip file were produced to Appian "all at once" in 2016.  Ex. 78 at BALDWIN00053.  "Many, if not all of" the documents in the Leon's briefcase zip folder "were also produced as part of a prior production" by Pegasystems to Appian in the *Maxwell* litigation.  Ex. 78 at BALDWIN00053; *see also* Ex. 78 at BALDWIN0054 ("Pegasystems made a production that included some or all of these documents but not identified as the contents of Leon's briefcase.  We later made a production of the documents identified as these are the contents of Leon's briefcase.").

150.    A list of all of the documents included in the Leon's briefcase zip folder are attached as Exhibit 79.  Ex. 79 (Exhibit to Baldwin Deposition from Virginia Litigation listing contents of Leon's Briefcase).  Among the documents listed in that list is the Technical Competitive Brief.  *Id.*

151.    Pegasystems voluntarily dismissed the *Maxwell* litigation in December 2018.  At no point between receiving the Technical Competitive Brief in 2016 and the dismissal of the lawsuit in December 2018 did Appian attempt to assert any counterclaims predicated on the Technical Competitive Brief.

**C.    Prejudice to Pegasystems**

  *1.    PREJUDICE DUE TO ECONOMIC PREJUDICE*

152.    ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████

153.    ███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

2.    *PREJUDICE DUE TO LOSS OF RECORDS*

154.    Due to Appian's delay in asserting its counterclaims, Pegasystems no longer possesses certain documents that may have been relevant to those claims.

155.    ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████

157.    Desmond Conte, the Pegasystems employee designated to testify as a Rule 30(b)(6) witness with regards to Pegasystems' document retention practices, testified that although Pegasystems never received a "final number" with regards to the number of documents

38

permanently lost during this transition, "[i]t was definitely in the thousands." Ex. 82 (Excerpts of Rule 30(b)(6) Deposition Transcript of Pegasystems (D. Conte), December 16, 2021) at 14:4-15:14. Those "thousands" of lost documents included both "messages and attachments." *Id.* at 14:17-18.

158. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

        ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

### 3.   *PREJUDICE DUE TO LOSS OF EMPLOYEES TO APPIAN*

160. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

        ████████████████████████████████████████

████████████████████████████████████████ Pegasystems laid off John Petronio in January 2015. Ex. 84 (Excerpts of Deposition Transcript of John Petronio (December 13, 2021)) at 259:23-25. ████████████████████████████████████████

████████████████████████████████████ Mr. Petronio is now Senior Director,

Market Intelligence and Strategy at Appian.

162.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███ Michael Caton subsequently left the company and, since January 2018, has worked as

independent "content and market research consultant," including for Appian, which Mr. Caton

characterized as his largest client in terms of both amount of work and revenue received.  *Id*. at

161: 3-23.

### 4.   *PREJUDICE DUE TO THE FADING OF MEMORIES*

163.   Finally, multiple witnesses testified in this litigation that they could not remember

details relevant to Appian's claims and Pegasystems' defenses, due to the passage of time.

164.   For instance, Malcolm Ross, while testifying in his individual capacity, repeatedly

testified that he could not remember certain details regarding the Sinur Paper, Appian's response,

and other related events because they occurred years ago.  *E.g.*, Ex. 85 (Excerpts of Deposition

Transcript of Malcolm Ross (April 30, 2021) at 60:3-6 ("Q:  Let's say around 2012; how frequently

do you recall Appian briefing Mr. Sinur?  A: I have no idea.  It's almost a decade ago."); *id*. at

82:14-19 (████████████████████████████████████████████

████████████████████████████████████████████████

*id*. at 182:25 – 183:8 ("Q: How much had the Appian software changed between February 2012,

which you said was the last interaction with Mr. Sinur, and this period in the summer of 2013?

[Objection] A: Yeah, I mean, this was, you know, seven-plus years ago.  We had regular releases.

I don't know exactly, offhand, how the product changed in that time frame, specifically."); *id*. at

183:25 – 184:10 ("Q: Do you recall a blog post by HCL around the time of the Sinur paper?  A: No.  I don't recall, no.  Q: Its title may have been 'Appian versus Pega, the Fast Food Analogy.' Does that refresh your recollection at all?  A:  Vaguely.  You know, this is, again, six – over six years ago.  So I don't recall it specifically.").

166.   Mr. Ross likewise testified that he could not remember relevant details during his deposition as a Rule 30(b)(6) witness on behalf of Appian.  *See, e.g.*, Ex. 13 at 30:8-19



*id.* at 326:18-22 ("A: Well, this is a request on product capabilities that was approaching 10 years old.  So, no, I don't know this granular level of product configuration off the top of my head on decade-old product capabilities.").

166.   Jim Sinur, the author of the Sinur Paper that is at the heart of Appian's counterclaims, also testified that he could not remember certain details due to the passage of time. *See, e.g.*, Ex. 83 at 88:7-11 ("Q: … Do you recall interacting with anyone else at Pegasystems regarding this … A: No, I don't recall.  That was a long time ago."); *id.* at 93:17-25 ("Q: Is this one of the blog posts that Pegasystems paid you to publish?  A: I believe so.  Q: Why do you think that?  A: Because I – that's what I remember.  I think I'm remembering that this is one of them. Q:  Okay.  A:  This is – this is seven years old, so – going on eight."); *id.* at 111:15-17 ("Q: You forgot about this one?  A: Yeah, I – I forgot about it, yes.  It's seven years ago, man."); *id.* at 115:8-15 ("Q: I'm going to give you one moment to just think if there is any other payments that Pegasystems made to you during this time.  A: I – you can't force a memory out of somebody that

doesn't have it.  Q:  Yes, I'm not trying to force you, just trying to give you a minute to think back.

A:  I'm not remembering.  Seven years ago.").

     167.    Christopher Thorpe, a former employee at Bank of America ███████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████ also testified that he could not remember

certain details due to the passage of time.  *See id*. at 13:14-19 ("Q: You don't recognize [at-issue

project] Deceased Consumer Notification?  A:  It is not familiar to me because this was a long

time ago, so I do not remember all the Pega projects that were at Bank of America at the time.");

*id*. at 34:12-19 ("Q: But do you recall any of the software engineers or people that built this product

that you met with from Pegasystems?  [Objection] A: It's a long time ago…"); *id*. at 152:24-153:4

## V.   TRUTH OF THE CHALLENGED STATEMENTS

169.   In the Virginia Litigation, an expert witness for Appian has identified certain facts that Appian alleges are its trade secrets.  Some overlap with the Challenged Statements in this case. *See* discussion in following sections of trade secrets presented at trial; *see also* Ex. 144 (Appian's Response to Interrogatory No. 1 from Youyoung Zou in Virginia Litigation), identifying the following as some of the allegedly misappropriated trade secrets:

- "Scalability: how the platform performs with an increased number of users or processes; the ability of Appian or Appian apps to be deployed across servers and interact with existing servers in a customer's topology;" (*see* Sections A and I below);

- "Details and limitations on integrations with third-party software and databases;" (*see* Sections G and K below);

- "Details and limitations on Appian's use of web services and workarounds for the same;" (*see* Section K below);

- "The number of developers who could simultaneously work on developing processes for use in Appian apps;" (*see* Section L below); and

- "limitations on the number of rows that could be loaded or based on memory consumed by the database;" (*see* Section J below).

## A.    Scalability Generally

170.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████



174.    Scalability is not a binary concept—i.e., can scale or cannot scale.  Rather, some software can scale better and further than others.



176.    There is no universally applicable definition for the terms "little," "almost no," "large scale," "transformational," "deep business change," and "significant mass"—alone or as used in conjunction—such that readers would all be in agreement as to their meaning and what evidence, implementations, or level of professional support would qualify.

177.    There is no evidence in the record to show that a customer would take any specific factual meaning from these Challenged Statements.

178.    Appian omits the conclusion of the final challenged sentence: "…with only 600 consultants." *See* Ex. 56 at 3.  Appian has not challenged that number as false or misleading.



183.    The only customer to testify in this case determined that Appian would have difficulty scaling to meet his company's needs based on direct discussions with Appian's engineers—not because of anything he heard from Pegasystems or Mr. Sinur.  Ex. 86 at 249:9-251:8.



184.    Appian challenges the following statement from the Sinur Paper:



█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████

186.    "Many" means a large, but indefinite, number.  Ex. 93.

187.    "Many" is a fair characterization of 50%.

188.    At the time, one of the things that distinguished Appian from its competitors was that it was "one of the early movers to a cloud architecture," which it promoted to its customers. Ex. 85 at 134:4-13; *see also* Ex. 56 at 1 (calling Appian "the king" of cloud).

189.    There is no evidence in the record to show that a customer would take any meaning from the word "many" that 50% would not satisfy.

██   ████████

190.    Appian challenges the following statement from the Sinur Paper:

█   ██████████████████████████████████████████

████████████

███████████████████████████████████████████████

████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████

194.    In early 2014, Appian listed a selection of customers on its website, grouped by "Industry."  That list featured 24 customers Appian classified as "Government."  The industry with the next highest total was Financial at 15.   Ex. 95; Ex. 85 at 143:18-144:7.

195.    The only customer to testify in this case stated that he knew this Challenged Statement "to be accurate.  I got the sense from talking to them [Appian] directly that the bulk of the way they've been making money at the time, and they had some great relationships with some government contracts, so I actually know that to be true."  Ex. 86 at 207:13-18.  He also testified that he understood "primarily" to refer to "the majority" (*id*. at 207:25-208:8) <u>or</u> "a plurality" (*id*. at 246:5-15).

196.    There is no evidence in the record to show that a customer would understand the word "primarily" to indicate something more than a plurality and a third of its revenue.



197.    Appian challenges the following statements from the Sinur Paper:

    a.

200.    ████████████████████ an Appian VP who was later its corporate designee testified that "I wouldn't know what it meant" without "the context of the rest of the paper of what the author intended that word to mean."  Ex. 85 at 147:3-13

201. █████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

204.    There is no evidence in the record to show that a customer would take any specific factual meaning from these Challenged Statements.

**E.**    ████████████████████████

205.    Appian challenges the following statements in the Scalability Documents:

a.    ████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████

█    ████████████████████████████████████████

████████████████████████████████████████

██████

████████████████████████████████████████████████

██████████████████████

████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████

210.    There is no evidence in the record regarding the parties' respective total costs of ownership during the relevant time.

**F.**    ███████████████████████

211.    Appian challenges the following statement from the Scalability White Paper:

a.    ███████████████████████████████████

██████████████████████████

██████████████████████████████████████████

█████████████████████████████████

213.    Lacks can mean "has none" or "has insufficient."  Ex. 97.

214.    █████████████████████████████████████

████████████████████

215.    There is no evidence in the record to show that a customer would take from this Challenged Statement the specific factual meaning that Appian did not have <u>any</u> such tools.

**G.**    ██████████████████████

216.    Appian challenges the following statement from the Scalability White Paper:

a.    ███████████████████████████████████████

████████████████████

217.    ███████████████████████████████████████████████████████

███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

219.    Appian's expert witness in the Virginia Litigation identified as a trade secret that "Appian's software did not support star schema," which was "a common protocol in the industry in terms of how you report and send information."  Ex. 98 2224:8-22; *see also* Ex. 13 at 438:1-18 (star schema is a way of organizing data that is used by third-party reporting (or "business intelligence") tools).

220.    "Support" is an ambiguous term.

221.    There is no evidence in the record to show that a customer would take from this Challenged Statement the specific factual meaning that ███████████████████████████ ████████████████████████████████████

**H.**    ████████████████

222.    Appian challenges the following statement from the Scalability White Paper:

a.    ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

223.    JavaScript is a "coding" or "programming" language.

224.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████

230.    A developer who used Appian software stated in 2014 that "20 to 30% of the total effort, is for Java and javascript" and noted contexts where, in his experience, that was the case. Ex. 103 at ZOU-002100.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█   ████████████████

233.     Appian challenges the following statements from the Scalability Documents:

a.     ████████████████████████████████████████

████████████████████████████

█   ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

234.     The Sinur Paper statement (Ex. 56) uses the ambiguous term "scale" and does not identify what, in relation to multiple servers, Mr. Sinur deemed "necessary for" scale.

235.     ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████

236.    There is no evidence in the record to show that a customer would take from these

Challenged Statements the specific factual meaning that A███████████████████████████

████████████████

**J.**    ████████████████

237.    Appian challenges the following statements from the Pega Documents:

a.    ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████    ████████████

████████████████████████

██    ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████

238.    Appian has presented no evidence to prove that ████████████████████████

██████████████████████████████

239.    ███████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

240. A developer experienced in Appian software, when asked to evaluate the claim "Large reports kill performance [] Reports that return large result sets (greater than 1000 rows) significantly degrade performance." responded simply "Yes."  Ex. 106 at ZOU-000439.

241. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████

**K.** ███████████

242. Appian challenges the following statements from the Pega Documents:

a. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

▌ ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

243. "Limited" in the Technical Competitive Brief is a subjective term.

244.   "Including" in the Technical Completive Brief indicates that what is set forth is not an exhaustive list.

245.   Appian's expert witness in the Virginia Litigation identified as a trade secret—i.e., something that is true—a limitation on Appian's integration capabilities, namely with respect to its web services functionalities.  Ex. 98 at 2233:10-2238:17.

246.   Appian's expert witness specifically identified the paragraph featuring the Challenged Statement in the Technical Competitive Brief as expressing this trade secret.  *Id*. at 2247:7-21; 2252:10-22.

**L.**   ████████████████████████

247.   Appian challenges the following statements from the Pega Documents:

a.   ████████████████████████████████████████

████████████████████████████████     ████████

████████████████████████

█ ████████████████████████████████████████

████████████████████████████████████

█ ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████

█ ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

248. ███████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

250.     Appian's expert witness in the Virginia Litigation identified the following as an Appian trade secret—i.e., something that is true:  "If you have a process that has multiple objects in the development environment and a developer is working in one of those objects, the entire process, all of those objects are locked, and no one else would be able to access any of those other objects."  Ex. 98 at 2221:8-2222:3.

251.     Appian's expert witness in the Virginia Litigation explained that the foregoing was a "limitation of Appian's software," that "concealing" the limitation from Appian's customer "had economic value" to Appian, and that Pega, knowing the limitation, "could overly emphasize it and utilize that as a strategic way to… win customers away from Appian."  *Id.* at 2407:10-2409:4.

252.     Appian's expert witness specifically identified the Challenged Statement from the Technical Competitive Brief as expressing this trade secret.  *Id.* at 2247:7-21; 2251:2-2252:5.

## VI.     CUSTOMERS APPIAN CLAIMS TO HAVE LOST







271.   Appian's damages expert in the Virginia Litigation used this same Rabobank opportunity as an example of the damages theory in that case.  Ex. 98 (Virginia Litigation Trial Transcript, Malackowski Testimony) at 3485:5-3487:5.

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████

279.    Former Bank of America employee Chris Thorpe, who ███████████████

█████████████████████████████████████ testified that his decision-making

process "was around economics and the pricing and the large, installed base," and that "these

marketing reports that are published all the time by various manufacturers have very little bearing

on how people make decisions, or at least how I make decisions at Bank of America." *Id*. at 27:18-

28:10.   Indeed, Mr. Thorpe testified that would treat with a "high degree of suspicion" an

evaluation document where one vendor is claiming to be superior to the other.  *Id*. at 202:20-203:9.

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████

281.    Asked whether he was aware of technical limitations on Appian's ability to scale,

Mr. Thorpe responded, "Only the one that I found out myself through direct questions of their

engineers."  *Id*. at 163:24-164:4.

███████████████████████████████████

███████████████████████████████████















███████████████████████████████████████████

███████████████████████████████████

## VII.   APPIAN'S DEFAMATION CLAIM BASED ON THE LINKEDIN POST

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████.

329.   The LinkedIn Post in question appeared as follows:



330.   As the above reflects, Mr. Libretto's LinkedIn Post stated:  "We all encounter examples of business ethics we find questionable … patent trolls, paid content promoted as 'unbiased truth,' and sometimes just blatant lies.  I'm proud to work for a company that is not afraid to undertake the unpleasant action of litigating against those whose actions we believe are unlawful and unethical.  If you're thinking about Appian, you should read this first:"

331.   Mr. Libretto's LinkedIn Post then linked to an article published by Adam Gaffan on the website universal.com entitled "Cambridge tech company can continue lawsuit over negative research report that didn't mention a competitor paid for it, judge rules."  The full

70

article is available at the following URL:  https://www.universalhub.com/2019/cambridge-tech-company-can-continue-lawsuit-over. *See* Ex. 136

332.    There is no evidence showing that Mr. Libretto acted with actual malice when making the LinkedIn Post.

333.    There is no evidence showing that any other Pegasystems employee acted with actual malice in sharing Mr. Libretto's LinkedIn Post.

Dated:  April 15, 2022                                  Respectfully submitted,

                                                                    PEGASYSTEMS INC.

                                                                    By its attorneys,

                                                                    */s/ Neil Austin*
                                                                    August T. Horvath (*pro hac vice*)
                                                                    James M. Gross (*pro hac vice*)
                                                                    Mital B. Patel (*pro hac vice*)
                                                                    Foley Hoag LLP
                                                                    1301 Avenue of the Americas, 25th floor
                                                                    New York, New York 10019
                                                                    Telephone:  646-927-5544
                                                                    Facsimile:  646-927-5599
                                                                    ahorvath@foleyhoag.com
                                                                    jgross@foleyhoag.com
                                                                    mpatel@foleyhoag.com

                                                                    K. Neil Austin (BBO # 657204)
                                                                    Nicole Kinsley (BBO # 682528)
                                                                    Foley Hoag LLP
                                                                    155 Seaport Boulevard
                                                                    Boston, Massachusetts 02210-2600
                                                                    Telephone:  617-832-1000
                                                                    Facsimile:  617-832-7000
                                                                    naustin@foleyhoag.com
                                                                    nkinsley@foleyhoag.com

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent to any non-registered parties.

*/s/  Neil Austin*