# EXHIBIT 98

Page 2190

1          IN THE CIRCUIT COURT OF FAIRFAX COUNTY

2                       - - - - -

3

APPIAN CORPORATION,            )

4                              )

      Plaintiff,               )   Civil Action No.

5                              )   2020-07216

      vs.                      )

6                              )

PEGASYSTEMS INC., & YOUYONG    )

7    ZOU,                      )

                               )

8          Defendants.         )

9

10                     TRIAL - DAY 8

11        BEFORE THE HONORABLE RICHARD GARDINER

12            Monday, April 4, 2022, 10:05 a.m.

13

14              FAIRFAX COUNTY CIRCUIT COURT

15                 4110 Chain Bridge Road

16                    Fairfax, Virginia

17

18

19

20    Reported By: Marjorie Peters, FAPR, RMR, CRR, RSA

21    Job Number: 5098813

22

Page 2219

1 is clear, I want to be clear that we do object. We
2 appreciate everyone's effort in setting up the
3 video, nonetheless, we think the jurors all need to
4 be present to evaluate the demeanor of the
5 witnesses, to see the exhibits, to hear the
6 testimony.
7         Under this circumstance, we will not
8 know whether this juror in fact does watch the
9 testimony and see the exhibits, and we have never
10 seen this in another trial. We think it's -- raises
11 serious concerns, so we do object.
12         THE COURT: All right. Your
13 objection is noted for the record.
14         MR. TRAVELL: Your Honor, Mr. Zou
15 joins in that objection.
16         THE COURT: All right.
17         Just for record, the juror of which
18 we're speaking is the second alternate, so there's a
19 decent chance, anyway, that he will not be on the
20 final jury anyway, but we'll see how that goes.
21         All right. Are you prepared to
22 question the witness?

Page 2220

1         MR. GINSBERG: I am, Your Honor.
2         THE COURT: Okay. All right. Let's
3 bring the jury in then.
4 (The jury entered the courtroom.)
5         THE COURT: All right. All members
6 except Juror Number 43 are present.
7         Mr. Ginsberg, are you prepared to
8 continue your examination.
9         MR. GINSBERG: I am, Your Honor.
10         THE COURT: Sir, if you would have a
11 seat. I remind you, sir, that are you still under
12 oath.
13         THE WITNESS: Thank you.
14         CONTINUED DIRECT EXAMINATION
15 BY MR. GINSBERG:
16     Q.   It's still morning. Good morning,
17 Dr. Cole.
18     A.   Good morning.
19     Q.   I believe we left off last week with
20 your testimony about a video clip showing Mr. Zou
21 providing Pegasystems with access to Appian's
22 software in a development environment.

Page 2221

1         Do you recall that?
2     A.   Yes, I do.
3     Q.   You testified that Pegasystems
4 acknowledged that they were learning things about
5 Appian software that they did not previously know.
6         Do you recall that?
7     A.   Yes, I do.
8     Q.   Now, Dr. Cole, based on your review of
9 the evidence in this case, can you identify some of
10 the specific trade secrets that Mr. Zou disclosed to
11 Pegasystems?
12     A.   Yes, I can.
13     Q.   Can you please do that for the jury.
14     A.   Yes.
15         So one of them is concurrent
16 development. So in Appian's software, when one
17 developer is utilizing a process, it's locked, and
18 no other developers can go in and access that
19 process.
20         So a little more specifically, if
21 you have a process that has multiple objects in the
22 development environment and a developer is working

Page 2222

1 in one of those objects, the entire process, all of
2 those objects are locked, and no one else would be
3 able to access any of those other objects.
4         A second one is on the web services.
5 It only returns back a process ID. So it's limited
6 in the information it provides back, just that
7 process ID, and in order to be able to go in and get
8 other information or other details, it's a fairly
9 complex workaround that has to be done within
10 Appian's system.
11         Then the third one is checkpointing.
12 Checkpointing is a process where you're writing
13 information to memory, and if you've ever had on
14 your computer, that's volatile. So if your computer
15 goes down, you lose the information. So checkpoint
16 is the process of taking information in volatile
17 memory and writing it to a hard drive.
18         Well, when that happens, there's
19 performance impacts on the system, and the specific
20 trade secret was the exact checkpointing settings
21 and parameters that were within Appian's software.
22     Q.   Have you heard of reporting tools and

9 (Pages 2219 - 2222)

1 chart types?

2    A.    Yes, I have.

3    Q.    Are you aware as to whether or not

4 Mr. Zou shared any confidential information about

5 Appian's reporting tools and chart types with

6 Pegasystems?

7    A.    Yes, he did.  The core of all of the

8 trade secrets is really going in to the development

9 environment, the Appian Forum that contains Appian's

10 trade secrets, and really showing in detail how it

11 works and how it operates.

12         So with the reporting, at the time,

13 Appian's software had limited reports that it could

14 display.  So if Pegasystems was aware of that and

15 knew that it had limited reporting, that's something

16 that they could use against Appian in their sales

17 efforts.

18    Q.    How about unified management tools.  Is

19 that something that Mr. Zou was sharing with

20 Pegasystems?

21    A.    Yes, it was.

22         So unified management tools is the

1 ability to be able to manage the performance of all

2 of the processes that are running on the system.

3 Once again, Appian's software did not have that

4 capability built into the software, but you would

5 only be able to know or determine that by going in

6 to the development environment, accessing the trade

7 secrets and seeing that information.

8    Q.    Have you ever heard of the term "star

9 schema"?

10         MR. BOOKBINDER:  Objection, Your

11 Honor.  Leading.

12         THE COURT:  Overruled.

13         THE WITNESS:  Yes.  Star schema is a

14 common protocol in the industry in terms of how you

15 report and send information.  And Appian's software

16 did not support star schema.

17         Once again, that would only be

18 information if you went into the development

19 environment and see that, and it was a trade secret

20 because it's not something that was publicly known,

21 and if Pega knew that information, they could use

22 that to compete against Appian.

1 BY MR. GINSBERG:

2    Q.    How about, have you ever heard the term

3 "topology"?

4    A.    Yes, I have.

5    Q.    Are you aware as to whether or not

6 Mr. Zou was sharing confidential information about

7 Appian's topology with Pegasystems.

8    A.    Yes, the topology is the setup or

9 configuration of the system.  It's how all of the

10 different pieces work together.  It's basically

11 essentially the brains of the interaction.

12         Once again, this information was

13 only available within the development environment,

14 and Mr. Zou went in and went through the development

15 environment, and showed exactly how the topology was

16 set up and how it worked and operated.

17         From a competitor's standpoint, if

18 you know your competitor's product, how it works in

19 detail, the trade secrets of how it operates and

20 interacts, you can then more effectively compete

21 against them in the market.

22    Q.    I believe we have heard some testimony

1 in this case about Appian's documentation.

2         What is your understanding of

3 Appian's documentation?

4    A.    Appian's documentation at the time with

5 Zou of 2012 to '14 was only available within the

6 Appian Forum, which was only accessible if you had

7 the user ID and password that we talked about on

8 Thursday, in which there were terms of service,

9 limited use.

10         This was not public information

11 that's readily available.  So by accessing the

12 development environment, and giving Pega access to

13 all of their documentation, that was also sensitive

14 trade secrets that gave details of how the products

15 worked, how they operated, and information that was

16 not publicly available.

17    Q.    Now, from time to time, Appian makes

18 improvements to its software; is that your

19 understanding?

20    A.    That is correct.

21    Q.    Appian's software has a variety of

22 features; is that correct?

10 (Pages 2223 - 2226)

Page 2231

1 let's say there's a shape in the process for the
2 user interface, no one can change the user interface
3 even if you're working on the write to data store
4 piece because they're all linked from the process;
5 is that right?
6         SPEAKER1:  Yeah.
7         SPEAKER2:  Okay.
8         SPEAKER1:  In Appian, you cannot do
9 that.
10         SPEAKER2:  I mean, unless the write
11 to data store references a rule that's external,
12 then you can use that, but otherwise, you really
13 can't get at it.
14         SPEAKER1:  (Inaudible) yeah.
15         SPEAKER2:  So only one person can
16 work at it at one time?
17         SPEAKER1:  Yes.  Okay.
18         SPEAKER2:  Okay.  So that's a big
19 shortcoming.
20         SPEAKER1:  Yeah, I mean, that's
21 actually -- (inaudible) like, for example, we have
22 like five people working on the same project, and

Page 2232

1 sometimes we -- like two or three people have to
2 working on same process sometimes, so we do
3 (inaudible) to, like, okay, can I -- (inaudible).
4 Okay, this process model.  I mean, you have to have
5 communication going on.
6         SPEAKER2:  Wow.
7         SPEAKER1:  Yeah.  So this process
8 doesn't really help.
9         SPEAKER2:  Okay.  That's
10 interesting.
11         (Video stopped.)
12 BY MR. GINSBERG:
13    Q.    Dr. Cole, based on your review of these
14 two clips, can you describe your understanding as to
15 what Mr. Zou was conveying to Pegasystems here.
16    A.    Yes.
17         He was not just merely saying that
18 you could only have one user in a process.  He was
19 actually showing the development environment whereas
20 you can see there were multiple object flows or
21 tasks, and that represented a single process, and if
22 you were working in one process, you couldn't

Page 2233

1 actually go in and utilize any of the other
2 processes.
3         And then after this conversation or
4 video, I saw communication within Pegasystems where
5 they said, oh, this is why Appian only sends one
6 sales engineer to do a demo.  We need to push
7 customers to always have multiple sales engineers or
8 multiple concurrent processes.
9    Q.    Thank you, Dr. Cole.
10         I believe you also identified web
11 services as one of the trade secrets misappropriated
12 by the defendants in this case, and you gave your
13 definition of web services.
14         Could you just remind the jury, what
15 again is web service data return in Appian's
16 platform?
17    A.    So when you run a web service, there's a
18 lot of information on what's happening within that
19 process, but Appian's software only returns the
20 process ID.  So it only returns that one piece of
21 information.
22         But then the other component of the

Page 2234

1 trade secret is in order to get additional
2 information, there's a complex process that you have
3 to go through in order to get additional details.
4    Q.    What do you mean by process ID?
5    A.    The process ID, or what we call in
6 computer science a PID, is just a unique number.  So
7 every time you're running a process on your
8 computer -- I'm not sure in your home computer if
9 you've ever gone in and control-alt and look at the
10 running processes and you see random numbers.  Those
11 are the PID or the process ID.
12         A number by itself doesn't really
13 give you a lot if you can't understand other issues
14 performance.  So you want to then have to go in and
15 get additional information, but in Appian's
16 software, one of the trade secrets is that requires
17 a complex process to pull that data.
18    Q.    Based on your review of the evidence in
19 this case, do you know how Pegasystems learned the
20 specifics about how web services data return works
21 in Appian's platform?
22    A.    They got that directly from Zou in which

12 (Pages 2231 - 2234)

Page 2235

1 he showed demos of the Appian Forum, and actually
2 showed them exactly the process ID, that limitation,
3 and then he actually went through and showed them
4 the workaround that was required in order to get
5 additional information.
6    Q.    Thank you.
7          Can we call up Plaintiff's Exhibit
8 1401.
9 (Plaintiff's Exhibit 1401 was marked for
10 identification.)
11         MR. TRAVELL:  Tab 37.
12 BY MR. GINSBERG:
13    Q.    As Mr. Travell just noted, it does
14 appear at Tab 37 of your binder.
15         Do you recognize this document,
16 Dr. Cole?
17    A.    Yes, I do.
18    Q.    What is this document?
19    A.    In addition to doing the live demos of
20 the development platform --
21    Q.    One second, Dr. Cole.
22         Can you just generally tell us what

Page 2236

1 this document is.
2    A.    Oh, sorry.
3          There is an e-mail from Mr. Zou to
4 Pegasystems.
5          MR. GINSBERG:  Your Honor, we move
6 for the admission of Plaintiff's Exhibit 1401.
7          MR. BOOKBINDER:  No objection.
8          MR. TRAVELL:  No objection, Your
9 Honor.
10         THE COURT:  1401 is admitted.
11 (Plaintiff's Exhibit Number 1401 was admitted into
12 evidence.)
13         MR. GINSBERG:  May we publish to the
14 jury?
15         THE COURT:  You may.
16         MR. GINSBERG:  Thank you.
17 BY MR. GINSBERG:
18    Q.    Now, do you see in the first e-mail, we
19 can go from John Petronio to Mr. Zou.  That's from
20 March 5, 2013.  There is a paragraph in quotes with
21 reference to Appian's integration.
22         Do you see that?

Page 2237

1    A.    Yes, I do.
2    Q.    What does this pertain to?
3    A.    This is pertaining to the web services
4 issue, where it's saying there, "Appian's
5 integration is very limited.  It only supports a
6 small number of connectors and services."
7          Then it goes on to say, sorry,
8 "Significantly, it has no ability to return data
9 when called via a web service.  Without the ability
10 to return information, customers will find it
11 difficulty (as read) to integrate Appian in the
12 situations where input is coming from other
13 systems."
14    Q.    Do you see that there's certain
15 questions that Mr. Petronio poses to Mr. Zou right
16 under that quoted paragraph?
17    A.    Yes, I do.
18    Q.    If we can go to the most recent e-mail
19 in this string, does Mr. Zou respond to
20 Mr. Petronio?
21    A.    Yes, he does.
22    Q.    Beginning at the sentence that states,

Page 2238

1 "The way Appian web services worked..."
2          Do you see that?
3    A.    Yes, I do.
4    Q.    What information is Mr. Zou providing
5 about Appian web services and how it works?
6    A.    He's explaining basically how it works
7 in terms of the limitation, but then he's also
8 explaining what the workaround is that you need to
9 do if you want to get additional information besides
10 just the process ID.
11    Q.    How did Mr. Zou obtain this information?
12    A.    From working directly within the
13 development environment, Appian Forum, which
14 represents Appian's trade secrets, and these e-mails
15 are a follow-up to actually working in that
16 environment and pulling out very specific details of
17 Appian's trade secrets.
18    Q.    Thank you.
19         Another misappropriated trade secret
20 that you identified is checkpointing; is that
21 correct?
22    A.    That was also correct.

13 (Pages 2235 - 2238)

Page 2247

1    A.    This is talking about the ability to
2  export data into other protocols or other systems,
3  and this is referring to the star schema, which is
4  also one of the other trade secrets that Pegasystems
5  learned from Zou.
6    Q.    Okay.
7          Could we call up another exhibit
8  that's already been admitted into evidence.  It's
9  Plaintiff's Exhibit 210.
10  (Previously marked Plaintiff's Exhibit 210 was
11  presented.)
12          MR. TRAVELL:  Tab 6.
13  BY MR. GINSBERG:
14    Q.    Do you recognize this document,
15  Dr. Cole?
16    A.    Yes, I do.
17    Q.    What is the title of this document?
18    A.    "Understanding Appian."
19    Q.    Have you also heard this referred to as
20  a technical competitive brief?
21    A.    Yes, I have.
22    Q.    Does this document contain some of

Page 2248

1  Appian's trade secrets at issue?
2    A.    Yes, it does.
3    Q.    Do you know whether Pegasystems used
4  this document in competition with Appian?
5    A.    Yes, they did.
6    Q.    How did they use it?
7    A.    They used this in a couple of ways.
8          So one is they used it to train up
9  their internal sales team so they would understand
10  some of the limitations with Appian's software so
11  they could differentiate and/or compete to win
12  business.
13          It's my understanding that they also
14  gave this "Understanding Appian" to some customers
15  to basically point out some of the issues within
16  Appian, so Pegasystems could differentiate, compete
17  and ultimately win business.
18    Q.    Let's take a little bit of a closer look
19  at some of the information that Pegasystems included
20  in this document that was derived from information
21  they obtained from Dr. Cole (sic).
22          If we go to the first bullet -- I'm

Page 2249

1  sorry.  That they obtain from Mr. Zou.  Sorry.
2          If we go to the first bullet on
3  column 1, do you see there's a reference to "All
4  in-flight processes and application logic lives in a
5  risky in-memory database with undesirable
6  performance tradeoffs"?
7    A.    Yes, I do.
8    Q.    Is this information about Appian
9  software platform that Mr. Zou provided to
10  Pegasystems?
11    A.    Yes, it is.  This is referring directly
12  to the checkpointing.  So whenever you are talking
13  about volatile memory and information at risk, and
14  then writing it to the hard drive has performance
15  tradeoffs, that's directly tying to the checkpoint
16  trade secrets.
17    Q.    Okay.
18          If we can go to, again, on the first
19  page of this document, the second column, the second
20  bullet, that begins "Administrators" -- or has a
21  heading "Administrators have no unified management
22  tools."

Page 2250

1          Do you see that?
2    A.    Yes, I do.
3    Q.    What is being discussed here?
4    A.    This is one of the other trade secrets
5  that I mentioned a little earlier, was Appian
6  doesn't have unified management tools, which means
7  it doesn't have ways to manage the performance of
8  all the running processes on the system.
9    Q.    Staying with Plaintiff's Exhibit 210,
10  could we call up the second page of this document, and
11  can we call up the second bullet in the first column
12  on this page that has the heading "Can't report with
13  external process data."
14          Based on your review of the
15  documents in this case, Dr. Cole, is it your
16  understanding that this was derived from information
17  that Mr. Zou provided to Pegasystems?
18    A.    Yes, it is.  When we are talking about
19  "can't report with external process data," this was
20  referring to the star protocol earlier that Appian
21  doesn't support, and this information came directly
22  from Zou to Pegasystems.

16 (Pages 2247 - 2250)

Page 2251

1    Q.    Okay.
2          If we can just go down a little bit
3  further in this document.  Do you see there's a
4  bullet "Appian lacks concurrent developer support,
5  greatly slowing down time to market"?
6    A.    Yes, I do.
7    Q.    Is this information that was derived
8  from information Mr. Zou provided to Pegasystems?
9          MR. BOOKBINDER:  Objection.
10 Leading.
11         THE COURT:  Sustained.
12 BY MR. GINSBERG:
13   Q.    Do you recognize any other trade secrets
14 that Mr. Zou provided to Pegasystems in this
15 document?
16         MR. BOOKBINDER:  Objection.
17 Leading.
18         THE COURT:  Overruled.
19 BY MR. GINSBERG:
20   Q.    You can answer, sir.
21   A.    Yes.  Concurrent development, that was
22 one of the first trade secrets I mentioned, which is

Page 2252

1  within Appian's environment, you can only have one
2  developer working within a process at a given time,
3  and when they do, it locks the process and no one
4  else -- no other developers can access any of the
5  other objects within the process.
6    Q.    Could we go to the -- sorry.
7          Could we just call up the entire
8  page of that document, please, for one second.
9  Thank you.
10         Turning to the second column on this
11 page, do you see that there's reference to "Appian's
12 integration is limited and requires time-consuming
13 workarounds"?
14   A.    Yes, I do.
15   Q.    What is this in reference to?
16   A.    This is in reference to the web services
17 trade secret where the web services will only return
18 a process ID, or what I called the PID earlier, and
19 in order to get additional information or additional
20 details, you have to do a complex workaround, which
21 Zou actually provided that workaround to
22 Pegasystems.

Page 2253

1    Q.    Now, are you aware of evidence showing
2  that Pegasystems actually used the Appian
3  information that it obtained from Mr. Zou to train
4  its salespeople?
5    A.    Yes, I am.
6    Q.    Let's call up another clip, if we could.
7  Could we call up clip number 4.  And this is from
8  Plaintiff's Exhibit 875, which has already been
9  admitted into evidence.
10 (Previously marked Plaintiff's Exhibit 875 was
11 presented.)
12         (Video played.)
13         SPEAKER2:  Another important aspect
14 of this architecture that you need to be aware about
15 is the concept of a checkpoint.  A backup mechanism
16 is built into this solution, which essentially dumps
17 the contents of the in-memory database out to a hard
18 disk.  This is called the checkpoint.  And while it
19 is being done, the performance of the system is
20 dramatically slowed; therefore, checkpoints are
21 typically done at intervals such as 30 minutes or an
22 hour, because doing so more frequently would result

Page 2254

1  in unacceptable performance.
2          (Video stopped.)
3    Q.    What is being discussed here and how is
4  Mr. Petronio, I believe, who is talking, using this
5  information?
6    A.    So Mr. Petronio had multiple demos and
7  meetings with Zou, and he took that information from
8  Zou and he created these series of videos that were
9  used directly to train the salespeople at
10 Pegasystems.
11   Q.    Could we call up slide 32 of Dr. Cole's
12 presentation.
13         Now, does Pegasystems deny that they
14 learned new information about Appian's platform from
15 Zou?
16         MR. BOOKBINDER:  Objection.
17         THE COURT:  What's the basis of the
18 objection?
19         MR. BOOKBINDER:  It's hearsay.
20         THE COURT:  Mr. Ginsberg.
21         MR. GINSBERG:  We have testimony
22 that's cited on the slide.  They did not object to

17 (Pages 2251 - 2254)

Page 2407

1 often considered trade secrets that you don't want
2 to generally be publicly known.
3    Q.   Right.
4         So if the prospective customers
5 didn't know about this, they would be -- might be
6 less likely to buy the Appian software; right?
7    A.   Depending on how it's positioned by a
8 competitor.
9    Q.   Okay.
10        Second area you testified about was
11 something I think you described as the lack of
12 concurrent developer support; is that right?
13    A.   That was one of the other items, yes.
14    Q.   All right.
15        So -- and the idea there is
16 essentially that only one person in a -- one person
17 at a time could work in a particular Appian
18 application; is that right?
19    A.   It's actually a process.  So an Appian
20 process that could have multiple objects, only one
21 user could access it because it would be locked.
22    Q.   Okay.  So one person at a time could

Page 2408

1 access this particular process; is that fair?
2    A.   That is correct.
3    Q.   This also was a weakness of Appian's or
4 a -- what -- limitation of Appian's software.  Is
5 that the term that you used?
6    A.   That was the term I used.
7    Q.   So this lack of concurrent developer
8 support was another limitation on Appian software;
9 right?
10    A.   That is correct.
11    Q.   And again, Appian kept information about
12 that limitation secret; correct?
13    A.   That is one of their trade secrets, yes.
14    Q.   Again, it's your opinion that concealing
15 from its customers Appian's lack of concurrent
16 developer option had economic value; right?
17    A.   Yes, it did.
18    Q.   Because if prospective customers knew
19 about this shortcoming, they might be less likely to
20 buy Appian software; is that your testimony?
21    A.   I would say it's a little more specific
22 that if a competitor of Appian knew about those

Page 2409

1 limitations or those trade secrets, they could
2 overly emphasize it and utilize that as a strategic
3 way to provide economic value to them, and win
4 customers away from Appian.
5    Q.   Okay.
6         And another area that you described
7 as a trade secret in this case related to process
8 ID; correct?
9    A.   I think you're referring to the web
10 services return information.
11    Q.   Right.  The web services would return
12 only a process ID for -- if the Appian software was
13 connected to it; is that right?
14    A.   That's the default that required a
15 complex workaround to provide additional
16 information.
17    Q.   Fair to say, this is another shortcoming
18 weakness of Appian software; right?
19    A.   This was a limitation of the software.
20    Q.   All right.  Final one I will ask you
21 about is related to scalability.  There was
22 testimony -- you testified about that, I think,

Page 2410

1 maybe on Thursday; right?  Scalability?
2         MR. GINSBERG:  Objection.  I believe
3 that's beyond the scope of direct.
4         MR. BOOKBINDER:  Let me rephrase.
5 BY MR. BOOKBINDER:
6    Q.   In your review of Appian's information
7 that Appian claimed was trade secrets, did you
8 review information related to Appian's lack of
9 scalability?
10        MR. GINSBERG:  Beyond the scope of
11 direct.
12        THE COURT:  Yes.  Sustained.
13 BY MR. BOOKBINDER:
14    Q.   The weaknesses that we've just gone
15 through with Appian software, these are things that
16 Mr. Zou was aware of because he was using the Appian
17 software; correct?
18    A.   Once again, I referred to them as
19 limitations, but Zou was familiar with it because he
20 had access to the development platform that
21 contained those trade secrets.
22    Q.   And anyone else who was a developer

56 (Pages 2407 - 2410)

Page 2487

```
1        CERTIFICATE OF COURT REPORTER
2        I, MARJORIE PETERS, Fellow of the Academy of
3   Reporting, Registered Merit Reporter, Certified
4   Realtime Reporter, Realtime Systems Administrator,
5   Notary Public, the officer before whom the foregoing
6   proceeding was taken, do hereby certify that the
7   witnesses whose testimony appears in the foregoing
8   hearing were duly sworn; that the testimony was
9   taken in shorthand and thereafter reduced to
10  typewriting by me or under my direction; that this
11  transcript is a true record of the proceedings; that
12  I am neither counsel for, related to, nor employed
13  by any of the parties to the action in which this
14  hearing was taken; and, further, that I am not a
15  relative or employee of any attorney or counsel
16  employed by the parties hereto, nor financially or
17  otherwise interested in the outcome of this action.
18
19
20
21  Marjorie Peters, FAPR, RMR, CRR, RSA
22
```

76 (Page 2487)

Page 3211

1          IN THE CIRCUIT COURT OF FAIRFAX COUNTY

2                          - - - - -

3

   APPIAN CORPORATION,              )

4                                   )

        Plaintiff,                  )   Civil Action No.

5                                   )   2020-07216

        vs.                         )

6                                   )

   PEGASYSTEMS INC., & YOUYONG      )

7   ZOU,                            )

                                    )

8         Defendants.               )

9

10                 TRIAL - DAY 11

11        BEFORE THE HONORABLE RICHARD GARDINER

12          Thursday, April 7, 2022, 9:37.a.m.

13

14            FAIRFAX COUNTY CIRCUIT COURT

15               4110 Chain Bridge Road

16                 Fairfax, Virginia

17

18

19

20   Reported By: Marjorie Peters, FAPR, RMR, CRR, RSA

21   Job Number: 5098816

22

Page 3244

1 because Dr. Marshall testified, very clearly,
2 that -- he talked about five foundational
3 improvements. He said that Pega's product would
4 have been obsolete if they had not stolen this
5 information from Appian.
6         So that is absolutely an appropriate
7 foundation.
8         Second of all, what Mr. Frank is
9 really saying is that he disagrees with Appian's
10 case. That doesn't surprise me. He has factual
11 disagreements with various things.
12        So, fine, go ahead, cross-examine
13 the witnesses on your factual disagreements and the
14 jury will decide who is right. That's why we're
15 here. That is not an objection. In fact, none of
16 this is an objection.
17        Third, what he is making is a
18 premature motion to strike, which the Court cannot
19 evaluate until all of the evidence is in. If he
20 wants to contends that Appian's evidence is somehow
21 insufficient, that's the stage at which he should
22 make it. He can't make it here.

Page 3245

1         Fourth and finally, since now we are
2 just previewing arguments, when we do get to the
3 motion to strike, first of all, under any analysis,
4 we have satisfied our causation burden, and that's
5 going to be the case no matter what.
6         But when it comes to the calculation
7 of damages, this is a trade secrets case. There is
8 burden shifted. Every argument that Mr. Frank just
9 made is going to boomerang on him because, in fact,
10 it's going to be his failure to carry his burden.
11        But all of that is for another day.
12        Now, the witness is here to testify.
13 His slides have been approved. There's nothing
14 objectionable about his testimony. Nothing
15 Mr. Frank just said constitutes an objection.
16        THE COURT: What was the first
17 objection you raised?
18        MR. MANGI: That Mr. -- he said that
19 his opinions are based on pervasiveness, but
20 Dr. Marshall testified to five discrete changes.
21 It's just argument about the weight of the evidence.
22 That is not an objection.

Page 3246

1         THE COURT: There was something he
2 said early on about methodology.
3         MR. FRANK: Yes. He did not use a
4 proper methodology to determine the amount of
5 damages to which he is going to testify because the
6 underlying assumptions stated in his expert report,
7 and that's the only thing I can go on at this
8 moment, are unsupported by the record as it exists.
9         He quotes certain --
10        THE COURT: So it's not the
11 methodology, then. It's the facts applied to the
12 methodology.
13        MR. FRANK: Well, in addition, for
14 example, he has already testified that the parties
15 are head-to-head competitors, without acknowledging
16 that the majority of Pega's sales are not made --
17        THE COURT: Mr. Frank, that's a
18 factual dispute for cross-examination. And I
19 noticed in your argument, you had a number of times
20 where you said, whereas, in fact, and when you say,
21 whereas, in fact, that's cross-examination material.
22 That's not a legal basis for preventing him from

Page 3247

1 testifying.
2         So I will overrule the objection.
3 (End SIDEBAR.)
4         THE COURT: All right. The
5 objection is overruled.
6         Mr. Faridi.
7         MR. FARIDI: I forgot where I was,
8 Your Honor. Just a moment. I think I know where I
9 was.
10 BY MR. FARIDI:
11   Q.   Mr. Malackowski, can you walk the jury
12 through at a very high level the steps that you
13 undertook to calculate the damages in this case?
14   A.   Yes.
15        At a very high level, I broke the
16 accounting down into two different analyses. The
17 first was to look at sales where there was direct
18 competition between Appian and Pega, and to
19 determine what the profits were that Pega made on
20 those transactions.
21        Then the second calculation was to
22 look more broadly at the platform that's asserted to

10 (Pages 3244 - 3247)

Page 3248

1 contain the trade secrets overall, and look at the
2 profits that Pega made that included the trade
3 secrets.
4    Q.   Let's focus on the direct competition
5 part of the analysis.  What's the damages
6 calculation that you arrived at?
7    A.   So that's in the first column shown on
8 the screen.
9         So I began by looking at the revenue
10 in those competitions.  Basically, how much cash did
11 Pega collect in competition with Appian with product
12 that contained the trade secrets or was informed by
13 the trade secrets in the sale.  That -- and that
14 amount was $1.4 billion.
15        Once that was known, I then went to
16 the Pega accounting records to deduct the cost of
17 that product, the direct material, the direct labor,
18 and the variable expenses there were incurred in
19 order to sell that product.
20        When you make those deductions, the
21 profits that I found to be attributable to the
22 misappropriation, in direct competition, was

Page 3249

1 $479,029,000.
2         So that would be one of the two most
3 important numbers in my work.
4    Q.   What do you mean by the phrase "direct
5 competition with Appian"?
6    A.   So specifically that instance where we
7 know from the documents that Appian and Pega were
8 competing for the same customer, for the same sale,
9 at the same time.
10   Q.   Focusing now on the $3 billion number;
11 can you walk us through your calculation at a very
12 high level?  We're going to come back to the details
13 later.
14   A.   Sure.
15        The analysis was similar in that I
16 began first by looking at revenue.  How much cash
17 could Pega earn on product sales that allegedly
18 contained misappropriated trade secrets.  That was
19 just over $6.6 billion.
20        I went through the same cost
21 analysis, and then determined that the profits
22 attributable to the misappropriation would be

Page 3250

1 $3,032,847,000.  That of course is the second most
2 important number in my analysis.
3    Q.   Did you also calculate Mr. Zou's profits
4 attributable to misappropriation?
5    A.   Yes.  As noted at the bottom of the
6 screen, Mr. Zou was paid during 2012 to 2014,
7 $23,608.
8    Q.   Mr. Malackowski, what information did
9 you review in connection with your work in this
10 case?
11   A.   It was significant.
12        What I show on the screen are three
13 general categories of our work.  The first is as an
14 expert, I signed an agreement of confidentiality.
15 So I'm allowed to look at the business records for
16 both Appian and Pega, and there were thousands of
17 pages that I and my team went through.
18        Second, the interviewing process.  I
19 was able to interview Appian witnesses -- executives
20 directly, but not so far Pega.  In order for me to
21 get information from Pega, I sent the lawyers
22 questions, they asked them in depositions.  I'm

Page 3251

1 guessing you've seen some depositions through this
2 trial.  I reviewed those.
3         Third, there's the legal pleadings
4 in the case; specifically, written answers to
5 questions, which are called interrogatories.  Some
6 of those questions were specifically what sales were
7 you competing with against Appian, and Appian what
8 sales were you competing with against Pega.
9         Then there were also expert reports
10 that I reviewed as well as part of this case.
11        MR. FARIDI:  Your Honor, may I
12 approach?
13        THE COURT:  You may.
14 BY MR. FARIDI:
15   Q.   I've given you a binder containing some
16 documents.  Can you describe, generally speaking,
17 what these documents are?
18   A.   Yes.  This is actually a subset, a small
19 portion of the documents that I reviewed and relied
20 on in this case.
21        These are essentially Pega documents
22 or Pega answers to legal questions.

11 (Pages 3248 - 3251)

1 Salesforce, that it wasn't just cold e-mails, it
2 wasn't just a training, but it was an opportunity
3 for them to ask questions and really make sure they
4 understood the benefit.
5     Q.   So we have spoken about sales and
6 marketing and the training.
7          How else did Pega misappropriate
8 Appian's trade secrets?
9          MR. FRANK:  Objection.
10          THE COURT:  What's the basis?
11          MR. FRANK:  The question includes a
12 legal conclusion.
13          THE COURT:  All right.  I'll sustain
14 the objection.  Why don't you rephrase.
15 BY MR. FARIDI:
16     Q.   How else did Pega use Appian's
17 information provided by Mr. Zou?
18     A.   It was also used in modification of the
19 Pega product, or making improvements to the Pega
20 product itself, as I described on the screen.
21 Here's five examples from Smart Shapes, ease of
22 editing, custom data types, social and mobile.

1          Importantly, these were changes of
2 significant that without these changes to the
3 platform, the platform would not have been
4 competitive in the market, and that's really
5 critical.
6     Q.   Why is that critical?
7     A.   Because it speaks to the importance of
8 the trade secrets, and it also speaks to the
9 economic significance in the competition.
10          So now, remember, we have not just
11 any competitors, we have head-to-head primary
12 competitors, and one of them has access to the
13 playbook of the other, the trade secret information.
14          Without that access and actually
15 changing their own product to compete with Appian,
16 they would not have had a successful product.  So
17 from Appian's perspective, they're competing against
18 someone who knows their confidential data, and
19 they're also competing against someone who is
20 offering their technology.  They're competing
21 against themselves, and that's critical in a
22 head-to-head competition.

1     Q.   So let's go to the last part of your
2 analysis, the damages calculation.
3          I want to focus first on the $479
4 million number.
5     A.   Yes, sir.
6     Q.   Can you tell the jury the number of
7 times Pega and Appian competed, as you put it,
8 directly between 2013 and 2021?
9     A.   Yes.
10          I was able, through the record of
11 the litigation, identify each one of those
12 instances.  It happened 201 times, according to the
13 records in this case.  And you can see how it
14 started in 2013, but it ramped up through 2018 to
15 2019.  2020 has COVID pandemic effect to it, but
16 basically, it was a continual competition utilizing
17 the trade secrets.
18     Q.   What type of data did you analyze in
19 connection with your analysis of Pega's profits?
20     A.   I went to the accounting data, the
21 detailed accounting records.
22          So what's shown on the screen here

1 is an example of the Pega accounting ledger.  I have
2 highlighted one direct competitive account,
3 Rabobank, and you can see for the customer, the
4 records show the revenues by year, and what type of
5 revenues were recorded; from maintenance revenues,
6 product licenses, services, consulting and cloud
7 revenues.
8     Q.   All right.  So let's focus on the
9 revenue.
10          What type of revenue did Pegasystems
11 obtain from each of these 201 customers that you
12 spoke about earlier?
13     A.   So I totaled it up for each of those 201
14 customers, for each of those categories.
15          So the license revenue is the
16 primary product permission.  The maintenance are the
17 continual contracts you pay to get the updates and
18 bug fixes, patches, that sort of thing.
19          Services and consulting are really
20 the same; that is the professionals who help to
21 implement, provide consulting time.
22          And then cloud is a separate charge

23 (Pages 3296 - 3299)

Page 3304

1 misappropriation where it competed directly with
2 Appian?
3      A.   Yes.
4           So starting with the revenue of
5 1,417,126,000, I subtracted the cost of revenue and
6 the variable expenses to determine the profits
7 attributable to the misappropriation when in direct
8 competition at $479,029,000.
9      Q.   Let's go to the products improvements
10 part of the calculation.
11           How did you begin this analysis?
12 This is a $3 billion analysis.
13      A.   It's really a $6 billion analysis, but I
14 started by understanding when the trade secrets were
15 incorporated into the Pega product.  That began with
16 Version 7.1 in the third quarter -- at the end of
17 the third quarter of 2013.  So starting in Q4, all
18 of the product that was being sold had a nexus or
19 connection or use of the trade secrets.
20           So then I simply went and totaled
21 the platform revenues through the last data that I
22 had, Q3 of 2021.  I, again, eliminated the earlier

Page 3305

1 contracts that I had eliminated before.
2           When you total those revenues, it's
3 $6.6 billion.
4      Q.   There's a notation at the bottom of the
5 slide here.  Can you read that out loud and describe
6 for us what you meant to convey?
7      A.   Yes.
8           I "eliminated revenues for Pega's
9 contracts that closed prior to Zou's engagement."
10           Again, that is the same adjustment I
11 made to the direct competition, to not try to
12 capture profits for sales that were made before Zou
13 disclosed the trade secrets.
14      Q.   Now, what type of revenue did you
15 account for?
16      A.   Same categories of revenue; the license
17 itself, as well as the maintenance, services and
18 consulting and cloud fees.
19      Q.   Now, did you investigate whether Pega
20 has any revenue for lines of business that are not
21 tied to its platform?
22      A.   I did.  Specifically, if you go to the

Page 3306

1 deposition record of the case, Mr. Stillwell
2 explained that in all cases, even if you are
3 interested in applications, you still need a license
4 to the platform, and substantially all of the
5 revenues are associated with the platform, 7.1 and
6 more current.
7      Q.   Who is Mr. Stillwell?
8      A.   He is the chief financial officer.  I
9 think he also has a chief operating officer position
10 at Pega.
11      Q.   Can you go to Tab 16, this is
12 Plaintiff's 823.
13      A.   Yes.
14 (Plaintiff's Exhibit 823 was marked for
15 identification.)
16 BY MR. FARIDI:
17      Q.   Can you describe for us just generally
18 what this document is?
19      A.   In the beginning of my testimony, I
20 described some of the information I looked at were
21 written answers by the parties in the litigation.
22           This is an example of that.  It's

Page 3307

1 called an interrogatory.  So one side sends
2 questions to the other.  The other side, through
3 their lawyers, write down the answers and send them
4 back.
5           This is an answer Pega gave.
6           MR. FARIDI:  Your Honor, we offer
7 Plaintiff's 823.
8           MR. FRANK:  No objection, Your
9 Honor.
10           MR. TRAVELL:  No objection.
11           THE COURT:  823 is admitted.
12 (Plaintiff's Exhibit Number 823 was admitted into
13 evidence.)
14 BY MR. FARIDI:
15      Q.   So let's focus on Interrogatory Number
16 18 and Pegasystems's response to it.
17           Can you tell us how the
18 interrogatory and the response to it bears on your
19 analysis?
20      A.   Yes.
21           The question was, Appian asked Pega
22 to identify all revenues received by Pega for each

25 (Pages 3304 - 3307)

Page 3324

1 improvements, the product would not have been
2 commercially viable.
3     Q.    The jury can decide whether
4 Dr. Marshall, in fact, so testified.
5         The --
6         MR. FARIDI:  Objection, Your Honor,
7 to the preamble.
8         THE COURT:  Yeah.  Sustained.
9 BY MR. FRANK:
10    Q.    It's correct, is it not, that it is your
11 brief that -- is it correct that it doesn't matter
12 what product was involved, what competitor was
13 involved, and that Pega would have lost every single
14 sale that it made, every single sale that it made
15 for over a period of eight years; is that your
16 testimony?
17    A.    No, I --
18        MR. FARIDI:  Objection.  Asked and
19 answered.
20        THE COURT:  Sustained.
21        THE WITNESS:  No, you're --
22        THE COURT:  Sir.

Page 3325

1         THE WITNESS:  Oh, I'm sorry.
2         THE COURT:  The objection is
3 sustained.
4         THE WITNESS:  Oh.
5         THE COURT:  You already answered the
6 question.
7 BY MR. FRANK:
8     Q.    So it's your testimony, is it not, that
9 Pega's sales would have dropped from $461 million in
10 2012, would have dropped to zero beginning on -- in
11 October of 2013, and would have remained at zero for
12 the next eight years; is that your testimony?
13    A.    No, you're not -- you're
14 misunderstanding my analysis.
15        My analysis is that all of those
16 sales benefited from the trade secrets.  So if you
17 are looking for the unjust enrichment, the profit
18 that was earned from the trade secrets, all of it is
19 relevant.
20        Now, I didn't offer the opinion that
21 but for there would have been a lost profits
22 calculation for Appian.  I understand that

Page 3326

1 Dr. Marshall concluded that the product would not be
2 viable, but you don't need to reach that conclusion
3 to award the damages that I suggest, because I'm
4 just looking for the profits that were made in
5 actuality with the trade secrets.
6         I'm not talking about what would
7 have happened but for use of the trade secrets.
8     Q.    Did the companies that -- it's correct,
9 is it not, that with respect to your product
10 improvement theory, better than 80 percent of the
11 sales transactions in question did not involve
12 Appian in any way?
13    A.    I didn't follow that question.  Could
14 you start -- re-read that?
15    Q.    Sure.  Let me -- because I'm not able to
16 remember exactly what I said, I'll see if I can ask
17 it again.
18        It's correct, sir, is it not, that
19 with respect to your product improvement theory,
20 better than 80 percent of the sales transactions in
21 question did not involve Appian in any way?
22    A.    Not that we can tell because, remember,

Page 3327

1 the direct Appian sales were about 1.4 billion, and
2 the total sales were 6.6 billion, so 1.4 is about 20
3 percent of the total, but there are sales we don't
4 know because of the fox in the henhouse and all of
5 the attempt to interfere with the proof of concept
6 or RFPs.
7     Q.    I want to start with your theory that if
8 it were not for six pieces of information that
9 Mr. Cole -- Dr. Cole said on Monday were trade
10 secrets that Pega included in Pega's marketing and
11 sales material, Appian would have beaten Pega every
12 single time that the two companies competed.
13        It's correct, sir, is it not, that
14 you assumed that what Dr. Cole identified as trade
15 secrets were actual secrets?
16        MR. FARIDI:  Objection, Your Honor.
17 He wasn't here for Dr. Cole's testimony.  He was not
18 allowed to be in the courtroom for that.
19 BY MR. FRANK:
20    Q.    How many trade secrets do you
21 understand -- withdrawn.
22        What is the number of -- what

30 (Pages 3324 - 3327)

Page 3428

1  Bookbinder proffered to me, I don't see that these
2  have been -- that there was a manifestation of
3  adoption or belief in their truth.
4          They're useful documents, I'm sure
5  they are, but I don't think that takes the necessary
6  step.  This is unlike Mr. Schuerman stating where he
7  plainly said that these were, in his view, the
8  honest -- I think that was the word he used --
9  honest statements, and therefore, clearly adopted
10  them as the view of the corporation.
11          So that motion is denied.
12          MR. MANGI:  Your Honor, may I ask,
13  what time are we starting on Monday?  Was it 10?  I
14  didn't hear.
15          THE COURT:  Yes, sir.  10:00.
16          MR. MANGI:  Thank you, Judge.
17          THE COURT:  All right.  Have a good
18  weekend.  The court is in recess.
19  (The proceedings were recessed for the day at
20  1:16 p.m., to resume on Monday, April 11, at
21  10:00 a.m.)
22

Page 3429

1          CERTIFICATE OF COURT REPORTER
2          I, MARJORIE PETERS, Fellow of the Academy of
3  Reporting, Registered Merit Reporter, Certified
4  Realtime Reporter, Realtime Systems Administrator,
5  Notary Public, the officer before whom the foregoing
6  proceeding was taken, do hereby certify that the
7  witnesses whose testimony appears in the foregoing
8  hearing were duly sworn; that the testimony was
9  taken in shorthand and thereafter reduced to
10  typewriting by me or under my direction; that this
11  transcript is a true record of the proceedings; that
12  I am neither counsel for, related to, nor employed
13  by any of the parties to the action in which this
14  hearing was taken; and, further, that I am not a
15  relative or employee of any attorney or counsel
16  employed by the parties hereto, nor financially or
17  otherwise interested in the outcome of this action.
18
19
20  *Marjorie Peters*
21
22  Marjorie Peters, FAPR, RMR, CRR, RSA

56 (Pages 3428 - 3429)

1      IN THE CIRCUIT COURT OF FAIRFAX COUNTY

2                      - - - - -

3

    APPIAN CORPORATION,            )

4                                  )

         Plaintiff,                )   Civil Action No.

5                                  )   2020-07216

         vs.                       )

6                                  )

    PEGASYSTEMS INC., & YOUYONG    )

7    ZOU,                          )

                                   )

8        Defendants.               )

9

10                   TRIAL - DAY 12

11        BEFORE THE HONORABLE RICHARD GARDINER

12          Monday, April 11, 2022, 10:00 a.m.

13

14              FAIRFAX COUNTY CIRCUIT COURT

15                 4110 Chain Bridge Road

16                   Fairfax, Virginia

17

18

19

20   Reported By: Marjorie Peters, FAPR, RMR, CRR, RSA

21   Job Number: 5123235

22

1        Then he says, "Highlighting rules
2  inheritance by Pega simply highlights the larger
3  issue with Appian around change control and
4  management such as discovery of related objects and
5  impact analysis like implementing a change as well
6  as complex rules support."
7        Do you see that, sir?
8    A.   I do.
9    Q.   You understand that to be an
10  acknowledgement that this is a feature that Appian
11  did not possess as of -- that rules inheritance was
12  a feature that Appian did not possess as of the
13  times of these e-mails, which are March of 2013?
14   A.   No.  It's not that they didn't possess
15  the ability for one program to take over the other.
16  They didn't use the old rules inheritance structure.
17  They used a dynamic structure.
18        So what they ultimately decided to
19  do, they said, this is a matter of customer
20  confusion, so let's publish what we do in detail so
21  everybody understands it, and this issue goes away.
22        So this is the type of information

1  that I think ultimately was published in order to
2  solve the problem.
3    Q.   Did Rabo remain a customer of Pega?
4    A.   Yes, they did, using the trade secrets.
5    Q.   Have you -- going on in the e-mail, the
6  next e-mail is an e-mail from a man named Bob Kramer
7  to -- I beg your pardon.
8        The next e-mail in sequence is
9  another e-mail from Mr. Edward Hughes.  And
10  Mr. Hughes says, "Okay.  All good input.  Could I
11  suggest breaking it down."
12        "Why is this an issue?  Tony hints
13  at Pega's architecture, but where does it come in to
14  play?  How important is it?  Is it a 5 percent issue
15  related to a very small minority of cases or is it a
16  big, honking issue that we face often?"  (As read.)
17        Do you see that?
18   A.   I do.  It's a "honking problem," not
19  issue, but I see what you are reading.
20   Q.   So let me stop there.  It is still your
21  conclusion, is it not, sir, that Rabo's decision to
22  stay with Pega had nothing to do with rules

1  inheritance, and had everything to do with what are
2  now said to be trade secrets?
3    A.   No, that's a slightly different
4  question.  That's not my opinion.
5        My opinion is that Pega used the
6  trade secrets to obtain the Rabo account, period,
7  stop.
8        There were other things that were at
9  issue in the sale, one of which is rules
10  inheritance.  It is my view that in the but-for
11  world where rules inheritance was still a confusing
12  issue, but Pega did not have the trade secret
13  technology to offer, in that case, the sale would
14  have gone to Appian.
15   Q.   Now, the -- you're aware, are you not,
16  sir, that these events all occurred in March of
17  2013?
18   A.   These e-mails occurred in March of 2013,
19  yes, sir.
20   Q.   You're aware, are you not, that Appian's
21  understanding at that time was that it had lost the
22  Rabobank opportunity because Appian did not have

1  rules inheritance -- a rules inheritance feature
2  comparable to Appian's (sic) feature?
3    A.   At that time, Appian was not aware that
4  Pega was using its trade secrets, that's true.
5    Q.   It's correct, is it not, that March of
6  2013 is prior to the introduction of any product
7  change that is at issue in this case?
8    A.   Prior to product change, but after the
9  dissemination of the trade secret material to the
10  sales force.
11   Q.   So there's nothing about a product
12  feature that affected Rabobank's decision; is that
13  correct?
14   A.   That's not true.
15        There's nothing about the product
16  features within the Pega product, but the product
17  feature limitations of Appian, as communicated from
18  the trade secret documents, was all part of the
19  dynamics of the sale.
20   Q.   But contemporaneously, no one at Appian
21  was identifying any such shortcoming in Appian's
22  product as the reason that Appian lost that

15 (Pages 3483 - 3486)

Page 3487

1 opportunity. What they identified was the absence
2 of rules inheritance; is that right, sir?
3      A.   Right. They didn't know that Pega was
4 using their trade secrets at the time, so they
5 didn't identify those as reasons.
6           MR. FRANK: Your Honor, it's 12:05.
7 It's entirely up to you. I'll go on or...
8           THE COURT: Do you want -- we can --
9 this would be a good time. I didn't want to
10 interrupt your cross, unless I could. Is this a
11 good time to interrupt it?
12          MR. FRANK: This is a perfectly good
13 time, yes.
14          THE COURT: All right. Very good.
15          Ladies and Gentlemen, we'll take
16 what was the morning recess at this point.
17 (The jury exited the courtroom.)
18          THE COURT: Court is in recess.
19 (RECESS, 12:05 p.m. - 12:22 p.m.)
20          THE COURT: All right. Bring the
21 jury in, please.
22 (The jury entered the courtroom.)

Page 3488

1           THE COURT: All right. All Members
2 of the Jury are present. Everyone may be seated.
3           Mr. Frank, if you want to continue
4 your cross-examination, please.
5           MR. FRANK: Thank you, Your Honor.
6           CONTINUED CROSS-EXAMINATION
7 BY MR. FRANK:
8      Q.   Mr. Malackowski, I may have misheard
9 something you said when we were talking about the
10 Rabobank situation, so I'll ask the question again,
11 and I apologize if I'm mischaracterizing something
12 you said.
13          Are you testifying that the but-for
14 cause of Rabobank's purchase from Pega in the
15 transaction included in your damage analysis was
16 the -- the subset of the materials in Pega's
17 marketing material that are now alleged to be trade
18 secrets; in other words, that that sale would not
19 have been made if it had not been for those
20 statements?
21          Is that your testimony?
22      A.   I think I understand your question.

Page 3489

1      No.
2      So to be clear --
3           THE COURT: Sorry. Could you pull
4 that microphone up a little bit.
5      Thank you, sir.
6      THE WITNESS: No.
7      To be clear, it's my testimony that
8 the Rabobank sale as well as the others were
9 associated with, had a nexus to, benefitted from,
10 the trade secret.
11          As we talked about on Thursday, I'm
12 not doing a but-for lost profits calculation.
13 BY MR. FRANK:
14     Q.   Thank you, sir.
15          I want to ask you now about a
16 different situation that I believe you have studied.
17          You have studied, have you not, a
18 situation involving Amazon, which was at one time an
19 Appian customer?
20     A.   At some level, sure.
21     Q.   Yes.
22          That's set out -- you set out your

Page 3490

1 description of that transaction in your first expert
2 report; is that correct?
3      A.   Amazon as well as a number of customers
4 are described in that report, yes.
5      Q.   Yes.
6           It's correct, is it not, sir,
7 that -- and the Amazon situation is included in your
8 calculation of damages; is that correct?
9      A.   Again, I'm not sure what you mean by
10 "the situation."
11          But the head-to-head competition for
12 Amazon would be connected to the profits analysis.
13     Q.   Okay.
14          You reviewed the evidence relating
15 to the Amazon transaction; is that correct?
16     A.   Generally.
17     Q.   Okay.
18          It's your opinion -- is it your
19 opinion that Amazon chose Pega because of Pega's use
20 of the alleged -- what are now said to be trade
21 secrets by Appian?
22     A.   Again, not a but-for lost profits

16 (Pages 3487 - 3490)

Page 3623

1  evening.
2  (The proceedings were recessed for the day at
3  4:53 p.m., to resume on Tuesday, April 12, at
4  10:00 a.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 3624

1       CERTIFICATE OF COURT REPORTER
2       I, MARJORIE PETERS, Fellow of the Academy of
3  Reporting, Registered Merit Reporter, Certified
4  Realtime Reporter, Realtime Systems Administrator,
5  Notary Public, the officer before whom the foregoing
6  proceeding was taken, do hereby certify that the
7  witnesses whose testimony appears in the foregoing
8  hearing were duly sworn; that the testimony was
9  taken in shorthand and thereafter reduced to
10  typewriting by me or under my direction; that this
11  transcript is a true record of the proceedings; that
12  I am neither counsel for, related to, nor employed
13  by any of the parties to the action in which this
14  hearing was taken; and, further, that I am not a
15  relative or employee of any attorney or counsel
16  employed by the parties hereto, nor financially or
17  otherwise interested in the outcome of this action.
18
19
20
21
22  Marjorie Peters, FAPR, RMR, CRR, RSA

50 (Pages 3623 - 3624)