**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PEGASYSTEMS INC., | |
| Plaintiff/Counterclaim Defendant, | |
| v. | |
| APPIAN CORPORATION, | |
| Defendant/Counterclaim Plaintiff, | Case No. 19-cv-11461-PBS-MPK |
| and | LEAVE TO FILE OVERSIZED BRIEF GRANTED ON APRIL 14, 2022 |
| BUSINESS PROCESS MANAGEMENT, INC., | |
| Defendant. | |

**APPIAN'S OPPOSITION TO PEGASYSTEMS' MOTION**
**FOR PARTIAL SUMMARY JUDGMENT ON ITS CLAIMS**
**AND FOR SUMMARY JUDGMENT ON APPIAN'S COUNTERCLAIMS**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT .........................................................................................1

I.   PEGASYSTEMS' MOTION FOR SUMMARY JUDGMENT ON ITS CLAIMS
     SHOULD BE DENIED ...........................................................................................2

     A.   There Is No Evidence Pegasystems Was Injured by the BPM.com Report ...........2

     B.   The Alleged Falsity of the BPM.com Report Is A Disputed Issue of Fact..............4

     C.   Appian's Unclean Hands Defense Raises Additional Disputed Issues of
          Fact.......................................................................................................................6

II.  PEGASYSTEMS IS NOT ENTITLED TO SUMMARY JUDGMENT ON
     APPIAN'S COUNTERCLAIMS............................................................................6

     A.   Pegasystems Engaged in A Willful, Years-Long Campaign of False
          Advertising and Commercial Disparagement ............................................6

     B.   Appian's False Advertising and Commercial Disparagement
          Counterclaims Are Not Barred by Laches ................................................9

          1.   Appian Did Not Unreasonably Delay Bringing Suit ................................. 9

          2.   Pegasystems Has Failed To Demonstrate Prejudice................................ 11

          3.   Pegasystems' Inequitable Conduct Precludes Its Assertion of
               Laches ................................................................................................ 14

          4.   Appian's State-Law Claims Are Not Time-Barred .................................. 15

     C.   There Are Triable Issues Regarding Each Element of Appian's False
          Advertising and Commercial Disparagement Claims..............................15

          1.   There Is A Triable Issue Regarding Injury ............................................. 15

          2.   There Is A Triable Issue Regarding Falsity ............................................ 18

          3.   There Is A Triable Issue Regarding Materiality ...................................... 22

          4.   The Scalability White Paper and the Technical Competitive Brief
               Are "Commercial Advertising" Under the Lanham Act.......................... 23

5.    There Is A Triable Issue Regarding Actual Malice ................................... 24

D.    Pegasystems Is Not Entitled to Summary Judgment Regarding Appian's Claims Arising from the Defamatory LinkedIn Post ...............................................25

CONCLUSION .........................................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
  960 F.2d 1020 (Fed. Cir. 1992)............................................................................12

*Am. Traffic Solutions, Inc. v. Redflex Traffic Sys. Inc.*,
  2010 WL 1640975 (D. Ariz. Apr. 22, 2010) ......................................................24

*Bd. of Forensic Document Exam'rs, Inc. v. ABA*,
  287 F. Supp. 3d 726 (N.D. Ill. 2018) .............................................................26, 27

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
  483 F. Supp. 3d 38 (D. Mass. 2020) .....................................................................9

*Camel Hair & Cashmere Inst. of Am., Inc. v. Assoc. Dry Goods Corp.*,
  799 F.2d 6 (1st Cir. 1986)......................................................................................3

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*,
  284 F.3d 302 (1st Cir. 2002)..........................................................5, 18, 19, 23

*Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*,
  228 F.3d 24 (1st Cir. 2000).........................................................................18, 19

*Country Floors, Inc. v. P'ship of Gepner & Ford*,
  930 F.2d 1056 (3d Cir. 1991).................................................................................9

*Crown Packaging Tech., Inc. v. Rexam Bev. Can Co.*,
  679 F. Supp. 2d 512 (D. Del. 2010).....................................................................10

*Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*,
  379 F. Supp. 3d 53 (D. Mass. 2019) ....................................................................13

*DeCosta v. CBS*,
  520 F.2d 499 (1st Cir. 1975).................................................................................15

*Dream Team Holdings LLC v. Alarcon*,
  2017 WL 3460806 (D. Ariz. Aug. 11, 2017)..........................................................6

*EEOC v. Acorn Niles Corp.*,
  1995 U.S. Dist. LEXIS 9346 (N.D. Ill. July 6, 1995)...........................................12

*EEOC v. Massey-Ferguson, Inc.*,
  622 F.2d 271 (7th Cir. 1980) .........................................................................13, 14

**TABLE OF AUTHORITIES**

(continued)

Page(s)

*EEOC v. Watkins Motor Lines, Inc.*,
    463 F.3d 436 (6th Cir. 2006) ....................................................................................13

*Emery v. Merrimack Valley Wood Prods., Inc.*,
    701 F.2d 985 (1st Cir. 1983)......................................................................................25

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
    314 F.3d 48 (2d Cir. 2002)........................................................................................24

*Gant v. Grand Lodge*,
    12 F.3d 998 (10th Cir. 1993) ....................................................................................10

*Gasser Chair Co. v. Infanti Chair Mfg. Corp.*,
    60 F.3d 770 (Fed. Cir. 1995)....................................................................................15

*Gibson v. Metropolis of CT LLC*,
    2020 WL 956981 (D. Conn. Feb. 27, 2020) ............................................................10

*Giese v. Pierce Chem. Co.*,
    29 F. Supp. 2d 33 (D. Mass. 1998) ..........................................................................12

*Hall v. Aqua Queen Mfg.*,
    93 F.3d 1548 (Fed. Cir. 1996)..................................................................................13

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989)..................................................................................................27

*HipSaver Co. v. J.T. Posey Co.*,
    490 F. Supp. 2d 55 (D. Mass. 2007) (Saris, J.)........................................................21

*HipSaver, Inc. v. Kiel*,
    984 N.E. 2d 755 (Mass. 2013) ..................................................................................25

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
    191 F.3d 813 (7th Cir. 1999) ....................................................................................14

*Howell v. Enter. Publ'g Co., LLC*,
    920 N.E.2d 1 (Mass. 2010) ......................................................................................26

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
    304 F.3d 829 (9th Cir. 2002) ....................................................................................11

*John G. Alden Ins. Agency, Inc. v. John G. Alden Ins. Agency of Fla., Inc.*,
    2003 WL 22843069 (D. Mass. Nov. 26, 2003), *vacated by*, 389 F.3d 21 (1st
    Cir. 2004) ..................................................................................................................12

## TABLE OF AUTHORITIES

(continued)

Page(s)

*Lotus Dev. Corp. v. Borland Int'l, Inc.*,
    831 F. Supp. 202 (D. Mass. 1993) ........................................................................13

*Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*,
    960 F.2d 294 (2d Cir. 1992) ...............................................................................19

*Merial LLC v. Fidopharm, Inc.*,
    2014 WL 11930586 (N.D. Ga. Sept. 5, 2014) .......................................................19

*Merisant Co. v. McNeil Nutritionals, LLC*,
    515 F. Supp. 2d 509 (E.D. Pa. 2007) ..................................................................15

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990) ..............................................................................................27

*Murphy v. Boston Herald*,
    865 N.E. 2d 746 (Mass. 2007) ...........................................................................27

*Nordock Inc. v. Sys. Inc.*,
    927 F. Supp. 2d 577 (E.D. Wis. 2013) .................................................................12

*Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro Credito Oriental*,
    698 F.3d 9 (1st Cir. 2012) ..................................................................................10

*Ouellette v. Beaupre*,
    977 F.3d 127 (1st Cir. 2020) ..............................................................................10

*Petrella v. MGM*,
    572 U.S. 663 (2014) ..........................................................................................15

*Philips v. Zoll Med. Corp.*,
    2013 WL 6169331 (D. Mass. Nov. 19, 2013) ..................................................9, 14

*Podiatrist Ass'n v. La Cruz Azul de P.R., Inc.*,
    332 F.3d 6 (1st Cir. 2003) ..................................................................................23

*Quabaug Rubber Co. v. Fabiano Shoe Co.*,
    567 F.2d 154 (1st Cir. 1977) ................................................................................3

*Riley v. Harr*,
    292 F.3d 282 (1st Cir. 2002) ..............................................................................27

*Riverdale Mills Corp. v. Cavatorta N. Am., Inc.*,
    189 F. Supp. 3d 317 (D. Mass. 2016) .................................................................26

## TABLE OF AUTHORITIES

(continued)

Page(s)

*Sch. Union No. 37 v. Ms. C.*,
     518 F.3d 31 (1st Cir. 2008) ...........................................................................11

*Seven-Up Co. v. Coca-Cola Co.*,
     86 F.3d 1379 (5th Cir. 1996) ....................................................................16, 24

*SharkNinja Operating LLC v. Dyson Inc.*,
     200 F. Supp. 3d 281 (D. Mass. 2016) ...........................................................19

*Spruce Envtl. Techs., Inc. v. Festa Radon Techs., Co.*,
     248 F. Supp. 3d 316 (D. Mass. 2017) ...........................................................22

*Stein v. United States*,
     135 F. Supp. 2d 265 (D. Mass. 2001) .........................................................9, 14

*U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*,
     898 F.2d 914 (3d Cir. 1990) .........................................................................27

*Vascular Sols., Inc. v. Marine Polymer Techs., Inc.*,
     2008 WL 11429636 (D. Mass. June 30, 2008) .............................................25

*Vineberg v. Bissonnette*,
     548 F.3d 50 (1st Cir. 2008) ................................................................ *passim*

*Wolinetz v. Berkshire Life Ins. Co.*,
     361 F.3d 44 (1st Cir. 2004) ..........................................................................15

**Statutes**

Lanham Act ...............................................................................................9, 10, 11, 25

**Other Authorities**

Restatement (Second) Torts § 611 ...............................................................................26

Restatement (Third) Agency § 5.03(b) .........................................................................11

## PRELIMINARY STATEMENT

Pegasystems makes a half-hearted bid for summary judgment on its affirmative claims. The fact that Pegasystems spends just four of its 27 pages on this effort tells the Court all it needs to know: Pegasystems is, quite literally, just going through the motions. As Appian has shown, no reasonable factfinder could determine that the BPM.com Report caused Pegasystems to suffer any injury whatsoever. *See* ECF 571. This requires summary judgment ***for Appian*** on Pegasystems' claims; *a fortiori*, it precludes summary judgment ***for Pegasystems***. Moreover, as even Pegasystems' cursory discussion reveals, there are disputed facts as to all of the remaining elements of Pegasystems' claims, including falsity, deception and materiality.

The real objective of Pegasystems' motion is not to prevail on its meritless claims, but to escape a trial on Appian's counterclaims. It is easy to see why Pegasystems is so desperate to avoid going before a jury: ██████████████████████████ ██████████████████████████ ██████████████████████ Indeed, discovery has shown that Pegasystems engaged in a years-long campaign of false advertising against Appian, directed from the highest levels of the company, with full appreciation of the falsity of the claims it was making. The evidence shows that this campaign caused Appian to lose at least seven specific business opportunities and to suffer lost profits of more than ██████

Pegasystems principally argues that Appian waited too long to sue over Pegasystems' wrongful conduct, so its claims should be barred by laches. But this Court has already explained—in this very case—that laches is "not susceptible to pretrial resolution," as it requires (among other things) a clear showing of prejudice and a careful balancing of the equities. Pegasystems has shown no prejudice at all, and the equities sharply favor Appian. For these reasons, among others,

Pegasystems cannot prevail on its laches defense—let alone in this pretrial posture.

Pegasystems' other arguments fare no better.  For example, it insists that its claims that Appian's software lacked specific features and capabilities are "incapable of being proven true or false."  It contends that the features it falsely claimed Appian lacked are just "bells and whistles" that reasonable purchasers would not care about—when all evidence in the record says the opposite.  And it argues that some of the challenged materials were not distributed widely enough to constitute "advertising"—when the law is clear that "even a single promotional presentation to an individual purchaser may be enough" in an industry such as this one, where the parties sell expensive, customized products to a small number of customers.  These arguments reek of desperation.

Pegasystems' lawsuit has boomeranged on it spectacularly.  Its own case has turned out to be a dud, with no evidence of injury of any kind.  Meanwhile, discovery revealed that Pegasystems itself has done exactly what it complained that Appian did—and far worse—while causing Appian tens of millions of dollars in damages.  Pegasystems has only itself to blame for its current predicament.  The Court should reject Pegasystems' Hail Mary summary judgment arguments and send Appian's counterclaims through to trial, where the truth will at last be told.

## I.  PEGASYSTEMS' MOTION FOR SUMMARY JUDGMENT ON ITS CLAIMS SHOULD BE DENIED

### A.  There Is No Evidence Pegasystems Was Injured by the BPM.com Report

Pegasystems devotes all of seven lines of argument to its preposterous claim that it has established injury beyond genuine dispute.  Pegasystems not only misrepresents the relevant legal framework (and neglects to cite any authority at all), but also fails to identify any record evidence supporting its assertions of injury.

Pegasystems first argues that it need only establish that it is "likely to be injured."  It cites no evidence that it is "likely to be injured" by the long-abandoned BPM.com Report, and there is

none.  In any event, Pegasystems mistakenly invokes the standard for injunctive relief—even though any claim for injunctive relief has been moot for years.[1]  There is "a clear distinction between the showing required to establish a right to injunctive relief and that required to establish a right to damages."  *Camel Hair & Cashmere Inst. of Am., Inc. v. Assoc. Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986).  "[T]o recover damages" (Pegasystems' only remaining claim), "the aggrieved party must show that it suffered ***actual harm*** to its business"—not "likely" harm.  *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 161 (1st Cir. 1977) (emphasis added).

Pegasystems next argues that it "already incurred actual injury in responding to the false claims."  Br. 6.  But there is no evidence Pegasystems spent even a single dollar "responding to" the BPM.com Report.  As far as the record shows, Pegasystems' "response" consisted of three short emails exchanged with customers who raised the BPM.com Report with Pegasystems (and who thereafter chose or remained with Pegasystems).  Appian's SUMF ¶¶ 37-44; 175-189.  There is no evidence that sending these emails cost Pegasystems any money it would not otherwise have spent—let alone any quantification of these purported costs.  And Pegasystems has not shown that any money it supposedly spent "responding" to the BPM.com Report was "necessary," so those self-inflicted costs cannot bootstrap Pegasystems' way to a showing of injury.  ECF 571 at 22-25.

The remaining "evidence" of actual injury that Pegasystems proffers—all buried in its accompanying statement of facts ("Pega SUMF")—is insufficient to withstand Appian's motion for summary judgment, let alone to support summary judgment for Pegasystems.  *See* Appian's Response to Pega SUMF ("Resp.") ¶¶ 89-99.  Not only has Pegasystems waived any claim of injury vis-à-vis these customers by failing to identify them as lost or deceived during discovery, *see* ECF

---

[1] Appian voluntarily discontinued all use of the BPM.com Report in 2020.  *See* Appian's SUMF ¶ 23 (ECF 572).

571 at 18-19, the cited documents simply do not show that Pegasystems lost any business because of the BPM.com Report.  Rather, they involve: (a) customers that chose Pegasystems over Appian; (b) customers that Pegasystems does not claim to have competed for in the first place; and (c) customers who were sent a copy of the BPM.com Report, but for which there is zero evidence of reliance on that document when selecting Appian.  Resp. ¶¶ 89-99.

      **B.**     **The Alleged Falsity of the BPM.com Report Is A Disputed Issue of Fact**

Pegasystems asserts that the BPM.com Report was "full of false representations of fact," but its brief addresses just one purported misrepresentation: that Appian users, on average, have a lower total cost of ownership ("TCO") than Pegasystems users.  Br. 4.

As a threshold matter, the BPM.com Report contains no such claim.  On its face, the report says only that, *among the participants in the underlying survey*, those who used Appian reported lower average TCO.  Resp. ¶ 15.  Pegasystems does not, and cannot, dispute that this is true.  It is hotly disputed, and far from evident, that reasonable members of the parties' savvy and sophisticated clientele would read the BPM.com Report as making a claim that Appian has a lower "average" TCO *as a general matter* (*i.e.*, across the parties' entire respective customer bases).

Even if the BPM.com Report had made a generalized TCO claim, Pegasystems' bid for summary judgment would still fail for a simple reason: Pegasystems has adduced no evidence that Appian's average TCO is *not* lower than Pegasystems'.  Instead, Pegasystems asserts that the BPM.com Report's purported conclusion about TCO is "unreliable" and "unrelated to reality," and therefore "literally false."  *Id.*  Such proclamations are not evidence.  Despite promising at the pleadings stage that it would "prove" with its own "superior evidence" the falsity of the BPM.com Report's conclusions about TCO, *see* ECF 28 at 13, Pegasystems has arrived at summary judgment

with literally zero evidence that its average TCO is lower than Appian's.[2]

In fact, the record is replete with evidence that Pegasystems is ***substantially more expensive*** than Appian.  For example, a 2019 Gartner report—which Pegasystems' own experts relied on as an authoritative source— ████████████████████████████████████

████████████████████████████████████████████████████████████████

████ Resp. ¶ 210; *see also id.* (similar statement from another industry analyst).  Even Pegasystems' own employees conceded ██████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████ A reasonable fact-finder could certainly conclude that, to the extent the BPM.com Report makes an implied claim that Appian is less expensive than Pegasystems for the "average customer," that claim is true.

The remaining allegedly false "representations of fact" all concern the methodology BPM.com used to conduct the survey underlying the report—not the truth of the report's substantive conclusions.  Here too, there are triable issues as to whether BPM.com used an appropriate methodology and accurately described that methodology in the report.  *See* Resp. ¶¶ 65-81.  In any event, what actually matters to a business considering which BPM platform to purchase is not whether a particular white paper discussing BPM platforms used proper sampling techniques or correctly reported its methodology, but which platform ***actually has a lower TCO***.  *See Cashmere*

---

[2] The sole "evidence" Pegasystems offers is ██████████████████████████████████████
████████████████████ Pega SUMF ¶ 73.  This proves nothing.  As the BPM.com Report itself makes clear, ***total*** cost of ownership is a metric that includes far more than just direct payments to BPM vendors like Pegasystems; it also includes various additional expenses relating to the customer's overall investment in a software platform.  Resp. ¶ 71. And as Pegasystems itself admits, ████████████████████████
████████████████████████████████████ Pega SUMF ¶ 73.

*& Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 315 (1st Cir. 2002) (statements in advertising are generally material if they "explicitly misrepresent ... an inherent quality or characteristic of the article sold").  Pegasystems does not, and cannot, offer any evidence (let alone undisputed evidence) that the BPM.com Report's purported methodological flaws resulted in an inaccurate conclusion on the substantive TCO question.  Nor does Pegasystems offer any evidence (let alone undisputed proof) that the report's purported methodological shortcomings—as opposed to its ultimate conclusions, which are unchallenged—were material to the report's savvy and sophisticated readership.  Indeed, there is persuasive evidence that they were not.  *See* Resp. ¶ 15.[3]

### C.    Appian's Unclean Hands Defense Raises Additional Disputed Issues of Fact

Finally, even if the facts relevant to Pegasystems' claims were not in dispute, summary judgment would be inappropriate because there is a triable issue as to whether those claims are barred by its unclean hands.  As the proof at trial will show, Pegasystems engaged in widespread false advertising that employed many of the same techniques for which it now faults Appian.  *See* Supp. ¶¶ 1-257.[4]  Pegasystems' egregious misconduct bars summary judgment in its favor.  *See Dream Team Holdings LLC v. Alarcon*, 2017 WL 3460806, at *4 (D. Ariz. Aug. 11, 2017) ("Defendants have raised a colorable 'unclean hands' defense, which precludes summary judgment").

## II.   PEGASYSTEMS IS NOT ENTITLED TO SUMMARY JUDGMENT ON APPIAN'S COUNTERCLAIMS

### A.    Pegasystems Engaged in A Willful, Years-Long Campaign of False Advertising and Commercial Disparagement

In 2012, Pegasystems launched a multiyear campaign of false advertising against Appian,

---

[3] As for the element of deception, Pegasystems has submitted no evidence, and instead argues that "courts presume deception where a misrepresentation is literally false."  Br. 6.  Because falsity is a disputed issue, Pegasystems cannot rely on this legal shortcut.

[4] All citations to "Supp." are to Appian's Supplemental Statement of Material Facts, which can be found at the end of Appian's Response to Pegasystems' SUMF.

premised on the notion that Appian's product was technologically incapable of scaling to meet the needs of large, "enterprise" clients.  Supp. ¶¶ 1-7.  ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

These attacks first took form in the Scalability White Paper (2012-2016) and the Technical Competitive Brief (2013-2018).  ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████  *Id.* ¶¶ 29-35.   As set forth below, *supra*, at 18-21, all of these claims were false—and for many, Pegasystems ***knew*** they were false when made.  *Id*. ¶¶ 101-257.

In February 2014, ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[5] Additional details regarding Pegasystems' willful and egregious conduct are set forth in Appian's accompanying Supplemental Statement of Material Facts.  *See* Supp. ¶¶ 1-257.

### B.   Appian's False Advertising and Commercial Disparagement Counterclaims Are Not Barred by Laches

As this Court has already noted, laches "requires a fact-sensitive inquiry into the particular circumstances of the case," and is therefore ***normally not susceptible to pretrial resolution***." ECF 122 at 12 (quoting *Vineberg v. Bissonnette*, 548 F.3d 50, 57 (1st Cir. 2008)) (emphasis added). The laches inquiry "requires the kind of record only created by a full trial on the merits." *Country Floors, Inc. v. P'ship of Gepner & Ford*, 930 F.2d 1056, 1066 (3d Cir. 1991). This Court has repeatedly rejected Pegasystems' efforts to wriggle out of a merits trial by prematurely invoking laches. *See* ECF 122 at 12; ECF 186; ECF 466 (sealed) at 11. It should do so again here.

The first stage of the laches inquiry turns on "whether the plaintiff's delay in bringing suit was unreasonable and whether the defendant was prejudiced by the delay." *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 55 (D. Mass. 2020). "The burden to prove prejudice and unreasonable delay rests squarely on the shoulders of the moving party"—*i.e.*, Pegasystems. *Id.* However, "laches is not applied mechanically" even when undue delay and prejudice are shown. These factors "merely lay the foundation for the trial court's exercise of discretion." *Philips v. Zoll Med. Corp.*, 2013 WL 6169331, at *6 (D. Mass. Nov. 19, 2013). Ultimately, "a district court must weigh all pertinent facts and equities," including "the defendant's [own] conduct or culpability." *Stein v. United States*, 135 F. Supp. 2d 265, 270 (D. Mass. 2001). "When there is evidence of other factors which would make it inequitable to recognize [a laches] defense despite undue delay and prejudice, the defense may be denied." *Philips*, 2013 WL 6169331, at *6.

#### 1.   Appian Did Not Unreasonably Delay Bringing Suit

Pegasystems argues that Appian waited too long to sue. But the laches clock starts ticking only when the "plaintiff knew or should have known ... that [it] ***had a provable [Lanham Act]***

*claim* against [the] defendant." *Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro Credito Oriental*, 698 F.3d 9, 21 (1st Cir. 2012) (emphasis added). This requires knowledge not just of Pegasystems' false advertising, but also that Pegasystems successfully used it to divert business from Appian. *See Gant v. Grand Lodge*, 12 F.3d 998, 1004 (10th Cir. 1993) (no laches where plaintiff "wait[ed] until she was harmed ... before filing a claim"); *Gibson v. Metropolis of CT LLC*, 2020 WL 956981, at *5 (D. Conn. Feb. 27, 2020) (in Lanham Act suit, holding that laches runs only from the "point Plaintiffs knew or had reason to know of their alleged harm").

With respect to the Sinur Report, Pegasystems' delay argument is premised primarily on the Sinur Rebuttal—a document that an Appian employee created in 2014 in response to the Sinur Report—along with a few other documents reflecting Appian's knowledge of the Sinur Report's existence and its suspicion that Pegasystems had commissioned it. Pegasystems contends these materials show that Appian "knew or should have known" about its potential legal claims regarding the Sinur Report in 2014. But they come nowhere close to showing—let alone as a matter of law—that Appian should have known it had a "provable" claim against Pegasystems at that time. The author of the Sinur Rebuttal testified ██████████████████████████ ████████████████████ Resp. ¶ 129. "[M]ere suspicion" does not "activate the laches clock." *Crown Packaging Tech., Inc. v. Rexam Bev. Can Co.*, 679 F. Supp. 2d 512, 520 (D. Del. 2010). Appian did not truly learn of a provable claim ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ Supp. ¶¶ 40-88; 258-365. *See Ouellette v. Beaupre*, 977 F.3d 127, 136 (1st Cir. 2020) (accrual is delayed until plaintiff is or should "be aware of both the fact of his … injury and the injury's likely causal connection" to defendant).

10

With respect to the Scalability White Paper and the Technical Competitive Brief, Pegasystems' delay argument is even weaker.  If a plaintiff "legitimately was unaware of the defendant's conduct, laches is no bar to suit."  *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002).  There is **no evidence** that Appian had **any knowledge** of these challenged documents before learning of them through discovery in this case.  Resp. ¶ 141.

Pegasystems contends that the laches clock began to run as soon as Appian caught wind of unspecified "scalability attacks" by Pegasystems because they shared the same "central theme" as the materials Appian now challenges.  Br. 9-10.  This is nonsense.  Appian's mere knowledge that Pegasystems was calling into question Appian's ability to scale—without knowledge of specific false materials constituting "commercial advertising" that had caused Appian to suffer lost business—did not put Appian on notice of a "provable [Lanham Act] claim."

As a last-ditch argument, Pegasystems suggests that Appian had knowledge of the Technical Competitive Brief ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████  Thus, knowledge of the document cannot be imputed to Appian based on this unrelated lawsuit—let alone as a matter of law.  *See* Restatement (Third) Agency § 5.03(b) (2006) (noting that knowledge is not imputed to a principal if the agent "is subject to a duty to another not to disclose the fact to the principal").

### 2.    Pegasystems Has Failed To Demonstrate Prejudice

Even if Appian delayed unreasonably in filing suit, laches also requires a "clear showing of prejudice" resulting from that unreasonable delay.  *Sch. Union No. 37 v. Ms. C.*, 518 F.3d 31, 35 (1st Cir. 2008); *see also Vineberg*, 548 F.3d at 58 (party arguing laches "ha[s] an obligation to

adduce specific evidence of prejudice").  Pegasystems' claims of prejudice are both legally defi-cient and factually unsupported.  They come nowhere close to the requisite "clear showing" or "specific evidence" necessary to establish laches—let alone on summary judgment.

*First*, Pegasystems argues that it was prejudiced because, if Appian prevails, Pegasystems' liability will be greater than it would have been if Appian had sued earlier. Br. 12.  But the mere "increased amount of [an adversary's] damages as a result of the delay" is "insufficient" to estab-lish cognizable prejudice.  *Nordock Inc. v. Sys. Inc.*, 927 F. Supp. 2d 577, 606 (E.D. Wis. 2013).  Otherwise, prejudice "would then arise in every suit" where delay has occurred.  *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1033 (Fed. Cir. 1992).  Rather, a showing of "economic prejudice" requires an "expenditure of resources in reliance upon the status quo," *Vine-berg*, 548 F.3d at 57, such as "build[ing] a factory to manufacture [an infringing] article," *Giese v. Pierce Chem. Co.*, 29 F. Supp. 2d 33, 42 (D. Mass. 1998).[6]  Pegasystems offers no evidence of any such investment.  Moreover, Pegasystems has cited no proof that it would have ceased its false advertising campaign had Appian sued earlier.  *See EEOC v. Acorn Niles Corp.*, 1995 U.S. Dist. LEXIS 9346, at *15-17 (N.D. Ill. July 6, 1995) (no prejudice absent "evidence that [Defendant] would have acted differently had plaintiff filed his claim at an earlier date").  If anything, Pega-systems' vigorous defense of the Sinur Report shows that it would ***not*** have done so.

*Second*, Pegasystems argues that it was prejudiced



Even under Pegasystems' view of the law, Appian's

---

[6] For this reason, *John G. Alden Ins. Agency, Inc. v. John G. Alden Ins. Agency of Fla., Inc.*, 2003 WL 22843069 (D. Mass. Nov. 26, 2003), *vacated by*, 389 F.3d 21 (1st Cir. 2004), a trademark case, is of no help to Pegasystems.  There, the court found that the defendant had relied on the plaintiff's inaction for nearly two decades by "build[ing] up its business" and "market position" around the infringing trademark. *Id.* at *5.

delay did not become "unreasonable" until 2018, four years from that publication date. "[B]y definition," any events that transpired before that point "may not figure at all in the [prejudice] analysis." *Hall v. Aqua Queen Mfg.*, 93 F.3d 1548, 1557 (Fed. Cir. 1996). Any prejudice stemming ████████████ could not have been "incurred *as a result of*" Appian's allegedly unreasonable delay, *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 831 F. Supp. 202, 220 (D. Mass. 1993) (emphasis in original), because it did not occur "after the point at which [Appian's] delay became unreasonable," *EEOC v. Massey-Ferguson, Inc.*, 622 F.2d 271, 280 (7th Cir. 1980).

Moreover, a party arguing laches on the basis of evidentiary prejudice must show which "*particular* documents ... [it] might have located but for the delayed commencement of the action" and "*how* the acquisition of [those] documents [would have] assist[ed] [its] defense." *Vineberg*, 548 F.3d at 58 (emphasis added); *see also Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*, 379 F. Supp. 3d 53, 100-02 (D. Mass. 2019) (party asserting prejudice must "explain why [the missing] evidence would change the outcome of the case"). Pegasystems has not even attempted to do so, and Mr. Schuerman—Pegasystems' Rule 30(b)(6) designee on the topic of laches—█████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

Pegasystems further argues that witnesses "could not remember facts" due to the passage of time. Br. 13. But a generic assertion "that witnesses' memories have lessened" is "not sufficient" to show prejudice, *Dana-Farber*, 379 F. Supp. 3d at 101—especially since Pegasystems has not explained with any particularity how any faded memories impaired its defense. *See also EEOC v. Watkins Motor Lines, Inc.*, 463 F.3d 436, 440 (6th Cir. 2006). As Mr. Schuerman testified, ██

██████████████████████████████████████████████

████ Resp. ¶ 163.  At best, this presents "[a] question of fact on the issue of prejudice which ma[kes] summary judgment improper."  *Massey-Ferguson*, 622 F.2d at 279-81.

Pegasystems' final theory of prejudice is that two of its former employees "now instead work for Appian."  Br. 13.  Prejudice "may arise out of … the ***unavailability*** of important witnesses."  *Vineberg*, 548 F.3d at 57.  However, both witnesses were available and were in fact deposed by Pegasystems in this case.  Resp. ¶ 160.  Mr. Schuerman ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

### 3.      Pegasystems' Inequitable Conduct Precludes Its Assertion of Laches

Even if Pegasystems had shown undue delay and prejudice, that would "merely lay the foundation for the [C]ourt's exercise of discretion."  *Philips*, 2013 WL 6169331, at *6.  An "equitable defense, such as laches, cannot be used to reward a party's inequities or to defeat justice." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 825 (7th Cir. 1999).  The Court must "weigh all pertinent facts and equities," including Pegasystems' own "conduct or culpability."  *Stein*, 135 F. Supp. 2d at 270.

The equities weigh strongly against applying laches to bar Appian's claims given the extensive proof of Pegasystems' willful and egregious conduct.  ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████

Pegasystems' calculated, years-long effort to mislead consumers and steal business from

Appian constitutes "egregious conduct which … change[s] the equities significantly in [Appian's] favor," thereby precluding Pegasystems from invoking laches—especially in this summary judgment posture. *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 775 (Fed. Cir. 1995); *see also DeCosta v. CBS*, 520 F.2d 499, 514 (1st Cir. 1975) (holding that laches was unavailable "where defendant's action was found by the jury to be deliberate and knowing"); *Merisant Co. v. McNeil Nutritionals, LLC*, 515 F. Supp. 2d 509, 523 (E.D. Pa. 2007) (denying summary judgment on basis of laches where plaintiff "raise[d] genuine disputes of material facts as to whether [defendant's] hands are 'unclean'").

### 4.    Appian's State-Law Claims Are Not Time-Barred

Appian's state-law claims are not time-barred because the relevant statutes of limitations did not begin to run until Appian should have known "of the factual basis for [its] cause of action," including both the "conduct" *and* the resulting "injury." *Wolinetz v. Berkshire Life Ins. Co.*, 361 F.3d 44, 47-48 (1st Cir. 2004). As explained above, Appian had no knowledge of the injury caused by the Sinur Report prior to discovery in this case, and did not know that the other challenged materials even existed. Moreover, each successive distribution of the challenged ads constituted a "new wrong . . . [that] start[ed] a new limitations period." *Petrella v. MGM*, 572 U.S. 663, 671 (2014). Pegasystems distributed the Sinur Report and other materials through multiple channels for a number of years. Supp. ¶¶ 36-39; 81-83. Thus, even if Appian's claims regarding the earliest distributions of the Sinur Report were time-barred (and they are not), its claims for successive distributions would remain timely.

### C.    There Are Triable Issues Regarding Each Element of Appian's False Advertising and Commercial Disparagement Claims

### 1.    There Is a Triable Issue Regarding Injury

Pegasystems asserts that "there is no evidence demonstrating that Appian lost any

competitive opportunity because" of its false advertising.  Br. 16.[7]  That is willful blindness to the

undisputed facts.  Unlike Pegasystems, which could not identify a single dollar of business it lost

because of the BPM.com Report, Appian has adduced substantial evidence that it lost business

from at least *seven* specific customers due to Pegasystems' false advertising.[8]  Appian's expert,

John Hansen, has opined that Appian's loss of these seven opportunities alone resulted in over ██

████████████████  Supp. ¶ 261.  This is more than sufficient to preclude summary judgment.

- ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ██████████████████████████████████

- ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  █████████████████████████████████

---

[7] As set forth in prior briefing, there is no merit to Pegasystems' alternative suggestion that Appian should be precluded from seeking damages in this case because of potential overlap with damages Appian seeks in separate litigation involving Pegasystems' theft of Appian's trade secrets.  *See* ECF 549 at 18.

[8] This is so even though the parties agree that these lost opportunities involved a "lengthy and complex sales process," in which "product demonstrations, proofs of concept, and request for customer references" may also have influenced customers' decisions.  Br. 16.  Appian does not contend—and has no obligation to prove—that Pegasystems' false advertising was the "sole" or "but-for" cause of these customers' decisions, only that it was a "substantial factor" in those decisions.  *See Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1387 & n.12 (5th Cir. 1996).





### 2.   There Is A Triable Issue Regarding Falsity

Appian may prove falsity by showing that the statements at issue are either "literally" or "implicitly" false.  *Cashmere*, 284 F.3d at 311.  A claim is "literally false" not only if it makes an "explicit claim," but also if the false claim "is conveyed by necessary implication"—*i.e.*, where, "considering the advertisement in its entirety, the audience would recognize the claim as if it had been explicitly stated."  *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co*., 228 F.3d 24, 35 (1st Cir. 2000).  As set forth below, Pegasystems' claims regarding Appian's purported technical limitations were direct, unambiguous and categorical.  At minimum, these claims would have been readily understood by their intended audience to convey that Appian lacked key capabilities and features necessary to meet the needs of large enterprise clients.  Appian has adduced overwhelming evidence that these claims were literally false, and certainly enough to defeat Pegasystems' bid for summary judgment.  *See generally* Supp. ¶¶ 101-261; Resp. ¶¶ 169-252.

By and large, Pegasystems has not even attempted to show that its claims were true.

Instead, it seeks to muddy the waters by mischaracterizing the claims at issue and portraying them as "ambiguous."  Indeed, Pegasystems devotes much of its argument to suggesting that ordinary English words such as "lacks," "support," and "necessary" are so subjective and ambiguous that they rendered the challenged statements mere puffery "incapable of being prove true or false."  Br. 21-22.  This borders on the frivolous: words have meaning, especially in this highly technical field. That is why Pegasystems chose them so carefully.  As Appian's industry expert, Dr. Marshall, explained, the parties' customer base would have easily grasped the specific technical messages conveyed by these claims.  Supp. ¶¶ 118, 126, 133, 140, 145, 148, 166, 171, 188, 192, 196, 206, 214, 218, 239, 245, 254.  But even if there were any potential ambiguity, that only confirms there is a factual dispute for the jury to resolve.  *See SharkNinja Operating LLC v. Dyson Inc.*, 200 F. Supp. 3d 281, 290 (D. Mass. 2016) (the "message [a] claim actually communicates or necessarily implies is a factual dispute best resolved by a jury"); *Clorox*, 228 F.3d at 34 ("[A] factfinder must determine the claim conveyed by the advertisement.").[10]

- 

---

[10] Pegasystems claims that Appian cannot proceed on a theory of implied falsity absent evidence of consumer deception. Br. 19 n.11.  This is incorrect for two reasons. First, "[i]t is well established that if there is proof that a defendant intentionally set out to deceive or mislead consumers, a presumption arises that customers in fact have been deceived."  *Cashmere*, 284 F.3d at 316; *see also Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298–99 (2d Cir. 1992).  Here, there is substantial evidence of Pegasystems' intent to deceive.  *See* Supp. ¶¶ 101-261.  Second, as just noted, Appian's industry expert, Dr. Marshall, has explained exactly how industry participants would have understood these claims.  *See Merial LLC v. Fidopharm, Inc.*, 2014 WL 11930586, at *4 (N.D. Ga. Sept. 5, 2014) ("Evidence of consumer deception can include … expert testimony").





---

[11] For space reasons, Appian does not respond here to Pegasystems' arguments regarding the ████████ ████████████████████ but disputes that summary judgment should be awarded to Pegasystems on those claims for the reasons set forth in its supplemental statement of facts.  *See* Supp. ¶¶ 236-257.

21

Finally, there is no merit to Pegasystems' convoluted argument that Appian is precluded from asserting that these claims were false because, according to Pegasystems, Appian argued in the Virginia Action that Pegasystems' false claims were actually Appian trade secrets.  Br. 20. Appian did no such thing.  As Appian's corporate designee has explained at length, although Pegasystems used confidential documents stolen from Appian as the ***starting point*** for some of the false advertising in this case, it intentionally "twisted" the stolen documents' contents in a manner that rendered the resulting claims false—while maintaining a veneer of plausibility, because the claims sounded like they came from Appian technical documents.  Supp. ¶ 35.  There is no inconsistency in arguing that the original documents Pegasystems stole were trade secrets, and that Pegasystems' intentional distortions of statements from those documents constitute false advertising.

### 3.      There Is A Triable Issue Regarding Materiality

"To meet the materiality requirement," a plaintiff "must demonstrate that the false statement is 'likely to influence the purchasing decision' or involves an 'inherent quality or characteristic'" of the product.  *Spruce Envtl. Techs., Inc. v. Festa Radon Techs., Co*., 248 F. Supp. 3d 316, 320 (D. Mass. 2017) (citations omitted).  Pegasystems' false advertising—both the central message that Appian cannot scale to meet the needs of large clients, and the individual technical claims intended to support that message—was material under either standard.

The unmistakable thesis of these materials is that Appian lacks a feature essential to any large organization looking to purchase BPM software: the technical ability to scale.  ███████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████  Supp. ¶ 103, 105.  Pegasystems now tries to argue that these claims concerned mere "bells-and-whistles" and did not relate to "essential" aspects of BPM software platform.  Br. 19 n.10.  But Pegasystems' own corporate representative ████████████████████████████████████████████████████████████████

22

███████████████████████████████████████████████

███████████████████████████████████████████████

Supp. ¶ 104.  Pegasystems also argues, vis-à-vis its affirmative claims, that TCO is a material feature of a BPM software platform that would influence a reasonable purchaser's decision; it cannot argue the opposite when its own TCO claims are challenged.

Appian has also shown that Pegasystems' claims are "likely to influence the purchasing decision" via the testimony of Dr. Marshall, an industry expert.  *Cashmere*, 284 F.3d at 311.  Dr. Marshall reviewed the claims at issue, and concluded that each was important to consumers and likely to influence their purchase decisions.  Supp. ¶¶ 102-103, 119, 127, 131, 141, 157, 169, 181, 197, 205, 215, 226, 238, 247.  The reactions of actual customers to the challenged statements further confirm their importance to purchase decisions.  *Supra*, at 16-18.  Collectively, this evidence is more than sufficient to survive summary judgment on materiality—which "is generally a question of fact."  ECF 122 at 9 (citation omitted).

### 4.    The Scalability White Paper and the Technical Competitive Brief Are "Commercial Advertising" Under the Lanham Act

The Scalability White Paper and Technical Competitive Brief both constitute "commercial advertising" under First Circuit law, which requires only that the "representation ... (a) constitute commercial speech (b) made with the intent of influencing potential customers to purchase the speaker's goods or services (c) by a speaker who is a competitor of the plaintiff in some line of trade or commerce and (d) disseminated to the consuming public in such a way as to constitute 'advertising' or 'promotion.'"  *Podiatrist Ass'n v. La Cruz Azul de P.R., Inc*., 332 F.3d 6, 19 (1st Cir. 2003).  Pegasystems disputes only the final prong of this test, arguing that these documents did not "reach[] sufficient numbers of customers."  Br. 22.

However, the "touchstone" of the analysis is not how many customers were reached, but

whether the challenged material was "part of an organized campaign to penetrate the relevant market." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002).



These facts are more than sufficient to permit a jury to conclude these materials constitute commercial advertising.

Moreover, the "required level of circulation … will vary according to the specifics of the industry," *Seven-Up*, 86 F.3d at 1385-86, and as Pegasystems admits, "no minimum number of statements is required," Br. 23. "Where the potential purchasers in the market are relatively limited in number"—as is the case here, where the parties are selling highly expensive, specialized business software via direct, one-on-one customer interactions—"even a single promotional presentation to an individual purchaser may be enough to trigger the protections of the [Lanham] Act." *Id.*; *see, e.g.*, *Am. Traffic Solutions, Inc. v. Redflex Traffic Sys. Inc.*, 2010 WL 1640975, at *3 (D. Ariz. Apr. 22, 2010) ("A reasonable trier of fact could find that disseminating contract proposals to eleven governmental entities constitutes promotion in defendant's industry.").

### 5. There Is A Triable Issue Regarding Actual Malice

Appian's commercial disparagement claim cannot be resolved at summary judgment because there is a genuine dispute as to whether Pegasystems acted with "actual malice." To meet this requirement, Appian need only show that Pegasystems had "knowledge of the statement's

---

12

falsity or act[ed] with reckless disregard of its truth or falsity." *HipSaver, Inc. v. Kiel*, 984 N.E. 2d 755, 763 (Mass. 2013). As outlined above, *see supra*, 6-9, 18-21, Appian has easily adduced sufficient evidence to proceed to trial on this issue. *See Emery v. Merrimack Valley Wood Prods., Inc.*, 701 F.2d 985, 992 (1st Cir. 1983) ("State of mind is difficult to prove and great circumspection is required where summary judgment is sought on an issue involving state of mind.").

> ### D.     Pegasystems Is Not Entitled to Summary Judgment Regarding Appian's Claims Arising from the Defamatory LinkedIn Post

Just days after the Court denied Appian's motion to dismiss Pegasystems' claims, Pegasystems' Chief Marketing Officer, Tom Libretto, published a post on LinkedIn (the "Post") falsely suggesting that the Court had ruled that Appian had told "blatant lies" and acted "unlawfully." Resp. ¶¶ 328-330. ███████████████████████████████████████

████████████████████████████████████████████████████████████████

Resp. ¶ 333. As the Court has already held, these undisputed facts set forth a claim for defamation *per se*. ECF 122 at 18-19. Pegasystems' four arguments to the contrary are without merit.[13]

*First*, Pegasystems may not invoke the First Amendment to evade liability because "it is well settled that false commercial speech is not protected by the First Amendment." *Vascular Sols., Inc. v. Marine Polymer Techs., Inc.*, 2008 WL 11429636, at *1 (D. Mass. June 30, 2008). This Court has already held that the Post "was made with the intent of influencing potential customers to purchase [Pegasystems'] goods or services over those of Appian." ECF 122 at 18-19.

████████████████████████████████████████████████████████████████

█████████████████████████████████████████ Resp. ¶ 333. This coordinated

---

[13] Pegasystems' "understanding" that Appian has not asserted Lanham Act or Chapter 93A claims based on the Post is simply incorrect. Pegasystems previously moved to dismiss those claims, and the Court denied that motion. *See* ECF 122 at 18-19.

commercial smear campaign falls far outside the protections of the First Amendment.[14]

***Second***, the Post is not insulated by the "fair report" privilege.  As Pegasystems admits, this privilege extends only to reports on court proceedings that are "substantially correct."  Br. 26; *see also Howell v. Enter. Publ'g Co., LLC*, 920 N.E.2d 1, 21 (Mass. 2010) (report must "fairly and accurately describe statements" made in court proceedings).  Here, the Post's essential message was anything but accurate: that the Court, by denying Appian's motion to dismiss, had concluded that Appian had told "blatant lies" and committed "unlawful" conduct.  As the Court has already found, the denial of Appian's motion to dismiss "does not support [the Post's implication] that Appian told 'blatant lies.'"  ECF 122 at 17.  The Post, therefore, is ***not*** an accurate description of a court proceeding, because it gives "an erroneous impression of what actually happened." *Howell*, 920 N.E.2d at 21.  Moreover, "[t]he reporter is not privileged ... to make additions of his own that would convey a defamatory impression, nor to impute corrupt motives to any one, nor to indict expressly or by innuendo the veracity or integrity of the parties."  Restatement (Second) Torts § 611, cmt. f.  That is precisely what the Post does.  Finally, the privilege does not apply where the speaker acts with "malice," as Pegasystems did here.  *Howell*, 920 N.E.2d at 13 n.8.

***Third***, Pegasystems argues that the Post's claims were "true," and thus non-actionable, because they merely conveyed Pegasystems' "belie[f]" that Appian had told "blatant lies," and Pegasystems actually held that belief.  Br. 27.  But Pegasystems "cannot just couch a 'false asser-tion of fact' in 'terms of an opinion' and thereby evade liability."  *Bd. of Forensic Document Exam'rs, Inc. v. ABA*, 287 F. Supp. 3d 726, 736 (N.D. Ill. 2018).  As the Supreme Court has

---

[14] Pegasystems' attempt to cast the Post as protected "petitioning activity" fails for the same reason.  The Post references a "direct competitor," has a "distinctly commercial flavor," and served the "commercial purpose of attracting potential customers by sharing unfavorable information about" Appian.  *Riverdale Mills Corp. v. Cavatorta N. Am., Inc.*, 189 F. Supp. 3d 317, 325 (D. Mass. 2016) (holding that challenged statement was not protected "petitioning activity" even though it referenced an ongoing court proceeding).

observed, "If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth.... [I]f those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement" is still actionable—even if the speaker believes Jones is a liar. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990).

**Finally**, Pegasystems asserts (without any evidence or legal authority) that it did not act with actual malice. Br. 27. But Appian has no obligation to prove actual malice because Appian is not a "public figure." *Riley v. Harr*, 292 F.3d 282, 288 (1st Cir. 2002). A "corporation must do more than … typical comparative advertising" to be deemed a public figure subject to the actual malice requirement, *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 939 (3d Cir. 1990)—yet that is all Appian did here to provoke Pegasystems' defamatory statements.

Regardless, even if Appian did have an obligation to prove "actual malice"—i.e., that Pegasystems acted with "reckless disregard" of the truth, *see Murphy v. Boston Herald*, 865 N.E. 2d 746, 752 (Mass. 2007)—Appian has easily adduced enough evidence to survive summary judgment on that score. As the Court already noted, "the author of the Post had access to the Court's prior opinion and would have known that the opinion did not support an accusation that Appian told 'blatant lies.'" ECF 122 at 17-18. Mr. Libretto, the Post's author, ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Resp. ¶ 332. That easily qualifies as reckless disregard; at minimum, a reasonable jury could so conclude. *See, e.g.*, *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989) (speaker's "purposeful avoidance of the truth" by failing to review readily available sources constituted actual malice).

## CONCLUSION

For these reasons, Pegasystems' Motion for Summary Judgment should be denied.

Dated:  May 6, 2022

By: /s/ Adeel A. Mangi

Adeel A. Mangi (*pro hac vice*)
Steven A. Zalesin (*pro hac vice*)
Jonah M. Knobler (*pro hac vice*)
Jason Vitullo (*pro hac vice*)
Michael Sochynsky (*pro hac vice*)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone:  (212) 336-2000
Facsimile:  (212)336-2222
aamangi@pbwt.com
sazalesin@pbwt.com
jknobler@pbwt.com
jvitullo@pbwt.com
msochynsky@pbwt.com

-and-

Timothy H. Madden (BBO #654040)
DONNELLY, CONROY & GELHAAR, LLP
260 Franklin Street, Suite 1600
Boston, Massachusetts 02110
(617) 720-2880
thm@dcglaw.com

*Attorneys for Defendant/Counterclaim Plaintiff*
*Appian Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I, Adeel A. Mangi, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Adeel A. Mangi
Adeel A. Mangi