<pre>
 1                   IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS
 2

 3      PEGASYSTEMS INC.,                )
                                         )
 4                     Plaintiff         )
                                         )
 5           -VS-                        )  CA No. 19-11461-PBS
                                         )  Pages 1 - 89
 6      APPIAN CORPORATION, et al,       )
                                         )
 7                     Defendants        )


 8

 9                            MOTION HEARING

10            BEFORE THE HONORABLE PATTI B. SARIS
                     UNITED STATES DISTRICT JUDGE

11

12

13

14

15                                  United States District Court
                                    1 Courthouse Way, Courtroom 19
16                                  Boston, Massachusetts  02210
                                    July 15, 2022, 9:12 a.m.
17

18

19

20

21

22                           LEE A. MARZILLI
                          OFFICIAL COURT REPORTER
23                       United States District Court
                        1 Courthouse Way, Room 7200
24                          Boston, MA  02210
                             leemarz@aol.com
25
</pre>

```
 1    A P P E A R A N C E S:

 2         AUGUST T. HORVATH, ESQ. and KRISTOPHER N. AUSTIN, ESQ.,
      Foley Hoag LLP,155 Seaport Boulevard, Seaport World Trade
 3    Center West, Boston, Massachusetts, 02210, for the Plaintiff.

 4         JAMES M. GROSS, ESQ., Foley Hoag LLP,
      1301 Avenue of the Americas, 35th Floor, New York, New York,
 5    10019, for the Plaintiff.

 6         ADEEL A. MANGI, ESQ., JONAH M. KNOBLER, ESQ. and
      MICHAEL SOCHYNSKY, ESQ., Patterson, Belknap, Webb & Tyler LLP,
 7    1133 Avenue of the Americas, New York, New York, 10036-6710,
      for the Defendant, Appian Corporation.

 8
           DAVID MICHAEL MAGEE, ESQ. and KARL FISHER, ESQ.,
 9    Armstrong Teasdale LLC, 800 Boylston Street, 30th Floor,
      Boston, Massachusetts, 02199, for the Defendant Business
10    Process Management.

11    ALSO PRESENT:  Christopher Geyer

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

THE CLERK:  Court calls Civil Action 19-11461,
Pegasystems v. Appian Corporation, et al.  Could counsel please
identify themselves.

MR. HORVATH:  Good morning, your Honor.  For Plaintiff
Pegasystems, August Horvath from the firm of Foley Hoag.  With
me are my colleagues Neil Austin and James Gross.

THE COURT:  Thank you.

MR. MANGI:  Good morning, your Honor.  Adeel Mangi
from Patterson Belnap Webb & Tyler for Appian.  With me are my
colleagues, Jonah Knobler, Michael Sochynsky, as well as our
client, Christopher Geyer, who's right behind me.

MR. MAGEE:  Good morning, your Honor.  David Magee on
behalf of Defendant Business Process Management.  With me today
is my associate, Karl Fisher.

THE COURT:  All right.  So have you all worked
among -- you may be seated, please -- have you all worked out a
schedule, or do you want me to put you on one?  It sounds
like --

MR. MANGI:  By schedule, your Honor, I assume you mean
a schedule for the process --

THE COURT:  We have two hours.  How long is your
presentation likely from Pegasystems?

MR. AUSTIN:  Well, your Honor, I think if we ran
through from start to finish, it would be roughly 45 minutes,

```
 1   maybe less.
 2            THE COURT:  And yours?
 3            MR. MANGI:  About an hour, your Honor, but we can
 4   adjust to whatever time you have available.
 5            THE COURT:  And were you addressing all four motions
 6   in your PowerPoint?
 7            MR. MANGI:  Yes, your Honor.
 8            THE COURT:  So I was thinking what might be more
 9   helpful to me would be, for example, Appian's motion for
10   summary judgment on the claims, then your motion for summary
11   judgment on the counterclaims, and if there was time left over,
12   which there probably wouldn't be, address the motions to strike
13   experts.
14            MR. MANGI:  That's fine, your Honor.
15            THE COURT:  I don't know if you're -- I've just now
16   seen for the first time the PowerPoints, and I didn't know if
17   they broke down that way.
18            MR. MANGI:  That actually fits my time sequence
19   perfectly.
20            MR. AUSTIN:  Yeah, and it's not exactly fitting with
21   our proposed presentation, but that's fine, your Honor.  We can
22   work around your preference.
23            THE COURT:  Yes, just I'll be able to -- you also have
24   a motion for summary judgment on your own claim.
25            MR. AUSTIN:  Correct, both affirmative and defensive.
```

```
 1              THE COURT:  So I don't mind if you address that at the

 2    same time, but why don't we start with -- and is BPM going to

 3    separately argue?

 4              MR. MAGEE:  Not unless necessary, your Honor.

 5              THE COURT:  Okay.  So I'll just assume that, what I

 6    thought would make the most sense, and I defer to you, would be

 7    half an hour, half an hour on the -- is that too much time? --

 8    on the...

 9              MR. MANGI:  On Appian's motion, your Honor?

10              THE COURT:  Yes, your motion, a half an hour response.

11              MR. AUSTIN:  That sounds about right, your Honor.

12              THE COURT:  And maybe a little less, and to the extent

13    we have some left over, we can talk about the Daubert motions,

14    but --

15              MR. MANGI:  I may borrow a little time from our other

16    motions, but that's basically fine.

17              THE COURT:  Well, I'm not sure there will be time for

18    your two Daubert motions.

19              MR. MANGI:  Right.

20              THE COURT:  But you're welcome to leave it in.  Some

21    of it overlaps actually.

22              MR. MANGI:  Yes.  Do you intend to reach their motions

23    for purposes of argument today, just in terms of whether I

24    should leave time?

25              THE COURT:  Their motion for summary judgment?
```

1          MR. MANGI:  Yes, his motion.

2          THE COURT:  That's why a half an hour for your

3    presentation on your motion for summary judgment on their

4    claims, a half an hour on their claims for the BPM report.  And

5    then we're going to move on to Pegasystems' motion for summary

6    judgment, for example, on the laches issue, et cetera, on your

7    claims, and whether things are advertisements, et cetera, and a

8    half an hour for them and a half an hour you can respond.

9          MR. MANGI:  Understood.

09:16 10          THE COURT:  And if you want to save a few minutes for

11    rebuttal, that's fine too.

12          MR. MANGI:  Thank you.

13          THE COURT:  The hard stop is, I have a sentencing at

14    11:00, so if there's stuff left over -- that will probably take

15    about a half hour -- you'd come back afterwards.  I'd ideally

16    like not to have to make you do that.  Okay, thank you.

17          MR. MANGI:  Your Honor, would you prefer that I

18    address issues here or from the podium, or do you not have a

19    preference?

09:16 20          THE COURT:  It's all about it doesn't matter to either

21    Ms. Marzilli, the Court Reporter, or me.  You just need to

22    speak into the mic.  And you're really tall, so sometimes the

23    mic doesn't catch you well.

24          MR. MANGI:  Are you able to read me okay?  Okay, I'll

25    make up for tallness with loudness, your Honor.

|   | |
|---|---|
| 1 | THE COURT:  All right. |
| 2 | MR. MANGI:  Okay, could we have control over the |
| 3 | system? |
| 4 | THE CLERK:  You should.  Let me toggle over to your |
| 5 | table.  Just a minute. |
| 6 | THE COURT:  I wouldn't mind borrowing a few of your |
| 7 | precious moments for argument for you to basically explain to |
| 8 | me what your product does. |
| 9 | MR. MANGI:  Yes, your Honor, absolutely. |
| 09:17 10 | THE COURT:  Because a lot of your debates about |
| 11 | whether something was truthful or not made no sense to me |
| 12 | without a tutorial on how the product worked. |
| 13 | MR. MANGI:  Certainly.  I'll start with that, your |
| 14 | Honor. |
| 15 | I note that our screen is not lit up, although the |
| 16 | others appear to be. |
| 17 | THE COURT:  I don't know.  She just left.  If you |
| 18 | could grab... |
| 19 | I'm sorry, the screens aren't working. |
| 09:18 20 | THE CLERK:  Whose aren't working? |
| 21 | MR. MANGI:  Well, theirs just came on.  Ours appear to |
| 22 | still be off. |
| 23 | THE CLERK:  Just tap the front.  It was on earlier, |
| 24 | correct? |
| 25 | THE COURT:  Are we set now? |

         1              THE CLERK:  Yes.  We checked it this morning and it

         2     worked, but there's always a glitch.

         3              THE COURT:  Yes.  Okay, go ahead.

         4              MR. MANGI:  Your Honor, let me start with the

         5     background you asked for on what the products do.  So, your

         6     Honor, these are competitors in a field called "business

         7     process management," and the idea here is that when companies

         8     have business functions and they wish to automate those and

         9     have a way of working with them through a computerized process

09:19   10     flow, they can use these companies as vendors to help them do

        11     that.  So it could be something very small.  Let's say you have

        12     a company that has an employee on boarding process for new

        13     hires, and they want to set up a way to do that such that

        14     emails are automatically sent at certain stages, information is

        15     pulled in from electronic databases at certain stages, but the

        16     whole process is run through a business process that's set up

        17     electronically.  They can hire these companies to come in and

        18     set up the technology to do that.

        19              But sometimes it's much more involved than that.  You

09:19   20     know, a company may wish to have a similar business process set

        21     up electronically to run their whole business, from procurement

        22     to manufacturing to shipping, have automated emails going out

        23     at various stages of the process, manage it all through one

        24     system, have data pulled in from different places.  These

        25     systems also allow them to do that.  These are highly

1   customized products.

2         The companies offer their own consulting services or

3   they work with partners that help clients do that.  In general,

4   these are sophisticated clients.  They're some of the largest

5   companies in the country, as well as a number of small

6   companies, because the products run the gamut from things that

7   are very modest --

8         THE COURT:  The consultants help design it, or they're

9   helping to run it?

09:20 10         MR. MANGI:  There are consultants involved at all

11   stages of the process, some at procurement, some at design and

12   implementation, and then sometimes later at a client's

13   election, depending on the type of client and their own in-house

14   resources.  So that in a nutshell is what they're doing, your

15   Honor.

16         THE COURT:  And how many companies compete in this

17   market?

18         MR. MANGI:  Many, many.  In fact, I have a slide

19   showing you that.

09:20 20         THE COURT:  All right, so I'll let you go.  So say you

21   were a shoe manufacturer, this would help you with what,

22   everything from supply chain through sales?

23         MR. MANGI:  Sure, yes.  Where am I getting my leather

24   from?  What's my manufacturing process?  Which manufacturing

25   run are things on?  When are they ready?  Where are the orders

1    coming in?  Where are we shipping them?  Maybe we have an

2    automated email draft for a supplier when the inventory gets to

3    a certain level.  Customer interactions can be automated, all

4    of that.

5            THE COURT:  All right, so it's everything from, as I

6    read your papers, from banks to governments to just retail

7    merchants?

8            MR. MANGI:  Yes, absolutely.  If you look through both

9    companies' client lists, you'll recognize, you know, most of

09:21 10   the companies in the country, from the very large financial

11   institutions and banks and, you know, government agencies.  For

12   example, Appian's clients include the U.S. Air Force.  So it

13   runs the gamut, but this is a technology that is powering the

14   way many household brands and government agencies function

15   behind the scenes.

16           THE COURT:  All right, so it's not the future; it's

17   the present.  And all major companies have it?

18           MR. MANGI:  It's very much the present.

19           THE COURT:  So I'm not talking about little

09:22 20   mom-and-pop stores, but basically any major --

21           MR. MAGI:  Little mom --

22           THE COURT:  -- basically have these programs?

23           MR. MANGI:  Little mom-and-pop stores can also use

24   this technology, your Honor.  I'll give you an example.  When

25   COVID hit, many state governments required businesses to have a

1    setup to track whether your employees have had a fever in the

2    last ten days or whether they had a positive test.  Many

3    businesses used little COVID-specific apps.  So every day

4    before coming in, you had to check off the right boxes.  That's

5    an example of a product that these companies can supply, the

6    very simple small-end level.

7             THE COURT:  All right, thank you.

8             MR. MANGI:  Okay, that's a little bit of background.

9             Now, your Honor, let me touch, before I get directly

09:22 10   to our motion, on some crosscutting issues that I think will

11   apply both to our motion as well as to others.

12             Now, your Honor, as you know, Pega filed this lawsuit

13   almost three years ago now, in July of 2019.  It wasn't the

14   first time they'd sued Appian.  They had other lawsuits they

15   walked away from eventually, but they then chose to start this

16   one.  And since then, as time has gone on, Pega has maintained

17   the suit, even though your Honor denied the preliminary

18   injunction motion, denied them expedited discovery to take that

19   further.  BPM.com is not even in business anymore in this area,

09:23 20   but they've stuck with this and maintained it throughout.

21             But this lawsuit has, your Honor, turned out to be a

22   case study in unintended litigation consequences in ways that

23   are relevant in some ways to all of the motions you have in

24   front of you today.  And let me give you just a quick overview

25   on some of those issues before I get specifically to our

1    motion.

2         Let me start, your Honor, by pointing out that once

3    this litigation started, we got into discovery from Pega, and

4    we discovered that they had been running some extraordinary

5    false advertising campaigns against Appian.

6         Now, this is just one example, your Honor.  This is a

7    document I want to show you, and it's relevant to a number of

8    the motions here today because it goes ultimately to these

9    equitable issues that all sides are pointing to.  And if I can

09:24  10   show you who these people are.  So this is an email that

11   exchanges some texts between Matt Adams and Mark Ryan.  Both of

12   these are senior executives at Pega.  Mark Ryan is now they're

13   Managing Director of North American Financial Services dealing

14   with all those bank customers we talked about.  Matt Adams is

15   now their Sales Director.  And they're talking about the

16   advertising Pega has been running against Appian, and I want to

17   look at some of the things they say:

18        "We have been making stuff up for the past 2 years on

19   Appian."  They recognize they don't have the best products.

09:25  20   They say, "Maybe one of the reasons that 90 percent of the

21   sales force isn't effective is that they are selling lies."

22   And then they say, "Actually, Sinur's document is somewhat

23   baseless based on our revelations."  And they go on to

24   recognize what they're saying is "NOT true," capital N, and

25   they compare themselves to Woodward and Bernstein uncovering a

1   coverup.

2        So as things have developed, your Honor, we now have

3   counterclaims against them --

4        THE COURT:  But aren't you -- I thought we were going

5   to deal with essentially their claims.

6        MR. MANGI:  Yes, I'm about to get to their claims,

7   your Honor, but I just want to point out that when it comes to

8   these issues of equities that have come up all over, you know,

9   this is some piece of the background that I just wanted to flag

09:25 10   for your Honor, and I'll get to the rest of it in due course.

11        Now, let me turn specifically to our motion.  Okay, so

12   our motion, your Honor, is focused on a very simple,

13   straightforward issue.  Pega has all kinds of complaints about

14   the BPM.com report.  They don't agree with those, but we set

15   all of those aside because our motion is focused singularly and

16   simply on one issue, the lack of injury to Pega.

17        Now, let me start with the legal grounding that we are

18   proceeding on.  There is a debate about presumption, so I'll

19   get to that in a moment, but I will point out, the Supreme

09:26 20   Court in *Lexmark* pointed out that a plaintiff must show injury,

21   whether economic or reputational, flowing from the advertising.

22   And the Supreme Court there characterized that injury in terms

23   of causing customers to withhold trade from the plaintiff.  And

24   while *Lexmark* did address that issue, it's not something new or

25   unique.  You know, we cite some other cases on our Slide 11.

1          And let me note, your Honor, in particular the

2     *Verisign* case from the Fourth Circuit in 2017 because in some

3     ways, I think that's on all fours with what we have here.  So

4     in *Verisign*, your Honor, Verisign was the exclusive seller of

5     dot-com domain names on the Internet, and they were suing XYZ,

6     which was a new, top-level domain that had been launched there,

7     XYZ.  And there were false advertising claims as here.  They

8     said XYZ was saying untrue things about the quality of dot-coms

9     available and about their own reputation and success in the

09:27 10    marketplace.

11          And the argument was then ultimately, is there any

12    injury here that is actionable?  And the plaintiffs said, your

13    Honor, two things, the same things they say here:  They say,

14    "Well, we've suffered a loss of goodwill because of this

15    advertising," and they had an expert.  And the expert said,

16    "Oh, well, when I look at the business and the revenues before

17    the advertising and after the advertising, I see a difference,

18    so therefore that's injury."  And the Court rejected both of

19    those things and granted summary judgment on the basis of no

09:28 20    injury because correlation and timing from the expert analysis

21    without showing causation doesn't meet the standard, and the

22    loss of goodwill needs to be particularized.  And the Court

23    pointed out, of course, that this is a core requirement of the

24    statute.

25          So then, your Honor, knowing from our perspective this

1    BPM.com report that's at issue, it is in a dump, your Honor.

2    We put it out there.  We didn't trace a dollar of business to

3    it.  It had just been a failure from a marketing perspective.

4    In the litigation we focused very hard on, "Okay, in discovery,

5    we want to know how you say this injured you."  And we went

6    after that through discovery in front of Judge Kelley, hard

7    from the beginning.  And Pega gave us confirmation again and

8    again and again, and to Judge Kelley, that they could not

9    identify any lost business based upon this.

09:29 10        And I've given you a few examples here.  In January of

11   2020 in front of Judge Kelley, she asked, "Do you believe

12   you've lost a customer?"  And they said, "No, we've not

13   identified specific lost customers."  In May of 2020, again

14   they asked, Mr. Horvath did, and confirmed no lost business, no

15   lost customers, no potential customers.

16        In July we had a hearing in front of Judge Kelley

17   again pressing the issue, and Judge Kelley asked them, "You're

18   not in possession of any documents showing your business was

19   diminished in any way?"  And again they said, "No, we don't

09:29 20   know of anything to that effect."  In fact, Judge Kelley

21   ordered them to, by October 22, identify to us any such lost

22   business because we were pressing it in discovery, and again

23   they wrote to us and said in Slide 15, "We haven't identified

24   anything there."

25        So then, your Honor, we went to their 30(b)(6)

1    witness's deposition.  This was a witness who was identified

2    specifically to talk about the topic of injury to Pega from the

3    BPM.com report.  When we asked him the open-ended question,

4    "Well, tell us, is there any specific customer you've lost?"

5    he said, "I don't know."

6         We went to other fact witnesses, same story.  They had

7    a fact witness who was identified in their initial disclosures

8    on this very topic, injury from the BPM.com report.  As you see

9    here, again he said, "Off the top of my head, no, I can't

09:30 10    identify any customers that we've lost."

11         They did give us, your Honor, emails that they had had

12    with three customers, but all of those customers, Ford,

13    Trackform, and Great West Casualty, an insurance company,

14    stayed with Pega.  They never came to Appian.  We never got any

15    business from them.

16         So when we pressed on that in discovery, ultimately we

17    got a stipulation from them, which is here on Slide 18.  Their

18    business was not affected in any way with these customers.

19         So then, your Honor, after that whole sequence I just

09:31 20    showed you, they did eventually say, "Well, there's one.

21    There's one customer that we lost because of this, and that is

22    Oklahoma Gas & Electric."  And this for context, your Honor, is

23    a company from which Appian got a total of $196,000 in revenue

24    over three years.  That's revenue, not profit.  But what is

25    their claim based on as to OG&E?  It is these ten words, your

1    Honor, that I've highlighted on the screen:  an email from

2    Appian, within Appian, from a sales rep, Ryan Byrne, saying,

3    "The OG&E folks were really excited to hear about it,"

4    "it" being that there was this BPM.com report.  And to be

5    clear, your Honor, that is it.  That is all they have to ground

6    this claim of injury.

7         Now, they produced no communications with OG&E on

8    their side going to this.  There is no evidence that OG&E ever

9    even read the BPM.com report, let alone that it had any

09:32 10    material impact in anything that they wanted to do or any

11    decisions that they ultimately made about any of this.

12         So that's it, that's what they're going on, and we

13    submit that's clearly not enough.  They didn't, by the way, go

14    out to try and depose this Ryan Byrne who sent this email.

15    They didn't seek any discovery from Oklahoma Gas either, so

16    that is the sum total of it.

17         So then, your Honor, we went to that same 30(b)(6)

18    witness of theirs on injury, and he didn't bring up Oklahoma

19    Gas on his own when we asked, "How were you injured?"  So then

09:33 20    we asked about this company specifically and said, "Well, what

21    about this company?  What's your basis for saying you lost any

22    business from them?"  And all he pointed to is, he said, "Well,

23    it's the timing and the lack of response."  In other words,

24    "Right around the time you were using this BPM report, we

25    ceased to hear from this client."

1        And that, your Honor, is clearly not enough to

2   establish any kind of causal link, and we know that because

3   their own expert agrees.  This is testimony from their expert,

4   Rebecca Kirk Fair, the economist, and we asked, "Does the fact

5   that they lost this opportunity in the same time frame that the

6   report was available provide a basis to conclude Pega lost it

7   because of the BPM.com report?"  And she says, "No, I wouldn't

8   infer that, and I think it's improper to infer causation based

9   on that."

09:33  10        Now, given, your Honor, that they have no factual

11   evidence of any injury -- and let me point out, Judge Kelley

12   required them to specifically identify for us any basis for the

13   claim of injury -- OG&E is all they came up with.  So given

14   that they don't have any factual basis, what they try to do to

15   plug that gap is to rely on experts.  But experts, they can't

16   invent injury out of thin air, and here you see Kirk Fair says

17   exactly this, which is, you know, you can't just infer it from

18   temporal proximity.  But then she goes ahead and tries to do

19   exactly that.

09:34  20        So the methodology that she ultimately implemented --

21   and my colleagues, your Honor, will address the *Daubert*

22   issues --

23        THE COURT:  Well, if we have time.

24        MR. MANGI:  Yes, yes, but I'll touch on the key issue

25   here, which is she says, "Look, I looked at the business in the

1    time period before the advertising and the time period after

2    the advertising, and so I see there's a difference.  Appian's

3    rate of acquiring new customers went up," so Appian has no

4    injury, right?

5            Now, that's clearly not good enough because your Honor

6    will recall the *Verisign* case I pointed to.  The court there

7    said the fatal flaw in Lanham Act cases is where experts or

8    parties try to infer causation from correlation.  This is

9    exactly that same fatal flaw here, the same thing she said was

09:35 10   inappropriate.  And in fact we pressed the issue.  So we said

11   to her, "Okay, so you're saying some of these new customers are

12   because of the BPM.com report?  How many?"  And her testimony

13   was, "Well, it's more than zero percent, less than a hundred

14   percent."

15           So that's completely meaningless.  She was just

16   guessing based on the fact that they're new customers, and we

17   know that because when we pressed the issues further, here's

18   what she said, your Honor.  Let alone say this was caused by

19   the BPM.com report, which is the proximate causation injury

09:35 20   requirement in *Lexmark* and others, she says, "I was not even

21   asked to identify a causal relationship between the BPM.com

22   report and any of these contracts."  She didn't even try.  She

23   admits that many of these incremental customers may never even

24   have seen the BPM.com report.  She says they weren't exposed;

25   they're not even injured.

1          THE COURT:  The BPM report was on the website, right?

2          MR. MANGI:  It was on the website, your Honor, for a

3     period of time, and then we took it down.

4          THE COURT:  For what period was it on the website?

5          MR. MANGI:  So it was on our website, it went up in

6     May of 2019, and we took it down in January of 2020, a period

7     of about eight months.

8          THE COURT:  And are the companies she talks about ones

9     that signed on during that period?

09:36 10          MR. MANGI:  She is looking at the time period 2019 and

11     on into 2020.

12          THE COURT:  So not exactly cabined by those dates?

13          MR. MANGI:  I think that's right, yes.  She's looking

14     at splits.  But, in any event, were they concerning Pega?  No,

15     doesn't have any basis to say that.  And in fact we asked her,

16     "Is it possible some of these had nothing to do with the

17     BPM.com report?"  She agrees with that, doesn't dispute it.

18          Now, your Honor, your *HipSaver* case, you mentioned

19     this case at our motion to dismiss hearing, and I wanted to

09:37 20     just point out there in red, your Honor also dealt with this

21     exact same issue which the *Verisign* court did too.  You pointed

22     out that without an expert opinion, the growth rate

23     differential was a result of the false ads.  You know, growth

24     rates alone can't support causation.

25          And your Honor pointed out various other factors that

1   can play into differential growth rates, and we've got very

2   much the same ones here, your Honor:  different advertising,

3   different strategies.  In fact, the thing we talked about in

4   the morning when I started about some of these small customers

5   with COVID-related apps, that was in play here too.  So there

6   is no evidence ultimately of any causation, only of correlation

7   at best.

8          THE COURT:  Economic harm?

9          MR. MANGI:  Absolutely, an actionable injury.

09:38 10          THE COURT:  How do I think about reputational harm?

11          MR. MANGI:  So I have a few slides on that.

12          THE COURT:  Okay, go for it.

13          MR. MANGI:  Okay.  Well, let me just round out on this

14   topic, and then we're actually going straight to that, which

15   is --

16          THE COURT:  Yes, they're not seeking lost profits.

17          MR. MANGI:  Yeah, they're not even seeking it, so

18   we're not arguing.

19          They have another expert, Dr. Pearlson, and this is a

09:38 20   cyber-security expert, and she comes and just provides a

21   conclusory one paragraph where she says, "Oh, you know, I think

22   there is injury here too."  But she's got nothing to do with

23   this industry.  She has done no quantification.  She's just

24   opining, and she says, "I don't know anything about BPM.  I'm

25   not an expert in this --"

```
 1              THE COURT:  Can I just --
 2              MR. MANGI:  Yes.
 3              THE COURT:  I understand your point on economic injury,
 4       but on reputational injury --
 5              MR. MANGI:  Yes.
 6              THE COURT:  And I go there because isn't it common
 7       sense that when you have two prime competitors battling it out,
 8       that if you're going to say one is eleven times more expensive
 9       than the other one, that that is going to hurt them
09:39 10   reputationally?  I mean, do you need an expert to think that?
11              MR, MANGI:  Well, yeah, let me address that, your
12       Honor.
13              THE COURT:  I mean, is that a reasonable inference?
14       Apart from presumptions, apart from experts, you're duking it
15       out for many customers, and you say, "Well, not only is it
16       eleven times more expensive, but it's longer to get to market
17       than we are."
18              MR. MANGI:  Yes.
19              THE COURT:  "We're more nimble," I guess the effective
09:39 20   point is.
21              MR. MANGI:  Right, yeah.  Our -- please.
22              THE COURT:  So I don't know what reputational harm
23       gives you, but that was the point of the BPM, was to beat them
24       out in the marketplace.
25              MR. MANGI:  Yes, I understand your point entirely,
```

1    your Honor.  Let me address it.  So reputational harm is a

2    nebulous concept, and certainly many plaintiffs, anytime

3    there's advertising, can come in and say, "Well, you know, you

4    talked about us.  Therefore by inference it's harmed our

5    reputation, so we get to go ahead."  And so therefore courts

6    and the Supreme Court have been careful to say:  Reputational

7    harm, sure, that is a thing, but if you're going to get past

8    summary judgment, especially when you're pursuing a monetary

9    claim, you have to show that that injured you in the form of

09:40 10    lost business.  And that is a direct quote from *Lexmark* that I

11    put up on the earlier slide.  Loss of trade is a measure, that

12    we're talking both about reputational injury and economic

13    injury.

14          THE COURT:  They're not seeking damages.  They're

15    seeking disgorgement.

16          MR. MANGI:  It doesn't matter, your Honor.

17          THE COURT:  Do you have a case that discusses that

18    specifically --

19          MR. MANGI:  Yes.

09:40 20          THE COURT:  -- when you do not have lost profits,

21    which they concede?

22          MR. MANGI:  Yes.

23          THE COURT:  And not *Lexmark*.  That was more general.

24    Just something where there was reputational harm but no lost

25    profits, what do you get?

         1          MR. MANGI:  Yes, I'll give you some examples, your

         2   Honor.  So, first of all, I will say, you know, *Lexmark* itself

         3   stated categorically, talking about reputational injury, you

         4   need to show lost business.  We cite cases in our papers --

         5          THE COURT:  Can you give me the exact quote because

         6   I'm not sure I saw that.

         7          MR. MANGI:  Yes.

         8          THE COURT:  You keep emphasizing the word "evidence"

         9   from that case, but I think they weren't excluding reasonable

09:41 10   inferences, that if you have a head-on-head attack and it's

        11   false, willfully false, that there's an inference there's

        12   reputational harm.

        13          MR. MANGI:  Yeah, so let me take us back to Slide 11.

        14   Here we go.  Okay, so that's what they were talking about, your

        15   Honor, economic or reputational injury flowing from the

        16   advertising.  And then how do you show that?  You need to show

        17   that it caused customers to withhold trade from the plaintiff.

        18          THE COURT:  So you're saying *Lexmark* was intended to

        19   eliminate the theory of disgorgement of profits?

09:42 20          MR. MANGI:  No, your Honor.  You can pursue

        21   disgorgement, but even to pursue disgorgement, you need to show

        22   that you were injured in some concrete way in terms of loss of

        23   business.  And in fact we do cite a case of *Gravelle v. KABA*

        24   from the Federal Circuit 2017 that goes to specifically that

        25   point and says that under *Lexmark*, you still need to show

1    injury in the form *Lexmark* prescribed, even for a disgorgement

2    claim.

3        THE COURT:  But was it economic injury or reputational

4    injury in that Fifth Circuit case?

5        MR. MANGI:  The *Gravelle* case?  I'll have to check

6    that one, your Honor.  But the point there is disgorgement,

7    right?  Even in disgorgement, you've gotta show --

8        THE COURT:  But reputational injuries -- I'm not sort

9    of playing in the gray area of this case -- for reputational

09:42 10   injury, do you have to show actual business injury because then

11   doesn't that conflate the two notions?

12       MR. MANGI:  Well, I would suggest, your Honor, that --

13   yeah, so we also cite, your Honor, at Page 23 of our summary

14   judgment papers the *Scholz* case, and this is a quote:  "At the

15   summary judgment stage, a plaintiff," quote, 'needs to point to

16   actual evidence of reputational injury.'"  And what the cases

17   do also point out, your Honor, is that a subjective belief is

18   not enough, and so --

19       THE COURT:  But here what we've got is three companies

09:43 20   who made inquiries, right?

21       MR. MANGI:  Right.

22       THE COURT:  And you have an expert in the field

23   saying, in my view, somewhat the obvious -- it wasn't that it

24   was outside her expertise -- is that if you have an attack

25   head-on-head on a competition, competitive situation, it's

1  likely to cause injury.

2  MR. MANGI:  Your Honor, I'll cite to you another case

3  exactly with the parallel here, *Pandora Jewelry v. Chamilia*

4  from the District of Maryland in 2008, also cited in our

5  papers, a summary judgment case where the same thing had

6  happened in terms of three customers had wrote in and said, you

7  know, "What about these claims that are being put out there?"

8  You know, "Doesn't this harm us?"  And the court said, "That's

9  not enough.  You've got to show that there's actual injury

09:44 10  beyond that."

11  There can be no generalized inference, I would

12  suggest, your Honor.  There's no basis for drawing a

13  generalized inference to that effect, especially -- and this is

14  most pronounced --

15  THE COURT:  I don't view it generalized.  I think of

16  it in terms of reasonable inferences; you know, just like

17  you're ticked off about the Sinur paper.  You know, reasonable

18  inferences, the two of you have been fighting for seven years

19  or so, and you're attacking each other; you're trying to attack

09:44 20  each other's reputation.

21  MR. MANGI:  Yeah.  Well, let me show you some of the

22  specifics on that reputational issue, your Honor, so you can

23  get a sense of what's happening here.  So, you know, this is

24  one of the emails that they sent on which they're grounding

25  this reputational claim.  This is from Great West Insurance

1    Company, and they are saying, you know, "We came across this

2    report.  We're interested in hearing Pega's comments on it,"

3    all right.  So this is one of the bases they have for that

4    claim.

5           If you look at the next slide, this is how they

6    responded to it.  And this, your Honor, is part of our more

7    general point that everything about this report and its

8    methodology is fully disclosed.  We know that because Pega was

9    able to address all of the issues they complain about now at

09:45 10   the time responding to this company.  They talked about the

11   number of respondents and how Pega respondents were a small

12   percentage, so their numbers could be swayed by one, how many

13   are an insurance, how many and so on.  So they're addressing

14   all of their reputational issues directly.

15          And then what happened?  Subsequently they say

16   themselves, "Look, the report has been out for five months.

17   We're not even seeing downloads of our planned report to it.

18   There is no activity that we're seeing out here in the market

19   from it."  And in fact, when we asked the 30(b)(6) witness,

09:46 20   "What is the reputational injury that you're suffering, and

21   where did you have to invest money to repair these

22   relationships?" he couldn't point to any.  He had no evidence

23   of any actual dollar spending.

24          And, your Honor, this I think is the most, perhaps the

25   strongest factual point on reputational injury, which is if

```
 1    this was really injuring their reputation, you would think the
 2    last thing Pega would want to do is encourage people to read
 3    it, but that's exactly what they were doing.  So this is an
 4    email from their chief financial officer and chief operating
 5    officer, Ken Stillwell, and he's referring to a hearing before
 6    your Honor where your Honor had asked me at the motion to
 7    dismiss stage that, did we commission the report?  And we said,
 8    yes, we did, the BPM report.  And he's telling them, look,
 9    under questioning from the Judge, they conceded a devastating
10    fact, that they commissioned the report, and go out and used
11    this in the marketplace.  So if anything, your Honor, they
12    thought that this whole story helped them from reputational --
13            THE COURT:  You can't do that on summary judgment.
14    But the narrow legal point you're making, because you're out of
15    time basically, if you want to wrap up, the narrow legal point
16    is that there are no economic damages, and your view is
17    legally, the question of law is, perhaps there was reputational
18    injury, but there was no showing that it caused economic harm.
19    And that's not enough to just have reputational injury without
20    economic injury; is that right?
21            MR. MANGI:  Yes, in the circumstances of this case,
22    your Honor, where there's now no live injunctive claim because
23    we have comprehensively mooted that, this is about monetary
24    relief.  And they cannot proceed in the abstract on a claim of
25    reputational harm without showing that some actual injury
```

resulted from that, economic injury.  Whether, you know, it be

a lost customer, or perhaps even they could pursue something

like, you know, "We had to spend these $10,000, $100,000 on

this project or that project because of this."  There has to be

some economic linkage for a monetary damages claim before you

can proceed.  Just saying it was about us, that's not enough,

because what that would mean, your Honor, is essentially

they're applying a presumption, but in this case in particular,

where it's not a two-player market, unlike in your *HipSaver*

case and others.

And, you know, let me say also, if there were any

presumption here, which we don't think there is and we don't

think it survives *Lexmark*, it's comprehensively rebutted, and

the bubble is burst in terms of the language of the case law

because we've shown there is no basis for any claim.

THE COURT:  All right, I think you need to wrap it up.

MR. MANGI:  And I'll point out in my last point, your

Honor, that if anything, you know, their sales in this time

period -- and *HipSaver*, your Honor, pointed out one of the

things you look to is lost customers, or were their sales

impacted? -- their sales went up.  In fact, after we started

this advertising, they went up even more sharply than they ever

had before.  And this is a chalk where you can see that.  2019

is where we started this advertising, and you can see their

sales skyrocketed.  There's no actionable evidence of any

1  injury.

2       THE COURT:  Thank you.

3       MR. AUSTIN:  Good morning, your Honor.

4       THE COURT:  Good morning.

5       MR. AUSTIN:  Thank you, your Honor.  Neil Austin for

6  Pegasystems.  And if I may, I'd like to actually start with

7  some undisputed facts just to set the stage here.  And so while

8  we are waiting for those, let me just say that the gist of

9  Appian's argument is that Pega has failed to come forward with

09:49 10  evidence that it suffered any injury, and that's just wrong on

11  a number of fronts, and -- do we have this up?

12       THE CLERK:  Hold on.

13       MR. AUSTIN:  And, your Honor, I want to start with

14  some undisputed facts because I think they really set the

15  stage, both in terms of what the intent of the defendants were,

16  which I think is certainly relevant to the presumption, but,

17  frankly, relevant even in the absence of any presumption; and

18  what the evidence shows is that the defendants made literally

19  false statements about Pega that appeared as unbiased,

09:50 20  verified, and objective, and which were very difficult to

21  debunk.  And if you look at the BPM.com report itself, it's

22  presented almost as a scientifically valid survey.  It uses

23  words like "verified" and "validated," and it references

24  information in ways that would lead one to believe that it's

25  objective and unbiased.  But if we look at actually how the

1   report was generated, it's very telling, your Honor.

2           And so we'll start with the contract itself between

3   BPM.com and Appian, and what it says is that "BPM.com will

4   develop an authoritative, evidence-based white paper targeting

5   an audience of evaluators and economic buyers of BPM and

6   digital business platforms."  And here's the really important

7   part:  "This white paper will clearly identify and articulate

8   the value delta of Appian over Pega through the specific data

9   points and metrics captured with the market research performed

09:51 10  with this project."  In other words, your Honor, BPM.com

11  obligated itself contractually to create a report that would

12  show that Appian was superior in terms of value and other

13  metrics.

14          And if we go to the next slide, we'll see that the way

15  they did this in practice was evident in the internal emails.

16  We see an internal email here from Cat Pang Aniban dated

17  October of 2018.  She's one of the individuals who was really

18  critical in generating the BPM.com report.  She wrote

19  internally to Appian -- not externally, of course -- that "We

09:52 20  have an opportunity to influence the outcome by allowing some

21  of our happy customers to participate."

22          So, again, clearly, your Honor, the fix was in; the

23  thumb was on the scale.  But it actually didn't stop there

24  because her boss later that same day said, "Happy is not

25  enough.  We need to get customers that have a low TCO profile,"

which, by the way, is one of the metrics in the paper and the
report, "which means they pay significantly lower than our
average customer per user/per month."

And let's just pause there.  They're looking for
Appian customers --

THE COURT:  You know, I know you've stated a claim
with respect to the report.  The issue is whether you had
injury flowing from it.

MR. AUSTIN:  So I'll get to that, your Honor.  I'm
only walking through this because I think it's relevant to the
issue of intent, but let me address your Honor's question more
directly because in fact there is evidence of actual harm here.
There are the three customers who we referenced before.  You
know, one of the customers said that if this report is remotely
accurate, it is very concerning, as you might imagine.  This
shows the customers read the report, they took the claims
seriously, and that they were concerned about the implication.

But, of course, not every customer or potential
customer, and especially not every potential customer who sees
this, is going to reach out to Pegasystems for an explanation.
This is the kind of paper that really poisons the well in terms
of getting new business because you're just not going to get in
the door if a potential client thinks that you're eleven times
more expensive than your competitor.  So we think that those
three customers are relevant, whether or not they show economic

1    damage, because they demonstrate that there is this reputational

2    harm, this reputational impact.

3          There is also the evidence that Pegasystems lost a

4    customer, OG&E.  I think in the context of a summary

5    judgment -- I can see the expression on your face, your Honor,

6    but --

7          THE COURT:  I have been thinking a lot about that.

8    It's an internal email within Appian interpreting the feelings

9    of someone from OG&E that they were excited to get it.  So we

09:54 10   can say they got it.  We have no way of knowing what weight

11   they put on it and -- and the fact they got the contract.  I

12   don't know if you can support a reasonable inference from that

13   that --

14         MR. AUSTIN:  Well, the other piece of it, your

15   Honor -- I'm sorry.

16         THE COURT:  -- that the report caused the loss of

17   profits.

18         MR. AUSTIN:  Well, I think the other piece of it, your

19   Honor, and I hear your point, but I think the other piece is

09:54 20   that we will have testimony at trial that, from the Pega side

21   of the equation, things were going very well with OG&E, and

22   suddenly --

23         THE COURT:  I don't have any of that in the record, do

24   I?  I don't have a deposition from OG&E.  I don't have your

25   salesperson who dealt with them.  It's just pretty -- it's

1    something.  It's something.  Is it enough to get over that a

2    reasonable fact-finder could find they lost it due to this?  I

3    don't know.  It's pretty thin.

4         MR. AUSTIN:  There's testimony, your Honor, from the

5    corporate representative, Don Schuerman, which is captured in

6    our statement of fact.  But in addition to that, obviously, as

7    your Honor knows, the evidence is construed in the light most

8    favorable to Pega for purposes of summary judgment.

9         THE COURT:  Why didn't you take his deposition?

09:55 10         MR. AUSTIN:  Your Honor, there's a concern, frankly,

11   with our client, perhaps with both clients, that by dragging

12   customers and clients into this --

13        THE COURT:  You lost it, though, so --

14        MR. AUSTIN:  Well, you never know when you can win a

15   customer back, your Honor.

16        THE COURT:  It's a "maybe."

17        MR. AUSTIN:  Pardon me?

18        THE COURT:  It's a "maybe."

19        MR. AUSTIN:  Understood.

09:56 20         THE COURT:  I mean, I wouldn't want to rest my whole

21   case on what a fact-finder would find based on that one

22   internal Appian email.

23        MR. AUSTIN:  Because the flip side of the coin, your

24   Honor, is that Appian's own internal documents also show that

25   the BPM.com report was influencing prospects.  For example,

there's an internal Appian email that shows that a program

manager at a potential customer, GE Healthcare, noted that the

information in the BPM.com report was highly valuable; and he

showed it to a colleague, and she's about ready to jump on

board the train.  So that's another piece of evidence.  That's,

again, from Appian's own internal records.  And even another

that --

THE COURT:  So why aren't you claiming these places --

I'm having trouble with your damage theory or disgorgement

09:56 theory.  Why aren't you claiming these as lost profits?

MR. AUSTIN:  Well, in the case of GE Healthcare, your

Honor, I don't think the evidence is clear that Pega was in

competition for that.  But, frankly, the issue is one of, we

don't know all the customers and all the potential damage, so

focusing on lost profits is, frankly, a very narrow approach;

whereas, we can look at what happened behind the scenes at

BPM.com and Appian.  We see the intentionality that went into

creating a false report.

THE COURT:  Let's assume I'm with you on this, there's

09:57 some evidence of reputational injury, the experts says zero to

a hundred percent, how does one even begin to -- zero to one

hundred percent, I couldn't send it to a jury, right, I mean,

at zero to a hundred percent?  You'd be reversed in a

nanosecond for speculation.  Sometimes disgorgement is

equitable.  Is that me?  I mean, is that the case in a Lanham

1        Act case?  I don't know that it's jury or --

2                MR. AUSTIN:  It's equitable, your Honor.

3                THE COURT:  It's equitable.  I'm just having trouble

4        with your disgorgement theory if you're not looking for lost

5        profits and you don't think you have enough evidence to even

6        get lost profits, and you're asking me to disgorge all their

7        profits for companies that you can't say you would have won?

8        That may be jumping the gun, but it's fundamentally, if you're

9        not in the economic injury mode, and you're right that

09:58 10        reputational injury is part of it, really?  You want me to make

11        a disgorgement finding based on a zero to one hundred percent

12        range?

13                MR. AUSTIN:  Well, your Honor, what I would say to

14        that is that -- and this sort of bleeds over into the *Daubert*

15        issues as well -- but Ms. Kirk Fair, in calculating potential

16        damages scenarios, she tied it to specific advertising.  So she

17        took a look at the incremental growth rate, which accelerated

18        after the BPM.com report, and within that roughly $30 million,

19        she focused on amounts that were at issue with competitive

09:58 20        opportunities between Pegasystems and Appian.  And even within

21        that, she looked at instances of competitive opportunities

22        where there's known exposure to the BPM.com report.  So there's

23        a tie-in to the --

24                THE COURT:  That's unlikely, right, to be supported,

25        just to say you get all of the growth factor?  I know there's

1   an alternative theory, but I'm just trying to figure out where

2   this is going.  If all you've got is reputational injury, sure,

3   they tried to hurt your reputation, sure, it's on their website

4   for six months or so; but there is no lost profits because you

5   were pretty aggressive and on the mark, I remember, in getting

6   a preliminary injunction, and then they withdrew it, et cetera.

7   I'm just trying to understand, even if I say there's reputational

8   injury, where does that get you?

9          MR. AUSTIN:  Well, again, your Honor, I think the

09:59 10   critical piece here is that the nature of this report is that

11   it is, again, unbiased, objective apparently.  And so customers

12   or potential customers seeing this or receiving this, they're

13   never going to come to Pegasystems as a potential vendor

14   because they're going to understand that we're eleven times

15   more expensive.  It's very difficult to prove that, and in fact

16   I would say it's impossible to prove the customers that you

17   lost that you didn't know about.

18          THE COURT:  For a hundred percent of all their

19   business in the six-month period, is that essentially your

10:00 20   theory?

21          MR. AUSTIN:  Well, the theory is that some portion of

22   that certainly should be --

23          THE COURT:  How would I know?

24          MR. AUSTIN:  Well, the jury would hear the evidence

25   and make --

```
 1              THE COURT:  I thought it was me, you said, if it was
 2      equitable.
 3              MR. AUSTIN:  Well, your Honor would hear the evidence
 4      and make a determination.
 5              THE COURT:  I'm jumping the gun a little bit, but even
 6      if I find your way and then when all reasonable inferences are
 7      drawn in favor of you that there's reputational injury, I'm not
 8      sure what I do with it if there's no showing of economic harm.
 9      You hear what I'm saying?  I don't know what other cases like
10      this have done with it.
11              MR. AUSTIN:  Well, your Honor, right, and so on the
12      issue of the cases, if your Honor would like for us to brief
13      that --
14              THE COURT:  No more briefing.
15              (Laughter.)
16              MR. AUSTIN:  Okay, understood.
17              THE COURT:  In fact, I have a standing order:  No one
18      gets above the local rule page limit anymore.  That was an
19      insane amount of briefing.  I couldn't even carry most of it in
20      here.  The poor law clerk, I felt like I was burying him alive.
21      It's too much.  Look at all the lawyers you have.  I have one
22      law clerk.  So, please, no more briefing.  You can do notice of
23      supplemental authority, that's fine, if something comes in, but
24      no more briefing.
25              MR. AUSTIN:  And the other point I'd make, your know,
```

         1    is that there's still a live claim for a permanent injunction,

         2    obviously which doesn't turn on damages at all.

         3            THE COURT:  Is this case all about that?

         4            MR. AUSTIN:  Well, no.  It's --

         5            THE COURT:  They've withdrawn it.  And maybe it's

         6    moot, maybe it's not.  There's case law on both sides on that

         7    depending on whether there's a likelihood of having them redo,

         8    republish it.  They say that there's not.  It basically sounds

         9    like a dead letter right now.

10:02   10            MR. AUSTIN:  Well, they do say that, your Honor, but I

        11    think the law is pretty clear, the voluntary cessation

        12    doctrine, that -- and, in addition, we asked for more than --

        13            THE COURT:  You might get attorneys' fees to that

        14    point, but my point is only, I'm hoping the suit isn't just

        15    about whether or not I issue a permanent injunction.

        16            MR. AUSTIN:  No, it's not, your Honor.  We do think

        17    we're entitled to disgorgement, whether having shown actual

        18    harm or whether under the presumption of harm from the *HipSaver*

        19    case.

10:02   20            THE COURT:  Because would you agree they've rebutted

        21    the presumption of harm, which I do think is viable case law,

        22    but do you think they've rebutted it by showing there are no

        23    lost profits?

        24            MR. AUSTIN:  I don't, your Honor, again because the

        25    issue and the challenge for this document is that it's very

1  difficult to rebut, to debunk because, again, someone who's

2  reading this is looking at it as an objective, unbiased,

3  quantitative, data-driven report, and so they take it at face

4  value.  And, again, it poisons the well.  It's going to be the

5  type of report that makes it very difficult, if not impossible,

6  for Pega to reach customers who have seen it and who were

7  impacted by it.

8          THE COURT:  Don't you assume everybody has seen it,

9  even the ones who go to you?

10:03 10         MR. AUSTIN:  I don't think -- well, I wouldn't assume

11  that.  There's no evidence of that.

12          THE COURT:  For that short period of time.

13          MR. AUSTIN:  Well, there's no evidence to that in the

14  record, your Honor, and I --

15          THE COURT:  I mean, it's on the website, right?

16          MR. AUSTIN:  It was on the website for some time.

17          THE COURT:  Do you consider them your prime

18  competitor?

19          MR. AUSTIN:  They are a significant competitor.  I

10:03 20  don't know that we would consider them our prime competitor.

21          THE COURT:  Who are the other competitors?

22          MR. AUSTIN:  There are many others, your Honor; IBM,

23  for example, Salesforce.com.  There are others.  They're

24  certainly a significant competitor.

25          THE COURT:  Is there a breakdown in the market of how

         1    many, you know, what Salesforce has or --
         2             MR. AUSTIN:  There is, your Honor.  It's not in the
         3    record, frankly.
         4             THE COURT:  Okay, but they're all major competitors?
         5             MR. AUSTIN:  Well, whether we would consider them
         6    major competitors or not, I'm not sure, but they are
         7    competitors.
         8             THE COURT:  Are you the leader in the field?
         9             MR. AUSTIN:  Absolutely.
10:04   10             THE COURT:  So that's -- yes, anyway.
        11             MR. AUSTIN:  Without question, your Honor.
        12             THE COURT:  I'm sure your client is sitting there,
        13    right?
        14             (Laughter.)
        15             THE COURT:  I've heard of, obviously, IBM.  I've heard
        16    of Salesforce.  What was the other one you mentioned?
        17             MR. AUSTIN:  I think those are the only two I mentioned.
        18             THE COURT:  Oh, are they?  All right, all right.
        19             MR. AUSTIN:  But again, your Honor, that's the point I
10:04   20    would stress.  The reason we're seeking monetary disgorgement
        21    here is because the very nature of this report, it can't be
        22    rebutted.  The total cost of ownership is -- frankly, it's
        23    difficult to find out that information even from your own
        24    customers, but certainly we don't have information about
        25    Appian's customers' total cost of ownership.  So it's out

 1   there.  It's poisoning the well.  It's making it very difficult

 2   for us to increase our new business, and that's a fact.  It's

 3   difficult to prove, I take that, but I think the Lanham Act

 4   cases understand and recognize that.  And that's, frankly, one

 5   of the reasons we have disgorgement as a penalty here, and I

 6   think it's appropriate, particularly when you look at some of

 7   the really egregious conduct that took place in the creation

 8   and, frankly, dissemination of the report.

 9           THE COURT:  Well, in the alternative theory of the 29

10:05 10   where you had head-to-head competition?

11           MR. AUSTIN:  Pardon me?

12           THE COURT:  There was an alternative theory, which is

13   not looking at every increase in revenue, which seems out of

14   line, but specific companies that went to Appian over

15   Pegasystems during a time period.

16           MR. AUSTIN:  That's exactly right, your Honor, and

17   maybe --

18           THE COURT:  Wasn't that her alternative theory, the

19   expert's alternative theory?

10:05 20           MR. AUSTIN:  Well, I wouldn't call it an alternative

21   theory.  There were a number of different ways of calculating

22   the potential scope of damage.  One looked at just the gross

23   increase in growth rate, so that was roughly $29 million, if I

24   recall correctly.  Of that number, the expert did two other

25   calculations, one that looked at the incremental growth rate

1    where there was actually competition for new clients between

2    Pega and Appian.  That number was roughly $19 million, if I

3    recall.

4              THE COURT:  And of the ones that went to Appian

5    instead of Pega?

6              MR. AUSTIN:  Correct, correct.

7              THE COURT:  In that time period?

8              MR. AUSTIN:  In that time period.  And even drilling

9    down further, there was yet a third cut of the damages model

10:06 10   that looked at, there had to be competition between Appian and

11   Pega, it had to be an Appian win, and it had to be a situation

12   where we know that the customer received the BPM.com report.

13             THE COURT:  And how much was that?

14             MR. AUSTIN:  $13 million.  And so, your Honor, that's

15   the point I'd like to stress because, you know, the case law

16   really does seem to make a distinction between proof of

17   causation and injury on the one hand -- and that's where the

18   presumption comes in -- but then there's a second line in the

19   case law which says that the actual measure of damages has to

10:06 20   have some connection to the false advertising.  And I would

21   submit that that clearly does, your Honor, whether it's the

22   $19 million figure that's based on the head-to-head

23   competition, or whether it's the $13 million figure that's

24   based on a combination of head-to-head competition and

25   knowledge that the BPM.com report was actually distributed to

1    those customers.

2              THE COURT:  Thank you.

3              MR. AUSTIN:  You're welcome.  So I think, your Honor,

4    if I've addressed your questions, we'll reserve any extra time

5    we have for additional argument.

6              THE COURT:  Yes.

7              MR. MANGI:  May I rebut, your Honor?

8              THE COURT:  Ten minutes, but you're over the time, so

9    you're going into the other one.

10:07 10         MR. MANGI:  I'll shorten my later argument.

11             So, your Honor, I'll just deal with a few quick points

12    here.  First, the question your Honor asked, how have other

13    courts dealt with this issue on reputational injury?  Obviously

14    we don't concede there was any injury, even reputational, but

15    set that aside for a moment.

16             So let me refer your Honor to a supplemental authority

17    that we submitted earlier this week that I think is exactly on

18    point.  It's a case from June 28, just a few days ago, from the

19    Western District of Washington.  The case is *Universal Life*

10:08 20    *Church Monastery Storehouse v. American Marriage Ministries*,

21    and I think this goes exactly, your Honor, to the issue you're

22    concerned about.

23             So the parties in this case, your Honor, are companies

24    that offer online ordination services, so they qualify people

25    to perform marriages.  I suppose in some ways they're competing

1    with your Honor, among other things, but --

2           THE COURT:  Do you know the judges in Massachusetts

3    refused to get the right to marry people because they didn't

4    want every weekend taken up?

5           (Laughter.)

6           THE COURT:  It deliberately withdrew from that market.

7           MR. MANGI:  Well, your Honor, then you won't have

8    standing.  But, nonetheless, they sued each other.  And, your

9    Honor, talk about, you know, reputational injury; some of the

10:08 10   allegations here were by one against the other, where they'd

11   been in and out of courtrooms, they've had their not-for-profit

12   status revoked, they've been embroiled in fraud allegations,

13   so, you know, really going after the reputation in very direct

14   and uncontroversial ways.  So that's what was going on there.

15          And the parties came in, and the argument again was,

16   the plaintiff was saying, "Well, look, you know, with all of

17   these types of claims out there, you have to assume that we

18   were injured, that there was, you know, reputational injury."

19   And in fact they said, "We should have a presumption of

10:09 20   reputational injury and presumption of injury."  And the other

21   side came in and said, "Well, you know, after *Lexmark,* there

22   can't be any presumption because *Lexmark* says clearly you need

23   to have evidence of an injury."

24          And interestingly enough, your Honor, the Western

25   District of Washington, they disagreed with the notion that

1    *Lexmark* has done away with presumptions altogether, and so they

2    disagreed even with the position that we argue, which is that

3    *Lexmark* has done away with it altogether.  But what the court

4    said is -- and they were relying on Ninth Circuit law, your

5    Honor, and they were focusing on the issue of in a two-player

6    market, which are all things that are absent here, but

7    nonetheless they said, well, you know, what we find is, under

8    Ninth Circuit precedent in this two-player market, for purposes

9    of an injunctive relief claim, you know, they say reputational

10:10   10    challenge, but that's enough; and that's enough because, you

11    know, this could do harm in the future as well because clearly

12    it's a full frontal attack on the other side's reputation and

13    veracity and so on.

14           But the Court then made a distinction and said, but at

15    summary judgment, when we're talking about monetary relief,

16    there it's different.  And the court said, for monetary

17    relief --

18           THE COURT:  What page are we on?

19           MR. MANGI:  So, your Honor, this is now at page *15.

10:10   20           THE COURT:  Okay, I'm going there.

21           MR. MANGI:  And if you look at the bottom of the

22    second column, there's a WCPA claim section, and right above

23    that, the paragraph right above that starting with "here" about

24    ten or twelve lines up, the Court says, "Here, ULC Monastery

25    has not directed the Court to any evidence that would support

1    an award of monetary relief on its Lanham Act claim, nor has it

2    cited any case that awarded monetary damages to a plaintiff

3    based only on the presumption of commercial injury."  And you

4    will see at the top of that paragraph is where the Court says

5    the same is not true on monetary relief, and before that,

6    they're talking about injunctive relief.  So that, your Honor,

7    I would submit is very much the issue here.

8         Also, just so your clerks have it, on Page 23 of our

9    moving brief at Footnote 16, we pull together a series of these

10:11 10  reputational injury cases, and all of them, your Honor, all of

11   them come out the same way, which is, at the summary judgment

12   stage, you know, let aside the PI, but at the summary judgment

13   stage, it's not enough to just say "damage to reputation

14   because you're talking about us."  You have to identify an

15   actual sale lost or other discernible injury, something that's

16   not speculative.  You know, *Dependable Sales & Service v.*

17   *Truecar*" from the Southern District 2019, that's the first case

18   we cited.

19         THE COURT:  Don't cite them all out.

10:12 20      MR. MANGI:  Yeah, yeah, they're all there in the

21   briefing.  But the point, your Honor, is at this stage, it's

22   not enough to say, "Well, you can figure it out," because

23   there's nothing in the record to figure it out from.  There is

24   no evidence of any discernible injury in that sense.

25         Then, your Honor, let me just touch briefly on a few

1    other points.  And as regards their expert, Ms. Kirk Fair's,

2    other methodology focusing on competition between the parties,

3    it's exactly the same issue because there is zero causal

4    connection to the BPM.com report --

5              THE COURT:  Well, you're saying that, but you could

6    draw a reasonable inference that they saw that report, and

7    there was head-on-head competition while the report was up,

8    that it played a role.

9              MR. MANGI:  Your Honor, I would suggest that there

10:13 10    needs to be evidence that it played a role, and they're free to

11    develop that record.  They had three years to develop that

12    record; you know, call in the customers, subpoena the

13    customers.  We subpoenaed some customers and got their

14    documents, and we've got evidence on our case of people saying,

15    "This is very concerning.  This is how we won based on this

16    advertisement."  They've got none of that.  It's not enough, I

17    would suggest, to just say, you know, it's out there.  In fact,

18    their expert expressly disclaims any causal link.  So it's not

19    enough, I would submit, your Honor, to just suggest it was

10:13 20    about them, so that gets them over the hump.  You have to show

21    it mattered, that people read it, that they cared about it,

22    that it was a factor in their decision for there to be

23    actionable injury.  Again here, they're seeking monetary

24    relief.  If they come to your Honor --

25              THE COURT:  They're seeking not damages but

1     disgorgement, which is a little different.

2          MR. MANGI:  A little different, your Honor, but

3     doesn't change the fundamental fact that they need to show

4     injury to be able to get there.

5          THE COURT:  So I guess the point is whether or not

6     when I draw all reasonable inferences their way, just a

7     head-on-head win during that time period, is that enough to

8     support a reasonable inference that it played a motiving role,

9     causative role?

10:14 10          MR. MANGI:  Yes, your Honor.

11          THE COURT:  You're saying that.  Okay, thank you.  I

12     think we need to go on to the next issue.

13          MR. AUSTIN:  Thank you, your Honor.  Just by way of

14     introduction, I'm going to split this argument with my

15     associate, Jim Gross, but just to set the stage on our

16     defensive motion --

17          THE COURT:  Are you an associate?

18          MR. GROSS:  I am.

19          THE COURT:  Have you ever argued in Federal Court?

10:14 20          MR. GROSS:  I have, your Honor.

21          THE COURT:  Oh, all right, so I can't sort of do my "I

22     won't be too mean" thing?

23          MR. GROSS:  Thank you, your Honor.  I appreciate that.

24          THE COURT:  I can be as mean as I want?

25          MR. GROSS:  You can be as mean as you want, your

1    Honor.

2           THE COURT:  All right, okay, that seems good.

3           MR. AUSTIN:  So, your Honor, there are four

4    overarching reasons -- and I'm focusing first on our defensive

5    motion because I want to make sure we come to address laches

6    because I think that's a real big problem in Appian's case --

7    there are four overarching reasons that we say judgment should

8    enter in our favor on their claims.  The first is that the

9    counterclaims are time barred, and Mr. Gross is going to

10:15 10   discuss that.

11          The second is that Appian can't prove key elements of

12   its claim, including falsity, deception, and materiality.

13          The third is that many of these challenged materials,

14   putting aside the Sinur paper for just a moment, they're not

15   commercial advertising.  They just weren't -- there's no

16   intention.  There's no evidence that there was an intent to

17   penetrate the relevant market.  They're just a handful of sort

18   of random and occasional distributions.

19          And, finally, the LinkedIn post claim still, your

10:15 20   Honor, the defamation claim, Mr. Gross will also discuss that

21   one.  And if you find our way on Mr. Gross's arguments, the

22   laches and the LinkedIn post claims, effectively that a

23   judgment should enter in favor of Pegasystems.

24          THE COURT:  The thing I would not spend time on, I do

25   not understand your technology well enough.  I did not spend

1   any time on it.  There are technical claims like, "This was a

2   lie and this was a lie."  I'm not going into that.

3          MR. AUSTIN:  We'll spare you that today, your Honor.

4          THE COURT:  No, I'm not doing it on summary judgment.

5   There are, like, eighteen points that you say are false, and

6   it's not well explained about what it even means.  Both of you

7   do it.  I'm just not doing it.  I'm not doing it on your

8   affirmative claim that I should find summary judgment in your

9   favor on the BPM report or on the defensive, "This is why it's

10:16 10  false."  It needs expert, almost like a tutorial on what you're

11  talking about.  So I don't want you to use your time doing

12  that, okay?

13         MR. AUSTIN:  Understood, your Honor.

14         MR. GROSS:  Thank you, your Honor.  While I'm about as

15  tall as Mr. Mangi, I'm not as loud, so I'm going to use the

16  podium, if that's okay.

17         THE COURT:  That seems good.  But let me just say

18  this:  We now have 45 minutes before I have to do this

19  sentencing, so, ideally speaking, if you did, I don't know, 20

10:17 20  and 20.

21         MR. GROSS:  Thank you, your Honor.  Jim Gross of

22  Foley Hoag on behalf of Pegasystems.  While the screen is

23  switching over, your Honor, I just want to quickly address,

24  there was a supplemental authority letter that was brought up.

25  We obviously have not responded.  We're not going to burden the

 1    Court with more briefing on that point, but just two quick

 2    points about that case, your Honor, the *Universal Life* case

 3    that Mr. Mangi just cited.  The first is, your Honor, at no

 4    point in their briefing has Appian previously tried to draw a

 5    distinction between the applicability of a presumption at the

 6    injunctive relief stage for injunctive relief versus monetary

 7    relief.  In fact, their entire argument was, under *Lexmark,* no

 8    matter what, you need evidence, and that court expressly

 9    rejected that argument.

10:17 10      The second point, your Honor, the court there said,

11    "You have not pointed us to any case in which monetary relief

12    was granted on a presumption," but the very case that cites for

13    that proposition was *Porous Media*, which upheld a $1.5 million

14    monetary judgment on disgorgement grounds.  That, of course, is

15    not the only case that has done that.  Your Honor in *HipSaver*

16    dealt with a disgorgement-of-profit claim.  In addition, the

17    Second Circuit case, I think it's *Merck AG* -- it's cited in our

18    papers, I think in 2014 -- expressly holds that monetary

19    damages are available with a presumption.  So to the extent

10:18 20    that that Western District of Washington --

21          THE COURT:  The problem here is, your economic injury

22    was rebutted because there was none, so it's a little harder on

23    reputational.

24          MR. GROSS:  Understood, your Honor, and I don't want

25    to go back into those arguments.  I do think on disgorgement,

1    what *Porous Media* says is:  We're no longer looking at just

2    reputational injury.  You don't have to show any evidence for

3    the presumption.  You do need some sort of link, something your

4    Honor has hinted at, tying back the disgorgement amount to the

5    challenged advertising; and as Mr. Austin explained, the expert

6    report we think provides that requisite link.  We understand

7    you had a --

8              THE COURT:  Zero to hundred percent link.

9              MR. GROSS:  Well, again, there are multiple categories,

10:19 10    as Mr. Austin explained, and we'll submit our point on that.

11             But what I'm supposed to talk to you about, your

12   Honor, is the issue of laches.  So unlike Pegasystems which

13   brought suit two months after the BPM.com report was filed, the

14   evidence here shows that Appian waited at least 70 months

15   before it thought to challenge the purported advertising

16   campaign that's at issue in this case.  Laches bars that sort

17   of lie-in-wait approach, as multiple Courts of Appeal decisions

18   make clear, including in cases that Appian itself cites, like

19   the Seventh Circuit's decision in *Hot Wax* and the Ninth

10:19 20   Circuit's decision in *Jarrow Formulas*.  And three key legal

21   principles emerged from those cases, which apply here, show

22   that Pegasystems is entitled to summary judgment on all of the

23   claims related to challenged documents.

24             Principle number one, that laches runs from the first

25   time that Appian knew or learned of the purported advertising,

1    even if that advertising then continued.

2          Principle number two is that when that knowledge point

3    began outside the applicable limitations period, laches

4    presumptively applies, and the burden is on Appian to show

5    otherwise; and there is quite literally no evidence in the

6    record submitted by Appian on this point.

7          And, third, summary judgment is appropriate on laches

8    grounds even as to knowingly false advertisements.  So I'll

9    take each of those in turn, your Honor.

10:20 10          Point number one is that laches runs from the first

11    time that Appian became aware of the purported advertisement

12    campaign, as *Jarrow* and *Hot Wax* previously recognized.  And

13    this, of course, makes sense because if a party could just

14    simply lie in wait under a continuing-wrong type of theory,

15    then laches would be a spineless defense because the party

16    could theoretically wait to bring suit until it was convenient

17    for it to do so, even if it was years down the line.  That

18    would hardly be equitable, and, of course, laches is an

19    equitable defense.

10:20 20          So this is true even if the campaign changed around

21    the edges in the meantime.  For example, in *Hot Wax,* the

22    plaintiff tried to explain away its delay in bringing suit by

23    saying there had been, quote, "evolutionary development" in the

24    advertising campaign at issue there, there related to the

25    defendant's car wax and the characteristics thereof.  The

1    Seventh Circuit rejected that argument and said, because the

2    core message of that advertising campaign remained the same --

3    again, the characteristics of the car wax -- the knowledge

4    point for when laches presumptively applied, it ran from the

5    first time the plaintiff learned of the campaign.

6          That's significant here for two reasons, your Honor.

7    The first is, while Appian purports to be challenging a wide

8    series of documents, they're actually challenging what they

9    claim is a single advertising campaign.  And they make this

10:21 10   point in their own papers.  So if we look at Slide 26, for

11   example --

12         THE COURT:  Wait a minute.  So I hear your point loud

13   and clear about the Sinur advertisement, but I think other -- I

14   can't sort of say, oh, you lose on laches on Sinur, but all

15   these other ones lose too because it's part of the same

16   campaign, if they're separate documents.

17         MR. GROSS:  I don't think that's correct, your Honor.

18         THE COURT:  Why?

19         MR. GROSS:  Because --

10:22 20   THE COURT:  In other words, some of these slide decks

21   and scaleability documents, I'm not sure they're advertising

22   documents.

23         MR. GROSS:  Understood, understood.

24         THE COURT:  That's a different point.  But the Sinur

25   paper is what it is, and if they knew about it, which they

```
 1    apparently did, laches is a strong argument.  But some of these
 2    other things were separately marketed to -- I forget, the
 3    scaleability paper, the -- what was the other one?
 4              MR. GROSS:  The technical competitive brief, your
 5    Honor.
 6              THE COURT:  Yes.
 7              MR. GROSS:  Yes.
 8              THE COURT:  So I think it's when they knew about those
 9    documents.
10    MR. GROSS:  Respectfully, no, your Honor, and here is
11    why:  Because according to Appian, the Sinur paper merely
12    parrots those exact same documents.  So the language and the
13    message contained in those other materials, the technical
14    competitive brief and the white paper, is the same thing that
15    was said in the Sinur paper.  And, again, this is not our
16    characterization.  If we look at the next slide, for example,
17    in their opposition brief on Pages 6 and 7, they say that the
18    Sinur paper parroted many of the same false claims in the
19    technical competitive brief.  If we go to the Supplemental
20    Statement of Facts on the next slide, they say again, the draft
21    of the Sinur report closely resembles claims about Appian that
22    Pegasystems previously included in the technical competitive
23    brief and the scaleability white paper, in fact, including
24    extensive charts in Paragraph 68 that lines up all of the
25    similarities.
```

1          So all of these documents make the very same purported

2     advertising claims that are challenged here, and that is

3     significant, your Honor, because, as your Honor previewed, the

4     Sinur rebuttal document conclusively shows that Appian knew

5     that Pegasystems was engaging in this advertising campaign, as

6     evidenced by its response thereto, as well as Pegasystems' role

7     in it, and the evidence makes this unequivocally clear.  So we

8     know this from the Sinur rebuttal itself which we'll see on

9     Slide 29 in which --

10:24 10          THE COURT:  Could you go back for a minute?

11          MR. GROSS:  I sure can, your Honor.

12          THE COURT:  So the technical competitive brief, I was

13     having more problems with whether they were advertisements or

14     not.  So was that circulated to clients?

15          MR. GROSS:  It is not, your Honor.  So, of course, on

16     the merits, as Mr. Austin is going to address, we dispute that

17     any of this is advertising at all, right?  And so therefore it

18     cannot be subject to a Lanham Act claim.  But if we're wrong

19     about that, then their argument fails on laches grounds because

10:24 20     the things that they are challenging in these documents are all

21     the same things that were contained in the Sinur paper, and

22     that's according to their own statement of facts.

23          And so the starting point for the laches analysis

24     begins at least in 2014.  That's when they knew.  Then they

25     issued the Sinur rebuttal.  And that includes all of the

1    messaging that's included in all these other documents that

2    they seek to challenge in their amended counterclaims.

3         So, your Honor, I think you understand the point about

4    the Sinur rebuttal, so I'll just quickly run through it.  So we

5    see in the Sinur rebuttal itself, of course, they're addressing

6    the claims made in the Sinur paper, again, the claims that

7    parrot things that were previously made in the scaleability

8    white paper and the technical competitive brief, as well as

9    the, quote, "known fact" that Pegasystems was involved.

10:25 10        To the point I was just making, your Honor, on

11   Slide 30, when they were drafting the Sinur rebuttal, we have

12   some internal communications from Appian, which of course they

13   point out again that it's a contract piece and a paid attack.

14   But if you look at the communication from Ms. Astle, she says,

15   "This fits with what we are seeing at Roche, a potential

16   customer."  In other words, what is being said in the Sinur

17   paper are the exact same scaleability attacks that are the

18   subject of the other documents that are at issue in this case.

19        So that emphasizes our main point, your Honor, which

10:25 20   if the Sinur paper is truly just parroting the same claims,

21   these are all subject to the same laches knowledge point of at

22   least 2014, which falls well outside the four-year period that

23   your Honor previously recognized at the motion to dismiss

24   stage.

25        THE COURT:  Okay, thank you.

1           MR. GROSS:  May we move on to Slide 34 just quickly.

2      Your Honor, we have a number of points about their knowledge of

3      the Sinur rebuttal.  I think that you understand these, but

4      there are other points emphasizing the one I just made, other

5      evidentiary pieces showing again that Appian was on knowledge

6      of this same purported advertising campaign, regardless of

7      whether it knew -- regardless of whether they were based in

8      other documents.

9           So, for example, in October, 2013, approximately six

10:26 10      months before the Sinur paper was ever published, we see

11      complaints, internal Appian correspondence complaining about a

12      presentation that Pegasystems had made about Appian challenging

13      its ability to scale.  And the response from Ms. Epstein is,

14      "It would be very useful to get this for future reference

15      because this is not the last time they're going to give such a

16      presentation about us."  Again, highlights the knowledge of the

17      use of these purported advertising materials that are at issue

18      here.

19           We have further evidence of this from 2015, your

10:27 20      Honor, in February, again external correspondence at Appian

21      highlighting that Pega is trying to convince potential

22      customers that Appian can't scale.  And then, as we have on the

23      next Slide, of course, is the production of the technical

24      competitive brief in the *Maxwell* litigation.

25           Now, on this point, your Honor, Appian pointed out

that this is produced pursuant to an "attorneys' eyes only"
confidentiality designation, and we did correct that point and
state otherwise in our reply brief.  But the core point is,
your Honor, the documents that are the subject of the amended
counterclaims here, the technical competitive brief, the
scaleability white paper, et cetera, those were also produced
under an "attorneys' eyes only" confidentiality designation in
this case.  And that, of course, didn't prevent Appian from
bringing suit about them because they asked Pegasystems to
lower the confidentiality designations so that they could
evaluate whether to bring a claim, and that's exactly what
ended up happening.  They could have done the exact same thing
in 2016 when they received this document.  They simply chose
not to do so.

So looking at this holistically, your Honor, we think
the evidence is overwhelming and no reasonable juror could
conclude anything other than that Appian knew about this
advertising campaign.  It just simply chose not to do anything
about it.

And so that leads to the second core legal point, your
Honor, which is that because the challenged conduct began
outside the relevant laches period, laches presumptively
applies, and the burden is on Appian to show otherwise.  And we
think this is, frankly, dispositive, your Honor, because there
is not a single undisputed fact from Appian, either in response

1      to Pegasystems' statement or in its own affirmative statement,

2      showing that its delay was reasonable or that Pegasystems was

3      not prejudiced by this delay.  And that's significant, your

4      Honor, because as Appian's own case law confirms, Pegasystems,

5      as not having the burden, didn't have to introduce any evidence

6      to win on this point.  And this is just a quick quote from the

7      *Giese* case cited by Appian on Page 12 of their brief, a

8      District of Massachusetts case.  Quote, "Giese merely points to

9      weaknesses in the defendants' affirmative proof of prejudice.

10:29 10  Such an attack is, of course, unavailing, inasmuch as the

11     defendants could have remained utterly mute on the issue and

12     nonetheless prevailed.  Giese has failed to come forward with

13     any evidence demonstrating a lack of prejudice as to any of the

14     defendants, and thus failed to burst the presumption bubble

15     with a 'no prejudice' lance."

16         The *Giese* case there is actually quoting from a case

17     called *Hall*, a Federal Circuit case which is also cited in

18     Appian's opposition brief at Page 13, and both of those cases

19     granted summary judgment to the defendant on laches grounds due

10:29 20  to the plaintiff's failure to introduce evidence of a lack of

21     prejudice here.

22         And, of course, in this case, as you know from the

23     briefs, Pegasystems did not simply stand silent.  We did

24     introduce significant evidence of prejudice.  Most prominently,

25     your Honor, the damages claim here is severely inflated as a

1    result of Appian's delay.  That's exactly what the Seventh

2    Circuit found in *Hot Wax*, the Ninth Circuit found in *Jarrow*

3    *Formulas*, and this Court found in the *John G. Elden* case is

4    sufficient to establish prejudice for laches purposes.

5         There is also, through no fault of Pegasystems, there

6    was a significant loss of emails in 2017 from Pegasystems due

7    to a data migration that sort of went awry with a third-party

8    vendor.  They lost about 50,000 to 100,000 emails that could

9    potentially bear on the issues in this case.  And as we point

10:30 10   out in our briefing, numerous witnesses, including Appian's own

11   witnesses, just simply could not remember certain details,

12   given the amount of time that's passed.

13        The only other point I'll make on this, your Honor,

14   is, it's a two-pronged issue, right?  It's prejudice but also

15   reasonableness of delay.  There's also no evidence that

16   Appian's delay here was reasonable, and in fact we know the

17   reason for their delay.  We can actually just go back to what

18   is Slide 31.  Appian's CEO, Matt Calkins, upon learning of the

19   Sinur paper, said, quote, "It is also okay to ignore the event

10:31 20   entirely."  In other words, Appian just didn't think the Sinur

21   paper was worth addressing, and that's why they didn't bring

22   suit, your Honor.  That is not a reasonable delay, and the fact

23   that they now launch a weapon to fight back in this litigation

24   is not a sufficient basis to avoid the application of laches.

25        The third core legal principle that arises from the

cases, *Hot Wax* and *Jarrow Formulas*, is that summary judgment is appropriate on laches grounds, even when there's a dispute of fact as to whether or not the advertising was knowingly false, and *Hot Wax* and *Jarrow* make this point expressly. And this, of course, makes sense because if --

THE COURT: Am I going to have to get to that if they delayed bringing the suit?

MR. GROSS: We don't think you do, your Honor. The reason I raised it is because as Mr. Mangi I think previewed in his opening, he said, "Oh, Appian's knowledge of the falsity of these things bears on the equitable issues at play here," which I take to mean that Appian is going to say that Pegasystems' hands are unclean, and therefore they can't invoke laches as an equitable remedy.

THE COURT: Oh, I see.

MR. GROSS: And in the Lanham -- and, again, at the risk of making Appian's argument for it, but the problem with that argument, your Honor, is that case law is clear that in the Lanham Act context, you need a whole lot more than just some evidence that the advertising at issue was knowingly false. Of course, we dispute this is advertising at all, and we certainly don't agree that it was knowingly false.

THE COURT: As I've said, I don't think I have enough of a basis for --

MR. GROSS: Understood, understood.

1          THE COURT:  -- falsity the way it's been explained in

2     the briefs, and I don't want any more.

3          MR. GROSS:  Exactly, your Honor, but even on that --

4     so taking the assumption that there's a dispute of fact on that

5     issue, that was the case in *Hot Wax,* and that did not preclude

6     the application of laches.  In that case, the District Court

7     was faced with both a summary judgment motion on the merits of

8     the false advertising claim as well as a laches defense.  The

9     Court rejected summary judgment on the merits saying there's a

10:33 10     dispute of fact here as to the falsity issue, but it

11     nonetheless granted summary judgment to the defendant, the

12     party in Pegasystems' position here, on the issue of laches

13     because it said knowingly false -- the fact that they might

14     have known these advertisements were false cannot, standing

15     alone, constitute unclean hands.  Instead, you need some sort

16     of evidence of actual fraud.  It was a much significantly

17     higher burden, and there's just simply no evidence of that

18     here.  That was also the case in *Jarrow*.

19          Now, as to what sort of conduct might give rise to

10:33 20     that actual fraud standard, we, frankly, don't know because the

21     cases that Appian cites don't go there.  The closest they come

22     is an Eastern District of Pennsylvania case, which is -- it is

23     the *Merisant* case.  That case is different for a whole wide

24     variety of reasons, but the unclean hands issue there was that

25     the party -- this was about Splenda and whether it was in fact

1   artificial or natural, so that involved a public health issue

2   which necessarily implicated the public interest aspect, of

3   course, very relevant in an equitable remedy like laches.  But

4   beyond that, there was evidence of a destruction of evidence,

5   an attempt to cover up --

6         THE COURT:  I don't know that I need to go into --

7         MR. GROSS:  I agree, your Honor, but I just want to

8   point out the sort of conduct that's necessary to prevail on an

9   unclean hands defense to deckle remedy of laches.

10:34 10       THE COURT:  Thank you very much.  Okay, let's move on.

11        MR. GROSS:  So that's all the points on laches, your

12  Honor.  We do have, you know, there are other merits arguments

13  as to the other --

14        THE COURT:  Well, I think we need to get to them

15  because I do have a question about whether they're actually

16  advertising materials.

17        MR. GROSS:  Terrific.  I'll turn it back to Mr. Austin

18  then.

19        THE COURT:  But you're almost out of time.

10:35 20       MR. AUSTIN:  We can do it in two minutes, your Honor.

21  We have one slide that I think will make the point very

22  effectively.  Can we put up Slide 24, and apologies for the

23  informality.

24        THE COURT:  Are you kidding?  It's casual Friday.  I

25  should have asked you all to just come in khakis.

1          MR. AUSTIN:  The first time I've worn a suit in, like,

2     two years.

3          THE COURT:  Yes, who was it who wanted to come in

4     person?  Are you the New Yorkers?  Are you all back in the

5     office?

6          MR. MANGI:  We are, your Honor.  Not everyone is, but

7     I am.

8          MR. AUSTIN:  So as promised, within two minutes, your

9     Honor.  These four documents here are -- these aren't the Sinur

10:35 10     paper, and they actually are two of the so-called "challenged"

11     materials, that all they really do is repeat what the Sinur

12     paper says, so those aren't included here.  The number of

13     distribution of those are also quite low.  But here, here they

14     are.  These are the numbers of distribution, the scaleability

15     slide deck distributed outside of Pegasystems one time to one

16     organization over a several-month period.  Okay, clearly that's

17     not an intention to penetrate the market.

18          The scaleability white paper distributed outside of

19     Pegasystems six times to five unique customers over a period of

10:36 20     three years, absolutely not any intention there to penetrate

21     the market.

22          The Pega 7 versus Appian comparison chart, five

23     distributions, five unique organizations over the period of

24     more than a year.

25          And then, finally, the technical competitive brief,

1   thirty total distributions to fifteen unique organizations over

2   a period of five years.  So, again, just do the math.  There's

3   no way that those numbers demonstrate --

4        THE COURT:  I don't know any cases that do it straight

5   up on a mathematical basis.

6        MR. AUSTIN:  Well, the case law doesn't really do

7   that --

8        THE COURT:  It's kind of a unique market because it's

9   so specialized and customized, so it's hard to figure out what

10   advertisement means in this context.

11        MR. AUSTIN:  Yeah, I mean, advertisements can look

12   different.  Obviously this is not a 30-second, you know, spot

13   on during the Superbowl, but -- so the fact that it's a white

14   paper, that's not our point so much as there has to be an

15   intention to -- in distributing the materials, there has to be

16   evidence of an intention to penetrate the market, and that's

17   just not present here at all, your Honor.

18        And the other thing I would add is, there are cases,

19   of course -- you've probably read them or are familiar with

20   them -- in which a relatively low number of distributions is

21   nevertheless deemed to be advertising.  That only applies in

22   cases with a small market.  And just by point of reference,

23   Appian's most recent 10K refers to the fact that they have over

24   a hundred customers.  This isn't a small market, so these

25   numbers just don't suffice for commercial advertising.

1          Thank you.

2          THE COURT:  Thank you.

3          MR. MANGI:  Your Honor, I'll ensure we're done in time

4    for 11:00.  In terms of the *Daubert*, your Honor, I think we'll

5    rest on the papers, with apologies to my colleague, one of whom

6    it was going to be her first argument, an associate.

7          THE COURT:  Wait, wait, wait, wait.  I like people to

8    be able to say "I argued in Federal Court," so let's have you

9    finish around ten of, and then you do a quick spiel on your

10:38 10   Daubert.  Is that okay?

11         MS. ROBINSON:  Sounds great, Judge.  Thank you.

12         THE COURT:  How many years out are you?

13         MS. ROBINSON:  From law school?  I guess three and a

14   half?

15         THE COURT:  All right, it's time, okay, as long as I'm

16   not pouncing on someone who just took the Bar.

17         (Laughter.)

18         MR. MANGI:  Mr. Sochynsky has argued before, so we'll

19   focus that on Ms. Robinson.  Okay, so can we switch over again,

10:38 20   please.

21         THE CLERK:  Yes.

22         MR. MANGI:  Thank you.  Okay, so, your Honor, the

23   motion that they have made for summary judgment affirmatively

24   on the BPM claims, I'm not going to deal with that because your

25   Honor is not going into claims of falsity.

 1          THE COURT:  No.

 2          MR. MANGI:  So I'm just going to focus on whether our

 3     counterclaims should survive and go forward.  Now, I'll skip

 4     over a couple of these.

 5          Okay, your Honor, this is the range of the advertising

 6     that we are challenging here.  There are a number of different

 7     advertising pieces.  And let me point out a few things, your

 8     Honor.  Let me deal first with the commercial advertising issue

 9     that came up right at the end there.

10:39 10          First, the record shows, your Honor, these are

11     advertising pieces that were designed and intended to be a live

12     use leave-behinds with customers.  So, for example, when it

13     comes to the technical competitive brief, we have evidence in

14     the record, in the summary judgment record in our findings that

15     shows, for example, their CEO, Alan Trefler, took this to a

16     customer who, rather than can use it as a live prop in a

17     meeting, he said that would blow up the deal using that.  We

18     have evidence in the record showing that they said, "Now that

19     we have these materials, we should never lose against Appian."

10:39 20     We have emails saying, "We must deploy these every time we're

21     competing with Appian on every deal."

22          So the fact that they say they lost a number of

23     emails, and so now when they look at the emails from 2012, they

24     can only find a certain number of distributions, that doesn't

25     matter.  We're going to show at trial that they used these

 1    pieces pervasively throughout the market, and they used them as

 2    live pieces, live advertising.

 3          Let me also just flag, your Honor, that the law on

 4    this --

 5          THE COURT:  The one at the end, which is the slide

 6    deck, was apparently only used once.  Is that enough?

 7          MR. MANGI:  Yes.

 8          THE COURT:  Well, let me ask this:  Should I just

 9    cherry-pick one by one, this one is, this one isn't?

10:40 10          MR. MANGI:  You shouldn't, your Honor, for two

11    reasons.  One is, all of these, including the slide deck, were

12    intended for use as live pieces.  So therefore the fact that

13    they may say there's only one email, we're going to have

14    witnesses that testify these were designed for use anytime

15    there is competition.

16          THE COURT:  Maybe, but I don't know that I have that,

17    do I?

18          MR. MANGI:  I believe it is in our findings, your

19    Honor.  Yes, for example, with the scaleability white paper,

10:40 20    you know, our findings, 38 at Page 187, we point out them

21    sharing it at various accounts, including AT&T, Pfizer, FedEx,

22    UPS, Novartis, and the FCC.  So, you know, there is more

23    evidence in the record than that chart lets on.  But let me

24    point out this, your Honor.  Nonetheless --

25          THE COURT:  Excuse me.  What was that?

1          MR. MANGI:  That is our Supplemental Statement of

2     Material Facts, Paragraph 38, Page 187 of the document.  But

3     let me point out, your Honor, that --

4          THE COURT:  But let's say I say you're right, okay, on

5     that one, that it was shown widely enough to be an

6     advertisement, but there might be others that were shown once,

7     like the slide deck.  I don't know how I assess -- are you

8     agreeing with Pegasystems that I should think about it as a

9     whole campaign?

10:41 10          MR. MANGI:  No, your Honor.  Well, let me parse it

11     out, your Honor.  Here's the issue:  They're all different

12     advertisements.  They are addressing -- they're all under the

13     same umbrella of suggesting that, you know, "If you have a

14     serious project, look at Pega; you can't look at Appian."  But

15     that doesn't change the fact that they're different

16     advertisements making different claims.  And sometimes some of

17     the claims are technically similar, sometimes they have

18     different variants, but these are all different pieces of

19     advertising.

10:42 20          And let me point out, your Honor, that the law --

21          THE COURT:  You would say laches would apply

22     differently to each one?

23          MR. MANGI:  Yes, absolutely.  I'm going to get to that

24     in just a second.

25          THE COURT:  What's sauce for the goose is sauce for

1    the gander.  You think about it, if it's advertising and you

2    knew about it one by one --

3         MR. MANGI:  On laches the analysis -- it is

4    advertising, but that doesn't mean we knew about all the

5    advertising.  We knew about one piece of advertising, which was

6    the Sinur report, and we had limited knowledge on that, but we

7    knew about that one.  But we didn't know about the others at

8    all.  Let me deal with that, your Honor.  I'm going to get to

9    that very specifically in just a moment.

10:42 10        I just want to make one other point on this, though,

11    which is, the case law, your Honor, we cite at Page 24 of our

12    brief the *Seven-Up* case, makes clear that even one use in

13    advertising is sufficient under the Lanham Act because that's

14    commercial advertising.  And it depends on the market.  You

15    know, if you're advertising chocolate bars, then, sure, you

16    need to show some wide consumer campaign, but here these are

17    specialized, customized products, and so even one use is

18    enough.

19        THE COURT:  Let's say a salesperson goes into

10:43 20    somebody's company and writes out scribbles, you know, "Here's

21    what's good about Appian over Pegasystems," and it turns into a

22    piece of paper, side-by-side comparison, I imagine in a

23    customized presentation you might do that.

24        MR. MANGI:  Yes.

25        THE COURT:  Depending on if you're a shoe manufacturer,

1  as you said, or one mom-and-pop COVID, you might sort of -- do

2  you consider that an advertisement?

3        MR. MANGI:  I would say, your Honor, it's a very

4  fact-dependent analysis.  But let's say they're designing, you

5  know, highly customized shoes that cost millions of dollars,

6  and they're coming in for this one client in, you know, a high

7  methods-based trail, that could qualify as commercial

8  advertising.

9        THE COURT:  What's the difference between that and a

10:44 10  sales pitch?  You're saying there is none.

11        MR. MANGI:  Well, it depends, your Honor, again on the

12  market because if it's a mass-scale retail product, then one

13  instance absolutely not enough; I agree with you.  But here

14  where it's a highly customized product, even a single use

15  absolutely can be enough.

16        THE COURT:  I don't know.  It's not usually what you

17  think about as advertising.

18        MR. MANGI:  Sure, absolutely.

19        THE COURT:  I get it when you're putting it up on your

10:44 20  website for everyone to see, that's advertising.

21        MR. MANGI:  Yeah.

22        THE COURT:  It's a little harder when it's a customized

23  document, and then these sometimes fall in between that.

24        MR. MANGI:  But I will say, for these, your Honor, the

25  scaleability white paper, the technical brief, you know, for

```
 1   these there is evidence in the record that we have put in; you

 2   know, these are intended for use wherever there's competition

 3   and intended as live leave-behinds.  Sinur was used throughout

 4   the market up on the website, used --

 5              THE COURT:  The problem I have with Sinur, which is

 6   you really do have to get to laches, and I think that's a

 7   pretty strong argument.

 8              MR. MANGI:  Yeah, let's go straight there.  Okay.

 9              Okay, so laches, your Honor.  So there are really

10   three elements to the laches test, just to be clear:  One, they

11   have to show that we have engaged in unreasonable and

12   inexcusable delay.  Two, they've got to show that they were

13   prejudiced.  And, three, even if both those things are satisfied,

14   that just lays the foundation.  Then your Honor has to engage

15   in the equitable determination of, should it nonetheless be

16   applied in all of the circumstances of the case?

17              Okay, now, your Honor pointed out also in your ruling

18   in the case that laches is a fact-sensitive inquiry, typically

19   not subject to resolution pretrial, and that is, I would

20   suspect, proven very true ultimately here.

21              Now, here's the divide I was pointing your Honor to

22   earlier.  On the Sinur report?  Yes, we knew it was out there

23   and that they were using it in the marketplace.  We didn't know

24   conclusively the origins of it.  We certainly didn't know our

25   injury stemming from it, and I would submit that all of that is
```

         1    necessary to trigger even the first prong.  But as to the

         2    others, your Honor, there is zero evidence in the record that

         3    we knew they were using any of these advertising pieces in the

         4    marketplace.

         5              THE COURT:  These other ones on the other side?

         6              MR. MANGI:  Everything on the right-hand side,

         7    everything other than Sinur.

         8              THE COURT:  What do you think about the argument,

         9    Pegasystems was pressing that this was all part of one

10:46   10    advertising campaign with all the same basic claims?

        11              MR. MANGI:  Yeah, your Honor, it's certainly true that

        12    they are making a general unified claim that for a big project,

        13    you've got to use Pega.  That is a unifying factor, no doubt,

        14    but that doesn't change the fact that these are all pieces

        15    making different claims in different ways in service of that

        16    theme, which spins on technical themes.

        17              For example, let me just give you just one very

        18    specific example.  In the scaleability slide deck, your Honor,

        19    they put up a slide deck where they say, oh, you know, we

10:47   20    have -- here, it's at Slide 63.  Can we go to 63, please.

        21              They put up a side deck, your Honor, where they say,

        22    "Look, let's do a comparison of Pega and Appian on all of these

        23    factors that bear on who you can use in a big case."  This is

        24    something that is only in the scaleability slide deck.  It's

        25    not in any of the other pieces.  So they give these relative

scores.  And then, when we did the discovery on where are these

scores coming from -- this is the man who actually created

them -- he says, if I may use his direct words, he says "It's

bullshit."  He says, "We just made the numbers up.  They've

been arbitrary.  We wanted to make ourselves look good."  That

is not a claim that is repeated in any of the other advertising

pieces that we're talking about.  So that just gives you an

example --

THE COURT:  You're saying that they were different

enough not to --

MR. MANGI:  Absolutely.  And we didn't even know about

the advertising.  There's no way they even get started on that

issue, and we didn't.

So then, your Honor, let me get to the issue of

prejudice, and now I'm focusing on Sinur because on the others

there's no suggestion we even saw them.  And I think

Ms. Robinson's argument, five minutes will cover what she had

planned to do, so I'll take another five, if that's okay.

So when it comes to the issue of prejudice, your

Honor, the cases are clear -- we cite them in our brief,

including from the First Circuit -- there has to be a clear

showing of prejudice.  It's not enough to just suggest it.  And

what do they really point to as their prejudice?  They say two

things:  One is that, you know, "We lost some emails during an

upgrade, and one employee left, and we don't have his emails

anymore."  But if you look at the time frame, your Honor, all

of those things happened within four years of the Sinur report

first being published; and that is categorically irrelevant as

a matter of law to a showing of prejudice because they need to

show that they were prejudiced by something that happened after

those four years had elapsed.  You know, we cite here some of

the cases that establish that principal actions undertaken

before the delay may not figure at all into the analysis.  So

they have absolutely no actionable showing of any prejudice

stemming from this.

I'll also point out that in their own interrogatory

response, they say, you know, "We had no idea.  Yeah, we lost

some emails.  We had no idea what was in them."  Well, that's

not good enough.  Again, under the First Circuit precedent,

they have to show there was something --

THE COURT:  It does run against the grain, though, to

allow you to sit on a claim, just sit there while your claims

are accumulated and damages, without your even putting them on

notice that -- in fact, one of the emails was, "Hey, we're

going to fight them in the marketplace where this isn't even

worth the effort," and then suddenly now, in your litigation

combat mode, you assert it.

MR. MANGI:  Well, focusing on Sinur, your Honor,

because that's what we're really talking about here --

THE COURT:  Really, that's what we're talking about.

| | |
|---|---|
| 1 | MR. MANGI:  Yeah, that's what we're talking about. |
| 2 | Let me address that issue.  You know, first of all -- |
| 3 | THE COURT:  It feels as if you saw it on your hands. |
| 4 | MR. MANGI:  Yeah.  Well, let me explain that, your |
| 5 | Honor, first, from a practical perspective, then from a legal |
| 6 | perspective.  From a practical perspective, Appian knew that |
| 7 | the Sinur piece was being used out there.  We didn't know the |
| 8 | extent or the way in which they were using it or the injuries |
| 9 | that were done to us, but here's another important point, your |
| 10:50 10 | Honor.  And I mention this because, remember, the test, your |
| 11 | Honor, is even if you have delay, even if you have prejudice, |
| 12 | neither of which you have here -- |
| 13 | THE COURT:  Well, you're claiming damages for this |
| 14 | entire period where you didn't squawk. |
| 15 | MR. MANGI:  Well, the law is clear, your Honor, that |
| 16 | the mere increase in damages alone over time does not grant |
| 17 | prejudice. |
| 18 | THE COURT:  What about loss of memory? |
| 19 | MR. MANGI:  There's no suggestion here, your Honor, |
| 10:50 20 | that there is any actionable or material loss of memory on key |
| 21 | issues.  But let me point out the key point here, your Honor, |
| 22 | just on the practical point of "why," which is you're asking |
| 23 | why didn't we do this, at the time, we didn't know the extent |
| 24 | of any of this.  But it's a very different situation, your |
| 25 | Honor, where they then -- remember, they used the Sinur report. |

1    They didn't disclose it was commissioned.  They in fact had

2    emails that we have in the record where they go out and tell

3    the market, "This Sinur report, this was not commissioned by

4    either party.  This is independent."  Their own website said

5    it's independent and objective.  Never been anything like that

6    with the BPM.com --

7          THE COURT:  All right, we need to move on to the last

8    one.

9          MR. MANGI:  Yes.  This is the last point, your Honor,

10:51 10   that the equation changes once they have filed suit against us.

11   In that situation, for them to be able to say, "Oh, sorry, you

12   didn't sue us earlier," when they are doing the exact thing,

13   that becomes inequitable.

14         THE COURT:  All right, thank you.  All right, so --

15         MR. GROSS:  Your Honor, I feel a kinship to my fellow

16   associate, but I have one minute for rebuttal.

17         THE COURT:  Go ahead.

18         MR. GROSS:  Just quickly, your Honor, on the prejudice

19   point, again, I just point out the burden point, Mr, Mangi

10:52 20   again asserting that it's our burden to show prejudice.  That's

21   just wrong under First Circuit precedent.

22         THE COURT:  All right, so it's their burden, and they

23   say that they took depositions, and you said that, you know,

24   you couldn't come up with any --

25         MR. GROSS:  But we didn't have to say anything.  We

1     don't have to show anything at all, and that's the key point.

2          THE COURT:  No, but they had a deposition that said

3     that you couldn't point out any emails that were on point, so

4     is that enough for them to show no prejudice?

5          MR. GROSS:  It is not, your Honor, because of course

6     there's a practical --

7          THE COURT:  Well, what would you say would be an

8     example of what they could do, other than say they asked about

9     the emails, and they -- they're right about the law that just

10:52 10   running up the damages isn't enough.  So what else?  Loss of

11    memory I can take judicial notice of, you have people lose --

12    but there's nothing specific in the record.

13         MR. GROSS:  There is something specific, your Honor.

14    There's a whole category of internal Pegasystems communications

15    that were lost during this relevant time frame.  If your Honor

16    looks at the *Bynher* (Phon) case, which Appian selectively

17    quotes in their brief, the First Circuit case, there the Court

18    points out that specific documents or categories of documents

19    that were lost through no fault due to the passage of time.

10:53 20   And here --

21         THE COURT:  Well, is there evidence in the record that

22    these were Sinur documents?

23         MR. GROSS:  These were internal Pega communications

24    during the relevant time frame, you Honor.  We can't tie them

25    to the specific papers.  We don't know what they said because

```
 1    they're lost.  And that's really the entire point:  When you

 2    sit on your hands, things happen that impact the evidentiary

 3    record, and we shouldn't be penalized for that.  And, again,

 4    it's their burden to show that in the first place.  We didn't

 5    have to say anything.

 6                THE COURT:  All right, thank you.

 7                MR. GROSS:  Thank you, your Honor.

 8                THE COURT:  All right, go ahead.

 9                MS. ROBINSON:  Thank you for the opportunity, your

10    Honor.  I appreciate it.  So I'm discussing Dr. Keri Pearlson.

11    She's one of the sources that Pega relies on to try to

12    manufacture injury.

13                So the two relevant opinions that Dr. Pearlson offers

14    about injury, she opines that the BPM.com report likely

15    impacted the purchasing decisions of customers, but she doesn't

16    point to any actual evidence of such impact.  And I think we've

17    discussed earlier that there really isn't evidence of such

18    impact in the record.  And she also opines that the BPM.com

19    report caused Pega reputational harm.

20                THE COURT:  My concern a little bit was, those were

21    both common-sense conclusions.  I mean, it's just, like, sure.

22    I mean, I don't know why you say it's beyond the range of her

23    expertise where she's the -- is she the one who's the

24    consultant or the professor?  But, whatever, I mean, it's

25    common sense.
```

1              MS. ROBINSON:  There are two things on that, your

2       Honor.  One, you know, to the extent that it's common sense,

3       then it's something that's not the proper subject of expert

4       testimony.  If anyone could figure out that a report that says,

5       you know, unkind things about a competitor is something that

6       could potentially harm that competitor's reputation, you know,

7       that isn't something that is helpful to a fact-finder from an

8       expert.  And, actually, Dr. Pearlson doesn't really have any

9       expertise that would make her uniquely qualified to opine on

10:55   10       that subject.  She's a cyber-security expert.  That's what's

11       set forth essentially in her report.  That's what she disclosed

12       at her deposition when we asked her about her expertise.  She

13       admitted that cyber-security expert is what's listed on her

14       expert bio online.

15              Now, in Pega's opposition, Pega tries to construct her

16       background and experience into something that it really isn't.

17       They say that she has decades of experience --

18              THE COURT:  I'm unlikely to say she's unqualified, but

19       what I'm trying to get at is, you're saying, because it's

10:55   20       common sense that of course an advertisement that's false will

21       hurt someone's reputation, that an expert can't say it?  Is

22       that the gist of it?

23              MS. ROBINSON:  So her opinion is that the report

24       actually caused reputational damage, and she doesn't have

25       evidence to support --

1          THE COURT:  Or likely caused it.

2          MS. ROBINSON:  No.  She says it actually caused.  She

3     said it likely caused an impact on purchasing decisions.

4          THE COURT:  Sure.

5          MS. ROBINSON:  But she says that Pega actually was

6     damaged in terms of its reputation by the report, and she

7     doesn't have a basis to opine that there was actual

8     reputational damage.  And she doesn't have experience in the

9     industry to establish that this kind of report would

10:56 10     definitively cause reputational damage either.

11          Now, to the extent her opinion is just, the report

12     could have caused damage because a report that compares a

13     competitor negatively could cause damage, that's just common

14     sense, like you said earlier.  It's not the proper subject of

15     expert testimony.

16          And just to get back to her experience, we didn't move

17     specifically on her qualifications.  We --

18          THE COURT:  Well, she's qualified.

19          MS. ROBINSON:  Well, I disagree.  She is a

10:56 20     cyber-security expert.  She doesn't have any background in this

21     specific industry.  And though Pegasystems writes in their

22     opposition that her background includes decades of experience

23     in software procurement and implementation, that's actually not

24     in the record.  And you can look at the citations they cite,

25     they use in their opposition to see that.  For example, when

1   they cite that specific language I just discussed, her decades

2   of experience, the citation is to a quote from Dr. Pearlson

3   from the deposition that just says, "I am qualified to render

4   an opinion on impact, and I did render an opinion on impact."

5   That's conclusory.  That's obviously not sufficient to explain

6   what in her experience showed, that she was qualified to render

7   these opinions and reach these conclusions.  And I think that's

8   all I have.

9          MR. HORVATH:  Thank you, your Honor.  I think I can

10:57 10  still get this done before 11:00.

11         THE COURT:  You will.

12         (Laughter.)

13         THE COURT:  We're on Zoom for some sentencing.  By the

14  way, you can stay here and clean up because we're going to be

15  doing the sentencing on Zoom, actually, because the person is

16  in custody in state prison, so we're going to just go upstairs.

17         MR. HORVATH:  So, your Honor, quickly on

18  Dr. Pearlson's qualifications, I think it's abundantly clear

19  from her resume` that although cyber-security is her current

10:57 20  gig at MIT Sloan, she has for decades taught, studied, and

21  written on a totally different topic, the topic of how large

22  business organizations purchase, adopt, and implement complex

23  business software.  And BPM's software, in its previous

24  iterations, has been a part of that that she has directly

25  engaged with in her teaching, her consulting, and her

1    publications for many decades.  She has been engaging with BPM

2    Software since before it was called BPM Software; she'll be

3    engaged with it after it's called BPM Software.  The term is

4    already becoming a bit unfashionable.  Our clients are tending

5    to refer to it more as "enterprise applications" and so forth

6    now.

7          She even worked with the guy who claimed the term, the

8    concept of business process management software.  So that's all

9    over her resume`.  She's a well-established expert.

10:58 10         THE COURT:  I'm not worried about qualifications.

11         MR. HORVATH:  Because some incorrect statements have

12    been made about her qualifications, I couldn't leave them

13    unaddressed.

14          As far as her opinion, your Honor, her opinion is

15    indeed based on her extensive knowledge of how businesses

16    receive, adopt, understand and implement marketing materials;

17    that, yes, a study purporting to be a quantitative, empirical

18    study of a survey of customers is going to have an impact on

19    those customers.  And she analyzed the record extensively.

10:59 20    It's not that there was no evidence.  There are 54 footnotes,

21    many of them citing multiple sources from the record in the

22    mere 13 pages out of her report that are challenged by Appian

23    here.

24          So she applied these years of her expertise and

25    qualifications to a very thorough review of the record

evidence, looking at what Pega said, what Appian said about its

own marketing materials, what third parties said about them,

what independent analysts said about them, to come to the

conclusion that, yes, this was intended to and did have an

impact on how customers viewed the landscape, whether they

would invite Pega to the table for deals, and in general

colored their understanding of the costs and quality and

reputation of Pegasystems; and, as I think we've established,

she is qualified to make a determination at a general level.

11:00         THE COURT:  Qualified is different than whether she

used a reliable methodology.  I mean, it's sort of people say

you're not just supposed to just do a gut check because you've

been in the industry for a while.  I mean, were there studies

she relied on to show that these one-on-ones make a difference?

        MR. HORVATH:  She did quote academic papers discussing

these kinds of marketing materials in some of the footnotes in

her expert report.  We cite those in our brief, your Honor.

But I think, in a case like this where it's not a scientific

study that the expert is reporting on, as we said in our brief,

11:00 the operative legal standard is, is this the type of analysis

the expert would conduct if this question came up in their

professional life as a consultant, as an academic, and so

forth?

        THE COURT:  She doesn't do much for you, though,

right?  She just says it could affect your reputation.

1            MR. HORVATH:  Right, this is only a --

2            THE COURT:  As I said, I even think that's a

3       reasonable inference a juror could draw.

4            MR. HORVATH:  Well, your Honor, the majority of her

5       report deals with the methodology of the BPM.com report and

6       the --

7            THE COURT:  Yes, I understand she serves another

8       purpose.

9            MR. HORVATH:  Yes, so this is, yes, just a minority of

11:01 10      her report, but, yes, she does add to that the idea that it

11      mattered.  Basically it's --

12           THE COURT:  Your other expert does this for you,

13      right?

14           MR. HORVATH:  Excuse me?

15           THE COURT:  Your own expert does this for you, right,

16      the other one?

17           MR. HORVATH:  Both of them reviewed the record.

18      Ms. Kirk Fair reviewed the record also to determine in the

19      aggregate sense -- you know, her main analysis was an

11:01 20      aggregate --

21           THE COURT:  Damages expert, right?

22           MR. HORVATH:  Right, right, she's a damages expert,

23      but she wears two hats really.  She is very qualified at the

24      kind of econometric analysis that she did to compute the number

25      of damages.  And she could have just done that just assuming

1    that there was causation.  She didn't have to do the causation

2    analysis, but she happens also to be a substantive expert in

3    consumer behavior and in the process of adopting high-tech

4    kinds of innovations in organizations.  So she was qualified

5    and able to also review the record and come to a conclusion.

6    She didn't really just say "zero to a hundred."  That's a

7    snippet of her testimony.  She didn't testify or write in her

8    report that it's equally probable that the value from zero to a

9    hundred percent of the increase is caused by the paper.

11:02 10          THE COURT:  I thought she did.  I mean, I was looking

11    at it.  I mean, I thought she basically said, "I can't

12    allocate."

13          MR. HORVATH:  She went on to opine, although she

14    didn't put a number on it, that it was a substantial amount.

15          THE COURT:  Yes.

16          MR. HORVATH:  Well, I mean, in false advertising

17    cases, that's how it goes.  If you imagine a Lanham Act case

18    about advertising --

19          THE COURT:  I don't know.  I mean, I don't know, I

11:02 20    haven't done enough of them, but usually I have at least one

21    lost client where it's clear.

22          MR. HORVATH:  Neither side has been able to do that in

23    this case, your Honor.  Even Appian's expert in the end

24    wouldn't testify to even a single customer that they switched

25    their business as a result of the Pegasystems marketing

1    materials.  It's just very challenging in a false advertising

2    case --

3            THE COURT:  I understand, and that's I guess why

4    people have this presumption, but it's still, if you're asking

5    for disgorgement, it's hard to ask either a judge or a jury to

6    just speculate.  It's hard.

7            Anyway, can I see lead counsel at sidebar.  I don't

8    think I can handle all of you, but --

9            I will be taking this under advisement, yes.

11:03 10            (Sidebar conference off the record.)

11            (Adjourned, 11:10 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 89 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action No. 19-11461-PBS,

11 Pegasystems Inc. v. Appian Corporation, et al, and thereafter

12 by me reduced to typewriting and is a true and accurate record

13 of the proceedings.

14          Dated this 21st day of July, 2022.

15

16

17

18

19         /s/ Lee A. Marzilli
           _____
20         LEE A. MARZILLI, CRR
           OFFICIAL COURT REPORTER
21

22

23

24

25