**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
)
PEGASYSTEMS INC.,                  )
)
               Plaintiff,      )
)   Civil Action
v.                                 )   No. 19-11461-PBS
)
APPIAN CORPORATION and BUSINESS PROCESS )
MANAGEMENT, INC.,                  )
)
             Defendants.      )
_____)

**MEMORANDUM AND ORDER**

September 30, 2022

Saris, D.J.

**INTRODUCTION**[1]

Plaintiff Pegasystems Inc. sued Defendants Appian Corporation and Business Process Management, Inc., accusing them of false advertising and commercial disparagement arising from an online report that portrayed Pegasystems unfavorably in the marketplace. Appian filed parallel counterclaims against Pegasystems accusing it of false advertising and commercial disparagement in its marketing materials. After protracted discovery, Defendants moved for summary judgment on Pegasystems' claims and Pegasystems cross-moved for partial summary judgment on its claims and moved for

---

[1] The Court assumes familiarity with its prior opinions in this case. See Pegasystems, Inc. v. Appian Corp., 424 F. Supp. 3d 214 (D. Mass. 2019) ("Pegasystems I"); Pegasystems, Inc. v. Appian Corp., 463 F. Supp. 3d 152 (D. Mass. 2020) ("Pegasystems II").

summary judgment on Appian's counterclaims.   After hearing, the Court **ALLOWS IN PART** and **DENIES IN PART** Defendants' motions for summary judgment, **DENIES** Pegasystems' cross-motion for partial summary judgment on its claims, and **ALLOWS IN PART** and **DENIES IN PART** Pegasystems' motion for summary judgment on Appian's counterclaims.

## FACTUAL BACKGROUND

The following facts are undisputed except where stated. Pegasystems and Appian are publicly traded companies that compete in the business process management ("BPM") software field.   BPM software applications allow enterprises to automate and optimize their business processes and functions.   Pegasystems and Appian typically sell their BPM platforms for millions of dollars to large corporations or government agencies.   The industry is competitive, with many vendors besides Pegasystems and Appian all competing in the BPM software space.

Defendant Business Process Management, Inc. ("BPM.com"), led by Nathaniel Palmer, operated the BPM.com website, which reported on the BPM industry.

This case concerns various marketing materials that Appian and Pegasystems promulgated about each other, purportedly containing falsehoods.

### A.   **Appian Marketing Materials – The BPM.com Report**

Pegasystems challenges the BPM.com Report, an Appian document

that Pegasystems alleges constituted false advertising.  Appian hired BPM.com to prepare the Report in 2018, and it was published on both the BPM.com and Appian websites on or around May 16, 2019.[2] Appian paid BPM.com $55,000 under the contract for the report. The contract provided that BPM.com would conduct market research and produce a white paper that would "clearly identify and articulate[] the value delta of Appian over Pega."  Dkt. 575-64 at 5.  The process of shaping the market survey and drafting the white paper was iterative between BPM.com and Appian, and the parties hotly contest whether the survey methodology was sound.

The BPM.com Report presented survey responses from customers of various BPM vendors, most notably Appian, Pegasystems, and IBM. The report published findings about each vendor across four areas: (1) total cost of ownership ("TCO"); (2) project team breakdown and total FTEs (i.e., full-time equivalents); (3) time to market/speed of application delivery; and (4) enterprise platform vs. departmental silos.  The report's results and associated commentary portrayed Appian more favorably than its competitors, including Pegasystems.  For example, the report stated that "Pega customers reported spending on average 11 times more than Appian customers, and nearly twice that of IBM customers."  Dkt. 575-6 at 11.  It also said that "Appian customers reported delivery on

---

[2] BPM.com took down the report in July 2019, and Appian removed it from its website on or around January 17, 2020.

average in one-fifth the amount of time cited by Pega customers, and nearly 3 times faster than IBM customers." Id. As to FTEs, the BPM.com Report warned that "Pega customers required about 5 times more FTEs on average than Appian customers (who cited the lowest TCO)." Id. And with regard to enterprise-wide deployments, the report touted Appian for having "the most responses for enterprise-wide deployments (59% of all deployments)." Id.

Appian encouraged its sales team to use the BPM.com Report, particularly when competing against Pegasystems. Appian further promoted the BPM.com Report by emailing it to customers and partners, sharing it through social media, and using a third-party marketing company to publicize the report.

**B.** **Pegasystems Marketing Materials**

In its counterclaims, Appian challenges a series of Pegasystems documents that Appian asserts amounted to false advertising (the "Pegasystems Marketing Materials").

*1. Scalability White Paper and Slide Deck*

In March 2012, then-Pegasystems employees John Petronio and Michael Caton (who both now work for Appian) developed the Scalability White Paper. The paper was titled "Appian Scalability Limitations." Dkt. 575-86 at 46. The Scalability White Paper noted that some BPM initiatives fail because organizations do not understand the importance of scalability. The paper summarized its findings as follows:

> This paper outlines the differences between the BPM
> solutions from Pega and Appian, a privately-held, "pure
> play" BPM vendor.   While Appian has a number of
> capabilities that will demonstrate well in a pilot
> project, when faced with real-world scalability
> challenges, we believe Appian to have many limitations
> that threaten an organization's success.   Pega's
> solution is far more scalable for enterprises.

Id.

The Scalability White Paper compared Pegasystems favorably to Appian across several factors that bear on each platform's scalability.  In making these comparisons, the Scalability White Paper made several claims that Appian asserts are false, including:

- "Appian lacks basic backend performance/tuning tools." Id. at 49.
- "There is no way to have more than one person working on a process at one time." Id. at 51.
- "Because Appian requires a great deal of JavaScript, especially for the user interface, it is not truly model-driven." Id. at 54.

In contrast, the paper concluded that "Pega is a platform for modernization.  It is agile and adaptive, can handle complexity to not only perform under load but [also to] allow organization[s] to automate processes and tasks.   Furthermore, it will allow organizations to leverage existing investments in enterprise applications." Id. at 62.

The Scalability Slide Deck accompanied the Scalability White paper, and was titled "Why Appian is **Not** the Choice for Enterprise BPM."  It contained just one substantive slide, which purported to score both Pegasystems and Appian across ten factors related to scalability.  Pegasystems outscored Appian for each factor, with

Pegasystems averaging a 9.50/10 and Appian averaging a 4.16/10.
The deck does not reveal how Pegasystems arrived at these scores.

Pegasystems shared the Scalability White Paper externally at
least six times before September 3, 2015, and the Scalability Slide
Deck at least once in May 2012.  Appian asserts that Pegasystems
likely shared these documents externally on additional occasions
that were not in the summary judgment record.

*2. Technical Competitive Brief*

While still employed at Pegasystems, Petronio and Caton
created the original version of the Technical Competitive Brief,
a document titled "Understanding Appian," in August 2012.  As with
the Scalability White Paper, the Technical Competitive Brief
maligned Appian's scalability.  A May 2014 version of the Technical
Competitive Brief stated that Appian:

> [L]acks the ability to reuse and manage versions.  It
> has no tools for capturing objectives, testing and
> troubleshooting performance.  It lacks key capabilities
> needed to scale and manage running systems.  It lacks
> depth with integration, decision management and
> analytics.  In short, Appian lacks the power to manage
> enterprise challenges and complexities.

Dkt. 596-105.

The various versions of the Technical Competitive Brief make
several additional claims about Appian's scalability that are
similar to those in the Scalability White Paper.  See id.

Pegasystems shared the Technical Competitive Brief externally
on at least thirty occasions to a total of fifteen organizations

between its publication and November 2017.  Pegasystems also circulated both the Scalability White Paper and the Technical Competitive Brief to its internal sales force to provide salespersons with talking points.

   *3. Sinur Paper*

   Pegasystems and Appian were competing over projects at Bank of America in early 2014.  Around that time, Pegasystems hired Jim Sinur, a researcher and influencer within the BPM community, to draft a report comparing Pegasystems' and Appian's platforms. Pegasystems paid Sinur $5,000 to draft the Sinur Paper. Pegasystems provided Sinur with the contents of the Technical Competitive Brief before he began drafting the paper and conveyed to Sinur that Pegasystems wished to portray Appian's platform as less scalable than Pegasystems'.  Upon receiving Sinur's initial draft, Pegasystems personnel edited the document after concluding that it was too slanted toward Pegasystems and would (correctly) appear to be a Pegasystems-commissioned piece.

   The final Sinur Paper was dated February 24, 2014, and titled "Appian and Pegasystems – Head to Head Comparison."  Dkt. 596-71 at 3.  It did not disclose that Pegasystems commissioned the paper. The document highlighted the "advantages" and "challenges" of both companies.  It concluded that "Appian has a highly appealing tool from a visual and pricing perspective" but its approach leads to "far greater total cost of ownership (TCO)," while "Pega does cost

more, but it supports these two critical strategies [i.e., reuse and end-to-end processes] perfectly to keep the overall TCO much lower over time." Id. at 8.  The report ended, "If you are picking one over the other, you need to look at the nature of the processes you will attempt over time. If they are strategic, pick Pega.  If you happen to own both tools, use Appian for tactical standalone processes that will not grow in performance needs and use Pega for strategic and wide impact processes."  Id.

Appian points to several claims in the Sinur Paper that it views as false, including:

- "While Appian has shown success in departmental implementations, there is little evidence of cross organizational process implementations. There is almost no evidence of transformational implementations that have enabled an organization to transform its business incrementally on a large scale with deep business change. In addition, there is not a significant mass of professional support that would help an organization scale to transformational efforts with only 600 consultants." Id. at 5.
- "Appian's vertical focus has been primarily in government. In the past few years, Appian has started to develop inroads in other verticals, including mid-sized banks, healthcare, and utilities.  Many of these implementations are aimed at the functional level." Id. at 4.
- "Many of Appian's implementations remain in the cloud once in production."  Id.

Pegasystems hosted the Sinur Paper on its website from approximately March 2014 to January 2019.  It encouraged its sales force to direct clients to the Sinur Paper.

Pegasystems also used statements in the Sinur Paper in other marketing materials.  In March 2016, Pegasystems created a document

called the "Appian vs. Pega 7 BPM Comparison Chart" (the "Competitive Comparison Chart") for use with prospective client Intel Corporation, which was considering both companies for its enterprise BPM platform.  The Competitive Comparison chart quoted many of the statements that Appian challenges from the Sinur Paper and attributed them to Sinur.  Similarly, in May 2018, Pegasystems created a document titled "Pega vs. Appian Technology Assessment" (the "Technology Assessment") that linked to the Sinur Paper and quoted many of its claims about Appian's ability to scale. Pegasystems used the Technology Assessment to compete for an opportunity with the Social Security Administration that the two companies were vying for.

####     4. *Pega 7 vs. Appian Comparison*

The Pega 7 vs. Appian Comparison is a Pegasystems-branded slide deck that Caton created in January 2015.  It listed several software capabilities and their benefits, then stated whether the two companies had these capabilities; in all cases, the deck listed Pegasystems as having the capabilities but in many cases Appian did not.  For example, the deck described Pegasystems as having, and Appian as lacking, a "[c]ollaborative, concurrent development environment" which "[s]peeds development by ensuring developers can work on different aspects of an application simultaneously, while having access to end user feedback mechanisms within the development environment to ensure user feedback is incorporated

quickly and accurately." Dkt. 575-86 at 74.

Pegasystems circulated the Pega 7 vs. Appian Comparison externally on at least five occasions, ending in June 2016. It also circulated the deck to its sales team.

### 5. LinkedIn Post

Appian also challenges a LinkedIn post that Pegasystems Senior Vice President and Chief Marketing Officer Tom Libretto made in connection with this lawsuit. On December 5, 2019, this Court denied Appian's motion to dismiss Pegasystems' Complaint in part, allowing Pegasystems' claims to proceed. See generally Pegasystems I. In the immediate aftermath of the decision, Libretto wrote on LinkedIn:

> We all encounter examples of business ethics we find questionable . . . patent trolls, paid content promoted as 'unbiased truth,' and sometimes just blatant lies. I'm proud to work for a company that is not afraid to undertake the unpleasant action of litigating against those whose actions we believe are unlawful and unethical. If you're thinking about Appian, you should read this first[.]

Dkt. 599-1 at 175.

The post then linked to an article on the website universalhub.com that summarized the Court's ruling. Libretto and Pegasystems management encouraged salespersons to share the post and to use it when competing against Appian.

## PROCEDURAL BACKGROUND

Pegasystems filed its initial Complaint against Appian and BPM.com on July 3, 2019, and an Amended Complaint (Dkt. No. 55) on

December 4, 2019.   The Amended Complaint brings claims of False Advertising under the Lanham Act, 15 U.S.C. § 1125 (Count I); violations of Mass. Gen. Laws ch. 93A §§ 2 and 11 (Count II); and common law commercial disparagement or injurious falsehood (Count IV), all based on the BPM.com Report.   The Court dismissed an additional claim for common law false advertising and unfair competition (Count III).   See Pegasystems I, 424 F. Supp. 3d at 225–26.

Appian's operative pleading is its Amended Answer and Counterclaims, which it filed on June 22, 2021 (Dkt. No. 335). The Amended Counterclaims include claims for violation of the Lanham Act (Counterclaim I), violations of Mass. Gen. Laws ch. 93A §§ 2 and 11 (Counterclaim II), common law commercial disparagement or injurious falsehood (Counterclaim III), and defamation (Counterclaim IV) based on the Pegasystems Marketing Materials, with Count IV relating only to the LinkedIn Post.

**DISCUSSION**

**A.   Legal Standard**

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. An issue is genuine for summary judgment purposes when "a rational factfinder could resolve it in either direction." Boudreau v. Lussier, 901 F.3d 65, 71 (1st Cir. 2018) (cleaned up).  A fact is

material "when it has potential of changing a case's outcome." Doe v. Trs. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018). In general, the moving party may satisfy its initial burden by "affirmatively produc[ing] evidence that negates an essential element of the non-moving party's claim" or "point[ing] to evidentiary materials already on file . . . that demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial." Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). This requires production of "evidence that is significantly probative," Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010) (cleaned up), and not based upon "conclusory allegations, improbable inferences, and unsupported speculation," Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). With respect to each motion for summary judgment, the court "view[s] the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995).

**B.   Analysis**

The core issue in this case is whether Appian and BPM.com on the one hand, and Pegasystems on the other hand, engaged in false advertising under the Lanham Act and Mass. Gen. Laws ch. 93A and

the common law tort of commercial disparagement.

The Lanham Act makes liable any person who communicates any "false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). A plaintiff bringing a Lanham Act false advertising claim must prove that:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 310–11 (1st Cir. 2002).

The elements of a false advertising claim under Chapter 93A are the same as under the Lanham Act, and thus, on a motion for summary judgment, "claims under the Lanham Act and Chapter 93A rise and fall together." Spruce Envtl. Techs., Inc. v. Festa Radon Techs., Co., 248 F. Supp. 3d 316, 321 (D. Mass. 2017).

To establish a commercial disparagement claim, a plaintiff

must prove that the defendant:

> (1) published a false statement to a person other than
> the plaintiff; (2) "of and concerning" the plaintiff's
> products or services; (3) with knowledge of the
> statement's falsity or with reckless disregard of its
> truth or falsity; (4) where pecuniary harm to the
> plaintiff's interests was intended or foreseeable; and
> (5) such publication resulted in special damages in the
> form of pecuniary loss.

HipSaver, Inc. v. Kiel, 984 N.E.2d 755, 763 (Mass. 2013).

A commercial disparagement claim differs from a Lanham Act or Chapter 93A false advertising claim in that it (1) "imposes liability only for false statements, while the Lanham Act also encompasses misleading statements"; (2) "requires 'actual malice,' meaning the defendant either has knowledge of a statement's falsity or acts with reckless disregard of its truth or falsity"; and (3) "does not require that the false statement be made in advertising, as the Lanham Act does." Pegasystems I, 424 F. Supp. 3d at 226 (citing Kiel, 984 N.E.2d at 767).

   *1. Appian and BPM.com's Motions on Pegasystems' Claims*

    a. Lanham Act — Injury

Appian and BPM.com challenge the fifth element of Pegasystems' Lanham Act claim: that the BPM.com Report caused Pegasystems a legally cognizable injury. A plaintiff may prove injury through loss of sales or goodwill. See Cashmere, 284 F.3d at 311. "[A]lthough diversion of sales to a direct competitor may be the paradigmatic direct injury from false advertising, it is not the only type of injury cognizable under § 1125(a)." Lexmark

Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 138
(2014).  One type of injury arises when "a defendant harms a
plaintiff's reputation by casting aspersions on its business," as
"the plaintiff's injury flows directly from the audience's belief
in the disparaging statements."  Id.  A presumption of injury and
causation may arise where a defendant makes literally false
comparative statements about competing products.  See Merck Eprova
AG v. Gnosis S.P.A, 760 F.3d 247, 259 (2d Cir. 2014); HipSaver
Co., Inc. v. J.T. Posey Co., 497 F. Supp. 2d 96, 106 (D. Mass.
2007).

Defendants contend that Pegasystems is not entitled to a
presumption of injury because multiple firms compete in the BPM
market.  In HipSaver, this Court held that "the weight of the
caselaw in this circuit supports a rebuttable presumption of
causation and injury for willful literally false advertising in a
two firm market where a defendant makes comparative statements
targeting a direct competitor's products."  Id. at 109.  However,
a two-player market is not always required to give rise to the
presumption.  The presumption of injury applies in cases involving
a "misleading comparison to a *specific competing product* [because
the comparison] necessarily diminishes that product's value in the
minds of the consumer."  Merck Eprova, 760 F.3d at 259 (quoting
McNeilab, Inc. v. Am. Home Prods. Corp., 848 F.3d 34, 38 (2d Cir.
1988)); see also Porous Media Corp. v. Pall Corp., 110 F.3d 1329,

1336 (8th Cir. 1997); <u>Harper House, Inc. v. Thomas Nelson, Inc.</u>, 889 F.2d 197, 209 n.8 (9th Cir. 1989).   One court recently identified three scenarios in which the presumption of injury applies: (1) "where the defendant made a false comparative advertising claim"; (2) "where the statement at issue was derogatory and undoubtedly referred only to the plaintiff"; or (3) "in a 'two-player market' where there is evidence of 'deliberate deception.'"   <u>In re Elysium Health-ChrornaDex Litig.</u>, No. 17-cv-7394, 2022 U.S. Dist. LEXIS 25090, at *158-59 (S.D.N.Y. Feb. 3, 2022) (quoting <u>Merck Eprova</u>, 760 F.3d at 259-61).

This is a false comparative advertising case to which the presumption of injury applies.  For purposes of this motion, Appian and BPM.com do not dispute that the BPM.com Report contained falsities, or even that the false statements were willful. Further, the BPM.com Report is replete with comparative statements.  For example, it states that "Pega customers reported spending on average 11 times more than Appian customers."  Dkt. 575-6 at 11.  It also says that "Appian customers reported delivery on average in one-fifth the amount of time cited by Pega customers."   <u>Id.</u>   Because the BPM.com Report's comparative statements would diminish Pegasystems in the minds of consumers, it is entitled to the presumption of injury at this stage.   <u>See</u> <u>Merck Eprova</u>, 760 F.3d at 259.

The summary judgment record also presents a fact question

regarding whether the BPM.com Report caused Pegasystems reputational injury. Three Pegasystems customers, Ford Motor Company, Tracfone Wireless, and Great West Casualty Company raised questions about the BPM.com Report's claims to Pegasystems following its publication. These customers did not move their business from Pegasystems, but a reasonable jury could infer, based on their concerns, that the BPM.com Report generated similar concerns in the marketplace. Thus, there is a triable issue on whether Pegasystems suffered reputational injury.

> b.   Damages

Appian and BPM.com argue that there is insufficient evidence of economic injury to support a claim of monetary damages. Pegasystems conceded at various points during discovery that it had not identified any business it lost because of the BPM.com Report.

Pegasystems now argues that it lost an opportunity with Oklahoma Gas & Electric ("OG&E") because of the BPM.com Report, but its evidence on that score is weak. Ryan Byrne of Appian sent two OG&E employees the BPM.com Report on May 14, 2019, in an email noting that the document was "referenced in our discussion." Dkt. 578-43 at 3. On May 15, Byrne wrote to several Appian colleagues that "the OG&E folks were really excited to hear about" the BPM.com Report. Dkt. 578-42 at 2. However, there is no testimony or documentary evidence from OG&E that the BPM Report was a

substantial factor in its decision. Even assuming OG&E read the report (which is far from clear), on this record, no reasonable jury could conclude that Pegasystems lost the OG&E opportunity because of the BPM.com Report.

Neither of Pegasystems' experts provides an opinion which supports a claim for monetary damages.[3]  Accordingly, the Court allows defendants' motions for summary judgment on the claim for money damages for lost business.

c.   Disgorgement

While Pegasystems may not seek monetary damages at trial, it can seek disgorgement from Appian.  "If a plaintiff without specific evidence of injury proves direct competition and willfulness, an accounting may be available to the plaintiff 'subject to the principles of equity.'"  Hipsaver, 497 F. Supp. 2d at 107 (quoting Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd., 282 F.3d 23, 35 (1st Cir. 2002)); see also Merck Eprova, 760 F.3d at 261-62.  Additional principles of equity that courts look to in determining whether disgorgement is appropriate include:

> (a) the degree of certainty that the actor benefitted from the unlawful conduct; (b) the relative adequacy to the plaintiff of other remedies, including an award of damages; (c) the interests of the public in depriving the actor of unjust gains and discouraging unlawful conduct; (d) the role of the actor in bringing about the infringement or deceptive marketing; (e) any unreasonable delay by the plaintiff in bringing suit or

---

[3] The Court will address Appian's Daubert motions (Dkt. 582; Dkt. 587) at a later date.

otherwise asserting its rights; and (f) any related misconduct on the part of the plaintiff.

Hipsaver, 497 F. Supp. 2d at 109 (quoting Restatement (Third) of Unfair Competition § 37(2) (Am. L. Inst. 1995)).

Critically, "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). This means that "the plaintiff does not need to show which of the defendant's profits were attributable to the false advertising; on the contrary, the defendant bears the burden of showing any portion of sales that was not due to the allegedly false advertising." Wing Enters., Inc. v. Tricam Indus., Inc., 511 F. Supp. 3d 957, 974 (D. Minn. 2021); see also Fishman Transducers, Inc. v. Paul, 684 F.3d 187, 196 (1st Cir. 2012) (finding evidence of direct competition would have sufficed to entitle plaintiff to disgorgement); Tamko Roofing Prods., 282 F.3d at 37 ("once plaintiff has shown direct competition and infringement, the statute places the burden on the infringer to show the limits of the direct competition").

"[A] showing of direct competition requires a substantial degree of equivalence and substitutability." Fishman, 684 F.3d at 196. Willfulness "requires a conscious awareness of wrongdoing by the defendants or at least conduct deemed 'objectively reckless' measured against standards of reckless behavior." Id. at 191. It "is a question of fact, which must be submitted to a jury."

HipSaver, 497 F. Supp. 2d at 107 (citing Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 66 (1st Cir. 2000)).

Pegasystems may obtain disgorgement of Appian's profits without showing which of Appian's sales were attributable to the alleged false advertising.  See 15 U.S.C. § 1117(a).  Its expert report is adequate to show that Appian has generated profits since the publication of the BPM.com Report (an estimated $29.1 million).  Thus, Pegasystems may proceed to trial against Appian on its claim for disgorgement of Appian's profits.

        d.   Injunctive Relief

Appian argues that Pegasystems' claim for injunctive relief is moot because it removed the BPM.com Report from its website and ceased distributing it once Pegasystems filed this lawsuit.  Pegasystems asserts that its claim for injunctive relief is not moot under the voluntary cessation doctrine.

A defendant's voluntary cessation of challenged conduct moots a case where "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) (citation omitted).

It is uncontroverted that Appian has discontinued use of the BPM.com Report since the onset of this litigation.  Appian further submitted a declaration from its Chief Marketing Officer attesting that (1) Appian has instructed its personnel to discontinue use of

the BPM.com Report, and (2) Appian will not at any time in the future resume use of the BPM.com Report.  The Court concludes Appian has ceased reposting the BPM.com Report on its website and will not do so again.  The issue is therefore moot.

### 2. Pegasystems' Motion on Its Claims

Pegasystems moves for summary judgment on the issue of liability (but not damages) for its own Lanham Act claim.  As to the element of falsity, Pegasystems argues that the BPM.com Report's claim that the average total cost of ownership of Pegasystems's products was more than ten times greater than that of Appian's products was literally false.  Pegasystems takes aim at the BPM.com Report's methodology, but does not show the actual cost to own its solutions as compared to Appian's.  Appian points to internal Pegasystems emails in which Pegasystems employees state that Pegasystems is much more expensive than Appian, and an independent report concluding that Pegasystems is "relatively expensive."  Dkt. 599-1 at 120-21.  There is a genuine issue of material fact on the question of whether the BPM.com Report's claim comparing the two companies' TCOs was false.  Pegasystems' motion is denied.

### 3. Pegasystems' Motion on Appian's Counterclaims

#### a.   Timeliness of Appian's Counterclaims

##### i.   Laches

Pegasystems argues that Appian's Lanham Act counterclaim is

barred by the equitable principle of laches.   There is a strong presumption that laches applies if the counterclaim was filed outside of the analogous state limitations period—here, the four-year period under Chapter 93A.   See Pegasystems II, 463 F. Supp. 3d at 161.   "The laches period starts to run when 'the plaintiff knew or should have known' of the defendant's wrongful conduct." Id. (citing Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Credito Oriental, 698 F.3d 9, 21 (1st Cir. 2012)).   Where laches presumptively applies, it additionally "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense."   Oriental, 698 F.3d at 21.   The burden of proving unreasonable delay and prejudice is allocated to the party asserting laches where the complaint is filed within the limitations period, and the burden of proving their absence falls on the nonmoving party where the complaint is filed outside of the limitations period.   See In re Bankvest Capital Corp., 375 F.3d 51, 61 (1st Cir. 2004).

Appian seeks to expand the limitations period for Chapter 93A claims by arguing that it begins to run not when it knew or should have known of Pegasystems' alleged false advertising, but when it knew that the advertising had caused it injury.   Contrary to Appian's position, the laches period begins to run once it should have known of Pegasystems's wrongful conduct, which occurred when it became aware of the allegedly false advertisements.   See

Pegasystems II, 463 F. Supp. 3d at 161; Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 837–38 (9th Cir. 2002) ("Laches penalizes dilatory conduct; as such, the presumption is that a § 43(a) plaintiff is barred if he fails to file suit promptly when the defendant commences the wrongful conduct."). Moreover, laches bars Lanham Act claims in the context of a continuing wrong. See Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 821 (7th Cir. 1999); Jarrow, 304 F.3d at 837.

Appian filed its initial counterclaim concerning the Sinur Paper on December 17, 2019, meaning laches presumptively applies if it knew or should have known of its claims arising from the Sinur Paper before December 17, 2015. Appian contends that there is no evidence that it knew Pegasystems commissioned the Sinur Paper until the commencement of this action. Yet in the spring of 2014, Appian employee Malcolm Ross drafted a rebuttal to the Sinur Paper that stated that it was a "known fact" that the Sinur Paper "was paid for by Pegasystems without input from Appian." Dkt. 599-1 at 81. It stated in other places that Pegasystems commissioned the Sinur Paper. Thus, Appian at least should have known by the spring of 2014 that it had a potential Lanham Act claim against Pegasystems.

Appian filed its amended counterclaim concerning the remaining Pegasystems Marketing Materials on June 17, 2021, so laches presumptively applies if it knew or should have known of

23

its claims arising from those documents before June 17, 2017. Pegasystems concedes that there is no evidence showing when Appian learned of the specific Pegasystems Marketing Materials other than the Sinur Paper. See Reply, Dkt. 621 at 10. Pegasystems instead submits evidence that Appian was aware that Pegasystems was generally attacking Appian's ability to scale at presentations and in marketing materials as early as 2013. See id. But the Lanham Act regulates specific instances of commercial advertising, and here, that means that Pegasystems must show when Appian learned of each of the Pegasystems Marketing Materials. Accordingly, Appian bears the burden to show reasonable diligence and lack of prejudice as to its Lanham Act claims arising from the Sinur Paper, while Pegasystems must show unreasonable delay and prejudice as to Appian's claims arising from the remaining Pegasystems Marketing Materials.

Appian has not shown that its delay in suing over the Sinur Paper was reasonable or that Pegasystems was unharmed by the delay. It has not meaningfully attempted to explain why it did not bring suit until 2019 despite being aware of the Sinur Paper in 2014. Thus, its delay was unreasonable for laches purposes. Similarly, Appian has not produced evidence demonstrating a lack of prejudice to Pegasystems. For example, Pegasystems continued to promote the Sinur Paper without any notice that Appian was challenging its truthfulness. Similarly, Pegasystems lost certain emails, some of

which may have been on point, in a 2017 system upgrade.   Laches
therefore applies, and summary judgment will enter for Pegasystems
on Appian's Lanham Act counterclaim arising from the Sinur Paper.

On the other hand, Pegasystems has not proven unreasonable
delay or prejudice as to Appian's Lanham Act counterclaim arising
from the remaining Pegasystems Marketing Materials.   Pegasystems'
core argument on unreasonable delay—that Appian chose to respond
to the objectionable marketing materials in the marketplace and
cannot now file suit—applies only to the Sinur Paper.   Pegasystems
has not produced evidence showing when Appian became aware of the
additional Pegasystems Marketing Materials, so there is no
evidence of unreasonable delay.   Laches does not apply to Appian's
counterclaims arising from the Pegasystems Marketing Materials
other than the Sinur Paper.

ii.   Statute of Limitations

Pegasystems raises a statute of limitations defense to
Appian's Chapter 93A and commercial disparagement counterclaims
that the Court finds persuasive only as to Appian's Sinur Paper
claims.   The limitations period for the Chapter 93A counterclaim
is four years and for the commercial disparagement counterclaim is
three years.   See Pegasystems II, 463 F. Supp. 3d at 162.   For the
limitations period to begin to run for tort claims, a plaintiff
must have "enough information to suggest that he has suffered an
injury caused by the defendant's conduct," which is an "inquiry

notice" standard.   Wolinetz v. Berkshire Life Ins. Co., 361 F.3d 44, 48 (1st Cir. 2004).   A reasonable plaintiff in Appian's position would have been on inquiry notice that it had suffered an injury from the Sinur Paper in early 2014.   Thus, Appian's state law counterclaims arising from the Sinur Paper alone are time barred.

### b.   Merits of Appian's Counterclaims

#### i.   Lanham Act and Chapter 93A Counterclaims

Pegasystems argues that Appian's Lanham Act and Chapter 93A counterclaims arising from the remaining Pegasystems Marketing Materials fail on the merits because they are not commercial advertising and on the grounds of injury, materiality, and falsity. To qualify as commercial advertising, a representation must:

> (a) constitute commercial speech (b) made with the intent of influencing potential customers to purchase the speaker's goods or services (c) by a speaker who is a competitor of the plaintiff in some line of trade or commerce and (d) disseminated to the consuming public in such a way as to constitute "advertising" or "promotion."

Podiatrist Ass'n, Inc. v. La Cruz Azul De. P.R., Inc., 332 F.3d 6, 19 (1st Cir. 2003).

Pegasystems contests the fourth element: that the Pegasystems Marketing Materials did not reach enough customers to constitute commercial advertising.   While there is no magic number of customers that an advertisement must reach, "the touchstone of whether a defendant's actions may be considered 'commercial

advertising or promotion' under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market." <u>Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.</u>, 314 F.3d 48, 57 (2d Cir. 2002).

It is undisputed that the BPM market is large, with over twenty vendors competing for business from a wide array of large corporations and government agencies. The evidence before the Court shows that Pegasystems distributed the Scalability White Paper 6 times to 5 organizations, and the Technical Competitive Brief 30 times to 15 organizations. There is no evidence of distribution of the Competitive Comparison Chart or the Technology Assessment. Further, Appian does not argue that the Scalability Slide Deck, the Pega 7 v. Appian Comparison, the Competitive Comparison Chart, or the Technology Assessment were commercial advertising. As to the Scalability White Paper and Technical Competitive Brief, Appian relies on the degree to which Pegasystems circulated both documents internally, noting that Pegasystems executives gave them to their sales force and encouraged salespersons to use them with customers. A reasonable jury could conclude that the Scalability White Paper and the Technical Competitive Brief alone were commercial advertising. Summary judgment must enter for Pegasystems on Appian's Lanham Act and Chapter 93A counterclaims with respect to all other marketing materials.

Pegasystems' remaining arguments for summary judgment on Appian's Lanham Act and Chapter 93A counterclaims are unavailing. As to injury, Pegasystems' statement that the BPM sales process is so lengthy and complex that the Pegasystems Marketing Materials could not have influenced purchaser decisions is conclusory. Appian, however, points to seven customers that it claims to have lost at least in part because of Pegasystems' conduct, which its expert states cost Appian $26 million in lost profits.  For example, in 2012, Pegasystems provided potential customer Rabobank with both the Technical Competitive Brief and the Scalability White Paper.  When Rabobank chose Pegasystems over Appian, it informed Appian that Rabobank needed a platform that could perform "on enterprise architecture level," which mimics the Technical Competitive Brief's criticism of Appian's inability to handle the "needs of an enterprise BPM program."  Dkt. 599-1 at 255–56.  A reasonable factfinder could infer that Rabobank, along with the other six companies that represent similar examples, chose Pegasystems at least in part because of the Pegasystems Marketing Materials.  There is a genuine issue of material fact on the issue of injury.

"[M]ateriality is generally a question of fact." Pegasystems II, 463 F. Supp. 3d at 161 (quoting LivePerson, Inc. v. 24/7 Customer, Inc., 83 F. Supp. 3d 501, 518 (S.D.N.Y. 2015)).  A statement is material if it is likely to influence a customer's

purchasing decision, which can be established by "showing that the false or misleading statement relates to an inherent quality or characteristic of the product." See Cashmere, 284 F.3d at 311–12 (cleaned up). Pegasystems does not point to any evidence that the statements about Appian's ability to scale contained in the Pegasystems Marketing Materials were immaterial. Moreover, as Appian points out, one of Pegasystems' own employees testified that scalability is "one of the things that you would need to be able to show to compete for business." Dkt. 599-1 at 208. Appian's expert also submits that scalability is an essential factor in the decision-making processes of potential purchasers. There is a genuine issue of material fact on the question of materiality.

There is also a triable issue regarding the falsity of the Pegasystems Marketing Materials. Pegasystems does not claim that the challenged statements were true, but rather tries to show that they were vague or open to interpretation and therefore not literally false. Yet a statement, like that in the Technical Competitive Brief, that Appian "lacks key capabilities needed to scale" is unambiguous. Pegasystems contends that its statements that Appian's total cost of ownership is "higher" cannot be literally false because "[h]igher than *what* is not specified." Dkt. 574-1 at 27. But any reasonable reader would understand the documents to compare the TCOs of Appian and Pegasystems. Moreover, the statements of Pegasystems employees suggesting that they knew

their claims about Appian's scalability were made up are probative
of falsity.  See, e.g., Dkt. 599-1 at 211-13 ("[w]hat we have
stated about [Appian's] scalability does not seem to jive with the
Appian documentation.").  A reasonable jury could conclude that
Pegasystems made false statements about Appian.

        ii.     Commercial Disparagement Counterclaim

Pegasystems challenges Appian's commercial disparagement
counterclaim on three grounds: lack of injury, lack of falsity,
and lack of actual malice.  As discussed above, Pegasystems has
failed to establish a lack of injury or falsity.  There is also a
triable issue regarding actual malice, which requires Appian to
show that Pegasystems "ha[d] knowledge of a statement's falsity or
act[ed] with reckless disregard of its truth or falsity."
Pegasystems I, 424 F. Supp. 3d at 226.  The record contains
evidence from which a jury could decide that Pegasystems knew it
was making false statements about Appian.  As noted, certain
Pegasystems employees made statements suggesting that they knew
their claims about Appian's scalability were fabricated.  The Court
denies Pegasystems's motion for summary judgment on Appian's
commercial disparagement counterclaim, with the exception of
claims arising from the Sinur Paper.

        iii.    Defamation Counterclaim

Appian brings a defamation counterclaim based on the LinkedIn
Post, which implied that the Court's opinion in Pegasystems I

supported the notion that Appian had told "blatant lies" in the BPM.com Report.  Appian must prove that (1) Pegasystems made a statement concerning Appian to a third party; (2) the statement "could damage Appian's reputation in the community"; (3) Pegasystems was "at fault" in making the statement, meaning that it acted negligently if Appian is a private actor or with actual malice if Appian is a public figure; and (4) the statement caused Appian economic loss, or was actionable without proof of economic loss, for example a statement that may prejudice Appian's business. Ravnikar v. Bogojavlensky, 782 N.E.2d 508, 510–11 (Mass. 2003). The First Amendment imposes a number of constraints on a plaintiff who seeks relief from defamation.  See Sindi v. El-Moslimany, 896 F.3d 1, 14 (1st Cir. 2018) (finding that rhetorical hyperbole are not actionable).  An undamaged person may recover nominal damages. See Ravnikar, 782 N.E.2d at 509.

Pegasystems first argues that the LinkedIn Post is protected by its First Amendment right to publicly comment on judicial proceedings.  However, false commercial speech is not entitled to First Amendment protection.  See Ibanez v. Fla. Dep't of Bus. & Prof'l Regul., Bd. of Accountancy, 512 U.S. 136, 142 (1994).  A jury could reasonably find that the LinkedIn Post was commercial speech, as it encourages readers to review an article about the Court's opinion if they are "thinking about Appian" and Pegasystems urged its sales force to share the post.

Second, Pegasystems argues that the LinkedIn Post is protected by the "fair reporting" privilege. A report on court proceedings is privileged if it "conveys to the persons who read it a substantially correct account of the proceedings" and does not "omit or misplace facts or make additions that 'convey an erroneous impression to those who hear or read it.'" Howell v. Enter. Publ'g Co., LLC, 920 N.E.2d 1, 21 (Mass. 2010) (quoting Restatement (Second) of Torts § 611 cmt. F (Am. L. Inst. 1977)). Here, a jury could find that the LinkedIn Post creates the mistaken impression that the Court found that Appian told "blatant lies."

Third, Pegasystems argues that everything in the LinkedIn Post is true. This Court previously found that "accusing another party of being a 'liar' has generally been held to be defamatory" and "[a]lthough the LinkedIn Post ostensibly relied on this Court's prior opinion regarding Pegasystems' claims against Appian, that opinion does not support the statement that Appian told 'blatant lies.'" Pegasystems II, 463 F. Supp. 3d at 163 (citing Milkovich v. Lorain Journal Co., 497 U.S. 1, 18-19 (1990)). While Pegasystems can point to aspects of the LinkedIn Post that are true, there are also elements that a jury could find are false.

Fourth, Pegasystems asserts that there is no evidence of actual malice. The actual malice standard applies only to defamation claims brought by public figures, who are people who achieve "pervasive fame or notoriety" or those who "voluntarily

inject[] [themselves] or [are] drawn into a particular public controversy and thereby become[] a public figure for a limited range of issues." <u>Lluberes v. Uncommon Prods., LLC</u>, 663 F.3d 6, 13 (1st Cir. 2011). A public controversy "must be more than a cause célèbre or a matter that attracts public attention." <u>Id.</u> (cleaned up). Further, "it must be shown that persons actually were discussing some specific question and a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution." <u>Id.</u> Under that standard, Appian is not a public figure. There is no reason to think that the Appian-Pegasystems dispute attracted public attention. The actual malice standard does not apply, and there is a genuine issue of material fact on Appian's defamation counterclaim.

**<u>ORDER</u>**

For the foregoing reasons, Defendants' motions for summary judgment (Dkt. 570; Dkt. 583) are **<u>ALLOWED IN PART</u>** and **<u>DENIED IN PART</u>**. Pegasystems' motion for partial summary judgment on its claims (Dkt. 573) is **<u>DENIED</u>**. Pegasystems' motion for summary judgment on Appian's counterclaims (Dkt. 573) is **<u>ALLOWED IN PART</u>** and **<u>DENIED IN PART</u>**. At trial, Pegasystems may seek disgorgement, but not monetary damages or injunctive relief. Appian may present its Lanham Act and Chapter 93A counterclaims arising from the Scalability White Paper and the Technical Competitive Brief, its

commercial disparagement counterclaim arising from all of the Pegasystems Marketing Materials except for the Sinur Paper, and its defamation counterclaim. The parties shall submit briefs within fourteen days of entry of this Order on whether any viable claims against Business Process Management, Inc. survive in light of this opinion.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge